# Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (___) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF MASTON N. CUNNINGHAM
## IN SUPPORT OF CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS AND APPLICATIONS

I, Maston N. Cunningham, hereby declare as follows:

1.     I am the President and Chief Executive Officer of Tri-Valley Corporation

("Tri-Valley" or the "Company"), a debtor and debtor in possession, and the parent corporation

of two wholly-owned subsidiaries, Tri-Valley Oil & Gas Co. ("TVOG") and Select Resources

Corporation, Inc. ("Select").  Tri-Valley is also the managing general partner of TVC Opus 1

Drilling Program, L.P. ("Opus" or the "Partnership," and collectively with Tri-Valley, TVOG,

and Select, the "Debtors"), another debtor and debtor in possession in the above-captioned

chapter 11 cases.  In this capacity, I am familiar with the Debtors' day-to-day operations,

business, and financial affairs.

2.     On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334).  The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

3.    I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and the so-called "first-day" motions and applications filed contemporaneously therewith (the "First Day Motions").

4.    Except as otherwise indicated, all statements set forth in this Declaration are based upon (i) my personal knowledge as President and Chief Executive Officer, (ii) information supplied to me by other members of the Debtors' management or the Debtors' professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

5.    Part I of this Declaration describes the Debtors' business, Part II describes the organizational structure, Part III describes the capital structure, Part IV describes the circumstances giving rise to the commencement of these chapter 11 cases, Part V describes the Debtors' intention to conduct a sale of substantially all of their assets and file a chapter 11 plan for distribution of the proceeds generated thereby, and Part VI sets forth certain facts relevant to and supportive of individual First Day Motions.

## I.

### Overview of the Debtors' Business

6.    Tri-Valley is a crude oil and natural gas exploration, development, and production company engaged in the business of locating and developing hydrocarbon resources in California. The Company is also engaged in early-stage exploration of precious minerals in Alaska. Tri-Valley currently conducts it operations through two wholly-owned subsidiaries, TVOG and Select.

7.    Tri-Valley's business is divided into two segments: oil and natural gas operations and minerals.  As further discussed below, TVOG operates the Debtors' oil and natural gas business and is involved in the exploration, development, and production of oil and natural gas in California.  Select operates the Debtors' minerals segment in Alaska.

8.    The Debtors have operations in two oil fields in California with approximately 1,025 total gross acres and 21 wells capable of production under their control representing approximately 22.4 million barrels of proved,[2] probable,[3] and possible[4] reserves.  As discussed further below, Tri-Valley, through its wholly owned subsidiary TVOG, has a 25% working interest (and management and operational control over) certain leases comprising one super heavy oil project known as "Pleasant Valley."  Tri-Valley also owns a 100% working interest in a lease related to a property known as "Claflin," which is part of the Company's project in and around the Edison Oil Field   In addition to these assets, the Debtors hold gas lease interests in approximately 1,300 gross acres in California with four natural gas wells in operation.  Through its wholly owned subsidiary, Select, Tri-Valley owns mineral rights interests

---

[2] "Proved" reserves are those quantities of crude oil and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and governmental regulations, prior to the time at which contracts providing the right to operate expire.  "Proved Developed" reserves are proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well.  "Proved Undeveloped" reserves are proved reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

[3] "Probable" reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered.  Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the reasonable certainty criterion.

[4] "Possible" reserves are those additional reserves that are less certain to be recovered than probable reserves.  Possible reserves may be assigned to areas of a reservoir adjacent to probable reserves where data control and interpretations of available data are progressively less certain.  Frequently, this will be in areas where geoscience and engineering data are unable to define clearly the area and vertical limits of commercial production from the reservoir by a defined project.

in two blocks of land totaling approximately 77,800 gross acres in Alaska.  As further discussed below, the Pleasant Valley project is being explored and developed in connection with the Opus Partnership.

9.    In the First Day Motions, the Debtors seek, among other things, to: (a) establish procedures for the efficient administration of these cases, (b) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (c) maintain the confidence and support of key constituencies, including employees; (d) obtain debtor-in-possession financing; and (e) retain a claims and noticing agent.  Operating the Debtors' day-to-day businesses with minimal disruption and erosion will be crucial to the success of the Debtors' efforts in these cases.

10.    While not filed as part of the First Day Motions, the Debtors intend to file pleadings within five days of the Petition Date seeking to establish procedures for a sale of substantially all of their assets, including those related to Pleasant Valley and Claflin.  Within the next thirty days, the Debtors further intend to propose a chapter 11 plan for distribution of the proceeds generated by the sale.  In connection therewith, the Debtors and their advisors are actively marketing the Debtors' assets and have secured debtor-in-possession financing to provide the cash necessary to complete such a sale process over the next 90 days.  The Debtors have determined that such a sale process is most effective way to maximize the value of their assets for the benefit of all major stakeholders.

A.    **Oil and Gas Segment: Pleasant Valley and Edison Project**

11.    The Debtors' oil and gas businesses are operated by TVOG and consist primarily of exploring and drilling for, as well as producing and selling, crude oil and natural gas.  The producing oil and natural gas properties are located in California, primarily the Pleasant Valley property located in the Oxnard Oil Field near Oxnard, California (hereinafter,

"Pleasant Valley") and at various properties located in or around the Edison Oil Field near Bakersfield, California (hereinafter, "Edison Project"). In addition, TVOG has interests in two natural gas fields in the Sacramento Delta Region of Northern California and in one natural gas field located in Madera County in Central California. While they also own certain minerals assets in Alaska, the Debtors derive most of their revenue from the production and sale of crude oil and (to a much lesser extent) natural gas.

### 1. Pleasant Valley Property

12.  The Pleasant Valley property consists of approximately 505 gross acres located in Ventura County near Oxnard, California about 50 miles northwest of Los Angeles. The Debtors' interests in Pleasant Valley are comprised of certain leases, including without limitation: (i) Oil, Gas & Mineral Lease dated August 11, 2005 with J. Thomas Hunsucker, Trustee of the Thomas O. Hunsucker Family Trust (the "Hunsucker Lease"); (ii) Lenox Oil & Gas Lease dated April 24, 1934 with E.E. Lenox (the "Lenox Lease"); and (iii) Snodgrass Oil & Gas Lease dated June 4, 1946 with the Lenox family (the "Snodgrass Lease")] (collectively, the "Pleasant Valley Leases").[5]  A 75% working interest in the Hunsucker Lease was assigned by TVOG to Opus on July 26, 2011.  Tri-Valley is the lessee under both the Lenox and Snodgrass Leases.

13.  The Pleasant Valley Leases collectively represent (i) a 100% working interest with drilling rights in various leases, (ii) an interest in 8 horizontal wells, 7 of which are currently producing oil, and (iii) an interest in 13 (currently) non-producing vertical wells.

---

[5] For simplicity, this recitation of the Debtors' oil and gas leases, including the Pleasant Valley Leases, does not include the various amendments, restatements, ratifications, assignments, and short forms executed and/or recorded in connection therewith.

14. As discussed further below, Tri-Valley and TVOG, on one hand, and Opus, on the other hand, own a 25% and 75% "working interest"[6] and an 18.75% and 56.25% "net revenue interest,"[7] respectively, in the Pleasant Valley Leases, although title to the Lenox and Snodgrass Leases remained with Tri-Valley on the Petition Date. Additionally, the Company owns overriding royalty interests of 5.17% in the Hunsucker Lease and 3.0% in the Lenox and Snodgrass Leases.

15. Currently at Pleasant Valley, the Debtors are producing super heavy oil from several wells using so-called "Cyclic Steam Stimulation" ("CSS") and an artificial lift on the Hunsucker Lease, which is processed and blended with purchased light crude oil in order to meet a delivery specification of 13° API gravity for the purchaser. Average total sales volume at Pleasant Valley over the past few months prior to the Petition Date ranged from 300-500 barrels per day.

16. 2011 was the first year of significant revenue generating operations at Pleasant Valley, which was attributable to higher global oil prices, better contract pricing, higher production, and lower unit operating costs. For example, during 2011, the Debtors extended CSS cycles on 7 horizontal wells on the Hunsucker Lease property thereby increasing production 33%. The Debtors also converted one horizontal well to a produced water disposal well to reduce field operating costs. As a result, in 2011, Pleasant Valley generated a gross operating profit of approximately $1.6 million.[8]

---

[6] "Working interest" refers to an interest in an oil and gas lease, where the interest holder bears responsibility for the costs of development, operation, or maintenance equal to its specified percentage.

[7] "Net revenue interest" refers to the net amount of revenues that a lessee is entitled to keep after payment of any portion of such revenues on account of so-called "royalty" or "overriding royalty interests" owed to the lessor or other parties.

[8] Operating income before, among other things, allocation of overhead.

17.    In August 2009, the Debtors engaged AJM Petroleum Consultants (now known as AJM Deloitte) ("AJM") to perform an evaluation of the Pleasant Valley property given AJM's experience with Canadian oil sand properties that utilize steam assisted gravity drainage ("SAGD") technology to continuously inject steam and produce oil from oil sands using horizontal well pairs.  AJM concluded that a low-pressure SAGD program would be suitable for the Pleasant Valley property to maximize recovery of original oil in place, and as a result, the Debtors requested AJM to build a reservoir simulation model to further evaluate SAGD for exploitation of Pleasant Valley.

18.    During 2011, the Debtors continued working to evaluate various options and locations for a low-pressure SAGD pilot installation.  In January 2012, the Debtors initiated a front-end engineering and design study to determine the costs and scheduling for installation of surface facilities to support a SAGD pilot.  A successful SAGD pilot will demonstrate the potential for higher production rates and higher recovery of original oil in place.  As of the Petition Date, the SAGD pilot was not anticipated to be completed and tested until 2013.

**2.    Edison Project**

19.    The Debtors' oil and gas interests in the Edison Project consist of 9 leases (collectively, the "Edison Leases") and comprise approximately 520 acres in and around the northeast portion of the Edison Oil Field close to Bakersfield, California in Kern County about 110 miles north of Los Angeles.

20.    Collectively, the Edison Leases provide the Debtors with (i) a 100% working interest in one partially developed lease and 8 undeveloped leases; and (ii) ownership of 14 vertical wells capable of production.

21.    Included within the Edison Project, the Debtors' have an interest in a 80 acre parcel ("Claflin"), which is currently being developed, pursuant to a certain Oil & Gas

Lease dated May 10, 2006 with Lawrence Randall Stafford, Trustee of the Fighting Dragon Trust (the "Claflin Lease").

22.     As discussed further below, Tri-Valley has a 100% working interest (and 85.5% net revenue interest) in the Claflin Lease.   The Company also has a 100% working interest and an 82.33% net revenue interest in an adjoining property (the "Brea Lease"), which was anticipated to be developed after the completion of development at Claflin.

23.     Average production at Claflin over the past few months prior to the Petition Date was approximately 30 barrels per day.

24.     Since 2011, Tri-Valley has continued its development of the Claflin property and expanded its footprint in the Edison Oil Field by acquiring additional acreage that brought its total ownership to more than 520 net acres.   In addition, the Company drilled 8 new wells on the property, upgraded its gathering system, and made other improvements.   As of the Petition Date, plans had been developed to drill an additional 8 to 10 horizontal wells to increase overall production rates.

**B.     Minerals Segment: Richardson and Shorty Creek**

25.     The Company's mineral business consists primarily of two significant minerals assets located in Alaska in the Richardson District (hereinafter, "Richardson") and the Tolovana District (hereinafter, "Shorty Creek").   Select holds title to these properties and related mining claims, both through direct ownership and leasing arrangements.   Neither of these properties has generated any significant revenues to date, but independent evaluations show high potential for copper, gold and molybdenum deposits.

**1.     Richardson Project**

26.     The Debtors' interests in Richardson consist of mineral claim rights in a block of approximately 34,000 gross acres located in the Richardson District, one of the most

underexplored gold exploration districts in east-central Alaska (collectively, the "Richardson Leases"). The Debtors' claims are located near the all-weather paved Richardson Highway, just south of the Trans-Alaska Pipeline corridor and about 65 miles southeast of Fairbanks, Alaska. The Richardson Project is an early-stage gold exploration project with past placer gold production and pilot-size lode gold production.

27. As of the Petition Date, the Debtors were in the process of searching for a qualified partner to help finance the continued exploration and development of the Richardson project. As of the Petition Date, no suitable partner had been located.

### 2. Shorty Creek Property

28. The Debtors' interests in Shorty Creek consist of mineral claim rights in a block of approximately 43,800 gross acres located in the Tolovana District about 65 miles northwest of Fairbanks, Alaska (collectively, the "Shorty Creek Leases"). The Debtors' claims are located near the all-weather paved Elliot Highway that is the principal route used to access the North Slope petroleum production areas. An independent geological consulting firm identified a potentially large porphyry copper, gold, and molybdenum system on the Shorty Creek property that may cover an area as large as 8 miles in diameter.

29. Prior to the Petition Date, the Debtors were evaluating potential strategic partners who would help the Debtors better exploit their mineral assets on the Shorty Creek property. As of the Petition Date, no suitable partner had been located.

### C. Opus Partnership

30. In 2002, Tri-Valley established Opus as a Delaware limited partnership for the purpose of exploring, drilling, developing, and operating oil and gas prospects in California and Nevada. Tri-Valley sought to raise $100 million from general and limited partners, and thereafter, the Partnership planned to conduct wildcat exploration involving 18 different projects

with 26 drilling prospects.  Between February 2002 and March 2010, approximately $97 million was raised through the private placement of Opus Partnership units.

31.    Tri-Valley serves as the managing general partner of Opus pursuant to an Agreement of Partnership dated May 16, 2002 (the "Partnership Agreement").  As the managing general partner of Opus, Tri-Valley has the full and exclusive authority to manage, control and administer the affairs of the Partnership.

32.    TVOG serves as the Program Manager for Opus.  In that capacity, TVOG manages the Partnership's wells and drilling activities pursuant to a Drilling Program Agreement dated May 16, 2002 (as amended, the "Program Agreement").

33.    Opus' business plan was to drill for oil and gas on leases acquired by TVOG, and where commercial quantities of oil and gas were discovered under the Program Agreement or had been previously discovered by others on such leases, to exploit, develop, and operate such leases to produce, collect, market, sell, or otherwise dispose of oil, gas, and related minerals from such properties.  Opus was expected to generate revenues (and profits) from the sale of oil and gas under the Partnership's leases.

34.    In 2005 and 2006, Tri-Valley acquired four properties with known oil and gas reserves, including Pleasant Valley, to be explored and developed by Opus.  Two of these properties were sold in June 2010.

35.    As of the Petition Date, Opus had an interest in certain of the Pleasant Valley Leases.  In particular, Opus holds a separate 75% working interest in the Hunsucker Lease.  As of the Petition Date, Tri-Valley was the lessee under the Lenox and Snodgrass Leases.

36.    The drilling projects were chosen by TVOG in a sequence that TVOG deemed to be the most opportune to advance the goals of the Partnership and in accordance with

the available funding.  When an Opus drilling prospect was to be developed under a "turnkey drilling agreement,"[9] the Partnership would pay a price to TVOG to cover all estimated costs incurred in connection with re-entry or drilling of proposed wells.  If TVOG elected to complete a well, the Partnership would bear all costs of completing and equipping the well.  If the actual cost of re-entering and drilling the wells exceeded the turnkey price, then TVOG would bear the excess costs over the estimate.  Wells that were drilled and not covered by a turnkey arrangement would be charged to the Partnership at TVOG's actual costs.

37.    Pursuant to the Program Agreement, TVOG was to receive a 25% carried working interest in wells drilled by TVOG for the Partnership.

38.    As of the Petition Date, Opus owed Tri-Valley approximately $5.7 million for costs and expenses incurred by Tri-Valley as the managing general partner (and to TVOG as program manager) for the Partnership.  As further discussed below, however, the Partnership has asserted offsetting claims against Tri-Valley and TVOG.

**D.    The Debtors' Customers and Competition**

39.    The market for oil and natural gas is marked by high volatility and widespread fluctuation in demand.  The fluctuations depend on numerous factors beyond the Debtors' control, including (i) seasonality, (ii) economic conditions, (iii) foreign inputs, (iv) political conditions in other energy producing countries, (v) market actions by the Organization of the Petroleum Exporting Countries or "OPEC," and (vi) domestic government regulations and polices.

---

[9] "Turnkey" refers to an agreement to pay a fixed turnkey price for their proportionate share of lease acquisition, evaluation, re-entry and drilling the wells.

40.   The Debtors derive the majority of its revenue from the sale of crude oil and natural gas at spot market prices.  Their revenue, therefore, fluctuates based upon changes in the market price for oil and natural gas caused by the above mentioned factors, among others.

41.   The crude oil and natural gas business is highly competitive.  The Debtors' competitors include the major integrated energy companies, as well as numerous independent oil and gas companies, individual proprietors and drilling programs.  There is intense competition within the oil and gas industry among these competitors to attract and retain capital available for investments.

42.   In the fourth quarter of 2011, the Debtors signed a new oil sales contract with Plains Marketing, L.P. for the sale of all of its oil from Pleasant Valley.  Around the same time, it signed a new oil sales contract with ConocoPhillips Company for the sale of oil from Claflin.  Prior to entering into these new oil sales contracts, the Debtors sold all of their oil produced from both Pleasant Valley and Claflin to Santa Maria Refining Company owned by Greka Oil and Gas, Inc.

43.   All of the Debtors' natural gas production is sold to DMJ Gas Marketing Consultants, LLC and to the California Energy Exchange Corporation.

44.   As of the Petition Date, neither of the Richardson nor Shorty Creek projects had generated any significant revenues.

## II.

## __Organizational Structure__

45.   Tri-Valley was incorporated as "Commodity Resources Incorporated" in Delaware in 1971 and changed its name to Tri-Valley Oil & Gas Corporation" in October 1982, and then to "Tri-Valley Corporation" in December 1986.  Tri-Valley has two wholly owned

subsidiaries: TVOG and Select. TVOG was formed in 1963 as a California corporation and Select was formed in 2004 as a Delaware corporation. Opus was formed in 2002 as a Delaware limited partnership. Tri-Valley is the managing general partner and TVOG is the program manager of Opus pursuant to the Partnership and Program Agreements. There are approximately 73 general partners and 222 limited partners of Opus. The Debtors' principal offices are located at 4927 Calloway Drive, Bakersfield, California 93312.

46.    As of the Petition Date, Tri-Valley had 22 employees and approximately 4 independent contractors, some of whom are located in the Debtors' Bakersfield, California headquarters and others of whom are assigned to field operations at Pleasant Valley and Edison Project.

### III.

### Capital Structure

**A.    Secured Notes Owed to Gamble Trust**

47.    During 2011 and 2012, Tri-Valley obtained debt financing from G. Thomas Gamble ("Mr. Gamble") and an affiliate, The George T. Gamble 1991 Trust (the "Gamble Trust"). Mr. Gamble served as a member of Board of Directors of Tri-Valley from 2006 to 2011, including as Chairman of the Board from March 2010 to November 2011. Mr. Gamble resigned from the Board of Directors of Tri-Valley in November 2011.

48.    On March 30, 2012, Tri-Valley executed a senior secured note payable to the Gamble Trust in the amount of $3,298,310 (the "First Gamble Senior Secured Note"). The First Gamble Senior Secured Note matures on April 30, 2013 and bears interest at 14% per annum, which is payable monthly in arrears.

49.    The First Gamble Senior Secured Note was executed to replace and cancel three short-term demand loans in the amount of $3,150,000 made to the Company by Mr.

Gamble and the Gamble Trust in 2011[10]. The amount of the First Gamble Senior Secured Note included interest accrued on these short-term demand loans through March 1, 2012.

50.   The First Gamble Senior Secured Note is secured by, among other things, a pledge by Tri-Valley of its capital stock in both TVOG and Select.   In addition, TVOG and Select guaranteed the debt, which guaranty is secured by a pledge of certain of TVOG's oil and gas leases, including the Claflin Lease.   Further, as an inducement to the Gamble Trust to provide long-term funding to the Company when no other financing was available on reasonably favorable terms, Tri-Valley assigned to the Gamble Trust, in perpetuity, (i) 2.0% of its overriding royalty interests ("ORRI's")[11] on the Claflin Lease, (ii) 1.0% of its ORRI's on certain other specified leases, and (iii) 1.0% of its ORRI's on any other then held or thereafter acquired lease within a specified area of mutual interest specified therein.

51.   In addition, the First Gamble Senior Secured Note was accompanied by a warrant for the Gamble Trust to purchase 3,000,000 shares of Tri-Valley's common stock, at an exercise price of $0.19 per share, exercisable for a period of five (5) years from March 30, 2012.

52.   On April 3, 2012, the Gamble Trust loaned Tri-Valley an additional $1.5 million on the express condition that the Company's obligations thereunder be secured by the same collateral that secured the First Gamble Senior Secured Note issued to the Gamble Trust on March 30, 2012.   On May 4, 2012, Tri-Valley executed another senior secured note (the "Second Gamble Senior Secured Note") in the aggregate principal amount of $1.5 million.[12]   The Second

---

[10] These short term demand loans consisted of (i) a $150,000 loan with interest at 10% per annum; (ii) $1 million loan with interest of 14% per annum; and (iii) $2 million loan with interest at 14% per annum.

[11] "ORRI's" are an assignment of a fractional share of the oil and gas produced under the various leases and effectively operate as a transfer of ownership of that specified share to the party receiving it.

[12] The proceeds of the Second Gamble Senior Secured Note were used to settle the Company's pending litigation with the plaintiffs in *Hansen et al. v. Tri-Valley Corporation et al.*, No. 56-2010-00373549-CU-OR-VTA, Superior Court, Ventura County, California, relating to the Hansen lease (also referred to as the Scholle-Livingston lease).

Gamble Senior Secured Note also matures on April 30, 2013 and bears interest at 14% per annum, which is payable monthly in arrears.

53. Tri-Valley's obligations under the Second Gamble Senior Secured Note are secured by, among other things, a pledge by Tri-Valley of its equity interest in TVOG and Select. TVOG and Select guaranteed the debt, which guaranty is secured by a deed of trust providing for, among other things, the grant by TVOG of a security interest in the mortgaged property described therein, including the Claflin Lease.

54. In addition, the Second Gamble Senior Secured Note was accompanied by a warrant for the Gamble Trust to purchase 1,365,000 shares of Tri-Valley's common stock, at an exercise prices equal to $0.10 per share (which was equal to the closing price of the common stock on May 3, 2012, the last trading day prior to issuance, plus $0.01). The warrant is exercisable for a period of five (5) years from the closing date of the transaction.

55. On June 1, 2012, Tri-Valley issued a Senior Secured Demand Note (the "Gamble Demand Note") to the Gamble Trust, documenting an uncommitted line of credit pursuant to which Tri-Valley could request advances up to, but not to exceed, $1,350,000. Advances made under the Gamble Demand Note mature on April 30, 2013 and bear interest at 14% per annum, which is payable monthly in arrears. Tri-Valley's obligations under the Gamble Demand Note are secured by the same collateral that secures the First Gamble Senior Secured Note and the Second Gamble Senior Secured Note.

56. On August 2, 2012, Tri-Valley and the Gamble Trust amended the Gamble Demand Note to permit Tri-Valley, until August 3, 2012, to borrow an additional over line amount up to but not exceeding $294,258.14 (the "Over Line"), with any advances under the Over Line being deemed to be advances under the Gamble Demand Note and secured by the

same collateral that secures the First Gamble Senior Secured Note and the Second Gamble Senior Secured Note.

57. As of the Petition Date, the Gamble Trust had advanced $1,644,258.14 in aggregate principal amount to Tri-Valley under the Gamble Demand Note (not including interest, fees, and other costs).

58. The First Gamble Senior Secured Note, the Second Gamble Senior Secured Note, and the Gamble Demand Note (collectively, the "Gamble Notes") include cross-default provisions such that an event of default under one note also constitutes an event of default under the others. As of the Petition Date, the total outstanding debt owed to the Gamble Trust by Tri-Valley under all of the Gamble Notes was $7,198,078.55 (including interest, fees, and other costs).

**B.    Unsecured Debt**

59. On December 30, 2006, Tri-Valley executed a non-interest bearing, unsecured promissory note in the amount of $1,092,000 payable to Gary D. Borgna, Julie R. Borgna and Equipment 2000 for the purchase of the Company's rig and equipment. This unsecured debt is a seller-financed loan repayable in equal monthly installments until December 30, 2016. As of the Petition Date, the total amount of payments outstanding on this unsecured note was $527,800.

60. As of the Petition Date, the Debtors estimate that the total unsecured debt (including the unsecured equipment note referenced above) owed by the Debtors to various trade creditors, vendors, lessors, royalty and working interest owners (on account of net revenues), and other parties was approximately $9.4 million.

### C.    Common Stock

61.    As of the Petition Date, there were approximately 68 million shares of Tri-Valley common stock outstanding out of the 100 million shares authorized for issuance and there were approximately 15 million shares of common stock available for issuance net of shares reserved for the potential exercise of outstanding warrants and stock options.  As of April 2, 2012, there were approximately 700 certificated shareholders and approximately 7,600 beneficial owners whose shares are held in the names of various brokers, dealers and clearing companies.  During the twelve months ended March 31, 2012, the Company's stock price traded as low as $0.13 per share and as high as $0.83 per share.

62.    Until shortly before the Petition Date, Tri-Valley's common stock was publicly traded on NYSE Amex under the symbol "TIV."  Beginning in late 2011, the NYSE Amex expressed concerns about the Company's performance.  On April 26, 2012, Tri-Valley received a letter from NYSE Amex indicating that it was not in compliance with certain continued listing requirements based on the Company's net annual losses and its recent public disclosure of adverse financial information.  The NYSE Amex requested that Tri-Valley present a detailed plan to regain compliance within a certain period of time.

63.    In view of, among other things, management's belief that it was not reasonably practicable for Tri-Valley to establish and implement a plan of compliance that would satisfy NYSE Amex's continued listing requirements; the Board of Directors determined that it was in the best interests of the Company to delist voluntarily the Company's common stock from NYSE Amex.  As such, the last day of trading of Tri-Valley's common stock on NYSE Amex was June 22, 2012.  Effective at the open of the market on June 25, 2012, Tri-Valley's common stock began trading on the OTCQB Marketplace under the symbol "TVLY."

### D.   Financial Information

64.   As of June 30, 2012, the Company's financial statements showed a cash balance of approximately $275,000 and negative working capital of $11.8 million.  For the fiscal years ended December 31, 2010 and 2011, Tri-Valley's total revenues were $1.9 million and $2.6 million, respectively.   Tri-Valley suffered net losses of $8.7 million and $11.7 million, respectively, in those years.  The Opus Partnership suffered net losses of $1.48 million and $1.66 million in 2011 and 2010, respectively.

## IV.

### Events Leading to these Chapter 11 Cases

65.   Several factors have caused the Debtors to seek protection under chapter 11 of the Bankruptcy Code, including: (i) insufficient cash flow from operations; (ii) disputes concerning the Opus Partnership; and (iii) an investigation by the United States Securities and Exchange Commission (the "SEC"), among other things.

### A.   Insufficient Cash Flow

66.   By the end of 2011, Tri-Valley's ability to continue as a going concern had become dependant, in large part, on obtaining one or more substantial infusions of working capital and project-level financing.  Without such additional funding, the Debtors were unable to undertake the testing, development, and drilling necessary for their oil, gas, and mineral assets to produce the cash flow necessary to sustain their operations.

67.   Further, the revenues generated from the Debtors' producing wells are highly dependant upon future prices of and demand for oil and gas.  The unsettled energy markets make it particularly difficult to accurately predict future oil and gas prices.  Various factors beyond the Debtors' control affected these prices, including, among other things, (i) the domestic and foreign supply of oil and gas and the price of foreign inputs, (ii) war, civil unrest,

or terrorism, (iii) levels of consumer demand and consumer confidence, (iv) weather, (v) the price and availability of alternative fuels, (vi) the rate of inflation, (vii) the availability of transportation capacity, and (viii) changes in existing and proposed state and federal regulations.

68. Additionally, as discussed further below, the Gamble Trust was no longer willing to provide additional financing to the Debtors outside of chapter 11 and no other financing was available to continue their operations as a going concern.

### B.    Opus Dispute

69. In 2010 and 2011, certain disputes arose between Tri-Valley and certain partners of Opus. In an effort to facilitate a resolution of those disputes, Tri-Valley and an ad hoc group of five Opus partners (the "Opus Special Committee")[13] had extensive discussions between June 2011 and July 2012 concerning the nature of those disputes and the parameters for a global settlement of them.

70. The dispute between Tri-Valley and the Opus partners primarily centered on alleged breaches of the Opus Partnership Agreement and Program Agreement between 2002 and March 2010. More specifically, the Opus Special Committee believed that Tri-Valley and its former management team were liable to Opus partners for (i) the return of certain oil and gas lease acquisition and title defense costs; (ii) overcharges for turnkey drilling and well completion costs, (iii) the disgorgement of fees for the work performed by finders who assisted in the private placement of Opus partnership units; (iv) improper distributions to an Opus partner; and (v) accrued interest on the foregoing amounts. The Company denied liability to the Opus partners for each of these claims, but worked constructively with the Opus Special Committee to

---

[13] The Opus Special Committee was organized in April 2011 for the purposes of negotiating a settlement of the alleged claims against Tri-Valley and developing a plan for restructuring Opus. Four of the members of the Opus Special Committee are limited partners and one is a general partner.

investigate the facts and to explore a potential resolution on amicable terms without the need for litigation.

71.    The Company and Opus Special Committee had extensive discussions on the contours of a settlement prior to the Petition Date.  Although no agreement had been finalized, the extensive work done by the Debtors and the Opus Special Committee produced a consensus on several key points that the Debtors believe will serve as a framework for a chapter 11 plan that will garner the support of all major stakeholders.

**C.**      **SEC Investigation**

72.    On February 2, 2012, Tri-Valley and Opus each received a subpoena issued by the staff of the SEC that sought documents and data from the period of January 1, 2002 to the present, relating to their financial condition, operations, transactions, activities, business, and offer and sale of securities of Tri-Valley and Opus.  The Debtors are cooperating with the staff's request and are in the process of responding to the subpoena.

73.    As of the Petition Date, the SEC was conducting a fact-finding inquiry into possible violations of the federal securities laws and had not yet concluded its investigation nor determined whether any enforcement action was necessary.  However, the public disclosure of the SEC's inquiry and the diversion of management's time (and the resulting costs of responding to the SEC's inquiry) had a materially adverse affect on the Debtors' operations and their prospects for third-party financing.

**V.**

**Proposed Course of Chapter 11 Cases**

74.    Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or some portion of the Debtors' assets, the issuance of new debt or equity capital infusions, and the reorganization of the Debtors'

operations. Given the severe time and capital constraints, however, it was apparent that prospects for raising new debt or equity and/or to restructure the business were unlikely.

75. More specifically, on June 1, 2012, the Debtors engaged FTI Consulting, Inc. ("FTI") to review the Debtors' cash flows and liquidity position and to assist it with its internal evaluation of strategic alternatives and objectives. During the month of June 2012, the Debtors worked with FTI to evaluate such issues.

76. In June and early July, the Debtors, representatives of the Gamble Trust, and the Opus Special Committee met to discuss potential solutions to the Debtors' pressing need for capital and the strategic alternatives available under present circumstances. After further consultation with the Debtors' major stakeholders, including the Gamble Trust, the Opus Special Committee and their respective advisors, and an examination of the Debtors' current operating cash flow issues and critical need for additional financing, the Debtors determined that the best (and perhaps the only feasible) way to maximize the value of their assets was to commence these chapter 11 cases and proceed with a sale of the Debtors' assets, including the Pleasant Valley and Edison Project Leases in a competitive sale process under Section 363 of the Bankruptcy Code.

77. To that end, the Debtors, with the assistance of FTI commenced a program to market their assets for sale, and the Debtors are confident that a robust auction will generate sufficient cash proceeds to provide a meaningful recovery for all of their major stakeholders. In support of these efforts, FTI was also tasked with assisting the Debtors in securing debtor-in-possession financing for the chapter 11 process. As part of this, FTI contacted eighteen (18) potential funding sources, of which eight (8) declined immediately and ten (10) requested non-disclosure agreements. Of those ten (10), eight (8) of them executed non-disclosure agreements

and received diligence information, but none of them expressed any interest in providing such financing. Neither prospect, however, could provide financing on terms or within a time frame to meet the Debtors' needs. Ultimately, the Gamble Trust agreed to immediately provide the debtor-in-possession financing necessary to allow the Debtors adequate time to market and sell their assets over the next 90 days. The Gamble Trust was the only party willing to provide such financial support on realistic terms and within a realistic time frame.

78. In addition to filing the pleadings necessary to commence the sale process within the next five days, the Debtors intend to propose a chapter 11 plan within the next 30 days that simultaneously (i) resolves the outstanding claims between Opus, on the one hand, and Tri-Valley and TVOG, on the other, and (ii) expeditiously distributes the expected proceeds of sale.

## VI.

## <u>Additional Facts in Support of First Day Motions</u>[14]

79. Concurrently with filing the voluntary petitions to commence these cases, the Debtors will be filing several First Day Motions. The Debtors anticipate that the Court will conduct a hearing within one or two business days after the commencement of these cases (the "<u>First Day Hearing</u>"), during which the Court will entertain the arguments of counsel with respect to the relief sought in certain of the First Day Motions while others will be subject to notice as set forth in the Debtors' notice of filing.

80. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of these cases; (b) continuing the Debtors' operations during these cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of their employees.

---

[14] Capitalized terms used in this section and not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

81.   The First Day Motions are identified, listed and more fully described below:

*__Administrative Motions__*

**A.    Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Authorizing the Debtors to Prepare (A) a Consolidated List of Creditors and (B) a Consolidated List of the Debtors' Top Thirty Unsecured Creditors**

82.   By this Motion, the Debtors seek entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

83.   The joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest.  The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect all of the Debtors.  Joint administration will permit counsel for all parties in interest to include the Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these cases.  Joint administration also will enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in both cases.

84.   The entry of an order of joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays.  Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

85.   For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

**B.  Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy Solutions LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), § 105(a) of the Bankruptcy Code, and Local Rule 2002-1(f)**

86.  By this Motion, the Debtors seek entry of an order authorizing the employment and retention of Epiq Bankruptcy Solutions LLC ("Epiq") as their notice and claims agent for their chapter 11 cases pursuant to the terms of that certain Engagement Agreement by and between Epiq and the Debtors (the "Engagement Agreement").

87.  I submit that authorizing the relief requested in the Motion on an expedited basis is appropriate in these cases due to the hundreds of creditors and other parties-in-interest involved, which will likely impose heavy administrative and other burdens on the Debtors, the Court and the Office of the Clerk of the Court (the "Clerk's Office").  The size of the Debtors' creditor and interested party body makes it impracticable for the Debtors to, without assistance, undertake the task of sending notices to creditors and other parties-in-interest.  For ease of administration of their estates, I propose to engage Epiq as the Debtors' notice and claims agent. I believe that the retention of Epiq as the Debtors' notice and claims agent in these chapter 11 cases is in the best interests of the Debtors, their estates and their creditors.

88.  Epiq is one of the nation's leading chapter 11 administrators, with extensive experience in noticing, claims processing, claims reconciliation and distribution, and other related services critical to the effective administration of chapter 11 cases.  Indeed, Epiq has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing and claims processing portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties-in-interest.  Further, Epiq will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.  Epiq

has acted as official notice and claims agent in numerous chapter 11 cases filed in Delaware and in other jurisdictions nationwide.

89.     Contemporaneously herewith, the Debtors have also filed an application seeking to retain Epiq under Section 327(a) of the Bankruptcy Code, as described further below.

90.     For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

### C.     Debtors' Motion for Entry of an Order (I) Extending the Debtors' Deadline to File (A) Schedules of Assets and Liabilities and (B) Statements of Financial Affairs and (II) Waiving the Requirement that Tri-Valley Corporation File a List of Equity Security Holders

91.     By this Motion, the Debtors seek the entry of an order, pursuant to Sections 105(a) and 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(b) and (c), and Local Rule 1007-1 (b), extending the time within which the Debtors must file their Schedules and Statements, and waiving the requirement that the Debtors file a list of equity security holders.

92.     Given the size and complexity of their businesses, the Debtors must assemble and compile a significant amount of information to prepare their Schedules and Statements.   While the Debtors, with the help of their professional advisors, are diligently preparing the Schedules and Statements, resources are limited.   The Debtors' primary focus thus far has been preparing for the filing of their chapter 11 cases.  Thus, the Debtors have not been able to gather and analyze the necessary information to prepare and file their Schedules and Statements prior to the Petition Date.   In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial post-petition period and to facilitate the proposed sale of many of the Debtors' assets, the Debtors will not be

able to complete the Schedules and Statements properly and accurately within the required fifteen-day time period provided for under Bankruptcy Rule 1007(c).

93. Additionally, prior and subsequent to the Petition Date, the Debtors and their professionals have been consumed with a multitude of critical administrative and operational decisions arising in conjunction with the commencement of these chapter 11 Cases, as well as the burden of marketing their assets. For the foregoing reasons, although the Debtors have started to assemble the necessary data for the Schedules and Statements, they will not be able to complete this undertaking prior to the expiration of the Initial Deadlines.

94. With respect to filing a list of equity security holders, the Debtors seek a waiver of filing a list of equity holders for Debtor Tri-Valley Corporation. Tri-Valley is a public company and has approximately 68 million shares of common stock outstanding. Tri-Valley's common stock was traded in the market and the holders of the common stock changed on a daily basis. The Debtors estimate that there may be as many as 700 certificated shareholders and 7600 beneficial owners through street accounts. The Debtors submit that the cost of obtaining the list of equity service holders and sending notice to such parties would be expensive and time consuming and would serve no beneficial purpose. The Debtors further submit that, if it becomes necessary for such equity security holders to file proofs of interest, the Debtors will provide them with notice of any applicable bar date and an opportunity to assert their interests. Thus, equity security holders will not be prejudiced. Accordingly, the Debtors request that the Court waive the requirement in Bankruptcy Rule 1007(a)(3) to file a list of equity security holders for Tri-Valley.

95. For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

**D.**  **Debtors' Motion for Entry of an Order (A) Setting Bar Dates for Filing Proofs of Claim, Including Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9), (B) Approving the Form and Manner for Filing Proofs of Claim, and (C) Approving Notice Thereof**

96.   By this Motion, the Debtors seek of an order (a) establishing November 21, 2012 as the deadlines for filing proofs of claim in these chapter 11 cases, (b) approving the form and manner for filing proofs of claim and (c) approving notice thereof

97.   As mentioned above, the Debtors intend to conduct a sale of substantially all of their assets under Section 363 of the Bankruptcy Code.  In addition, within thirty (30) days of the Petition Date, the Debtors intend to propose a chapter 11 plan that distributes the expected proceeds of sale fairly and equitably.  In light of that proposed course of action for these chapter 11 Cases, I believe that the establishment of a bar date now will assist the parties in that confirmation process, particularly with respect to determining the precise nature, extent, and scope of claims asserted against the Debtors.

98.   I believe that the proposed bar date will provide all parties (including governmental units) with sufficient notice of approximately ninety (90) days before claims are due.  Further, the proposed bar date is approximately sixty (60) days after the current or proposed deadline to file the Schedules, as discussed above.

99.   For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

### *Operational Motions*

**E.**  **Debtors' Motion For Entry of an Order Granting the Debtors Authority to Pay Wages, Compensation, Employee Benefits, and Other Related Obligations**

100.  In order to enable the Debtors to maintain morale during this critical time, retain their current Employees, and minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the

Debtors, by this Motion, seek authority, in their discretion, to pay and honor, as the case may be, all prepetition amounts owing, and to continue paying in the ordinary course amounts incurred post-petition, on account of the various employee obligations described below. The Debtors further request that the Court enter an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

101. The Employees are essential to the continued operation of the Debtors' business, and the Employees' morale directly affects their effectiveness and productivity. Consequently, I submit that it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this juncture would undermine the Debtors' stability, and undoubtedly would have an adverse effect on the Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in chapter 11.

102. For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

### ***Background Relating to Employees***

103. The Debtors have approximately 22 full-time employees (the "Employees"), 12 of which are hourly Employees and 10 of which are salaried Employees. In addition, the Debtors utilized the services of 4 independent contractors (the "Independent Contractors").

### 1. Wages, Salaries, and Compensation

104. The Debtors' average aggregate monthly compensation to Employees for wages and salaries is approximately $166,000.00, exclusive of the deductions and exclusions detailed below. Employees are paid in arrears with direct deposits on the 15th and last calendar day of the month.[15]

105. The Debtors estimate that the aggregate amount of accrued pre-petition wages and salaries that remain unpaid to the Employees as of the Petition Date, following deductions and exclusions detailed below, is approximately $31,300.00 for the period of August 1, 2012 through the Petition Date (the "Unpaid Wages and Salaries").[16]

106. Excluding accrued but unused PTO, no individual Employees is owed more than $11,725.00 on account of wages and salaries earned prior to the Petition Date.

### 2. Reimbursable Expenses

107. In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred while performing their duties on the Debtors' behalf (the "Reimbursable Expenses").

108. In the normal course of business, Employees submit expense reports to receive reimbursement for these expenses. The Debtors pay for these expenses within five days of the submission of the expense reports, through either a paper check or electronic transfer of funds.[17] Reimbursable Expenses include expenses for travel (including meals, tickets, lodging,

---

[15] On July 31, 2012, the Debtors paid Employees for all wages and salaries earned through that date.

[16] The calculation of Unpaid Wages and Salaries incorporates payments owing on account of wages, salaries, and vacation pay (to the extent such vacation pay is payable in cash and the relevant Employee has sought payment in cash). The calculation does not attempt to incorporate amounts for other benefits, including health and dental benefits. Further, the calculation does not include Reimbursable Expenses (as defined below), which the Debtors do not consider compensation.

[17] The majority of the Reimbursable Expenses are incurred me and are paid through electronic transfers of funds.

and automobile mileage), training courses, and other business-related expenses. The Debtors estimate that the average total amount of Reimbursable Expenses per month is no more than $5,000.00.

109. The Debtors estimate that, as of the Petition Date, no Reimbursable Expenses remain unpaid, but are seeking authority out of an abundance of caution to pay any Reimbursable Expenses that are submitted postpetition that relate to prepetition amounts.

### 3. Pre-petition Deductions and Withholdings

110. For each applicable pay period, the Debtors deduct certain amounts from Employee paychecks (collectively, the "Deductions"), including, without limitation: (i) garnishments for child or spousal support and similar deductions; (ii) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below and (iii) other miscellaneous deductions. The Debtors estimate that they withhold a total of approximately $11,000.00 per month in Deductions from Employees' paychecks.

111. The Debtors estimate that, as of the Petition Date, approximately $3,000.00 in accrued, but not yet withheld, Deductions are outstanding.

112. The Debtors are also required by law to (i) withhold from an Employee's wages amounts related to, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). The Debtors estimate that they withhold approximately $44,000.00 per month in Payroll Taxes from Employees' paychecks.

113. The Debtors estimate that, as of the Petition Date, approximately $12,400.00 in accrued Payroll Taxes remain unpaid.

**4.     Independent Contractors**

114. The four Independent Contractors provide distinct services for the Debtors. One Independent Contractor provides accounting services for Debtor TVC Opus I Drilling Program L.P., another is a geologist who provides consulting services, the third is a former executive assistant, and the Debtors' former interim chief financial officer who now serves as a consultant to the Debtors is the fourth independent contractor. The Debtors generally compensate their Independent Contractors every two weeks through accounts payable upon submission of invoices for hours worked.

115. The Debtors estimate that, as of the Petition Date, approximately $2,000.00 remains outstanding to the Independent Contractors (the "Unpaid Independent Contractor Compensation," and, collectively with the Unpaid Wages and Salaries, the Reimbursable Expenses, the Deductions, and the Payroll Taxes, the "Unpaid Compensation").

**5.     Employee Benefit Plans**

116. The Debtors also offer or provide Employees (and their dependents) with a variety of benefits. These Employee benefits (collectively, the "Employee Benefits", and collectively with the Unpaid Compensation, the "Employee Wages and Benefits") include, but are not limited to: (i) paid time-off benefits other than accrued, but unused vacation time, or sick days, if any; (ii) health, dental, and vision care insurance; (iii) life and accidental death and dismemberment insurance; (iv) disability income insurance; (v) health reimbursement accounts; (vi) a 401(k) plan; and (viii) COBRA medical coverage. The Debtors estimate that, as of the

Petition Date, the total unpaid amount owing, which the Debtors seek authority to pay in connection with the Employee Benefits due to Employees is approximately $1,400.00.[18]

### (a) Paid Time-Off Benefits

117. The Debtors provide Employees with paid time-off benefits, depending upon the Employee's length of employment and level of experience. The Debtors provide some form of paid leave in connection with vacation time, sick days, holidays, jury duty, and bereavement leave (collectively, the "PTO Benefits"). Certain earned and unused vacation may be carried over year-to-year, up to a maximum that varies depending on length of employment but does not exceed 150% of vacation time allotted to the Employee in that calendar year. All Employees are entitled to a cash payout for accrued and unused vacation days upon termination of employment with the Debtors. With the exception of accrued vacation payouts for terminated Employees, the remaining value of the PTO Benefits are obligations ultimately satisfied in the ordinary course of business through salary and payroll continuation. As of the Petition Date, the Debtors estimate that they owe approximately $94,300.00 of accrued, but unpaid PTO Benefits, which solely reflects earned but unused vacation time as that is the only PTO Benefit convertible to a cash payment obligation.

118. This amount is not a current cash pay obligation as Employees are only entitled to be paid for accrued and unused vacation time in the event of termination of employment. The Debtors request that they be authorized, but not directed, to honor their existing PTO Benefits and to permit continuing Employees to use their accrued pre-petition PTO Benefits in the ordinary course of business. However, the Debtors will not pay any PTO

---

[18] This estimate excludes any accrued, but unused vacation time or sick days.

Benefits that exceed the the amounts entitled to priority pursuant to Sections 503 and 507 of the Bankruptcy Code.

### (b) Medical, Dental, and Other Health Plans

119. The Debtors offer coverage to eligible Employees (and their dependents) for medical, dental, vision, and other related benefits (collectively, the "Health Care Benefits").

120. The Debtors' Employee medical plan (the "Medical Plan") is provided by Anthem Blue Cross ("Anthem"). The Debtors estimate that they pay approximately $10,000.00 per month in fixed premiums to Anthem (the "Medical Plan Premiums"). Under the Medical Plan, Anthem covers the full cost of the Employees' claims, less any deductibles or co-pays. The Debtors pay 100% of the premiums, while the participating Employees pay any deductibles or co-pays. There are approximately 13 Employees currently enrolled in the Medical Plan. As of the Petition Date, the Debtors have paid all of the pre-petition Medical Plan Premiums.

121. The Debtors' Employee dental plan (the "Dental Plan") is provided by Principal Life Insurance ("Principal Life"). The Debtors estimate that they pay approximately $2,000.00 per month in fixed premiums to Principal Life (the "Dental Plan Premiums"). Under the Dental Plan, Principal Life covers the full cost of the Employee claims, less any deductibles or co-pays. There are 16 Employees currently enrolled in the Dental Plan. As of the Petition Date, the Debtors have paid all of the pre-petition Dental Plan Premiums.

122. Generally, for Employees and their enrolled family members, the Debtors pay 100% of the cost of the Medical Plan Premiums and the Dental Plan Premiums, but withhold co-payments from the payroll for those enrolled Employees. The Debtors withhold approximately 11.5% of the Medical Plan Premiums and 25% of the Dental Plan Premiums from the payroll of those enrolled Employees to cover those enrolled Employees' share of co-payments, which withholdings total approximately $1,600.00 per month. On a monthly basis,

the Debtors pay in advance for the month the amounts related to the Medical Plan and Dental Plan, totaling approximately $12,000.00 to the health care plan administrators or providers (the "Health Plan Withholdings").

123. The Debtors provide vision insurance (the "Vision Insurance") to Employees through CoPower ("CoPower"). There are currently approximately 16 Employees enrolled in the vision insurance plan. The participating Employees pay all premiums in connection with the vision insurance through payroll withholding, which the Debtors remit to CoPower on a monthly basis in an estimated amount of approximately $325.00. As of the Petition Date, the Debtors have paid all of the pre-petition Vision Insurance premiums.

### (c) Life, Accidental Death and Dismemberment, and Disability Insurance

124. The Debtors provide basic life insurance to all full-time Employees ("Life Insurance") through Sun Life Insurance ("Sun Life"). The Debtors estimate that they pay approximately $900.00 per month in premiums in connection with the Life Insurance. As of the Petition Date, the Debtors have paid all of the pre-petition Life Insurance premiums.

125. The Debtors provide supplemental life insurance and accidental death and dismemberment coverage, as well as long-term disability coverage ("Supplemental Life, AD&D, and Disability Insurance") through American Family Life Assurance Company ("AFLAC"). Participating Employees pay all premiums in connection with the Supplemental Life, AD&D, and Disability Insurance through payroll withholding, which the Debtors remit to AFLAC on a monthly basis in an estimated amount of approximately $1,300.00. There are approximately 15 Employees enrolled in the Supplemental Life, AD&D, and Disability Insurance program. As of the Petition Date, the Debtors have paid all of the pre-petition Supplemental Life, AD&D, and Disability Insurance premiums.

### (d) Health Reimbursement Accounts

126. The Debtors contribute, on a weekly basis, to health reimbursement accounts administered by Ceridian Benefits Services ("Ceridian") to assist Employees enrolled in the Medical Plan with the high cost of deductibles under the Medical Plan (the "Health Reimbursement Accounts"). The Debtors contribute up to $4,800.00 per year for each family enrolled in the Medical Plan and up to $2,400.00 per year for each individual enrolled in the Medical Plan. Ceridian charges the Debtors an annual administrative fee of approximately $250.00 per year to administer the Health Reimbursement Accounts. Although the amount the Debtors contribute to the Health Reimbursement Accounts on a weekly basis can vary significantly depending on medical reimbursement claims submitted by Employees, the Debtors estimate that they contribute approximately $2,000.00 per week to the Health Reimbursement Accounts. As of the Petition Date, the Debtors have paid all of the outstanding pre-petition contributions to the Health Reimbursement Accounts, and all of the outstanding pre-petition administrative fees owed to Ceridian.

### (e) 401(k) Plan

127. The Debtors maintain a 401(k) plan for the benefit of its full-time Employees who have been employed by the Debtors for at least 90 days (the "401(k) Plan"). The 401(k) Plan generally allows Employees to make automatic pre-tax salary Deductions subject to the limits set by the Internal Revenue Code (the "Withholding Contributions"). The Debtors contribute 3% of each Employee's gross salary or wages to the respective Employee's 401(k) Plan (the "Employer Contributions"), regardless of whether the Employee contributes to the 401(k) Plan on their own or not.

128. The 401(k) Plan is held in custody and administered by Principal Financial Group ("Principal Financial") on behalf of the Debtors. Withholding Contributions and

Employer Contributions are transferred by automated clearing house to Principal Financial on a semi-monthly basis to be credited to individual Employee 401(k) accounts.

129. The Debtors estimate that the Employer Contributions total approximately $5,000.00 per month. The Debtors estimate that Withholding Contributions total approximately $4,000.00 per month. As of the Petition Date, the Debtors estimate that they owe approximately $1,200.00 in Employer Contributions to the 401(k) Plan.

### 6.     COBRA Medical and Dental Coverage

130. Former Employees are entitled to continue to participate in the Debtors' Medical Plan coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months (such coverage, the "COBRA Medical Coverage"). As of the Petition Date, the Debtors estimate that only 3 former Employees are either currently on or eligible to elect COBRA Medical Coverage. Former Employees who elect to exercise their rights under COBRA must pay 102% of the premiums for COBRA Medical Coverage, and, pursuant to the American Recovery and Reinvestment Act of 2009, the Debtors must advance 65% of these premiums (which are then recouped quarterly through tax credits).

131. Failure to comply with the requirements of COBRA can subject the Debtors to penalties of up to $110 per day per qualified beneficiary (with a minimum penalty of $15,000 for more than *de minimis* violations), actions by the Department of Labor, and civil lawsuits by the former Employees to recover their benefits. See, e.g., 29 C.F.R. § 2575.502c-6. Accordingly, the Debtors request authority in this Motion to continue to offer COBRA Medical Coverage to eligible former Employees on a post-petition basis.

**F. Debtors' Motion for Entry of an Order Authorizing (I) Continued Use of Existing Centralized Cash Management System, as Modified; (II) Honoring of Certain Pre-Petition Obligations Related to the Use of the Cash Management System; (III) Maintenance of Existing Bank Accounts and Certificates of Deposit; (IV) Continued Use of Existing Business Forms; and (V) Limited Waiver of the Deposit and Investment Requirements of Section 345(b) of the Bankruptcy Code**

132. By this Motion, the Debtors seek entry an order authorizing (i) continued use of existing centralized cash management system, as modified; (ii) honoring of certain pre-petition obligations related to the use of the cash management system; (iii) maintenance of existing bank accounts and certificates of deposit; (iv) continued use of existing business forms; and (v) a limited waiver of the deposit and investment requirements of Section 345(b) of the Bankruptcy Code.

133. The Debtors also request the right, in their discretion, to (i) pay any bank account related fees, and (ii) to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate their chapter 11 cases and operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these cases.

134. I believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were to bounce.

135.   Likewise, the commencement of these cases will already place a strain on the Debtors' relationships with their employees, customers and vendors, all of whom are vital to the Debtors' continued operations.  Requiring the Debtors to open all new Bank Accounts and to dishonor and reissue checks and drafts would not only cause delay, confusion and disruption in the Debtors' operations, it would also jeopardize Debtors' relationships with these vital parties.

136.   For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

### *Background Related to Cash Management System*

137.   In the ordinary course of business, the Debtors primarily utilize four separate bank accounts with Wells Fargo Bank, N.A. ("Wells Fargo") as a cash management system to collect and disburse funds (collectively, the "Cash Management System").

138.   The continuation of the Cash Management System will not prejudice the rights of any party in interest, but rather will benefit all creditors by minimizing disruptions to the Debtors' businesses and by preserving the administrative savings which the Cash Management System currently provides.   The Cash Management System provides a cost-effective and efficient means of managing the Debtors' finances, and maintenance of the Cash Management System will benefit all creditors by reducing the daily operating expenses of the Debtors' estates.  Failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial and administrative burden on the estates.

139.   As of the Petition Date, the Debtors maintained four bank accounts with Wells Fargo and one bank account (collectively, the "Bank Accounts") at Union Bank, N.A.

("Union Bank")[19] and multiple Certificates of Deposit (the "CODs") at those and other banks, as identified on Exhibit A attached hereto. The Debtors represent that all of the Bank Accounts and CODs are in a financially stable banking institutions with FDIC insurance (up to an applicable limit on each account). The principal components of the Cash Management System are described below.

(a) Wells Fargo Operating Accounts: The Debtors Tri-Valley Oil & Gas, Co. ("TVOG"), Tri-Valley Corporation ("TVC"), and TVC Opus I Drilling Program L.P. ("Opus"), each maintain a separate operating account at Wells Fargo (collectively, the "Operating Accounts", and, individually, the "TVOG Operating Account", the "TVC Operating Account" and the "Opus Operating Account", respectively). Revenues from oil and gas sales are deposited into the TVOG Operating Account through automatic clearing house payments ("ACH Payments") or wires, approximately once a month. The monthly revenues deposited in the TVOG Operating Account are partially used to pay TVOG operating costs and expenses. On a weekly basis, the treasury management of TVOG will determine the cash needs of TVC and to the extent TVC requires funds for anticipated operating costs and expenses, TVOG will complete a book transfer through the Wells Fargo CEO Transfer system and deposit the requisite amount of funds in the TVC Operating Account. On a weekly basis, TVC will also determine the cash needs of Opus and to the extent Opus requires funds for anticipated operating costs and expenses, TVC will transfer such funds to Opus via check, which funds are then deposited into the Opus Operating Account. TVC and TVOG also complete book entries for each such transfers in accordance with the agreements governing the Opus partnership. Debtor Select Resources Corporation, Inc. ("Select") does not currently have a bank account. Any required operating costs and expenses of Select are paid directly out of the TVC Operating Account on an as needed basis. TVOG also completes a book transfer for these transfers, which is done between the Operating Accounts through the Wells Fargo CEO Transfer system. The intercompany transfers described herein shall be referred to the Intercompany Transactions.

(b) Health Reimbursement Checking Account: TVC maintains a Health Reimbursement Checking Account (the "HR Checking Account") with Wells Fargo to cover health reimbursement payments for TVC employees. Similar to the TVC Operating Account, the HR Checking Account is primarily funded through disbursements from the TVO Operating Account. Each of TVOG, Opus and Select do not currently have any employees, and as such do not maintain any similar health reimbursement checking accounts.

(c) Certificates of Deposit: TVOG and TVC maintain CODs at various banks. As required in many jurisdictions, TVC and TVOG are required to either post bonds or maintain the mandatory funds in an interest bearing account before they are permitted to

---

[19] The Debtors do not actively use the Bank Account at Union Bank. The Debtors occasionally receive revenue checks that are deposited in this account, which presently has a balance of approximately, $12,000. The Debtors have not made disbursements from this account for several years.

commence drilling operations.  The Debtors currently have ten (10) CODs, as described in detail on <u>Exhibit A</u>.

140. The Debtors' Cash Management System is similar to those commonly employed by corporate entities within the Debtors' industry.  The Cash Management System utilized by the Debtors allows the Debtors to: (i) quickly create status reports on the location and amount of funds, which allow management to track and control such funds; (ii) ensure cash availability; and (iii) reduce administrative costs associated with coordinating the collection and movement of funds.  Additionally, the CODs are necessary to enable the Debtors to continue their current drilling and exploration operations as required in their current jurisdictions of operation.  Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into these Chapter 11 Cases.

141. Furthermore, four (4) of the Bank Accounts and one COD are maintained with Wells Fargo, and the one remaining Bank Account and seven (7) CODs are maintained with Union Bank (the "<u>Union Bank CODs</u>"), both of which are federally insured institutions that are approved depositories by the Wilmington, Delaware Office of the United States Trustee (the "<u>U.S. Trustee</u>").  To the extent that the funds in the Bank Accounts or the Union Bank CODs may, at times, exceed the amounts insured by the Federal Deposit Insurance Corporation (the "<u>FDIC</u>"), both Wells Fargo and Union Bank have executed a Uniform Depository Agreement ("<u>UDA</u>") with the U.S. Trustee, thereby placing the Bank Accounts, the Union Bank CODs, and any funds in the Bank Accounts or the Union Bank CODs in excess of the FDIC insurance, into compliance with Section 345(b) of the Bankruptcy Code.

142. The remaining two (2) CODs (the "<u>Remaining CODs</u>") are currently maintained with Rabobank, N.A. ("<u>Rabobank</u>").  While Rabobank has not executed a UDA with the U.S. Trustee, the Debtors believe that the funds in the Remaining CODs are fully covered by

FDIC insurance, and therefore are in compliance with Section 345(b) of the Bankruptcy Code. To the extent that it is determined that the Remaining CODs are not in compliance with the depository and investment requirements of Section 345(b) of the Bankruptcy Code, the Debtors respectfully request a limited sixty (60) day waiver of such requirements within which to put an acceptable UDA in place with Rabobank, subject to the reasonable consent of the U.S. Trustee or, if that is not practicable, to move this Court for a final waiver of such requirements. As stated above, the CODs are necessary to enable the Debtors to continue their current drilling operations as required in their current jurisdictions of operation, and their early termination could negatively impact the Debtors' ability to carry on their ongoing operations, and subject them to early withdrawal penalties and fees.

143. In addition to the current Bank Accounts at Wells Fargo, on or soon after the Petition Date, the Debtors intend to open a new post-petition, debtor-in-possession account with Wells Fargo that will be used for the special purpose of paying all post-petition royalty overrides and working interest payments of the Debtors.

### *Financing Motion*

#### G.  Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Adequate Protection, (D) Scheduling a Final Hearing, and (E) Granting Related Relief

144. An immediate and critical need exists for the Debtors to obtain financing. Without the DIP Facility, the Debtors do not have the funds necessary to continue their operations. The Debtors' ability to continue their operations, including to maintain oil and gas operations, to maintain business relationships, to make payroll, to pay the costs of administration of their estates, and to satisfy other working capital and operational needs, depends on obtaining immediate access to the DIP Facility and use of Cash Collateral. The access of the Debtors to

sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital for preserving and maintaining the going concern values of the Debtors and to a successful reorganization. Failure to obtain the relief requested in the DIP Motion will immediately and irreparably harm (a) the Debtors, their estates, creditors and equity holders, and (b) the possibility of a successful sale or reorganization.

145. The Debtors are unable to obtain financing on terms more favorable than those offered by the Lender under the DIP Facility and are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit under Sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those offered by the Lender under the DIP Facility. Prior to the Petition Date, the Debtors sought to obtain financing on more favorable terms, but no other lender even proposed to extend credit to the Debtors. A credit facility in the amount and under the terms provided under the DIP Facility is not available from Lender without the Debtors (a) granting to the Lender, subject to the Carve-Out (as defined below), the DIP Liens, and DIP Superpriority Claims (each as defined below), (b) upon entry of the Final Order, providing for the roll up of the Existing Indebtedness (as defined below), and (c) providing the other protections set forth in the Interim Order.

146. Despite a diligent effort to obtain alternative financing, no other lender proposed to extend credit to the Debtors. Indeed, the only lenders that even discussed the prospect of financing indicated that if a DIP loan were possible, it would require refinancing the entire Existing Indebtedness. The roll up and deemed refinancing of the Existing Indebtedness upon entry of the Final Order is necessary to avoid immediate and irreparable harm to the

Debtors by loss of the DIP Facility, to avoid the risk, expense and delay attendant to litigation that would have ensued had the Debtors sought to impose new liens without this refinancing, and to avoid burdensome administration of segregating cash collateral.

147.    To best assess the Debtors' funding needs during these Chapter 11 Cases, the Debtors have, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in Chapter 11 and work toward a successful sale process.

148.    As part of the Debtors' financial review and analysis, the Debtors developed a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period.   This forecast considers a number of factors, including the impact of the Chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various "First-Day" pleadings.

149.    Utilizing this cash flow forecast to project their cash needs during these Chapter 11 Cases, the Debtors believe that proposed DIP Facility will provide the Debtors with sufficient liquidity to fund the Debtors' operations during these Chapter 11 Cases.   The immediate availability of the DIP Facility is necessary to provide assurance of payment and "business as usual" continued operations to trade vendors.   Without such assurances, trade vendors may very well refuse to provide goods and services to the Debtors and/or require cumbersome credit terms, which could negatively affect the Debtors' sale efforts and the Debtors' bankruptcy estates as a whole.

150.   I, in consultation with my advisors, have determined that (i) the Approved Budget is reasonable and will allow the Debtors to operate in the Chapter 11 Cases; and (ii) the Approved Budget includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the Approved Budget.

151.   The terms of the DIP Facility have been negotiated at arms' length and in "good faith," as I understand that term to mean under Bankruptcy Code section 354(e), and are in the best interests of the Debtors, their estates and creditors.  The Lender is extending financing to the Debtors in good faith.

152.   For the foregoing reasons, I submit the relief requested in the Motion is in the best interests of the Debtors' estates.

*__Applications to Employ/Retain Professionals__*

**H.      Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members**

153.   The Debtors seek entry of an order for authority to establish procedures for the compensation and reimbursement of court-approved professionals on a monthly basis, and on terms comparable to similar procedures which have been routinely followed in this district.  This process will provide the appropriate balance between efficient administration of fee applications for the estate's professionals while still providing the Court and parties-in-interest with sufficient opportunity to review, and where appropriate, object to, payments to professionals.

154.   Specifically, the Debtors propose that, except as otherwise provided in an order of the Court authorizing the retention of a particular "ordinary course professional" should the Debtors seek to retain any professional on such basis, all professionals retained pursuant to an order of the Court in these cases (collectively, the "Professionals") be permitted to seek

interim payment of compensation and reimbursement of expenses in accordance with the procedures more specifically described in the Motion.

155. The procedures should enable professionals to be paid amounts owed to them while ensuring appropriate oversight and to otherwise not unduly burden the Court, the Office of the United States Trustee, and the Professionals.

156. For the foregoing reasons, I submit that the relief requested in the Motion is in the best interests of the Debtors' estates.

***Applications to Employ Claims Agent and Professionals***

**I.    Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Administrative Advisor for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date**

157. By this Application, the Debtors respectfully request entry of an order authorizing and approving the retention of Epiq as administrative advisor for the Debtors in these chapter 11 cases nunc pro tunc to the Petition Date pursuant to the Engagement Agreement referenced above.  As described above, the Debtors have also filed an application under 28 U.S.C. § 156(c) for authorization to retain Epiq to serve as the notice and claims agent in these cases.  Given that the administration of these cases will require Epiq to perform duties outside the scope permissible by that application, the Debtors are supplementing it by the filing of this Application.

158. By this Application, the Debtors seek to retain Epiq to, among other things, (i) assist with solicitation, balloting and tabulation and calculation of votes, in furtherance of confirmation of a chapter 11 plan, (ii) generate an official ballot certification and testify, if necessary, in support of the ballot tabulation results; (iii) gather data in conjunction with the preparation, and assist in the preparation of the Debtors' Schedules and Statements, and (iv) perform such other claims processing, noticing, solicitation, balloting, and administrative

services described in the Engagement Agreement, but not included in the Section 156(c) Application, as may be requested from time to time by the Debtors.

159. Prior to the Petition Date, the Debtors solicited proposals from three companies that provide services in this field, ultimately selecting Epiq based upon several factors, including Epiq's extensive experience in chapter 11 case administration and the competitiveness of its rates. To help manage administrative tasks with respect to the hundreds of creditors, equity security holders and other parties in interest that are expected to be involved in these chapter 11 cases, I believe that Epiq's employment is necessary.

160. For the foregoing reasons, I submit that the relief requested in the Application is in the best interests of the Debtors' estates.

### J. Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as Delaware and Conflcits Counsel for the Debtors and Debtors-in-Possession

161. The Debtors desire to employ and retain Landis Rath & Cobb LLP ("LRC") as their Delaware and conflicts counsel in these cases. By this Application, the Debtors respectfully request the Court approve the employment and retention of LRC, *nunc pro tunc* to the Petition Date, pursuant to Bankruptcy Code Section 327(a), under a general retainer as their counsel to perform the legal services that will be necessary during the Debtors' chapter 11 cases.

162. LRC has informed the Debtors that Adam G. Landis and Kerri K. Mumford, partners of LRC, as well as other partners and associates of LRC who will be involved in these cases, are members in good standing of various state and federal bars.

163. The Debtors have selected LRC as its counsel because of its extensive experience and knowledge in the field of debtor and creditor law and business reorganizations under chapter 11 of the Bankruptcy Code. LRC has a recognized reorganization practice and experience in aspects of the law that are expected to arise in the context of these cases.

164. LRC's bankruptcy practice presently includes twelve (12) attorneys who regularly appear in bankruptcy cases in Delaware and other jurisdictions nationwide. LRC attorneys have represented debtors, creditors' committees, bank groups, and other significant parties in a multitude of bankruptcy cases.

165. In assisting with the preparation of the Debtors' cases, LRC has become familiar with the Debtors' business affairs, and will be able to immediately assist the Debtors in their efforts in these cases. LRC has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of these cases. Thus, in order to maximize the value of the Debtors' estates and because of LRC's recognized expertise in bankruptcy law, I desire that LRC represent the Debtors in these cases.

166. I submit that the Debtors' employment of LRC under a general retainer is appropriate and necessary to enable the Debtors to execute faithfully their duties as debtors and to implement a successful reorganization.

167. For the foregoing reasons, I submit that the relief requested in the Application is in the best interests of the Debtors' estates.

### K. Debtors' Application for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as General Bankruptcy Counsel for the Debtors and Debtors-in-Possession

168. The Debtors seek to retain and employ K&L Gates ("KLG") as their general bankruptcy counsel. By this Application, the Debtors respectfully request the Court approve the employment and retention of KLG, nunc pro tunc to the Petition Date, pursuant to Bankruptcy Code Section 327(a), under a general retainer as their counsel to perform the legal services that will be necessary during the Debtors' chapter 11 cases.

169. The Debtors believe that KLG is both well qualified and uniquely able to represent them in this Chapter 11 case in an efficient and effective manner. KLG has extensive

bankruptcy matters, as well as corporate and regulatory experience involving oil and gas businesses like the Debtors. Indeed, Attorney Charles A. Dale III and K&L Gates have been actively involved in major Chapter 11 Cases in this and other districts and have represented debtors-in-possession in many such cases.

170. I submit that the Debtors' employment of KLG under a general retainer is appropriate and necessary to enable the Debtors to execute faithfully their duties as debtors and to implement a successful sale process.

171. For the foregoing reasons, I submit that the relief requested in the Application is in the best interests of the Debtors' estates.

## L.  Debtors' Application for Entry of an Order Authorizing the Employment and Retention of FTI Consulting, Inc. as Financial Advisors for the Debtors and Debtors-in-Possession

172. The Debtors seek to retain and employ FTI Consulting, Inc. ("FTI") as financial advisor to the Debtors. By this Application, the Debtors respectfully request the Court approve the employment and retention of FTI, nunc pro tunc to the Petition Date, pursuant to Bankruptcy Code Section 327(a), under a general retainer as their counsel to perform the legal services that will be necessary during the Debtors' chapter 11 cases.

173. By this Application, the Debtors seek to employ FTI to perform certain financial advisory services. Since June 1, 2012, FTI's professionals have been working closely with the Debtors' management and other professionals. The Debtors have selected FTI as their financial advisor because of FTI's extensive experience and knowledge of the Debtors' businesses, operations, and financial affairs and FTI's expertise in business reorganizations under Chapter 11 of the Bankruptcy Code. Accordingly, the Debtors believe that FTI is well qualified to assist them in these Chapter 11 Cases.

174.  In consideration of the size and complexity of their business, as well as the exigencies of the circumstances, the Debtors have determined that the services of an experienced financial advisor will substantially enhance their attempts to maximize the value of their estates.

175.  FTI has an excellent reputation for the services it has rendered in Chapter 11 cases on behalf of debtors and creditors in Delaware and in other venues throughout the United States.  As such, the Debtors believe that FTI is well-qualified and able to advise the Debtors in a cost-effective, efficient, and timely manner.

176.  The FTI professionals involved with the Debtors' engagement are familiar with the Debtors' business, financial affairs, and capital structure.  Since the firm's initial retention on June 1, 2012, FTI professionals have worked closely with the Debtors' management and other professionals to understand the Debtors' business, study and compare the Debtors' performance against previous cash flow projections, and coordinate the necessary professional services and other vital aspects of preparing for these Chapter 11 Cases.  Accordingly, the Debtors believe that FTI has developed significant relevant experience and expertise regarding the Debtors.  Therefore, the Debtors submit that the retention of FTI on the terms and conditions set forth herein and in the Engagement Letter is necessary and appropriate, is in the best interests of their estates and creditors, and all other parties in interest, and should be granted.

177.  For the foregoing reasons, I submit that the relief requested in the Application is in the best interests of the Debtors' estates.

## Declaration

178.  Pursuant to Section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## **Relief Requested**

179.  I respectfully request that the Court grant all relief requested in the First Day Motions and such other and further relief as may be just and proper.

**[Remainder of Page Intentionally Left Blank]**

By: _Marton N. Cunningham_
Maston N. Cunningham
President and Chief Executive Officer

Executed on: _August 1, 2012_

# Exhibit 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291(___) |
| Debtors. | (Joint Administration Pending) |

## APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF K&L GATES LLP AS GENERAL BANKRUPTCY COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

The above-captioned debtors and debtors-in-possession (the "Debtors") hereby file this application (the "Application") seeking entry of an order, substantially in the form attached hereto (the "Proposed Order"), authorizing the Debtors to employ and retain K&L Gates, LLP ("K&L Gates") as their general bankruptcy counsel, *nunc pro tunc* to the commencement of these Chapter 11 cases. In support of this application, the Debtors submit the Affidavit of Charles A. Dale III, ("Attorney Dale"), a partner at K&L Gates (the "Dale Affidavit"), attached hereto as Exhibit A. In further support of this Application, the Debtors respectfully state as follows:

## JURISDICTION

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) (2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

2.      The basis for the relief requested herein are Sections 327(a) and 330 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND[2]

3.      On August 7, 2012 (the "Petition Date"), the Debtors commenced the above-captioned Chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

## RELIEF REQUESTED

5.      By this Application, the Debtors seek entry of an order pursuant to Sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016, and Local Rules 2014-1 and 2016-1 authorizing the Debtors to retain and employ K&L Gates as their general bankruptcy counsel in accordance with the terms and conditions set forth in that certain engagement letter between the Debtors and K&L Gates dated May 18, 2012 (the "Engagement Letter").

---

[2] A description of the Debtors' business and the reasons for filing these Chapter 11 Cases are set forth in the *Declaration of Maston Cunningham in Support of First Day Motions*

## K&L GATES'S QUALIFICATIONS

6.      The Debtors believe that K&L Gates is both well qualified and uniquely able to represent them in this Chapter 11 case in an efficient and effective manner.  K&L Gates has extensive bankruptcy matters, as well as corporate and regulatory experience involving oil and gas businesses like the Debtors.  Indeed, Attorney Dale and K&L Gates have been actively involved in major Chapter 11 Cases in this and other districts and have represented debtors-in-possession in many such cases.

## SERVICES TO BE PROVIDED

7.      Subject to further order of the Court and consistent with the Engagement Letter, K&L Gates will, among other things:

(a)     advise the Debtors with respect to their powers and duties as debtors-in-possession in the continued management and operation of their business and properties;

(b)     advise the Debtors on the conduct of the Chapter 11 case, including all of the legal and administrative requirements of operating in Chapter 11;

(c)     attend meetings and negotiate with representatives of the creditors and other parties in interest;

(d)     prosecute actions on the Debtors' behalf, defend any action commenced against the Debtors and represent the Debtors' interests in negotiations concerning litigation in which the Debtors are involved, including objections to claims filed against the Debtors' estate;

(e)     prepare pleadings in connection with the Chapter 11 case, including motions, applications, answers, orders, reports, and papers necessary or otherwise beneficial to the administration of the Debtors' estate;

(f)     appear before the Court and any appellate courts to represent the interests of the Debtors' estate;

(g)     assist the Debtors in conducting sales of assets and obtaining approval of a disclosure statement and confirmation of a Chapter 11 plan and all documents related thereto; and

(h)     perform all other necessary legal services for the Debtors in connection with the prosecution of this Chapter 11 case, including (i) analyzing the

Debtors' leases and contracts and the assumptions, rejections, or assignments thereof, (ii) analyzing the validity of liens against the Debtors, (iii) advising the Debtors on corporate and litigation matters, and (iv) developing a reorganization strategy.

## PROFESSIONAL COMPENSATION

8.      K&L Gates intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Chapter 11 Cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures and orders of the Court, on an hourly basis.

9.      K&L Gates' hourly rates are set at a level designed to compensate K&L Gates for the work of its professionals and paraprofessionals and to cover fixed and routine overhead expenses.  K&L Gates' hourly rates vary with the experience and seniority of the individuals assigned and are subject to periodic adjustments to reflect economic and other conditions.  The rate structure being used by K&L Gates in the Chapter 11 Cases is consistent with the rate structure predominantly used by K&L Gates for restructuring, workout, bankruptcy, insolvency, and other comparable matters and for similar large and complicated corporate, securities, and litigation matters, whether in court or otherwise.  This rate structure reflects that such particular matters are typically regional or national in scope and involve great complexity, high stakes, and severe time pressures – all of which are present in the Chapter 11 Cases.  This rate structure is similar to the rate structure used by other similar law firms on other similar matters.  Attorney Dale ($665 per hour) and Attorney Mackenzie L. Shea ($420 per hour) will have primary responsibility for providing services to the Debtors.  In addition, and as necessary, other K&L Gates professionals and paraprofessionals will provide services to the Debtors.

10.      It is K&L Gates' policy to charge its clients in all areas of practice for identifiable, non-overhead expenses incurred in connection with the client's case that would not have been incurred except for representation of that particular client. K&L Gates' policy and charges in connection with such items are outlined on the Schedule of Standard Charges, a copy of which is annexed to its Engagement Letter.

11.      To ensure the compliance with all applicable deadlines in the Chapter 11 Cases, from time to time, K&L Gates utilizes the services of overtime secretaries. K&L Gates charges fees for these services (as set forth in the Engagement Letter), which permits K&L Gates to bill the Debtor for overtime secretarial charges that arise out of business necessity. In addition, K&L Gates professionals also may charge their overtime meals and overtime transportation to the Debtor consistent with prepetition practices.

12.      K&L Gates currently charges $0.10 per page for standard duplication in its offices in the United States. K&L Gates charges $0.75 per page for facsimile transmission, plus cost of telephone line usage, but such charges will not exceed $1.00. K&L Gates has negotiated a fixed fee rate for Westlaw computer assisted legal research. Computer assisted legal research is used whenever the researcher determines that using Westlaw is more cost effective than using traditional (non-computer assisted legal research) techniques. K&L will charge the Debtors for their share of the fixed fee percentage, or as required by the Local Rules.

## COMPENSATION RECEIVED BY K&L GATES FROM THE DEBTORS

13.      Consistent with the terms of its Engagement Letter, the Debtors paid K&L Gates an advanced payment retainer as follows (collectively, the "Retainer"): (i) $50,000 on May 23; (ii) $50,000 on May 29; (iii) $50,000 on June 4; (iv) $50,000 on June 11; (v) $50,000 on June 15; (vi) $50,000 on June 22; (vii) $50,000 on June 29; (viii) $250,000 on July 30; and (ix)

$150,000 on August 6. This Retainer constituted an "advanced payment retainer" as defined in In re Prod. Assocs., Ltd., 264 B.R. 180, 184-85 (Bankr. N.D. Ill. 2001) and In re McDonald Bros. Constr., Inc., 114 B.R. 989, 997-99 (Bankr. N.D. Ill. 1990). As such, K&L Gates earned the Retainer upon receipt.

14.     The Retainer secured the payment of fees for legal services to be rendered and expenses to be incurred by K&L Gates prior to the Petition Date and, to the extent of any unused portion of the Retainer, to secure the payment of K&L Gates' fees and expenses to be incurred in the Chapter 11 Cases. As set forth in this Affidavit and the Statement Pursuant to Bankruptcy Code Sections 329 and 504, Bankruptcy Rule 2016, and Local Rule 2016-1 (the "Rule 2016 Statement"), attached hereto as Exhibit B, K&L Gates applied a portion of the Retainer to its prepetition fees and expenses and, subject to Court approval, will hold the unused balance to secure payment of post-petition fees and expenses.

15.     As of the Petition Date, except as otherwise noted in the Dale Affidavit, the Debtors do not owe K&L Gates any amounts for legal services rendered before the Petition Date.

### K&L GATES'S DISINTERESTEDNESS

16.     To the best of the Debtors' knowledge, and as disclosed herein and in the Dale Affidavit: (a) K&L Gates is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code, as required by Section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estate and (b) K&L Gates has no connection to the Debtors, their creditors, or their related parties, except as may be disclosed in the Dale Affidavit.

17.     K&L Gates will periodically review its files during the pendency of the Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any

new relevant facts or relationships are discovered or arise, K&L Gates will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

### SUPPORTING AUTHORITY

18.     Under Section 327(a) of the Bankruptcy Code, a debtor-in-possession "with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor-in-possession] in carrying out [its] duties under this title." 11 U.S.C. § 327(a). Such employment may be based "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

19.     The Debtors believe that K&L Gates is well qualified to represent them in their Chapter 11 Cases in an efficient and timely manner. The Debtors have selected K&L Gates as their bankruptcy counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights, business reorganizations, and liquidations under Chapter 11 of the Bankruptcy Code, its expertise, experience, and knowledge in practicing before this Court, and its ability to respond quickly to emergency hearings and other emergency matters in this Court. K&L Gates' services will enable the Debtors to execute faithfully their duties as debtors-in-possession. K&L Gates has stated its desire and willingness to act in the Chapter 11 Cases and to render the necessary professional services as counsel to the Debtors.

20.     Based on the foregoing, the Debtors submit that they have satisfied the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules to support entry of an order authorizing the Debtors to retain and employ K&L Gates in the Chapter 11 Cases.

## RULE 5002

21.        As set forth in the Dale Affidavit, no partner or associate of K&L Gates is a relative of, or has been so connected with, any judge of the bankruptcy court for this District. Accordingly, the appointment of K&L Gates is not prohibited by Bankruptcy Rule 5002.

## NOTICE

22.        As of this filing, no trustee, examiner, or creditors' committee has been appointed in these Chapter 11 Cases.  The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) each of the Debtors' creditors holding the thirty (30) largest unsecured claims on a consolidated basis; (iii) counsel to the Debtors' prepetition secured lender; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission and (vi) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR REQUEST

23.        No prior request for the relief sought in this Application has been made to this or any other court.

[Signature page to follow.]

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, (i) granting the relief requested herein and (ii) granting such other and further relief as the Court deems just and appropriate.

Dated: August 7, 2012
      Bakersfield, CA

Respectfully submitted on behalf of,

TRI-VALLEY CORPORATION, TRI-VALLEY OIL & GAS CO., SELECT RESOURCES CORPORATION, INC., and TVC OPUS I DRILLING PROGRAM L.P.

Maston N. Cunningham
President, CEO, Interim CFO, and Authorized Representative

# Exhibit 3

# EXHIBIT A
(Dale Affidavit)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, et al.,[1] | Case No. 12-12291 (___) |
| Debtors. | (Joint Administration Pending) |

### AFFIDAVIT OF CHARLES A. DALE III IN SUPPORT OF DEBTORS' APPLICATION TO EMPLOY AND RETAIN K&L GATES, LLP AS GENERAL BANKRUPTCY COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

COMMONWEALTH OF MASSACHUSETTS   )
                                     ) SS:
COUNTY OF SUFFOLK                       )

I, CHARLES A. DALE, III, being first duly sworn to oath, depose and say:

1.     My name is Charles A. Dale III. I am a partner in the law firm of K&L Gates LLP ("K&L Gates")[2], located at State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111. I am admitted, practicing and in good standing in the Commonwealth of Massachusetts, the United States District Court for the District of Massachusetts and the United States Court of Appeals for the First Circuit. There are no disciplinary proceedings pending against me.

2.     I submit this affidavit in support of the *Application of the Debtors to Approve the Employment and Retention of K&L Gates, LLP as General Bankruptcy Counsel For the Debtors and Debtors-in-Possession* (the "Application") of the above-captioned debtors and debtors-in-

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Application.

{944.001-W0022045.}

possession (the "Debtors") for an order approving the employment and retention of K&L Gates as their general bankruptcy counsel in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), in compliance with and to provide disclosure pursuant to Sections 329 and 504 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). Unless otherwise stated in this affidavit, I have personal knowledge of the facts hereinafter set forth. To the extent that any information disclosed herein requires amendment or modification upon K&L Gates' completion of further analysis, or as additional creditor information becomes available to it, a supplemental affidavit will be submitted to the Court.

3.      Subject to approval of this Court and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, K&L Gates intends to apply for compensation for professional services rendered in connection with the Chapter 11 Cases, plus reimbursement of actual, necessary expenses, and other charges incurred by K&L Gates during the case. The principal professionals and paraprofessionals designated to represent the Debtors and their current standard hourly rates are as follows:

| | | |
|---|---|---|
| (a) | Charles A. Dale III | $665 |
| (b) | JoAnn Brighton | $595 |
| (c) | Mackenzie L. Shea | $420 |
| (d) | Joshua Lane | $475 |
| (e) | Nathan P. Lebioda | $300 |
| (f) | Rebecca M. Fallon | $245 |

4.     The hourly rates set forth above are K&L Gates' standard hourly rates for work of this nature.  These rates are set at a level designed to compensate K&L Gates fairly for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  The hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions.  Other attorneys and paralegals within K&L Gates may from time to time serve the Debtors in connection with the matters described herein.

5.     The rate structure being used by K&L Gates in the Chapter 11 Cases is consistent with the rate structure predominantly used by K&L Gates for restructuring, workout, bankruptcy, insolvency, and other comparable matters and for similar large and complicated corporate, securities, and litigation matters, whether in court or otherwise.  This rate structure reflects that such particular matters are typically regional or national in scope and involve great complexity, high stakes, and severe time pressures – all of which are present in the Chapter 11 Cases.  This rate structure is similar to the rate structure used by other similar law firms on other similar matters.

6.     It is K&L Gates' policy to charge its clients in all areas of practice for identifiable, non-overhead expenses incurred in connection with the client's case that would not have been incurred except for representation of that particular client.  K&L Gates' policy and charges in connection with such items are outlined on the Schedule of Standard Charges, a copy of which is annexed to its Engagement Letter.

7.     To ensure the compliance with all applicable deadlines in the Chapter 11 Cases, from time to time, K&L Gates utilizes the services of overtime secretaries.  K&L Gates charges fees for these services (as set forth in its Engagement Letter), which permits K&L Gates to bill the Debtors for overtime secretarial charges that arise out of business necessity.  In addition,

{944.001-W0022045.}

3

K&L Gates professionals also may charge their overtime meals and overtime transportation to the Debtors consistent with prepetition practices.

8.　K&L Gates currently charges $0.10 per page for standard duplication in its offices in the United States. K&L Gates charges $0.75 per page for facsimile transmission, plus cost of telephone line usage, but such charges will not exceed $1.00. K&L Gates has negotiated a fixed fee rate for Westlaw computer assisted legal research. Computer assisted legal research is used whenever the researcher determines that using Westlaw is more cost effective than using traditional (non-computer assisted legal research) techniques. K&L will charge the Debtors for their share of the fixed fee percentage, or as required by the Local Rules.

9.　K&L Gates further states that pursuant to Bankruptcy Rule 2016(b) it has not shared, nor agreed to share (a) any compensation it has received or may receive with another party or person, other than with the partners, associates and contract attorneys associated with K&L Gates or (b) any compensation another person or party has received or may receive.

### COMPENSATION RECEIVED BY K&L GATES FROM THE DEBTORS

10.　Consistent with the terms of its Engagement Letter, Tri-Valley Corporation paid K&L Gates an advanced payment retainer as follows (collectively, the "Retainer"): (i) $50,000 on May 23; (ii) $50,000 on May 29; (iii) $50,000 on June 4; (iv) $50,000 on June 11; (v) $50,000 on June 15; (vi) $50,000 on June 22; (vii) $50,000 on June 29; (viii) $250,000 on July 30; and (ix) $150,000 on August 6. This Retainer constituted an "advanced payment retainer" as defined in In re Prod. Assocs., Ltd., 264 B.R. 180, 184-85 (Bankr. N.D. Ill. 2001) and In re McDonald Bros. Constr., Inc., 114 B.R. 989, 997-99 (Bankr. N.D. Ill. 1990). As such, K&L Gates earned the Retainer upon receipt.

11. The Retainer secured the payment of fees for legal services to be rendered and expenses to be incurred by K&L Gates prior to the Petition Date and, to the extent of any unused portion of the Retainer, to secure the payment of K&L Gates' fees and expenses to be incurred in the Chapter 11 Cases. As set forth in this Affidavit and the Statement Pursuant to Bankruptcy Code Sections 329 and 504, Bankruptcy Rule 2016, and Local Rule 2016-1 (the "Rule 2016 Statement"), attached to the Application as Exhibit B, K&L Gates applied a portion of the Retainer to its prepetition fees and expenses and, subject to further order of the Court, will hold the unused balance to secure payment of post-petition fees and expenses.

## K&L GATES'S DISINTERESTEDNESS

12. K&L Gates and certain of its partners and associates may have in the past represented, may currently represent, and likely in the future will represent parties in interest in the Chapter 11 Cases in connection with matters unrelated (except as otherwise disclosed herein) to the Debtors and the Chapter 11 cases. K&L Gates has searched on its electronic database for its connection to the entities listed on Exhibit 1 annexed hereto. The information listed on Exhibit 1 may have changed without our knowledge and may change during the pendency of the Chapter 11 Cases. Accordingly, K&L Gates will update this Affidavit as necessary when K&L Gates becomes aware of material information.

13. The following is a list of the categories that K&L Gates has searched:

| Exhibit | Category |
|---------|----------|
| 1(a) | Officers & Directors |
| 1(b) | TVC Opus Partners |
| 1(c) | Contractual Counterparties |
| 1(d) | 30 Largest Unsecured Creditors |
| 1(e) | Secured Lender |
| 1(f) | US Trustee's and Publically Listed Employees |

14. Listed on <u>Exhibit 2</u> annexed hereto are the results of K&L Gates' conflicts searches of the above-listed entities. No current or former client listed on <u>Exhibit 2</u> represents more than .5% of K&L Gates' fee receipts for the twelve months ended December 31, 2011.

15. Except as set forth on <u>Exhibit 2</u>, based on the conflicts search conducted to date and described herein, to the best of my knowledge and insofar as I have been able to ascertain, neither K&L Gates nor any of its partners or associates have any connection with the Debtors, their creditors, or any other parties in interest, their respective attorneys and accountants.

16. K&L Gates will periodically review its files during the pendency of the Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, K&L Gates will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## SPECIFIC DISCLOSURES

17. As specifically set forth below and on <u>Exhibit 2</u>, K&L Gates represents certain of the Debtors' unsecured creditors in ongoing matters unrelated to the Debtors and the Chapter 11 Cases. None of the representations described herein are materially adverse to the interests of the Debtors' estates. Moreover, pursuant to Section 327(c) of the Bankruptcy Code, K&L Gates is not disqualified from acting as the Debtors' bankruptcy counsel merely because it represents certain of the Debtors' unsecured creditors in matters unrelated to the Chapter 11 Cases.

18. In addition, as set forth in the Declaration of Maston N. Cunningham in Support of Chapter 11 Petitions and First Day Motions and Applications, Tri-Valley and TVOG are the managing general partner and drilling program manager respectively for the Opus Partnership, a limited partnership formed by Tri-Valley in 2002 to conduct oil and gas exploration. Presently,

Opus' primary asset is its 75% working interest in certain Pleasant Valley Leases. Tri-Valley and TV0G own the remaining 25% working interest.

19.    Opus is comprised of nearly 300 general and limited partners, most of whom are individuals. The Opus Partnership has no employees or operations that are independent of the operations conducted for the Partnership by Tri-Valley and TV0G. As a result, the interests of all Opus partners, including Tri-Valley, are closely aligned.

20.    Since 2011, the Debtors have been engaged in negotiations with the Opus Special Committee, an ad hoc committee of five partners of Opus concerning claims raised by various partners concerning, among other things, Tri-Valley's equity raising practices and their compliance with federal securities laws, and certain costs and expenses charged to the Partnership by Tri-Valley. The parties extensively analyzed each of these claims, diligently negotiated a potential resolution of each, and although no formal agreement was reached before the Petition Date, their discussions produced a consensus on several key points that the Debtors believe will serve as a framework for a Chapter 11 Plan that will garner the support of all parties.

21.    Tri-Valley believes that the Opus Partnership is solvent and that a substantial amount of money can be returned to its partners following a sale of substantially all of its assets. TVC believes, therefore, that each of the Debtors, including Opus, have a common interest in maximizing the value of their assets, which can best be achieved by a coordinated sale of substantially all of their assets. Accordingly, Tri-Valley, in its capacity as managing partner of Opus, believes that it is appropriate for K&L Gates to represent both Tri-Valley and Opus as general bankruptcy counsel in these cases notwithstanding the existence of certain claims by and between those entities. Upon the appointment of an equity committee for Opus, the equity committee will be able to represent any interests of Opus that are adverse to Tri-Valley. This

will ensure that the interests of all parties are adequately represented while also ensuring that these bankruptcy cases proceed as efficiently as possible and in a manner that will maximize value for all parties in interest.

22.  I do not believe that K&L Gates' representation of Tri-Valley and TVOG in connection with the matters raised by the Opus Special Committee renders K&L Gates not disinterested under the Bankruptcy Code.

23.  There are no relationships between K&L Gates and a party in interest in the Chapter 11 Cases that is a current or former client of the firm which represents more than .5% of K&L Gates' fee receipts for the twelve-month period ending on December 31, 2011.

24.  Supplemental conflict checks will be conducted and supplemental disclosures will be made as appropriate.  In light of the foregoing, I believe that I am, and that each member of my firm is, a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code, and neither I nor my firm hold or represent any interest adverse to the Debtors' estates.

25.  I have not agreed to share with any person (except members of my firm) the compensation to be paid for the services rendered in the Chapter 11 Cases.

26.  I believe that the proposed retention of K&L Gates is not prohibited by or improper under Bankruptcy Rule 5002.

27.  I shall amend this statement immediately upon learning that: (a) any of the within representations are incorrect; or (b) there is any change of circumstances relating thereto.

28.  Insofar as I have been able to ascertain, I know of no conflict of interest that would preclude K&L Gates' representation of the Debtors in the Chapter 11 Cases.

29.     To the best of my knowledge, no partner or associate of K&L Gates is a relative of, or has been so connected with, any judge of the bankruptcy court for this district.  Accordingly, I understand that the appointment of K&L Gates is not prohibited by Bankruptcy Rule 5002.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 7, 2012

By: _____

Charles A. Dale III

SWORN TO AND SUBSCRIBED

before me this 7th day of August, 2012

*Helen F. O'Donnell*

Notary Public

My Commission Expires:  8/11/2017

> HELEN F. O'DONNELL
> Notary Public
> COMMONWEALTH OF MASSACHUSETTS
> My Commission Expires
> August 11, 2017

- 10 -

# EXHIBIT 1

## List of Exhibits

| Exhibit | Category |
|---------|----------|
| 1(a) | Officers and Directors |
| 1(b) | TVC Opus Partners |
| 1(c) | Contractual Counterparties |
| 1(d) | 30 Largest Unsecured Creditors |
| 1(e) | Secured Lenders |
| 1(f) | US Trustee's and Publically Listed Employees |

## Exhibit 1(a)

## Officers and Directors

Maston N. Cunningham

Paul W. Bateman

Edward M. Gabriel

Henry Lowenstein

Loren J. Miller

## Exhibit 1(b)

## TVC Opus Partners

John C. & Sandra L. Allen, Ttees
John C. & Sandra L. Allen Ttees
Jacob L.Bateman
Joseph L. Bauer
F. Lynn & Patti L. Blystone
Eugene R. & Gerry A. Borcz
Russell S. Budnick
Marilyn F. Chalmers
Gardner Chalmers
Eugene Chevchek, Brian K. Chevchek &  Mark A. Chevchek
Mildred L. Chiesa, Ttee
Brent Crowder
Jack & Marcia Cutter
Pauline Demetrakopulos
Sandra J. Denny, Ttee
J. Darcy Dill
Peter Eberhard
Norelle Factor
Stephane C. Furrer
Todd A. Garrett
Kauai Hinode One LLC
Kauai Hinode Two LLC
C. Chase Hoffman & Marion N. Hoffman, Ttees
Nienke A. Lels-Hohmann
D. Holmes, T. Holmes,  G. Gaube, Ttees
Terry M. & Sheila M. Holmes, Ttees
Wayne C. & Carla B. Howard
Craig M. Iwami
Suzanne Iwami
T. Roy & Margo M. Iwami, Ttees
Frank L. Jenkins
The Estate of Julie E. Johnson
Don E. King
Steven B. Klayman
Glen Kojima
Albert C. & Frances E. Kutcher
Terry Kuwanoe
Robert H. & Carolyn S. Lacy
Dennis P. Lockhart
D. John & Marilyn D. Loden
Tri-Valley Investment Distribution

Alfred L. Lopez, Jr.
Mehdi Mahdavi
Linda Jo McDonald
Dennis J. & Carol R. Miller
The Estate of Ed Moss
Opus Capital Management, LLC
Nancy H. Rampani
Charles P. Rassel
Mahmood K. & Mamak Motamedi Razavi
John B. Runnels, Ttee
George J. & Grace L. Salmon
Donald V. & Beatrice J. Sanders
Donald V. Sanders
Behrooz Sarafraz
Terrence L. Sehy
William J. Smith & Ann L. Smith
Kila Peterson, Jon Staub & George Bean Ttees
Dagmar Sturm
Baker T. Taniguchi
Hisao Taniguchi
Jackie Y. Taniguchi
Brian C. Terrizzi
Kenneth R. & JoAnn Thomas
Motomu Togioka
The Estate of Dennis W. Vaughan
Thomas M. & Teresa L. Wagner
Mohammad R. & Fariba Zolnasr
Brent Garrett Exempt Trust II, u/a dtd 11/2/01
Joseph L. Bauer
George & Joy Bean
Jürgen Beine
Jeffrey W. Brock
Robert Clutton
Richard M. Crisman
The Launce & George Gamble Investment Partnership
G. Thomas Gamble
Launce E. Gamble
Michael D. Haight
J. Allen Harper, Jr.
Michael J. Harris
Rick Hartbrodt
Jerry L. Hill
Sharon Hill
Jerry L. Jones
Dennis Kaneshiro
Frank E. Kaplan & Marie McMillan

Kauai Hinode Three LLC
Kauai Hinode Four LLC
Jeffery Kiddy
Knoxville Associates LP
Albert C. Kutcher & Frances E. Kutcher, Ttees
Bryan & Gina LeFebure
Greg LoPour
Ann Grace McCoy
Jonathan Poneman
Frederic Poneman
Penny L. & Mark J. Quagliata
The Roy W. Richard Family Limited Partnership
James T. Rybicki
Shawn M. Sehy
Michael A. Tyler & Amy L. Schustack, Ttees
Wells Holdings, Inc.
Michael J. Harris-duplicate record was created in error when Mr. Harris inherited mother's (Julie Johnson's) interest
Linda Lee Bert
Bryan Del Bondio
Central Trust & Investment Company, Ttee
Allied Financial Strategies, Ltd.
Barbara Jo Graves
David A. Irvin & Paula A. Irvin
Janet W. Jarrell
Kauai Hinode 5 LLC
Kauai Hinode 6 LLC
Kauai Hinode 7 LLC
John D. & Flora B. Kubiak
Constantin Müeller
Emily Campbell, Ttee
Steven R. Williams, Ttee
Eppie Lopez
Prince Chahram Pahlavi
Cheryl Price
Belinda Melton
Doug & Janet Stakes
James & Pamela Starr, Ttee.
Catherine W. Stocker, Ttee.
Martina Sturm
Thell T. Torrence
Mark & Karen Walker
Po Chi Wu and Mary Thé-Wu
David L. Doyle, Jr.
Kenneth & Lois Weiss
Edward Bryan and Kehan Li

Kauai Hinode 8 LLC
David Abramowitz
The Estate of Celia Halperin
Brett Joerger & Alka Thakran
Kauai Hinode 9 LLC
Resource Holdings LLC
Amir Banifatemi & Mojdeh Eskandari
Steven Newmark
Charles Walter Seward
David A. Knapp & Barbara Knapp
Stan Cutter
Richard R. McDonald
Kauai Hinode 10 LLC
Thomas Price
Tradenda Capital Ltd.
Kauai Hinode 11 LLC
Ronald B. Stark
Zoe Maria Harber
A. Lawrence Rassel
Josh Klayman
Kauai Hinode 12 LLC
Keith A. & Tracy L. Yelton
Robert A. Gould & Jeanette  Miranda-Gould
Kauai Hinode 14 LLC
Kauai Hinode 15 LLC
Carlos E. Torrebiarte
Alfred A. Ueda
Kazue K. Taniguchi, Ttee
Manfred W. Sturm
Temple of the Divine Mother, Inc.
Behrooz Sarafraz, Ttee
Evan H. Shone
Kauai Hinode 16 LLC
Ingenjorsfirman Sillén & Co. AB
Alexis Meyer
Kauai Hinode 17 LLC
Moti Bagherian
Stephen & Theodora Murphy, Ttees
Edward Han
Dr. Barry Canty
Kauai Hinode 18 LLC
Kathrin Unger
George Robert Miller
Brent Kaneshiro
Tracy Kaneshiro
David Irvin

Kauai Hinode 19 LLC
Carl-Martin Nagel
Markus A. Auer
Richard Weinberg
G. Thomas Gamble, Ttee
David Groblebe, General Partner
David Harnick & Connie Harnick, Ttees
David P. Kniskern
Jon Kniskern
Eugen Wipf
GOL Holdings Limited Partnership
Daniel & Patricia McKenna, Ttees
Christopher J. Hardcastle & Helen L. Thorpe
Shahram Mirhosseini
Dr. Neda Nafei
Kauai Hinode 20 LLC
Alberto & Grace Evangelista
Dr. Craig Haruki DDS Inc. 401(k) PSP
Gina Kemsley
Kauai Hinode 21 LLC
Donald E. Butterfield
Daniel & Sondra Harding
Dr. Craig Haruki DDS Inc. 401(k) PSP
Kauai Hinode 22 LLC
Polycomp Trust Co. Cust. FBO Sara Byrnes IRA #042817
The Finberg Trust of 1995 dtd 4/4/95
John Kucera
Judy S. Merlini
Douglas DeSalvo
Dr. Angelo Cuzalina
Roger L. Finberg
Kauai Hinode 23 LLC
Jeff S. Pierce Trust
Black Pond LLC
Ruth Ann Rassel
Royal C. Lillge
Robert L. Wallace
Christian Wipf
Kauai Hinode 24 LLC
Claudia Kott
Clifford F. McGuire, Ttee
Kauai Hinode 25 LLC
Thomas G. Armstrong, Ttee
Stuart McLeod & Megaly Masci
Abbas Mash
John Royce Meyerott & Lee Bryant

Kauai Hinode 26 LLC
3 Valley Venture LLC
Robert & Nora Yudin
Ada Yong-Ching Hung
Philip Eisenberg
Martin & Triecia Dolan
Paul J. Stokes & Lynn J. Sakasegawa
Navaswan Energy Partners 2007 LP
Richard Colt
Fielding Lewis Cocke
Karen J. Quinn & Vladimir K. Kovalik
Tahir T. Eke
Lyndon L. Liebelt
Kauai Hinode 27 LLC
Gabriela Norris Blocker
David R. Holbrooke
Robert Weiss
Joseph J. Monaghan
John Gray
Kauai Hinode 28 LLC
Peter Marguglio, Ttee
William W. Wheeler
Polycomp Trust Company Custodian FBO Darrell L. Anderson IRA #5025
James D. Eyerman
Kauai Hinode 29 LLC
Brent Garrett
Polycomp Trust Co. Cust. FBO Terrance Lee Sehy Roth IRA #044057R
Dayle Dunn
Janie Tapia
William F. Draper Jr.
Paul Butler
George R. & Lucy N. Barabe
Robert J. Gallagher
Ashley K. Hill & Todd Wright
Dr. Jean-Guy Daigneault
Cyrus T. Johnston & Mary F. Johnston
Peter T. Beach
Suzanne Eisenhut
Janice Lynn Callon
Dr. Steven Siegal
Mary M. Luttrell
Richard Armstrong
David Armstrong
Kauai Hinode 30 LLC
David Renn, Ttee
Paul D. Hacker

Klaus Kott
Kimya Sagarchi
Opihi LLC
John D. Warbritton III & Martha L. Warbritton
Nicholas P. Curran
Dr. Johannes Hansjoerg Beha
James Fagan, Jr. & Barbara L. Fagan
Robert C. Lang & Melissa M. Lang
Dr. Lawrence J. Barcelo
Kenneth M. Hardin & Carol M. Hardin
Michael D. Miller
Margaret Jean Reveler
David & Valli Carter
Eugene D. Mundahl
Sterling Trust Company, Cust FBO James B. Wiliams IRA
Dr. Craig R. Haruki, Ttee
Margrit Muggler
Tomas & Diane C'de Baca
Arthur Veyna & Michelle Veyna, Co-Ttees
P. Romero-Beltran MD, Ttee
Kourosh Ghadishah
Myron D. Tiede & Candace Tiede
Robert J. Anglin & Peggy L. Hackney, Ttees
Ian Rassel
Drs. Peter & Denise Walinsky
Zahra Mansouri
Richard & Susan Lieberman
Elizabeth Rassel
Jay Coates
David R. Neff & Elizabeth L. Holmes
Robert A. Ginno
Momentum Services, LLC
Laura J. Vaughan Meier
Kenneth W. Vaughan
Christine E. Vaughan
Tobias Auer
Nicolas Auer
George F. Gamble, Ttee
Douglas DeSalvo
Gordon Kuwanoe
Larry Halperin
Debra Poneman

## Exhibit 1(c)

### Contractual Counterparties[1]

William E. Lenox
William E. Lenox 2002 Revocable Trust, William E. Lenox, Trustee
J. Thomas Hunsucker, Trustee of The Thomas O. Hunsucker Family Trust
Anne Snodgrass
Meridian Property Company
Wells Fargo Financial Leasing, Inc.
Alma Investment Company
Andrew B. Theisen
Brea Properties, Inc.
Ca W. & S.C. Grogg, Trustees
Dewey Family Tr Dtd 10/13/93
Donald J. May, Sr.
Donna R. Tarrence
E.M. Tilbury Fam Tr Dtd8/30/90
Edna Sproul Trust #809753295
Ernestine M. Williams Trust
Estate of Thomas J. Weber, Dec
Fairbanks District Recorder
Fairbanks District Recorder
Fighting Dragon Tr Dtd 5/8/02
Gail Barruga
Geraldine C. Forrester
Glen R. Heath
Gold Range Ltd
Greutert (R.H.&P.K.) 7/11/86
Hansen Brucker Hansen
Harlan Tr Dtd 1/17/96, Subtr B
Harland Family Tr Dtd 6/10/05
Irene M. Floto Livtrdtd2/16/90
John B. Monroe
Kenneth M. Cannon
Lenore Cathryn Williams
Marantha Wong
Margaret J. Walter
Norman J. Martins
Pleasant Valley Ranch Llc
Samara Monroe
Sherry Lawhon
State Lands Commission (Long Beach, Ca)
State Lands Commission (Sacramento, Ca)

---

[1] This information will be supplemented as we become aware of additional counterparties.

State Of Alaska (Div. Of Mining, Land & Water)
Summit Ventures, Inc.
T.J. & G.A. Grogg, Co-Trustees
Webster Family 1998 Trust
Wm E Lenox 2002 Revoc Trust

## Exhibit 1(d)

### 30 Largest Unsecured Creditors

Advanced Combustion and Process Controls
Anterra Energy Services, Inc.
Broadridge
Brown Armstrong Accountancy
Driltek
EVC Group Inc.
First Insurance Funding Corp. of California
Gary D. Borgna and Julie R. Borgna
Geoguidance Drilling Service, Inc.
Geokinetics USA, Inc.
Gerald T. Raydon
IFPS Corporation
JD Rush Company
Luna & Glushon
Myers, Widders Gibson, Jones,
NYSE Market Inc
Oil Well Service Co.
Pacific Petroleum Ca Inc
Patriot Enviromental Svcs Inc
Paul Graham Drilling Inc.
Petrawest LTD
Rabobank Visa Card
Rain For Rent-Santa Paula
Randy's Trucking, Inc.
RR Donnelley
Rutan & Tucker LLP
Sespe Consulting Inc
Tiger Cased Hole Service, Inc.
Wayne Long & Co CPA
Wishing Well Petroleum LTD

**Exhibit 1(e)**

**Secured Lender**

George T. Gamble

George T. Gamble 1991 Trust

## Exhibit 1(f)

## US Trustee's and Publically Listed Employees

Roberta A. DeAngelis
Joanne E. Clausen
Kam Salisbury
Dianne P. Dugan, Administrative Officer
Linda P. Logan, Regional Bankruptcy Analyst
Frederic J. Baker, Assistant U.S. Trustee
Dave P. Adams, Trial Attorney
Jeffrey M. Bookman, Bankruptcy Analyst
Maria Nicole Borgesi, Paralegal Specialist
Kevin P. Callahan,Trial Attorney
George M. Conway, Trial Attorney
Lisa L. Costa, File Clerk
Sandra J. Forbes, Bankruptcy Analyst
James B. Lambe, Paralegal Specialist
Janet C. Lewis,Bankruptcy Analyst
Nancy Miller,  Legal Clerk
Jo Ann Recchiuti, Paralegal Specialist
Deborah Roseboro, Legal Data Technician
Hugh J. Ward, Bankruptcy Analyst
Anne K. Fiorenza, Assistant U.S. Trustee
Darrel W. Bender, Senior Bankruptcy Analyst
James P. Farley, Bankruptcy Analyst
Brenda D. Gish   Paralegal Specialist
Gregory R. LyonsTrial Attorney
Wendy Paul, Paralegal Specialist
Rebecca Plesic, Paralegal Specialist
Gregory B. Schiller, Trial Attorney
Kimberly Sutton, Secretary
Joseph S. Sisca, Assistant U.S. Trustee
Steven Albright, Bankruptcy Analyst
David Berry, Bankruptcy Analyst
Andrew F. Cetnarowski, Bankruptcy Analyst
Joseph M. Fornari Jr, Trial Attorney
Lisa Geyer, Paralegal Specialist
Madeline Gigliotti, Legal Clerk (OA)
Norma L. Hildenbrand
David Milko, Paralegal Specialist
Linda Morris, Legal Clerk
Kathleen Nichols, Paralegal Specialist
Kathleen L. Robb, Trial Attorney
Cherilynn M. Schwartzmier, Secretary
Sharon Sirko, Legal Clerk (OA)
Jennifer M. Smith, Bankruptcy Analyst

Heather Sprague, Trial Attorney
Martha Hildebrandt, Assistant U. S. Trustee
Michael W. Aponte, Paralegal Specialist
Kirsten K. Ardelean, Bankruptcy Analyst
Francyne D. Arendas, Bankruptcy Analyst
Michael Artis,Trial Attorney
Peter J. D'Auria, Trial Attorney
Rosemarie Giles, Legal Clerk
Tia Green, Legal Clerk
Mitchell B. Hausman, Trial Attorney
Shining J. Hsu, Trial Attorney
Joseph C. Kern, Bankruptcy Analyst
Daniel C. Kropiewnicki,Bankruptcy Analyst
Donald F. MacMaster, Trial Attorney
Ivette Morales,Secretary,
Brenda J. Naughton, Paralegal Specialist
Tina L. Oppelt, Paralegal Specialist
Carmina Rosa, Legal Data Technician
Robert J. Schneider, Jr., Trial Attorney
Jessica Snyder, Paralegal Specialist
Jeffrey Sponder, Trial Attorney
Fran B. Steele, Trial Attorney
James Stives, Paralegal Specialist
Maria Suppa, Paralegal Specialist
William J. Ziemer, Bankruptcy Analyst
T. Patrick Tinker, Assistant U.S. Trustee
David Buchbinder, Trial Attorney
Shakima L. Dortch, Paralegal Specialist
Diane Giordano, Bankruptcy Analyst
Christine Green, Paralegal Specialist
Benjamin Hackman, Trial Attorney
Jeffrey Heck, Bankruptcy Analyst
Mark Kenney, Trial Attorney
David Klauder, Trial Attorney
Jane Leamy, Trial Attorney
Tony Murray, Legal Clerk
James R. O'Malley, Bankruptcy Analys
Lauren O'Neal, Assistant
Michael Panacio, Bankruptcy Analyst
Tiiara Patton, Trial Attorney
Juliet Sarkessian, Trial Attorne
Richard Schepacarter,Trial Attorney
Ramona Vinson, Paralegal Specialist
Michael West, Bankruptcy Analyst
Dion Wynn, Paralegal Specialist

Judges include:
Judge Kevin Gross, Chief Judge
Judge Judith K. Fitzgerald
Judge Kevin J. Carey
Judge Brendan L. Shannon
Judge Christopher S. Sontchi
Judge Mary F. Walrath
Judge Peter J. Walsh

**EXHIBIT 2**

| Name of Entity Searched/Relationship to Debtors | Name of Entity and/or Affiliate of Entity, that is a K&L Gates Client | Client Status | Nature of Representation |
|---|---|---|---|
| TVC Opus I Drilling Program L.P<br><br>(Joint Debtor) | Tri-Valley Corporation | | Limited Partnership negotiation and acquisition of lease and SEC issues |
| Broadridge<br><br>(30 Largest Unsecured Creditors) | NewRiver, Inc., f/k/a InUnity Corporation<br><br>(Broadridge Financial Solutions, Inc. is controlling party) | active | Representation in matters unrelated to the Debtors |
| RR Donnelly<br><br>(30 Largest Unsecured Creditors) | RFID Consortium<br><br>(R R Donnelly & Sons Company is parent) | active | Representation in matters unrelated to the Debtors |
| Pacific Petroleum CA, Inc.<br><br>(30 Largest Unsecured Creditors) | Pacific Petroleum and Supply, Inc. | active | Representation in matters unrelated to the Debtors |
| Rabobank Visa Card<br><br>(30 Largest Unsecured Creditors) | FGH Bank N.V., Natixis Zweigniederlassung Deutschland and Credit Foncier de France, S.A.<br><br>(Rabobank Group is parent)<br>Bank Sarasin & Co Ltd.<br><br>(Rabobank Group is parent)<br>Rabo AgriFinance, Inc.<br><br>(Rabobank International Holding B.V. is immediate parent and Rabobank Group is ultimate parent) | active | Representation in matters unrelated to the Debtors |
| State of Alaska (Div. of Mining, Land & Water)<br><br>(Lease Owner) | State of Alaska, Department of Law<br><br>and<br><br>State of Alaska | active | Representation in matters unrelated to the Debtors |
| Wells Fargo Financial Leasing, Inc. | Wells Fargo | active | Representation in matters unrelated to the Debtors |

# Exhibit 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |

Hrg. Date for Bidding Procedures: August 30, 2012 at 12:30 p.m. (ET)
Obj. to Bidding Procedures Due: August 23, 2012 at 4:00 p.m. (ET)
Hrg. Date for Sale Approval: October 18, 2012
(Proposed)
Obj. to Sale Approval Due: October 11, 2012 at 12:00 noon (ET)
(Proposed)

## MOTION BY DEBTORS AND DEBTORS IN POSSESSION FOR ORDERS (A)(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS BY PUBLIC AUCTION; (II) SCHEDULING A HEARING TO CONSIDER THE SALE OF ASSETS; AND (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (B)(I) AUTHORIZING AND APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF POTENTIAL DESIGNATED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Tri-Valley Corporation ("TVC"), on behalf of itself and its affiliated debtors and debtors-in-possession, Tri-Valley Oil & Gas Co. ("Tri-Valley Oil"), Select Resources Corporation, Inc. ("Select Resources"), and TVC Opus I Drilling Program L.P. ("Opus," and collectively with TVC, Tri-Valley Oil, and Select Resources, the "Debtors"), hereby submits this motion (the "Motion") requesting entry of an order pursuant to sections 105, 363, 365, 503 and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

"Bankruptcy Rules") and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (a)(i) approving bidding procedures in connection with the sale of substantially all of their assets by public auction; (ii) scheduling a hearing to consider the sale of assets; and (iii) approving the form and manner of notice thereof; (b)(i) authorizing and approving the sale of assets free and clear of liens, claims, encumbrances and interests, and (ii) approving the assumption and assignment of designated executory contracts and unexpired leases; and (c) granting related relief.  In further support of this Motion, the Debtors aver as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On August 7, 2012, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases, although the Office of the U.S. Trustee has scheduled a meeting for August 20, 2012 to solicit interest in such a statutory committee.

6.     A detailed description of the Debtors' business and the reasons for filing these Chapter 11 Cases is set forth in the Declaration of Maston N. Cunningham in Support of Chapter 11 Petitions and First Day Motions and Applications (the "Cunningham Declaration"), which is incorporated herein by reference.[2]

## THE PROPOSED SALE OF THE ASSETS

7.     As described in the Cunningham Declaration, the Debtors commenced these Chapter 11 Cases to conduct a prompt sale of all or substantially all of their assets (the "Assets") with the goal of maximizing value for all stakeholders.  As discussed below, consummation of a sale transaction by November 7, 2012 is in the best interests of all of the Debtors' estates and is a condition of the Debtors' DIP Facility (as defined below).   The cash flow issues facing the Debtors' continued operation of their businesses (as set forth in additional detail below and in the Cunningham Declaration) necessitate the completion of a sale of the Debtors' Assets as expeditiously as possible.

**A.     The Debtors' Assets**

8.     TVC currently conducts its operations through two wholly-owned subsidiaries, Tri-Valley Oil and Select Resources.  Tri-Valley Oil operates the Debtors' crude oil and natural gas business and engages in the exploration, development, and production of these hydrocarbon resources in California.   Select Resources is engaged in the early stage exploration of precious metals and operates the Debtors' minerals business in Alaska.

9.     The Debtors have operations in two oil fields in California with approximately 1,025 total gross acres and 21 wells capable of production under their control representing

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Cunningham Declaration.

approximately 22.4 million barrels of proved,[3] probable,[4] and possible[5] reserves. TVC, through its wholly owned subsidiary Tri-Valley Oil, has a 25% working interest (and management and operational control over) certain leases comprising one super heavy oil project known as "Pleasant Valley." TVC also owns a 100% working interest in a lease related to a property known as "Claflin," which is part of the Company's project in and around the Edison Oil Field. In addition to these assets, the Debtors hold gas lease interests in approximately 1,300 gross acres in California with four natural gas wells in operation. Through its wholly owned subsidiary, Select Resources, TVC owns mineral rights interests in two blocks of land totaling approximately 77,800 gross acres in Alaska.

10.     The Debtors' oil and gas businesses are operated by Tri-Valley Oil and consist primarily of exploring and drilling for, as well as producing and selling, crude oil and natural gas. The producing oil and natural gas properties are located in California, primarily the Pleasant Valley property located in the Oxnard Oil Field near Oxnard, California (hereinafter, "Pleasant Valley") and at various properties located in or around the Edison Oil Field near Bakersfield, California (hereinafter, "Edison Project"). In addition, Tri-Valley Oil has interests

---

[3] "Proved" reserves are those quantities of crude oil and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and governmental regulations, prior to the time at which contracts providing the right to operate expire. "Proved Developed" reserves are proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well. "Proved Undeveloped" reserves are proved reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

[4] "Probable" reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered. Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the reasonable certainty criterion.

[5] "Possible" reserves are those additional reserves that are less certain to be recovered than probable reserves. Possible reserves may be assigned to areas of a reservoir adjacent to probable reserves where data control and interpretations of available data are progressively less certain. Frequently, this will be in areas where geoscience and engineering data are unable to define clearly the area and vertical limits of commercial production from the reservoir by a defined project.

in two natural gas fields in the Sacramento Delta Region of Northern California and in one natural gas field located in Madera County in Central California. While they also own certain minerals assets in Alaska, the Debtors derive most of their revenue from the production and sale of crude oil and (to a much lesser extent) natural gas.

**B.     The Need to Sell the Assets**

11.     By the end of 2011, the Debtors' ability to continue as a going concern had become dependent, in large part, on obtaining one or more substantial infusions of financing for working capital and project-level expenses. Without such additional funding, the Debtors were unable to undertake the testing, development, and drilling necessary for their oil, gas, and mineral assets to produce the cash flow necessary to sustain their operations.

12.     Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or some portion of the Debtors' Assets, the issuance of new debt or equity capital infusions, and the reorganization of the Debtors' operations. Given severe time and capital constraints, however, it was apparent that prospects for raising new debt or equity and/or to restructure the business were unlikely.

13.     More specifically, on June 1, 2012, the Debtors engaged FTI Consulting, Inc. ("FTI") to review the Debtors' cash flows and liquidity position and to assist it with its internal evaluation of strategic alternatives and objectives. During the month of June 2012, the Debtors worked with FTI to evaluate such issues.

14.     In June and early July, the Debtors, representatives of the Gamble Trust (the prepetition secured lender) and the Opus Special Committee (an ad hoc committee comprised of five Opus partners) met to discuss potential solutions to the Debtors' pressing need for capital and the strategic alternatives available under present circumstances. After further consultation

with the Debtors' major stakeholders, including the Gamble Trust, the Opus Special Committee and their respective advisors, and an examination of the Debtors' current operating cash flow issues and critical need for additional financing, the Debtors determined that the best (and perhaps the only feasible) way to maximize the value of their assets was to commence these Chapter 11 cases and proceed with a sale of the Debtors' assets, including the Pleasant Valley and Edison Project Leases in a competitive sale process under Section 363 of the Bankruptcy Code.

15.     To that end, TVC's prepetition secured lender agreed to provide a postpetition debtor-in-possession financing facility (the "DIP Facility" and the lender thereunder, the "DIP Lender") to allow the Debtors to pursue a sale of their Assets over the course of the next 90 days. By an order entered on August 9, 2012 (Docket No. 29) (the "Interim DIP Order"), the Court granted interim approval of the DIP Facility and scheduled a hearing for August 30, 2012 at 12:30 p.m., prevailing Eastern time, to consider final approval of the DIP Facility.

16.     The Interim DIP Order establishes, among other things, several milestones for the Debtors' sale process, including requirements that the Debtors: (a)(i) file this Motion and (ii) apply for the retention of a financial advisor to, among other things, facilitate the Asset sale and auction process by August 13, 2012, (b) obtain approval of the Bidding Procedures by September 7, 2012, (c) conduct the Auction (as defined below) by no later than October 22, 2012, (e) seek to have the Sale Hearing occur and the Sale Order(s) entered by no later than October 27, 2012 and (f) consummate any sale(s) of the Assets by no later than November 7, 2012.

17.     The Debtors believe that conducting a sale process according to this timeline will produce a fair and robust auction and will provide these estates with the best opportunity to

maximize the value of their Assets. At the same time, the Debtors will continue to evaluate any other strategic alternatives that may be identified.

## C.    The Debtors' Marketing Efforts Thus Far

18.    Prior to the Petition Date, the Debtors engaged FTI to assist the Debtors with various tasks, including marketing their Assets for sale. FTI has worked closely with the Debtors' management to analyze their current financial position and business operations and to prepare diligence materials and populate a digital data room for prospective purchasers interested in the Debtors' Assets.

19.    In furtherance of these efforts, FTI has identified and contacted prospective purchasers, solicited their interest, executed confidentiality agreements, and circulated diligence materials. To date, FTI has contacted approximately 75 potential buyers, of which no fewer than 50 conduct business in or related to the Debtors' industry and were pre-screened to have an specific interest in the oil and gas business in California (which is the segment of the Debtors' business that generates substantially all of its revenues). As part of this process, FTI has sent "teasers" summarizing the Debtors' Assets and confidentiality and nondisclosure agreements to potential buyers. FTI is in the process of finalizing a digital data room and other means of facilitating potential buyers' due diligence.

20.    Despite these pre-and-post petition efforts, as of the date hereof, the Debtors have not identified an initial or "stalking horse" bidder for their Assets. The Debtors, nevertheless, are confident that they will secure the interest of several potential buyers before the proposed auction date approximately 75 days from now. Accordingly, the Debtors have filed this Motion while the marketing process continues. in compliance with the DIP Facility and the Interim DIP Order,

to ensure that the Asset sale process can be completed expeditiously and maximum value can be achieved for the Debtors' stakeholders.

## **SUMMARY OF RELIEF REQUESTED**

21.    The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014 and Local Bankruptcy Rule 6004-1, the Court's approval of: (a) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Assets (collectively, the "Bidding Procedures," attached as Annex 1 to the Bidding Procedures Order (as defined below)); (b) the sale of the Assets free and clear of Claims (as defined below) to the Prevailing Bidder (as defined in the Bidding Procedures); and (c) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder.

22.    More specifically, through this Motion, the Debtors request that the Court enter two orders:

23.    First, at a hearing (the "Bidding Procedures Hearing") to be held on or about August 30 2012, subject to the Court's calendar, the Debtors request entry of an order in substantially the form attached hereto (the "Bidding Procedures Order"), which, among other things:

        (a)    schedules a hearing (the "Sale Hearing") on or about October 18, 2012, subject to the Court's calendar (or as soon as the Court is available) to consider approval of the sale of the Assets to the Prevailing Bidder (if any);

        (b)    authorizes and approves (i) the Debtors' proposed procedures for the submission and consideration of bids for the Assets (the "Bidding Procedures"), as set forth in Annex 1 attached to the proposed Bidding Procedures Order and incorporated herein in its entirety by reference; and (ii) the form and manner of notice of these matters, including (A) notice of the Sale Hearing in the form attached as Annex 2 to the proposed Bidding Procedures Order (the "Sale Notice") to be served on parties in interest, and (B) a one-time publication version of the Sale Notice (modified as necessary or appropriate for publication); and

(c)     authorizes and approves (i) the Debtors' proposed procedures for (A) the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder in connection with a proposed Asset acquisition transaction, and (B) curing defaults under these executory contracts and unexpired leases; and (ii) notice of the assumption and assignment of such executory contracts and unexpired leases and the proposed amounts necessary to cure defaults related thereto (the "Cure Costs") in the form attached as Annex 3 to the proposed Bidding Procedures Order (the "Assignment Notice").

24.     Second, upon conclusion of the Sale Hearing, the Debtors request the entry of an order (the "Sale Order"), authorizing (a) the sale of the Assets free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Assets to the Prevailing Bidder or to be excused from accepting performance by the Prevailing Bidder or performing for the benefit of the Prevailing Bidder under any executory contracts or unexpired leases assumed and assigned to the Prevailing Bidder and all rights at law or in equity (collectively, "Claims") other than any Claims expressly assumed by the Prevailing Bidder; and (b) the assumption and assignment of certain executory contracts and unexpired leases intended to be acquired by the Prevailing Bidder as part of any Asset acquisition transaction.

## PROPOSED NOTICE, BIDDING AND OTHER PROCEDURES

**A.     Notice Procedures**

25.     The Debtors request approval of the following notice procedures:

(a)     Date, Time and Place of the Sale Hearing.  The Debtors propose that the Sale Hearing be held before the Honorable Mary F. Walrath in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware  19801, on or about October 18, 2012 (prevailing Eastern time)

subject to the Court's calendar, or such other date and time that the Court may direct. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

(b)     Sale Notice.   Within five (5) business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), the Debtors will serve the Sale Notice by first-class mail, postage prepaid upon: (i) counsel to the DIP Lender; (ii) counsel to any official committees appointed in these Chapter 11 Cases; (iii) any party that expressed in writing to the Debtors or FTI an interest in acquiring the Assets or that FTI or the Debtors previously contacted or identified as potentially having an interest in acquiring the Assets; (iv) non-Debtor counterparties to all Potential Designated Contracts (as defined below); (v) all parties who are known to assert liens upon the Assets; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and applicable state and local taxing authorities; (viii) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities; (ix) the U.S. Trustee; (x) the Federal Trade Commission; (xi) the United States Attorney General/Antitrust Division of Department of Justice; (xii) the U.S. Environmental Protection Agency and similar state agencies; (xiii) the United States Attorney's Office; and (xiv) all entities that have requested notice in these Chapter 11 Cases under Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(c)     Publication Notice.  On the Mailing Deadline, or as soon as practicable thereafter, the Debtors will (i) cause the Sale Notice (modified as necessary or appropriate for publication) to be published one time in the national edition of *The Wall Street Journal*.  On the Mailing Deadline, or as soon as practicable thereafter, the Debtors shall cause the Sale Notice to be published on the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, at http://dm.epiq11.com/TVA (the "Case Website").

(d)     Deadline for Objection to Relief Sought in the Motion.   The Debtors propose that, to be timely and otherwise eligible for consideration by the Court, objections to the approval of the sale of Assets to the Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Potential Designated Contracts (as defined below) or to any proposed Cure Costs including, but not limited to, the sale of the Assets free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code for all parties in interest must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court and served so as to be received by the following parties (collectively, the "Objection Notice Parties") by no later than 4:00 p.m. (ET) on the date that is seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline"):  (i) counsel to the Debtors, K&L Gates LLP, 1900 Main Street, Suite 600, Irvine, California 92614-7319 (Attn: Joshua Lane, Esq.); K&L Gates LLP, State Street Financial Center, One Lincoln Street, Boston, Massachusetts  02111 (Attn:  Chad Dale, Esq. and Mackenzie Shea, Esq.); and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware  19801 (Attn:  Adam G. Landis, Esq. and Kerri K. Mumford, Esq.); (ii) counsel to the DIP Lender, Ferry, Joseph & Pearce, P.A., 824 Market St., Suite

1000, P.O. Box 1351, Wilmington, Delaware  19899 (Attn: Rick S. Miller, Esq.); and Pillsbury Winthrop Shaw Pittman LLP, 1540 Broadway, New York, New York  10036-4039 (Attn: Andrew M. Troop, Esq. and David S. Forsh, Esq.); (iii) counsel to any official committees appointed in these Chapter 11 Cases; and (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Tiiara Patton, Esq.).

    (e) <u>Information Provided to Interested Parties</u>.  The Sale Notice provides that any party that wishes to obtain a copy of this Motion and the Bidding Procedures Order, including all exhibits thereto, may make such a request by (a) sending a written request to (i) counsel to the Debtors, K&L Gates LLP, 1900 Main Street, Suite 600, Irvine, California  92614-7319, Attn: Joshua Lane, Esq. (e-mail: josh.lane@klgates.com) and K&L Gates LLP, State Street Financial Center, One Lincoln Street, Boston, Massachusetts  02111, Attn: Chad Dale, Esq. and Mackenzie Shea, Esq. (e-mail: chad.dale@klgates.com and mackenzie.shea@klgates.com) and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware 19801, Attn: Adam G. Landis, Esq. and Kerri K. Mumford, Esq. (e-mail: landis@lrclaw.com and mumford@lrclaw.com); and (ii) financial advisor to the Debtors, FTI Consulting, Inc., 2001 Ross Avenue, Suite 400, Dallas, Texas  75201, Attn: Albert Conly (e-mail: albert.conly@fticonsulting.com) and FTI Consulting, Inc., 200 State Street, Second Floor, Boston, Massachusetts  02109, Attn: Michael Nowlan (e-mail: mike.nowlan@fticonsulting.com) or (b) accessing the Case Website.  All parties that have expressed, or may express, an interest in purchasing the Assets or who the Debtors believe may have an interest in purchasing the Assets, may obtain access to certain due diligence materials, subject to satisfying the conditions required to become a Qualified Bidder set forth in the Bidding Procedures.

**B.** **Proposed Bidding Procedures**

  26. The Debtors believe the proposed Bidding Procedures will maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other interested parties.  The Bidding Procedures contemplate an auction process pursuant to which bids for the Assets will be subject to higher or otherwise better offers.  The Bidding Procedures primarily benefit the Debtors by creating a bidding process that ensures, among other things: (a) structure and logistical certainty to the process; (b)  the Debtors' ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a purchase of the Assets; and (d) meaningful bidding increments.

27.     The Bidding Procedures are set forth in detail in <u>Annex 1</u> to the Bidding

Procedures Order.  The Bidding Procedures describe, among other things, the requirements for

prospective purchasers to participate in the bidding process, the availability and conduct of due

diligence by prospective bidders, the deadline and requirements for submitting a bid, the method

and criteria for bids to become "qualified," the manner in which qualified bids will be

negotiated, clarified and improved, and the criteria for selecting the Prevailing Bidder, including

if necessary, through a public auction.

28.     As described below and more fully in the Bidding Procedures, only Qualified

Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.

Specifically, the Bidding Procedures provide, in relevant part, as follows:[6]

*Participation Requirements and Due Diligence*
          (a)     In order to participate in the bidding process, the Auction, or
otherwise be considered for any purpose hereunder, a person interested in purchasing the
Assets (a "<u>Potential Bidder</u>") must first deliver the following materials to the Debtors and
their counsel:

               (i)     An executed confidentiality agreement in form and
substance satisfactory to the Debtors and their counsel (the "<u>Confidentiality
Agreement</u>").  Without limiting the foregoing sentence, the Confidentiality Agreement
will provide that all non-public information about the Debtors received by a Potential
Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept
strictly confidential and used only in connection with analyzing a transaction for the
Assets.  The Confidentiality Agreement also will provide that the Debtors and their
advisors and the DIP Lender and its advisors will have access to information provided
about a Potential Bidder by the Potential Bidder and that any confidential information
received from a Potential Bidder will be used only in connection with analyzing whether
the Potential Bidder will be qualified as a Qualified Bidder and a potential transaction for
the Assets.

               (ii)    Written evidence that enables the Debtors and their
advisors to determine, in their sole discretion, in consultation with the DIP Lender,
whether the Potential Bidder has the financial and other ability to close the contemplated

---

[6]     Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding
Procedures.  To the extent that the bidding provisions set forth below differ in any way from the terms set forth in
the Bidding Procedures, the terms of the Bidding Procedures shall control.

sale transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

           (iii)     The financial advisors to the Debtors, FTI, shall provide these Bidding Procedures, together with a copy of a form Asset Purchase Agreement (the "APA"), to each Potential Bidder. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of this Bankruptcy Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

           (b)     Any Potential Bidder wishing to conduct due diligence concerning a prospective acquisition transaction of the Assets shall be granted access to all relevant information regarding the Assets and the related business of each of the Debtors reasonably necessary to enable a Potential Bidder to evaluate the Assets and the prospective transaction. The Debtors shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact FTI Consulting, Inc., Attn: Albert Conly and Mike Nowlan, (e-mail: albert.conly@fticonsulting.com and mike.nowlan@fticonsulting.com). Notwithstanding the foregoing, FTI is not required to provide confidential or proprietary information to any person if the Debtors, in consultation with the DIP Lender, believe that such disclosure would be detrimental to the interests of the Debtors' estates. All due diligence must be completed before the Bid Deadline (as defined below). No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline. Potential Bidders are required to exercise their own discretion before relying on any information regarding the Assets provided by the Debtors. Neither the Debtors nor their representatives (nor the DIP Lender or its representatives) are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

           (c)     FTI shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Bidding Procedures.

*Submission of Bids*

           (d)     Any Potential Bidder interested in purchasing the Assets must submit a Bid prior to 4:00 p.m. prevailing Eastern time on the date that is seven (7) days prior to the Auction (the "Bid Deadline"). The Debtors may extend the Bid Deadline, and shall promptly notify all Potential Bidders of any such extension. In order for such Bid to be considered, however, it must be a "Qualified Bid." The Debtors and FTI will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtors and FTI, in their sole discretion, in consultation with counsel to the DIP Lender and any official committee appointed in these Chapter 11 Cases, determine that such Potential Bidder submitted either a Qualified Aggregate Bid or a Qualified Partial Bid.

(e)     A Bid will be considered a "Qualified Aggregate Bid" only if the Bid is for the sale of all or substantially all of the Assets and fulfills the following requirements prior to the Bid Deadline (capitalized terms used in this section are defined later in the Bidding Procedures):

(i)     Provides that the Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the sale of the Assets pursuant to the Sale Order; or (Z) such date as the Debtors affirm in writing that they do not intend to pursue a sale transaction (the "Bid Expiration Date");

(ii)     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(iii)     Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtors in their sole discretion, in consultation with the DIP Lender;

(iv)     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the APA, or a representation that no such authorization or approval is required;

(v)     Provides that the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtors, in consultation with the DIP Lender;

(vi)     Provides by wire transfer or immediately available funds to the Debtors or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value of such Bid, (the "Deposit");

(vii)     Provides evidence satisfactory to the Debtors that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Assets;

(viii)     Is submitted in a writing in the form of the APA with any proposed changes to the APA set forth in an electronic form both clean and marked to reflect such changes signed by the Qualified Bidder, that:

(1)     Identifies the Qualified Bidder and any members of its investor group, if applicable;

(2)     Is not subject to conditions, representations or terms that the Debtors determine, in consultation with the DIP Lender, to be unacceptable;

(3)     Specifies the consideration allotted to each Asset such Qualified Bidder proposes to purchase pursuant to the APA;

(4)     Is not conditioned upon the Bankruptcy Court's approval of any Bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment; provided, however, the Debtors may accept an Initial Highest Bid (as defined below) with such bid protections to the extent authorized by the Court according to the procedure outlined below;

(5)     Does not contain any financing or due diligence contingencies to closing of the proposed transaction;

(6)     Does not contain any condition to closing of the transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval);

(7)     Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Assets and the proposed transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the APA ultimately accepted and executed by the Debtors;

(8)     Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtors to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by section 365(f)(2)(B) of the Bankruptcy Code) along with the Bid; and

(ix)     Contains other information reasonably requested by the Debtors.

(f)     A "Qualified Partial Bid" for less than substantially all of the Assets will be considered for the Auction, and Qualified Bidders submitting Qualified Partial Bids shall be allowed to participate in the Auction only if the Qualified Partial Bid, or the Qualified Partial Bid when combined with other additional non-overlapping Qualified Partial Bids, if accepted and executed without modification, would yield individual asset sales amounting to a Qualified Aggregate Bid.  The Debtors in their sole discretion, in consultation with the DIP Lender shall determine which non-overlapping Qualified Partial Bids to include in determining whether they amount to a Qualified Aggregate Bid and shall assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Bid against all other Qualified Bids.  To

constitute a Qualified Partial Bid, a Bid must fulfill the following requirements prior to the Bid Deadline:

> (i)    Fulfills each of the requirements set forth in paragraphs (e)(i) through and including (e)(ix) above;

> (ii)   Conspicuously states that the Qualified Bidder offers to purchase a portion of the Assets, which assets shall be described in detail; and

> (iii)  Fully discloses the identity of each entity participating in connection with such Bid, and the complete terms of any such participation.

(g)    A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to any of the following representatives of the Debtors: (i) K&L Gates LLP, 1900 Main Street, Suite 600, Irvine, California 92614-7319, Attn: Joshua Lane, Esq. (e-mail: josh.lane@klgates.com); (ii) K&L Gates LLP, State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111, Attn: Chad Dale, Esq. and Mackenzie Shea, Esq. (e-mail: chad.dale@klgates.com and mackenzie.shea@klgates.com); (iii) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware 19801, Attn: Adam G. Landis, Esq. and Kerri K. Mumford, Esq. (e-mail: landis@lrclaw.com and mumford@lrclaw.com); (iv) FTI Consulting, Inc., 2001 Ross Avenue, Suite 400, Dallas, Texas 75201, Attn: Albert Conly (e-mail: albert.conly@fticonsulting.com); or (v) FTI Consulting, Inc., 200 State Street, Second Floor, Boston, Massachusetts 02109, Attn: Michael Nowlan (e-mail: mike.nowlan@fticonsulting.com). The Debtors shall deliver copies of any such Bids to the Office of the U.S. Trustee and counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases.

(h)    Persons who collectively are referred to as a "Qualified Bidder" need not be affiliated persons and need not act in concert with one another and the Debtors may aggregate separate bids from unaffiliated persons to create one "Qualified Bid" from a "Qualified Bidder"; provided, however, all bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

(i)    After the Bid Deadline, the Debtors, in consultation with the DIP Lender shall determine which Qualified Aggregate Bid or group of Qualified Partial Bids represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder"). Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid or a Qualified Partial Bid will be advised of such Initial Highest Bid and the Debtors may: (a) distribute copies of other Qualified Aggregate Bids or Qualified Partial Bids to other Qualified Bidders prior to or during the Auction; or (b) proceed with the open or sealed bidding process set forth in the Bidding Procedures Order to the extent authorized therein.

*Due Diligence From Potential Bidders or Qualified Bidders*

(j)    Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Potential Bidder's

financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets. Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtors to determine that a Potential Bidder is not a Qualified Bidder. Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the acquisition transaction of the Assets as the Auction progresses. Failure by a Qualified Bidder to comply with requests for additional information may be a basis for the Debtors to determine that the Qualified Bidder may no longer participate in the Auction.

*"As Is, Where Is"*

(k)      The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates or any other party, except to the extent set forth in the APA between the Debtors and the Prevailing Bidder. Except as otherwise provided in the Prevailing Bidder's APA, all of the Debtors' right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein (collectively, the "Claims") pursuant to section 363(f) of the Bankruptcy Code, such Claims to attach to the net proceeds of the sale of the Assets, with the same validity and priority as existed immediately prior to such sale.

*Later Award of Break-Up Fee on Shortened Notice*

(l)      Prior to October 1, 2012, the Debtors may seek authority to offer to the Initial Highest Bidder, as an actual and necessary cost and expense of preserving the value of the Debtors' estates, (i) a break-up fee in an amount not to exceed 3% of the total guaranteed cash price contained in its Initial Highest Bid plus (ii) reimbursement of reasonable expenses in an amount to be determined ((i) and (ii) together, the "Break-Up Fee") to a Qualified Bidder who agrees to provide a Qualified Aggregate Bid for substantially all of the Assets that will serve as a "stalking horse" Bid at the Auction. Any agreement to provide a Break-Up Fee shall be (a) approved by the Court by separate order entered no later than October 1, 2012 following a hearing upon no less than three (3) days notice to: (i) counsel to the DIP Lender; (iii) counsel to any official committees appointed in these Chapter 11 Cases; and (iii) the Office of the U.S. Trustee and (b) expressly conditioned on the consummation of a sale of the Assets to a Prevailing Bidder who made a cash Bid. The Break-Up Fee, if any is approved, shall be an administrative expense claim against the Debtors' estates pursuant to section 503(b) of the Bankruptcy Code; provided, however, in the event that the Debtors agree to a Break-Up Fee, which is approved by the Court, and (i) the Prevailing Bidder is a result of such Bidder's exercise of any credit bid right, or (ii) a sale of the property does not close for any reason on or before thirty (30) days after entry of the Sale Order, the Break-Up Fee will not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee and the Court's order approving such Break-Up Fee will provide and acknowledge the same. If the Debtors designate an Initial Highest Bid and obtain the Court's approval of a Break-Up Fee prior to October 1, 2012, the Debtors shall provide notice of the order approving

same prior to the Bid Deadline to any other party that expressed an interest in acquiring the Assets in writing to the Debtors or FTI.

*The Auction*

(m)     If more than one Qualified Bid has been submitted for the Assets in accordance with these Bidding Procedures, the Debtors will conduct the Auction on October 17, 2012, at 9:30 a.m., prevailing Eastern time, with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtors at the offices of their counsel, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 or such other location as may be announced prior to the Auction to all Qualified Bidders, the U.S. Trustee and any official committee appointed in these Chapter 11 Cases.

(n)     The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtors, FTI and the DIP Lender and any duly appointed official committee, and their respective counsel, financial advisors, and/or other authorized representatives.

(o)     The Debtors are authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the discretion of the Debtors and their counsel, in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases, which rules may include the determination of the amount of time between Qualified Bids, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(p)     The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder in the amount of the Initial Highest Bid.  The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid *plus* the amount of the approved Breakup Fee (if any) *plus* the Minimum Bid Increment (as defined below).  Thereafter, the Auction will continue in the manner determined by the Debtors above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, although received from a Qualified Bidder that made a Qualified Bid prior to the Bid Deadline, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $100,000.00 in cash (the "Minimum Bid Increment").  In the event the Debtors in their sole discretion, in consultation with their advisors and counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases determine that the Auction has failed to result in sufficient consideration for the Assets, the Debtors reserve the right to terminate the Auction without further notice except to those parties that are present at the Auction.

(q)     In the case of a Qualified Bid based upon Qualified Partial Bids, such Qualified Bid may be altered or re-submitted in the sole discretion of the Qualified Bidders, provided that such Bid remains a Qualified Partial Bid in accordance with the requirements set forth in paragraph (f) above. A Qualified Partial Bid will be considered for any given round of the Auction only if such Bid individually or in combination with other Qualified Partial Bids yields a Qualified Aggregate Bid (individually, a "Qualified Partial Overbid" and collectively, a "Qualified Aggregate Overbid"), provided that the Qualified Aggregate Overbid must, considered as a whole, meet all the requirements of paragraph (e) above. The Debtors shall, in their sole discretion, determine which Qualified Partial Overbids to include in the Qualified Aggregate Overbid, and shall, in each round of the Auction, as necessary, assemble and present such Bids in a way that allows for the ready comparison of the Qualified Aggregate Overbid as against all other Qualified Bids received in that round of the Auction.

(r)     The Debtors, (in consultation with their counsel, FTI, and counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases), shall determine, in their sole discretion and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(s)     At the conclusion of the Auction: (i) the Debtors shall, in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases, select (X) the Prevailing Bid and (Y) the second highest or best offer for the Assets (the "Back-Up Bid"); (ii) the Debtors shall notify the Prevailing Bidder that such person's offer has been determined by the Debtors to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtors to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtors shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder. Prior to the commencement of the Sale Hearing, the Prevailing Bidder shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder to all of the terms and conditions contemplated by the Prevailing Bid.

(t)     The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtors against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court. The Prevailing Bidder's Deposit shall be held by the Debtors and forfeited to the Debtors if the Prevailing Bidder breaches its obligations to close under the APA in accordance with the Prevailing Bid.

(u)     The Debtors shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtors' acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

*Back-Up Bidder*

        (v)     If for any reason the Prevailing Bidder fails to consummate the acquisition of the Assets in accordance with the Prevailing Bid, and in any event no later than ten (10) days from the entry of the Sale Order, the Debtors are authorized to proceed with the sale of the Assets to the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court. If for any reason the Back-Up Bidder fails to consummate the acquisition of the Assets in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtors.

*Deposit*

        (w)     No later than the Bid Expiration Date, the Debtors shall return to each Qualified Bidder(s), other than the Prevailing Bidder and the Back-Up Bidder, their respective Deposit(s). No later than the third (3rd) business day after the closing of the sale of the Assets to the Prevailing Bidder, the Debtors shall return the Back-Up Bidder's Deposit to the Back-Up Bidder.

*Modifications*

        (x)     The Debtors (in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases) may (a) extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, (b) waive any requirement for a Bid to be a Qualified Bid or the Prevailing Bid, including, but not limited to, designating one or more Qualified Partial Bids for less than substantially all the Assets as the Prevailing Bidder or Prevailing Bidders, and/or (c) adopt, implement, and/or waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend at an Auction or participated in the Auction, as appropriate.

        (y)     The Debtors (in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases) may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid that, in the discretion of the Debtors, in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors and FTI, in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in this case.

29.     The Debtors will consider all proposals that are deemed qualified in accordance with the Bidding Procedures. The Debtors will consider proposals for the acquisition of all of the Assets in a single sale to a single Qualified Bidder or in multiple sales to multiple Qualified

Bidders; provided, however, unit bidding will not be permitted, unless such Bids, when taken together, are Bids for substantially all of the Assets, unless otherwise decided by the Debtors. The Bidding Procedures establish the terms and conditions the Prevailing Bidder must satisfy to acquire the Assets.

30.     The Debtors reserve the right to modify the Bidding Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtors, in consultation with counsel to the DIP Lender and any official committees appointed in these Chapter 11 Cases, after or as they deem appropriate to maximize value for the Debtors' estates and creditors. In addition, the Debtors reserve their right to withdraw any or all Assets from the sale at any time prior to the Court's approval of such sale.

31.     The Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder was properly selected in accordance with these Bidding Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Asset sale by the Prevailing Bidder will provide the highest or otherwise best value for the Assets and is in the best interests of the Debtors, their estates and creditors.

32.     The Debtors believe that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding for the Assets.

**C.     Proposed Bidding Protections and Later Award of Break-Up Fee**

33.     The Debtors have determined, in their reasonable business judgment, that seeking the relief requested herein without first entering into a "stalking horse" agreement is warranted and necessary. The Debtors are, however, continuing their discussions with potential purchasers,

and as set forth above, reserve the right to enter into a stalking horse agreement to serve as the Initial Highest Bid (and/or to seek approval of a Break-Up Fee) if the Debtors believe that such an agreement will further the purposes of the Auction, by among other things, enticing value maximizing bids.

34.     Accordingly, the Debtors request authority, in the exercise of their sound business judgment, to reserve the right to seek the Court's later approval, upon no less than three (3) days notice to certain parties in interest identified above, of a break-up fee in an amount not to exceed 3% of the total guaranteed cash price offered by such Initial Highest Bid plus reimbursement of reasonable expenses in an amount to be determined (together, the "Break-Up Fee") to a Qualified Bidder who agrees to provide a Qualified Bid for the Assets that will serve as a "stalking horse" Bid at the Auction.  Any agreement to provide a Break-Up Fee would be expressly conditioned on the Court's approval of it prior to October 1, 2012 and consummation of a sale of the Assets to a Prevailing Bidder who made a cash Bid.  The Break-Up Fee, if any is approved, will be an administrative expense claim against the Debtors' estates under section 503(b) of the Bankruptcy Code; provided, however, in the event that the Debtors agree to a Break-Up Fee that is approved by the Court, and (a) the Prevailing Bidder is a result of such bidder's exercise of any credit bid right, or (b) a sale of the property does not close for any reason on or before ten (10) days after entry of the Sale Order, the Break-Up Fee will not be paid by the Debtors, their estates, or any other person or party, and no administrative obligation will be created, and any agreement by the Debtors to pay a Break-Up Fee and the Court's order approving any such Break-Up Fee will provide and acknowledge the same.

35.     The Initial Highest Bidder that might be selected as a stalking horse will have expended considerable time, money and energy pursuing the transaction and will have engaged

in extended and lengthy good faith negotiations. In particular, the Initial Highest Bidder would have taken part of an extensive process undertaken by the Debtors and their professionals to identify and negotiate a transaction that the Debtors believe to be the highest or best proposal for an acquisition of the Assets in order to maximize the value realized for the benefit of the Debtors' estates and their creditors. Accordingly, the Debtors may not be able to find an Initial Highest Bidder willing to serve as a stalking horse without having the flexibility to offer a Break-Up Fee and obtain the Court's approval of it on shortened notice.

**D.      Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases**

36.      In accordance with Bankruptcy Rule 6006(c), the Debtors must also provide notice of: (a) the potential assumption and assignment of executory contracts and unexpired leases and rights thereunder; (b) the proposed maximum Cure Costs that the Prevailing Bidder may pay to cure all defaults, if any, under executory contracts and unexpired leases and rights thereunder that the Debtors propose to assume and assign; and (c) the deadline to file objections to such assumption and assignment, maximum Cure Costs, the existence of any defaults, and/or adequate assurance of the future performance.

37.      The Debtors propose the following procedures (the "Contract Procedures") to govern the assumption and assignment of the Potential Designated Contracts in connection with the sale of the Assets:[7]

> (a)      By the Mailing Deadline, which is five (5) business days after entry of the Bidding Procedures Order, the Debtors shall file with this Court and shall serve an Assignment Notice by overnight delivery service on each non-debtor counterparty to an executory contract or unexpired lease with any of the Debtors (each a "Non-Debtor Counterparty") that may be assumed and assigned to the Prevailing Bidder (the "Potential Designated Contracts"). The Debtors shall attach to the

---

[7]      If requested by the Prevailing Bidder, these Contract Procedures may be modified if necessary by further order of this Court.

Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Designated Contracts and the proposed corresponding Cure Costs under the Potential Designated Contracts as of the Petition Date.

(b)     At any time prior to the closing of any sale transaction for the Assets, the Prevailing Bidder may direct the Debtors to serve a notice excluding any of the Potential Designated Contracts on (i) the Non-Debtor Counterparty to such Potential Designated Contracts and (ii) all Objection Notice Parties other than the Debtors, indicating, by reasonably specific information, which Potential Designated Contracts have been excluded, and stating that the Prevailing Bidder has excluded such Potential Designated Contracts.  Upon consummation of the sale with the Prevailing Bidder and service of such notice, the executory contracts and/or unexpired leases referenced in such notice (x) shall no longer be considered Potential Designated Contracts; (y) shall not be deemed to be, or to have been, assumed or assigned; and (z) shall remain subject to assumption, rejection or assignment by the Debtors.

(c)     For each Potential Designated Contract, on the Assignment Notice, the Debtors shall indicate the proposed Cure Costs relating to such Potential Designated Contract.  The Assignment Notice also may identify any additional terms or conditions of assumption and assignment.

(d)     Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Potential Designated Contracts, excluding, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than thirty (30) days after the Mailing Deadline (the "Cure Objection Deadline").  The Non-Debtor Counterparties shall have until the Sale Hearing to submit an objection to the Debtors' ability to assign the Potential Designated Contract to the Prevailing Bidder without the Non-Debtor Counterparty's consent or to the adequate assurance of future performance to be provided (the "Adequate Assurance Objection Deadline," and together with the Cure Objection Deadline, the "Contract Objection Deadlines").

(e)     Where a Non-Debtor Counterparty to a Potential Designated Contract files an objection meeting the requirements of subparagraph (d), objecting to the assumption by the Debtors and assignment to the Prevailing Bidder of such Potential Designated Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtors and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If the Debtors and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing, unless the Debtors, the Prevailing Bidder and the Non-Debtor

Counterparty to the Potential Designated Contract in dispute agree otherwise or the Court orders otherwise. If the Court determines at the Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract. If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Sale Hearing, the Prevailing Bidding shall escrow the portion of the Cure Costs that is disputed pending such resolution.

(f)     Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Potential Designated Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates or the Prevailing Bidder.

(g)     If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtors and assigned to the Prevailing Bidder and the proposed Cure Cost related to such Potential Designated Contract shall be established and approved in all respects, subject to the conditions set forth in subparagraph (h) below.

(h)     The Debtors' decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of an Asset sale transaction with a Prevailing Bidder. Accordingly, subject to the satisfaction of conditions in subparagraph (g) above, the Debtors shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of an Asset sale transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code. Also, assumption and assignment of the Potential Designated Contracts is subject to the Prevailing Bidder's right set forth in subparagraph (b) above (and inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtors or the Prevailing Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved). The Prevailing Bidder shall have no rights in and to a particular Potential Designated Contract until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

(i)      Except as may otherwise be agreed to in an APA with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: the Purchaser shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten days after the later of (i) the closing date specified in the APA entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with subparagraph (h) of these Contract Procedures.

## BASIS FOR RELIEF

**A.      Approval of the Bidding Procedures Is Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors**

*(1)      The Bidding Procedures Are Appropriate under the Circumstances*

38.      Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property.  In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process.  See, e.g., In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

39.      Although the Debtors and FTI commenced efforts to market the Assets for sale prior to the Petition Date, a stalking horse bid has not yet been identified.  Notwithstanding that, the Debtors believe that the Bidding Procedures will help the Debtors receive the maximum value for the Assets by establishing a competitive bidding process where potentially interested parties can step forward and bid, knowing, among other things, the quality of the title they will receive if they are the Prevailing Bidder.  In fact, prior to the Petition Date, certain parties expressed an interest in purchasing the Debtors' Assets, but were unwilling to consummate a

transaction outside of the protections offered by Section 363 of the Bankruptcy Code. The Debtors believe that the Bidding Procedures will encourage active bidding from seriously interested parties who possess the financial and operational capacity to purchase or operate the Assets. Furthermore, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and competitive fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Assets. Therefore, the Debtors believe the Bidding Procedures will confirm that they are receiving the greatest possible consideration for the Assets.

40.     Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other large, complex chapter 11 cases in this District. See e.g. WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012) Capitol Infrastructure, LLC, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); Traffic Control And Safety Corporation,, Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012); Contract Research Solutions, Inc., Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); Delta Petroleum Corporation, Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012); Dallas Stars, L.P., Case No. 11-12935 (PJW) (Bankr. D. Del. September 22, 2011). In sum, the Debtors believe that the proposed Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offer for the Assets. Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances.

*(2)     The Overbid Protections Are Appropriate Under the Circumstances*

41.     The Minimum Bid Increment is appropriate under the circumstances and will enable the Debtors to simultaneously maximize the value for the Assets while limiting the chilling effect in the marketing process. This provision also is consistent with the overbid

increments previously approved by courts in this District.  See e.g. WP Steel Venture LLC, Case

No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012); Solar Trust of America, LLC, Case No. 12-

11136 (KG) (Bankr. D. Del. May 11, 2012); Contract Research Solutions, Inc., Case No. 12-

11004 (KJC) (Bankr. D. Del. April 12, 2012); Delta Petroleum Corporation, Case No. 11-14006

(KJC) (Bankr. D. Del. January 11, 2012).

> (3)     *The Break-Up Fee, if Approved by the Court,  Is an Actual and*
> *Necessary Cost of Preserving the Debtors' Estate*

42.     The Debtors reserve the right to seek the Court's approval, upon no less than three

(3) days notice to certain parties in interest, of an Initial Highest Bidder to serve as a "stalking

horse bidder" at any time after entry of the Bidding Procedures Order and to offer that bidder a

Break-Up Fee.  While such procedures are, admittedly, not always found in "naked" auctions,

the Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to

take advantage of a potentially value maximizing initial bid.

43.     Break-up fees are a vital means by which a debtor-in-possession can manage

value maximization risk by setting a value floor for the assets to be sold, which is a key benefit

to the Debtors and their estates and weighs heavily in favor of approving the procedures for later

offering the Break-Up Fee.  Moreover, without the ability to later offer the Break-Up Fee upon

shortened notice, the sale and reorganization process might be substantially hampered.  Such fees

encourage the investment of time, effort and money necessary to consummate a sale of the

Assets, despite the possibility that the Initial Highest Bidder may not ultimately effectuate the

Transaction.  A break-up fee is an important tool to be used to encourage bidding.

44.     The ability of the Debtors to later offer and obtain approval of the Break-Up Fee

provides the incentive required to induce a Qualified Bidder to submit or increase its bid prior to

the Auction.   To the extent bids can be improved prior to the Auction, a higher floor is

established for further bidding. Thus, even if the Initial Highest Bidder is granted the Break-Up Fee and ultimately is not the Prevailing Bidder, the Debtors and their estates will have benefited from the higher floor established by the improved bids. The Debtors submit that the proposed procedures for later awarding the Break-Up Fee will not chill bidding – instead, it will only be offered if the Debtors receive a Bid that is worthy of such protection.

45.     Thus, the Debtors submit that the Break-Up Fee, to the extent offered by the Debtors and approved by the Court would be: (a) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred on the Debtors' estates by the Initial Highest Bidder, and (c) reasonable and appropriate in light of, among other things (i) the size and nature of the Asset sale contemplated and comparable transactions, (ii) the substantial efforts that will need to be expended by the Initial Highest Bidder, (iii) the benefits the Initial Highest Bidder will have provided to the Debtors' estate, their creditors and other parties in interest, notwithstanding that the Initial Highest Bid may be terminated by the Debtors if any higher or otherwise better transaction is identified and consummated at the conclusion of the Auction, and (d) necessary to induce the Initial Highest Bidder to serve as a "stalking horse" bidder and to continue to pursue the Asset sale transaction.

46.     The determination of whether a break-up fee should be allowed is made based on standards established by the Third Circuit in Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy. Inc.), 181 F.3d 527 (3d Cir. 1999). O'Brien held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Id. To be approved, bidding incentives, such as break-up fees, must provide

benefit to a debtor's estate. Id. at 533; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

47. O'Brien identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." Id. at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48. The Debtors submit that the Break-Up Fee, if agreed upon by the Debtors in the exercise of their business judgment and approved by the Court following a hearing, is consistent with the O'Brien standard and should be approved as fair and reasonable. First, the Debtors and their professionals are negotiating with any and all bidders including any potential stalking horse bidder willing to serve as the Initial Highest Bidder, which dispenses of any notion of self-dealing or non-arm's-length negotiations under the circumstances. Second, the Debtors believe, based on their reasoned business judgment, that their ability to designate an Initial Highest Bidder to serve as a "stalking horse" would enhance their ability to maximize value without chilling bidding. The presence of the ability to later offer a Break-Up Fee, first and foremost, signifies the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable. In addition, such an incentive provides the Debtors with the upside opportunity of

potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized. Third, the Debtors believe, based on their reasoned business judgment, that the amount of the Break-Up Fee would be reasonable and appropriate relative to the commitments made and resources expended by the Initial Highest Bidder. Further, if the Break-Up Fee were to be paid, it will be because the Debtors have received a higher or otherwise superior offer. Additionally, the proposed Break-Up Fee is well within the range of such fees approved by this and other courts, as noted above.

      *(4)*     *The Proposed Sale Notice and Assignment Notice and Proposed Dates for the Sale Objection Deadlines, the Contract Objection Deadlines and the Sale Hearing Are Appropriate*

49.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale and the deadline for filing any objections related thereto. The Debtors submit that the Sale Notice fully complies with Bankruptcy Rules 2002(a) and (l) and includes adequate information to (a) enable interested parties to bid on the Assets pursuant to the Bidding Procedures and by the Bid Deadline, and (b) inform such parties of the Sale Hearing and the relevant Sale Objection Deadline related thereto (collectively, the "Notice Objectives").

50.     The Debtors submit that the proposed Sale Objection Deadline is reasonable and appropriate under the circumstances. Parties in interest are provided adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

51.     The Debtors submit that the notice to be provided via the Assignment Notice is reasonably calculated to provide all counterparties to the Potential Designated Contracts with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any Cure Costs relating thereto and the Contract Procedures, including, but not

limited to, the Contract Objection Deadlines. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

52.     The Debtors submit that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bidding Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b) the Sale Objection Deadline; (c) the Contract Objection Deadlines; and (d) the Sale Hearing. Therefore, the Debtors respectfully request this Court to approve the proposed notice procedures.

**B.      Approval of the Proposed Sale Is Appropriate and
         In the Best Interests of the Debtors' Estates and Creditors**

> *(1)      The Sale of the Assets is Within the Sound
>          Business Judgment of the Debtors and Should be Approved*

53.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

54.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith.  Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully herein, the Debtors submit that the decision to proceed with a sale of the Assets to the Prevailing Bidder, if any, is based upon sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071.

55.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  In re Fesco Plastics Corp., 996 F.2d 152,154 (7th Cir. 1993); Pincus v. Graduate Loan Ctrs. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may

fashion an order or decree that helps preserve or protect the value of a debtor's assets. See Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

56.     The Debtors submit that more than ample business justification exists to sell the Assets to the Prevailing Bidder pursuant to the Bidding Procedures, thereby satisfying the first prong of Abbotts Dairies and that further justification for the sale of the Assets will be demonstrated at the Sale Hearing.  In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the most value for the Assets and provide interested parties with accurate and reasonable notice of the Asset sale.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and competitive fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Assets by helping ensure a competitive and fair bidding process.

57.     The Debtors believe the sale of their Assets must occur quickly in order to maximize the value of their estates, and that significant time spent in Chapter 11 increases the real and palpable risk of business loss and value deterioration.  The Debtors' liquidity is constrained and they have little ability to invest in their businesses.  Absent a prompt sale of the Assets pursuant to the procedures and timelines proposed, the Debtors believe that the going concern value of the Assets will be significantly compromised because the Debtors lack the

financing necessary to undertake the testing, development, and drilling necessary for their oil, gas, and mineral assets to produce the cash flow necessary to maximize their potential revenues. Finally, the Interim DIP Order requires that the Debtors consummate a sale of their Assets by November 7, 2012. Therefore, it is imperative that the Debtors effect a sale of the Assets as early on in these Chapter 11 Cases as possible. The Debtors respectfully submit that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of their estates for the benefit of the Debtors and their stakeholders.

58. In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets in the past year. Accordingly, the proposed sale of the Assets satisfies the second prong of the <u>Abbotts Dairies</u> standard.

59. The Bidding Procedures are also designed to maximize the value received for the Assets. The process proposed by the Debtors provides bidders ample time and information to submit a timely bid, while maximizing the sale of the Assets as a going-concern. Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price. The Debtors' right to cancel the Auction precludes the possibility of a Qualified Bidder reaping a windfall by acquiring the Assets at a significant discount as a result of an uncompetitive Auction. The Debtors are subjecting the value of the Assets to market testing and permitting Qualified Bidders to bid on the Assets at the Auction, thereby subjecting the proposed sale to a market check through the solicitation of competing bids in a court-supervised process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable thereby satisfying the third prong of the <u>Abbotts Dairies</u> standard.

(2)     *The Prevailing Bidder Should Be Entitled to "Good Faith"*
        *Purchaser Protection Under Section 363(m) of the Bankruptcy Code*

60.     The Debtors request that the Court find that the Prevailing Bidder is entitled to the

benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with

the sale of the Assets.

61.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under
> subsection (b) . . . of this section of a sale . . . of property does not
> affect the validity of a sale . . . under such authorization to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

62.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section

363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.  Additionally, the

United States Court of Appeals for the Third Circuit has indicated that section 363(m) of the

Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under

section 365 of the Bankruptcy Code.  See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,

141 F.3d 490, 497-98 (3d Cir. 1998) (concluding that, despite the absence of an explicit

reference to assignments of executory contracts under section 365 of the Bankruptcy Code,

section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain

automobile franchise agreements pursuant to an auction sale).  In light of Krebs, the Debtors

respectfully submit that section 363(m) applies to protect the Prevailing Bidder with respect to

both the Assets and any Potential Designated Contracts.

63.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the sale of the Assets and the assignment of the Potential Designated Contracts related thereto.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  Abbotts Dairies, 788 F.2d at 147.  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders."  Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings."  In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Mach. Corp., 572 F.2d at 1198).

64.     Here, the sale of the Assets and the assignment and/or transfer of the Potential Designated Contracts will be in good faith.  As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a negotiation process in which all parties will be represented by counsel and all negotiations have been and will continue to be conducted on an arm's-length, good faith basis.

65.     Moreover, the Debtors will not choose a Prevailing Bidder whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.  Finally, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.

Under the circumstances, the Prevailing Bidder should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. The "good faith" prong of the Abbotts Dairies standard for the approval of a sale pursuant to section 363(b) of the Bankruptcy Code is likewise satisfied.

66.     All parties in interest will receive notice of the Asset sale pursuant to the Sale Notice and will be provided with an opportunity to be heard. Additionally, all counterparties to Potential Designated Contracts will be provided notice of assumption, and assignment and any proposed Cure Costs associated therewith and an opportunity to be heard pursuant to the Assignment Notice. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

> (3)     *The Proposed Asset Sale Satisfies the Requirements*
> *of Section 363(f) of the Bankruptcy Code*

67.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free