AA. The Debtors have exercised their sound business judgment in seeking the assumption of the Assigned Contracts (as defined in the APA) and their assignment to the Purchaser.

BB. The Sale of the Purchased Assets outside a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors. The Sale does not constitute a sub rosa plan.

CC. Time is of the essence in consummating the Sale. In order to maximize the value of the Purchased Assets it is essential that the Sale of the Purchased Assets occurs within the time constraints set forth in the APA. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The relief requested in the Sale Motion with respect to the Purchased Assets is hereby granted and approved in its entirety, and the Sale is hereby approved.

2. All objections to the Sale Motion or the relief requested therein with respect to the Purchased Assets that have not been withdrawn, waived or settled, and all reservations of rights included in or related to such objections (whether written or oral), are hereby denied and overruled on the merits, with prejudice.

### Authorization and Approval of the
### Sale and the APA

3. The APA and all transactions contemplated therein and in the Transaction Documents, and all of the terms and conditions contained in the foregoing, are hereby approved in all respects, and the Sale pursuant to the APA is hereby authorized under, *inter alia*, Sections

{944.002-W0023918.4}

363(b) and (f) of the Bankruptcy Code. The omission from this Sale Order of specific reference to any provision of the APA shall not impair or diminish the efficacy, propriety or approval of any such provision, it being the intent of this Court that the APA, and each and every term contained therein, is hereby authorized and approved in its entirety.

4.      The Sellers are authorized, but not directed, to assume the Assigned Contracts and to assign them to the Purchaser, subject to the Purchaser's rights and obligations under the APA.

5.      By the issuance of this Sale Order, the Sellers (including their officers, employees and agents) are hereby authorized, but not directed, to execute and deliver, consummate and implement, and empowered to take any and all actions necessary or appropriate immediately to (i) consummate and implement the Sale in accordance with the terms and conditions of the APA, the other Transaction Documents, and this Sale Order, (ii) fully perform their obligations under and comply with the terms of the APA and the other Transaction Documents, in each case in accordance with the terms and conditions thereof, (iii) take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, any or all of the Purchased Assets, or as may otherwise be necessary or appropriate for the performance of the Debtor's obligations under the APA and the other Transaction Documents and the consummation of the Sale, in the case of the foregoing clauses (i), (ii) and (iii), without further order of this Court.

## **Transfer of the Purchased Assets**

6.      Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, upon satisfaction (or waiver to the extent permitted by the APA) of the conditions to the Closing, the Purchased Assets shall be transferred to the Purchaser at the Closing, and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets and shall be free and clear of

all Encumbrances of any kind or nature whatsoever (other than the Permitted Encumbrances), with all such Encumbrances released, terminated and discharged as to the Purchaser and the Purchased Assets, and with all such Encumbrances (other than the Permitted Encumbrances) to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect, if any, which they would then have against the Purchased Assets, subject to the Final DIP Order or any defenses, counterclaims, rights of avoidance and rights under Sections 506(c) or 552(b)(1) of the Bankruptcy Code that the Sellers may have with respect thereto. The Permitted Encumbrances shall continue to encumber the Purchased Assets and they shall not attach or otherwise encumber the proceeds of the Sale.

7.      The transfer of the Purchased Assets to the Purchaser pursuant to the APA shall constitute a legal, valid and effective transfer, assignment and conveyance of the Purchased Assets, and shall vest the Purchaser with all right, title (which shall be good, clear and marketable) and interest of the Sellers in and to the Purchased Assets free and clear of all Encumbrances (other than the Permitted Encumbrances).

8.      All Persons including, but not limited to, all debt security holders, equity security holders, federal, state, or local governmental, tax, environmental and regulatory authorities or agencies, lenders, trade and other creditors, holding any Encumbrances of any kind or nature whatsoever (including Encumbrances based on any successor or transferee liability, other than the Permitted Encumbrances) against or in any Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, now existing or hereafter arising, senior or subordinated, accrued, determined, determinable or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of

the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any Encumbrance (other than a Permitted Encumbrance), in each case of any kind or nature whatsoever that any such Person had, has or may have against any Debtor (or their respective predecessors), the Purchased Assets, or any other assets or operations of the Debtors or any of the Debtors' predecessors or affiliates against the Purchaser, the Purchased Assets, or any other assets or operations of the Purchaser. No such Person shall assert against the Purchaser or any of their successors in interest any Encumbrance relating to or arising from the Purchased Assets (including the ownership thereof) or any liabilities calculable by reference to the Debtors or any of their predecessors or any of their respective assets or operations, other than with respect to any Permitted Encumbrances.

9.     All Persons are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Sellers to transfer the Purchased Assets to the Purchaser in accordance with the APA and this Sale Order.  All Persons asserting possessory liens or in possession of some or all of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser at the time of the Closing, and any such liens, to the extent valid, shall attach to the proceeds of the Sale, subject to the provisions of the Final DIP Order.

## Release of Encumbrances

10.     This Sale Order shall operate to automatically release all Encumbrances in the Purchased Assets upon the occurrence of the Closing except with regard to the Permitted Encumbrances.  At or prior to the Closing, and except as otherwise provided in this Sale Order as to the Debtors, each Person is authorized and directed to execute such documents and take all other actions as may be necessary or appropriate to evidence the release of its Encumbrances in the Purchased Assets, as such Encumbrances may have been recorded or may otherwise exist.  If

any Person that has filed any mortgages, deeds of trust, financing statements or other documents or agreements evidencing any Encumbrances in any of the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases and/or other documents required to release all Encumbrances that the Person has with respect to any of the Purchased Assets, each of the Sellers and the Purchaser is hereby authorized, but not directed, to execute and file such statements, instruments, releases and other documents on behalf of the Person with respect to such Purchased Assets. Without limiting the effect of the foregoing, the Sellers and the Purchaser are hereby authorized, but not directed, to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances in the Purchased Assets. The foregoing notwithstanding, the provisions of this Sale Order authorizing the Sale free and clear of Encumbrances shall be self-executing, and notwithstanding the failure of the Sellers, the Purchaser or any other party to execute, file or obtain termination statements, instruments of satisfaction, releases, assignments, consents or other documents to effectuate, consummate and/or implement the provisions hereof or of the APA with respect to the Sale and the assignment of the Purchased Assets, all Encumbrances in the Purchased Assets (other than the Permitted Encumbrances) shall be deemed unconditionally released, discharged, terminated, divested, void and unenforceable upon the occurrence of the Closing.

11.     Following the Closing, no holder of any Encumbrances shall interfere with the Purchaser's title to, or use and enjoyment of, the Purchased Assets based on or related to any such Encumbrance, or based on any actions the Debtors may have taken or may in the future take in their Bankruptcy Cases.

{944.002-W0023918.4}

15

## Assumption and Assignment of Assigned Contracts

12.    Subject to the terms of the APA and this Sale Order and the occurrence of the Closing, the assumption by the Debtors of the Assigned Contracts and the assignment of such Contracts to the Purchaser, as provided for or contemplated by the APA, the Sale Motion and the Contract Procedures, shall be, and hereby is, authorized and approved pursuant to Sections 363 and 365 of the Bankruptcy Code.

13.    The Assigned Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing, pursuant to Sections 363 and 365 of the Bankruptcy Code, subject only to the payment of all Cure Costs in accordance with the provisions of the APA.

14.    Upon the payment of the Cure Costs, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.

15.    Pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, the requisite Cure Costs, if any, shall be immediately paid to the parties to any Assigned Contracts pursuant to the terms of the APA, as set forth in the Notice of Possible Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing [Docket No. 135] and the supplemental notice thereto [Docket No. 218] (together as the "Cure Notices") or as otherwise agreed to, as applicable, with respect to the assumption and assignment of the Assigned Contracts. The Cure Costs are hereby fixed at the amounts set forth in the Cure Notices or the amounts determined on the record at the Sale Hearing, as the case may be, and the non-Debtor counterparties to the Assigned Contracts are forever bound by such Cure Costs and are hereby precluded from objecting to the Cure Costs (if

{944.002-W0023918.4}

16

any) relating to such Assigned Contracts and the assumption and assignment of any Assigned Contract and enjoined from taking any action against the Purchaser or the Purchased Assets with respect to any claim for cure, or any other claim, under any Assigned Contract.

16.     All defaults, actual pecuniary losses (as defined in Section 365(b)(1)(B) of the Bankruptcy Code) or other obligations under the Assigned Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by the payment of the Cure Costs, and the non-Debtor counterparties to such Contracts shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional amounts are due or other defaults exist.

17.     Any provision in any Assigned Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all such Assigned Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Cost, if any. No sections or provisions of any Assigned Contract that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of a non-Debtor third party to the Assigned Contracts shall have any force and effect with respect to the transactions contemplated by the Agreement and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under Section 365(e) of the Bankruptcy Code and no assignment of any Assigned Contract pursuant to the terms of the APA in any respect constitutes a default under any Assigned Contract. The non-Debtor counterparty to each Assigned Contract shall be deemed to have consented to such assignment under Section 365(c)(1)(B) of the Bankruptcy Code, and the

{944.002-W0023918.4}

17

Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-Debtor counterparty's written consent to the assumption or assignment thereof.

18.     Where the Debtors are unable to establish that a default exists under a Contract, the Cure Cost relating to such Contract shall be set at $0.00.

19.     The Purchaser has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Assigned Contracts.

20.     The Debtors and their estates shall be relieved of any liability for any breach of any of the Assigned Contracts occurring on or after the Closing, pursuant to and in accordance with Section 365(k) of the Bankruptcy Code.

21.     The non-Debtor counterparties to the Assigned Contracts shall be prohibited from charging any rent acceleration, assignment fees, increases or other fees to the Purchaser as a result of the assumption and assignment of the Assigned Contracts.

22.     The *Objection Of Creditor Pleasant Valley Ranch, LLC To Motion By Debtors And Debtors In Possession For Orders (A)(I) Approving Bidding Procedures In Connection With The Sale Of Substantially All Of Their Assets By Public Auction; (II) Scheduling A Hearing To Consider The Sale Of Assets; And (III) Approving The Form And Manner Of Notice Thereof; (B)(I) Authorizing And Approving The Sale Of Assets Free And Clear Of Liens, Claims, Encumbrances And Interests; And (II) Approving The Assumption And Assignment Of Potential Designated Executory Contracts And Unexpired Leases; And (C) Granting Related Relief* [Docket No. 73] and the *Objection Of Pleasant Valley Ranch, LLC To Proposed Assumption And Assignment Of Lease And Cure Amount* [Docket No. 220] (together, the "Pleasant Valley Ranch

Objections") filed by Pleasant Valley Ranch, LLC ("Pleasant Valley Ranch") were fully and finally resolved pursuant to the terms and conditions set forth in the *Motion of Debtors, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, for Entry of an Order Approving Settlement of Dispute with Pleasant Valley Ranch LLC Concerning Assumption and Assignment of Lease and Related Cure Amount* [Docket No. 338] filed on November 15, 2012.

## **Good Faith Purchaser**

23.     The Purchaser is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.  To the full extent permitted by applicable law, the Purchaser is not deemed to be a successor to any of the Debtors, to have, *de facto* or otherwise, merged with or into any of the Debtors or be a mere continuation of the Debtors.

24.     In the absence of a stay pending appeal, the Purchaser will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the APA and the other Transaction Documents, at any time after the entry of this Sale Order and, accordingly, such closing in the face of an appeal will not deprive the Purchaser of its status as a good faith purchaser.  If the Sellers and the Purchaser consummate the Sale while an appeal of this Sale Order is pending, the Purchaser shall be entitled to rely upon the protections of Section 363(m) of the Bankruptcy Code, absent any stay pending appeal granted by a court of competent jurisdiction prior to such consummation.  Pursuant to Section 363(m) of the Bankruptcy Code, the reversal or modification of this Sale Order or any authorization provided herein shall not affect the validity of the Sale to the Purchaser (except to the extent such authorization is duly stayed pending such appeal prior to consummation of the Sale), and if any or all of the provisions of this Sale Order are hereafter reversed, modified or

{944.002-W0023918.4}

19

vacated by a subsequent order of this Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the APA or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and notwithstanding any reversal, modification or vacatur shall be governed in all respects by the original provisions of this Sale Order or the APA, as the case may be.

25.     The Sellers and the Purchaser have not engaged in any conduct that would cause or permit the Sale to be avoided, any amounts recovered or damages imposed, or costs, fees or expenses to be recovered, under Section 363(n) of the Bankruptcy Code.

### Additional Provisions

26.     From and after entry of this Sale Order, no Person shall take or cause to be taken any action that would adversely affect or interfere with the transfer of the Purchased Assets either to the Sellers prior to the Closing, for subsequent transfer to the Purchaser at the Closing, or to the Purchaser in accordance with the terms and conditions of the APA and this Sale Order.

27.     All Persons who are presently, or at any time hereafter prior to the transfer to the Purchaser, in possession of any Purchased Assets are hereby directed to surrender possession of such Purchased Assets either to the Sellers prior to the Closing, for subsequent transfer to the Purchaser at Closing, or to the Purchaser at the Closing (except to the extent the APA expressly provides otherwise).

28.     The terms and conditions of the APA and the other Transaction Documents, together with the terms and provisions of this Sale Order, shall be binding upon the Sellers, their affiliates, successors and assigns and their respective affiliates, agents, representatives, counsel and advisors, any trustee that may be appointed in these Bankruptcy Cases or in any cases under

Chapter 7 of the Bankruptcy Code to which these cases may be converted, their estates, creditors, and equity holders, the Purchaser and any other affected third parties, all Persons asserting any claims against or interests in the Debtors' estates or any of the Purchased Assets and all other Persons, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other Persons who may be required by operation of law or by the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Purchased Assets.

29.     Each and every federal, state and local governmental agency or department is hereby directed to accept any and all instruments and other documents necessary or appropriate to consummate the Sale, including without limitation, all instruments and other documents for recording in any governmental agency or department required to transfer to the Purchaser any and all licenses under the Sellers' ownership necessary for the operation of any Purchased Assets, and county and state offices wherein termination statements under the Uniform Commercial Code and/or mortgage releases are authorized to be filed.

30.     To the extent permitted by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Bankruptcy Cases or the consummation of the transaction contemplated by the APA.

31.     As of the time of the Closing, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof, but subject to the terms of the Final DIP

{944.002-W0023918.4}

21

Order, shall be deemed amended or otherwise modified to the extent required to permit the consummation of the Sale.

32.     Any of the terms and conditions of the APA and the other Transaction Documents may be waived, modified, amended or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court.

33.     This Court retains jurisdiction to (i) interpret, enforce and implement the terms and provisions of the APA and the other Transaction Documents, all amendments thereto and any waivers and consents thereunder; (ii) compel delivery of the Purchased Assets to the Purchaser; (iii) resolve any disputes arising under or related to the APA or any other Transaction Documents; (iv) interpret, enforce and implement the provisions of this Sale Order; (v) resolve any disputes relating to the receipt, use, application or retention of the proceeds of the Sale and any liens or security interests thereon; and (vi) protect the Purchaser against all Encumbrances.

34.     Nothing contained in any plan of reorganization or liquidation confirmed in these Bankruptcy Cases or in any order of confirmation confirming any plan of reorganization or liquidation, nor any order dismissing these cases or converting these cases to a Chapter 7 liquidation or any further order of this Court shall conflict with or derogate from the provisions of the APA or the terms of this Sale Order.

35.     Nothing in this Sale Order or the APA releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Closing.

36.     In accordance with the Final DIP Order, on the Maturity Date[4] (as defined in the Final DIP Order), the DIP Obligations (as defined in the Final DIP Order) shall be promptly paid out of the Sale proceeds in immediately available funds and without deduction, counterclaim or setoff, to the Lender (as defined in the Final DIP Order) and any remaining Sale proceeds shall continue to be Collateral (as defined in the Final DIP Order) subject to all DIP Liens (as defined in the Final DIP Order) to secure all current or future DIP Obligations and such Sale proceeds will be held by the Debtors (and not disbursed) except (i) upon further order of this Court with reasonable notice to parties in interest as required by the Bankruptcy Rules, including Luna & Glushon, or (ii) paid in accordance with the Final DIP Order or other prior order of the Court; provided, however, the payment of Sale proceeds to the Lender shall be without prejudice to the allocation rights of each of the Debtors in paragraph 15 of the Final DIP Order and without prejudice to the investigation and challenge rights of any Committee as provided in paragraph 19 of the Final DIP Order.  Further, any contrary provision of the APA or this Sale Order notwithstanding, no allocation of the purchase price for the Purchased Assets between the Purchaser and the Debtors shall be binding in any subsequent proceeding in this Court with respect to paragraph 15 of the Final DIP Order.

37.     No bulk sale or any similar law of any state or other jurisdiction shall apply in any way to the Sale and transactions contemplated by the APA.

38.     To the extent any provisions of this Order conflict with the terms and conditions of the APA, this Order shall govern and control.

39.     This Order and the APA shall be binding upon and govern the acts of all persons or entities, including without limitation, the Debtors, the Sellers, the Purchaser, and their

---

[4] As set forth in the Final DIP Order, the Maturity Date shall occur upon the Closing (as defined in the APA) of the Sale and the receipt by the Debtors of the Sale proceeds.

{944.002-W0023918.4}

respective successors and assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for any of the Debtors' estates or any trustee appointed in applicable chapter 7 cases, all creditors or equity holders of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets.

40.     The stay otherwise imposed by Bankruptcy Rules 6004(h) and 6006(d) is hereby waived and this Sale Order shall be effective and enforceable immediately upon entry. Time is of the essence in closing the Sale, and the Sellers and the Purchaser intend to close the Sale as soon as practicable, pursuant to the terms of the APA.

41.     All of the provisions of this Sale Order are nonseverable and mutually dependent.

42.     This Sale Order is a final order pursuant to 28 U.S.C. § 158(a), and notwithstanding Bankruptcy Rule 6004(h), the Bankruptcy Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directly directs the entry thereof.

Dated:  Dec. 11      , 2012
        Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

{944.002-W0023918.4}

24

# Exhibit 19

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |

**Objections Due: March 22, 2013 at 4:00 PM (ET)**
**Hearing Date: April 22, 2013 at 11:30 AM (ET)**

### DEBTORS' MOTION TO CONVERT CASES FROM CHAPTER 11 TO CHAPTER 7 OF THE BANKRUPTCY CODE EFFECTIVE APRIL 30, 2013

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move (this "Motion") this Court, pursuant to Section 1112 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, effective at 5:00 PM (ET) on April 30, 2013, converting these jointly administered Chapter 11 cases to liquidation proceedings under Chapter 7 of the Bankruptcy Code. In further support of this Motion, the Debtors respectfully state as follows:

### Preliminary Statement

From the outset of these cases, the Debtors worked diligently to maximize the value of their assets through a marketing and sale process that would be embraced by each of their major stakeholders. In response to concerns raised by the Creditors' Committee and members of the Opus Equity Committee (who were then acting on an ad hoc basis), the Debtors agreed to bifurcate the proposed sale process to allow more time to market their most significant assets, the "Pleasant Valley Assets." During this extended sale period, the Debtors explored strategic

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation ("Tri-Valley") (5250), Tri-Valley Oil & Gas Co. ("TVOG") (7433), Select Resources Corporation, Inc. ("Select") (0386), and TVC Opus I Drilling Program L.P. ("Opus") (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

alternatives with the Opus Equity Committee and its professional advisors.  However, no feasible alternative to a sale was identified by the parties.  Despite the extended marketing process, only one bidder ultimately surfaced for the Pleasant Valley Assets.  On December 21, 2012, the Pleasant Valley Assets were sold for a purchase price of only $19 million, substantially less than the parties had hoped they would generate.

When the lower market value of the Debtors' principal assets became known in December, the Debtors proposed a cessation of all discovery and litigation to afford the parties an opportunity to negotiate a liquidating plan, as professional fees related to discovery and litigation had already reached $1.5 million.  After several rounds of negotiation, a 30 day Standstill Agreement was reached (and later extended for another 30 days until March 22, 2013), affording the parties a brief opportunity to explore the prospects for a consensual plan.  Unfortunately, discussions failed to produce an agreement among the major stakeholders, leaving the Debtors with little choice but to convert these cases to Chapter 7, where independent Chapter 7 trustees will be appointed for each estate.

The Debtors believe that the best way to maximize value and to ensure a timely distribution to creditors is through a plan of liquidation.  Absent the consent of each major stakeholder, however, the Debtors fear that proposing a plan that is unacceptable to any significant stakeholder will only provoke another round of expensive litigation that will further deplete their estates.  Thus, to preserve the estates' limited resources, the Debtors reluctantly move to convert these cases to Chapter 7 cases, effective as of 5:00 PM (ET) on April 30, 2013. In an effort to streamline the administration of each Chapter 7 case, the Debtor's propose a process by which these cases will be converted in a controlled fashion where all post-bankruptcy, pre-conversion liabilities are paid prior to conversion.

2

## **Jurisdiction**

1.     This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Section 1112 of the Bankruptcy Code and Rule 1019 of the Bankruptcy Rules.

## **General Background**

3.     On August 7, 2012 (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.     On August 13, 2012, the Debtors filed their *Motion by Debtors and Debtors in Possession for Orders (A)(I) Approving Bidding Procedures in Connection with the Sale of Substantially All of Their Assets by Public Auction; (II) Scheduling a Hearing to Consider the Sale of Assets; and (III) Approving the Form and Manner of Notice thereof; (B)(I) Authorizing and Approving the Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests; and (II) Approving the Assumption and Assignment of Potential Designated Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 51] (the "Sale Motion"), seeking, *inter alia*, approval for biddings procedures for the sale of substantially all of their assets and scheduling hearings to consider the sale of such assets. [2]

---

[2] The assets consisted primarily of (1) the oil and gas properties located in and around the Edison Oil Field near Bakersfield, California in which the Debtors held leasehold interests (the "Edison Assets"); (2) the properties

5.      On August 27, 2012, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") [Docket No. 80].

6.      This Court entered orders dated August 30, 2012 [Docket No. 115] (the "Contract Procedures Order") and September 5, 2012 [Docket No. 130] (the "Bidding Procedures Order" and together with the Contract Procedures Order, the "Sale Procedures Orders"): (i) approving procedures for the sale of the assets and assumption and assignment of the contracts and leases contemplated by the Sale Motion (the "Sale Procedures"), (ii) scheduling hearings to consider approval of the Sale Motion (together, the "Sale Hearing"), and (iii) approving the form and manner of notice thereof.

7.      On September 15, 2012, the Office of the United States Trustee appointed the Official Committee of Equity Security Holders for the Debtor TVC Opus I Drilling Program L.P. (the "Equity Committee," together with the Creditors' Committee, the "Committees") [Docket No. 161].

8.      As a result of extensive negotiations, first with the George T. Gamble 1991 Trust (the "Lender" or "Gamble Trust") and Creditors' Committee and later the Opus Equity Committee, the Debtors took great care to ensure that each of their major stakeholders endorsed the proposed marketing and sale process. In this regard, and at the Committees' insistence, the Debtors extended the sale timeline for the Pleasant Valley Assets by approximately six (6) weeks. To accommodate the Committees' demand for a longer marketing process, the Debtors were required to renegotiate certain terms of the proposed DIP Facility with the Lender.

9.      In addition, to resolve conflict of interest concerns articulated by the Committees, the U.S. Trustee and the Court, Tri-Valley appointed an independent director to its Board of

---

located in the Richardson and Tolovana Districts of Alaska in which the Debtors held mineral rights and mining claims (the "Mineral Assets"); and (3) oil and gas properties located in the Oxnard Oil Field near Oxnard, California in which the Debtors hold leasehold interests (the "Pleasant Valley Assets").

{944.002-W0025116.}

Directors and created a special committee comprised solely of this newly appointed director (Hobart Truesdell) to exercise exclusive decision making authority over certain matters affecting Opus [See Docket No. 266]. Special conflicts counsel was also engaged [Docket No. 267].

10.     On September 28, 2012, the Court entered the Final Order approving the Debtors' DIP Financing [Docket No. 201], whereby Opus became liable for up to 50% of the Roll-up Loan and the parties reserved their respective rights with respect to certain allocation issues related thereto. In addition, the Final Order set forth certain Challenge Periods by which the Committees needed to file litigation against the Lender. Notably, the DIP Loan Agreement provides the Lender a right of indemnity for any challenge to the validity of the Lender's pre or post-petition loans.

11.     Pursuant to and in accordance with the Sale Procedures Orders, the Debtors held an auction for the Edison and Mineral Assets on October 17, 2012. After one round of sealed bids by each Qualified Bidder, Naftex Development LLC (the "Edison Buyer") and Bluestone Resources (the "Mineral Buyer") were chosen as having submitted the highest and best bids for the Edison and Mineral Assets, respectively.

12.     On October 18, 2012, the Court entered separate Orders: (1) *Authorizing and Approving (a) the Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (b) Approving the Assumption and Assignment of Designated Executory Contracts and Leases; and (c) Granting Related* Relief [Docket No. 268] (the "Edison Sale Order"), and (2) *Authorizing and Approving (a) the Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (b) Approving the Assumption and Assignment of Designated Executory Contracts and Leases; and (c) Granting Related* Relief [Docket No. 269] (the "Mineral Sale Order").

13.     The sales of the Edison and Mineral Assets each closed on November 1, 2012 at which time the Debtors received sale proceeds totaling approximately $3,200,000. Upon these closings, the Debtors' remaining assets primarily consisted of the Pleasant Valley Assets.

14.     On October 24, 2012, the Opus Equity Committee filed a Motion seeking approval for an extensive examination of the Lender and the Debtors under Bankruptcy Rule 2004. The Creditors' Committee joined the Opus Equity Committee as a moving party, seeking to conduct its own investigation. The Committees' 2004 Motion was resolved by consensual Order dated November 26, 2012 [Docket No. 371].

15.     On November 19, 2012, the Committees jointly filed an adversary complaint against the Lender and G. Thomas Gamble [A.P. No. 12-50994]. In their Complaint, the Committees seek to avoid the Debtors' obligations to the Lender on preferential transfer grounds, a theory that is predicated on a determination that the Lender and its principal, Tom Gamble are "insiders" as that term is defined in the Bankruptcy Code. The Lender and Mr. Gamble have moved to dismiss light of the fact that (i) Mr. Gamble resigned as a Director of Tri-Valley in 2011, (ii) neither Mr. Gamble nor any party affiliated with him hold 20% or more of the Debtors' voting securities, and (iii) Mr. Gamble has never exercised control over the Debtors.

16.     In accordance with the Sale Procedures Orders, the Debtors solicited offers for the purchase of the Pleasant Valley Assets. Despite the extended sale effort, Clarity Management LP (the "Purchaser") submitted the only Qualified Bid for the Pleasant Valley Assets at a price of only $19,000,000. While the Debtors negotiated an increase in the purchase price from an initial bid of $17,500,000, the ultimate price paid was substantially lower than had been anticipated for these assets.

6

17.     On December 11, 2012, the Court entered an *Order (I) Authorizing and Approving (A) the Sale of Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Approving the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (C) Granted Related Relief* (the "Pleasant Valley Sale Order") [Docket No. 420]. The sale of the Pleasant Valley Assets closed on December 21, 2012.

18.     Even before the sale of the Pleasant Valley Assets had been consummated, the Debtors began the process of winding-down their affairs, addressing post-closing obligations, and discussing the contours of a consensual liquidating chapter 11 plan with their major stakeholders.

19.     Confronted with a lower than anticipated sales price for the Pleasant Valley Assets, and the professional fee "burn" associated with multiple committees, an independent director, special conflicts counsel, and a Lender entitled to indemnification, the Debtors believed that if there was any prospect of confirming a consensual plan of liquidation, an agreement must be reached quickly and cost effectively.   On December 19, 2012, the Debtors proposed a standstill of discovery and litigation.  Ultimately, a Standstill Agreement was agreed to by the parties and was approved by the Court on January 22, 2013 [Docket #521].  The Standstill Period has been further extended through March 22, 2013.

20.     Despite fairly extensive plan discussions, primarily between the Debtors and the Opus Equity Committee, the parties have been unable to agree on a plan of liquidation. Therefore, to conserve the funds and other intangible assets remaining in the estate, the Debtors seek to convert these cases to Chapter 7 so that a single fiduciary for each Debtor can administer his or her respective estate in the most cost effective way possible.

7

21.     The Debtors believe that their estates have sufficient funds to satisfy (i) pre-petition secured claims, including the DIP Loan and various oil and gas liens, (ii) administrative claims, including cure obligations and estimated professional fees through conversion, and (iii) approximately $650,000 in costs associated with post-sale winding up of their business affairs. After the satisfaction of such obligations, the estates will consist of cash and potential causes of action.   In view of the inability of major stakeholders to agree on the terms of a plan of liquidation, the remaining administration of these estates should occur under the supervision and control of two or more Chapter 7 trustees.

**Basis For Relief**

22.     By this Motion, the Debtors seek entry of an order, effective at 5:00 PM (ET) on April 30, 2013, converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code.

23.     Section 1112 (a) of the Bankruptcy Code governs the conversion of a Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.  This section provides that:

(a)     The debtor may convert a case under this chapter to a case under chapter 7 of this title unless –

(i)     the debtor is not a debtor-in-possession;

(ii)     the case originally was commenced as an involuntary case under this chapter; or

(iii)     the case was converted to a case under this chapter other than on the debtor's request.

11 U.S.C. § 1112 (a).   Because subdivisions (i), (ii) and (iii) of Section 1112 (a) of the Bankruptcy Code are inapplicable here, the Debtors may convert this case to a case under Chapter 7 of the Bankruptcy Code as a matter of right.  In re Dieckhaus Stationers of King of Prussia Inc., 73 B.R. 969, 971 (Bankr. E.D. Pa. 1987) ("[Section 1112(a)] by its terms gives the debtor an absolute right to convert, unless the case is governed by one of the enumerated

8

exceptions."); In re Schuler, 119 B.R. 191, 192 (Bankr. W.D. Mo. 1990) (same).

24.     The Debtors have determined, in their business judgment, that it is in the best interests of the estates and their creditors to convert these jointly administered Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code. The Debtors have liquidated substantially all of their assets, yet they continue to incur administrative expenses, and now believe that they will be unable to effectuate a Chapter 11 plan of liquidation. If, after the date this Motion is filed, an agreement is reached on the terms of a consensual Chapter 11 plan, the Debtors may adjourn or withdraw this Motion. Absent an agreement, however, the Debtors believe that conversion is the most responsible way to complete the administration of these cases.

25.     Based on the foregoing, the Debtors believe that the timely conversion of these cases to cases under Chapter 7 of the Bankruptcy Code is warranted and seek to do so in a controlled fashion, with all post-bankruptcy, pre-conversion debts being paid to the greatest extent possible and all efforts taken to wind-down the Debtors' business prior to conversion.

## Notice

26.     Notice of this Motion has been provided to: (i) The Office of the United States Trustee; (ii) counsel to the Equity Committee; (iii) counsel to the Creditors' Committee; (iv) all known taxing authorities of the Debtors; (v) counsel to the DIP Lender; (vi) all other entities that have filed requests for notices pursuant to Bankruptcy Rule 2002; and (vii) all other known creditors. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice of the Motion is necessary.

## Conclusion

WHEREFORE, the Debtors respectfully request the Court to enter an order (i) converting

the Debtors' Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code at 5:00 PM (ET

on April 30, 2013; and (ii) granting such other and further relief as is just and proper.

DATED: March 6, 2013
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE  19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@K&Llaw.com
      mumford@K&Llaw.com
      brown@K&Llaw.com

*and*

Charles A. Dale III
Mackenzie L. Shea
**K&L Gates LLP**
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Telephone:  (617) 261-3100
Facsimile: (617) 261-3175

E-mail: chad.dale@klgates.com
      mackenzie.shea@klgates.com

*Counsel to Debtors and Debtors-in-Possession*

and

*/s/ Robert S. Brady*
_____
Robert S. Brady (No. 2847)
**Young Conaway Stargatt & Taylor LLP**
Rodney Square, 1000 King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 576-3283
Email: rbrady@ycst.com

*Special Conflicts Counsel to Debtor TVC Opus I Drilling Program, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |

**Hearing Date: April 22, 2013 at 11:30 a.m. (ET)**
**Objections Due: March 22, 2013 at 4:00 p.m. (ET)**

## NOTICE OF MOTION

TO:    The Office of the United States Trustee; Counsel to the Post-Petition Lender; Counsel to the Official Committee of Unsecured Creditors; Counsel to the Official Committee of Equity Security Holders of TVC Opus I Drilling Program, L.P.; all known Taxing Authorities; all known creditors; and all parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedures.

On March 6, 2013, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the ***Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code Effective On or About April 30, 2013*** (the "Motion").

Objections, if any, to the relief requested in the Motion must be filed with the United States Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, on or before **March 22, 2013 at 4:00 p.m. (ET).**

At the same time, you must also serve a copy of the objection upon the undersigned counsel so as to be **received no later than 4:00 p.m. (ET) on March 22, 2013.**

A HEARING ON THE MOTION WILL BE HELD ON **APRIL 22, 2013 AT 11:30 a.m. (ET)** BEFORE THE HONORABLE MARY F. WALRATH, UNITED STATES BANKRUPTCY COURT JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5th FLOOR, COURTROOM 4, WILMINGTON, DELAWARE 19801.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: March 6, 2013
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
J. Landon Ellis (No. 4852)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
     mumford@lrclaw.com
     ellis@lrclaw.com

and

Charles A. Dale III
Mackenzie L. Shea
**K&L GATES LLP**
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Telephone: (617) 261-3100
Facsimile: (617) 261-3175
Email: chad.dale@klgates.com
     mackenzie.shea@klgates.com

*Counsel to the Debtors and Debtors-In-Possession*

and

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
**Young Conaway Stargatt & Taylor LLP**
Rodney Square, 1000 King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 576-3283
Email: rbrady@ycst.com

*Special Conflicts Counsel to Debtor TVC Opus I Drilling Program, L.P.*

{944.002-W0025113.}

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | Ref. No. _____ |

## ORDER CONVERTING CASES FROM CHAPTER 11 TO CHAPTER 7 OF THE BANKRUPCTY CODE EFFECTIVE ON APRIL 30, 2013

Upon the motion dated March 6, 2013 (the "Motion"), of the above-captioned debtors and debtors-in-possession (the "Debtors") in the above-captioned cases seeking an entry of an Order (this "Order") to convert the above-captioned cases from Chapter 11 to Chapter 7 of the Bankruptcy Code Effective On March 22, 2013 (the "Motion"); and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334; and it appearing that venue of theses cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is reasonable and in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefore; it is hereby:

**ORDERED**, that the Motion is GRANTED; and it is further

**ORDERED**, that effective at 5:00 PM (ET) on April 30, 2013, pursuant to section 1112

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation ("Tri-Valley") (5250), Tri-Valley Oil & Gas Co. ("TVOG") (7433), Select Resources Corporation, Inc. ("Select") (0386), and TVC Opus I Drilling Program L.P. ("Opus") (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

(a) of the Bankruptcy Code, the Chapter 11 cases of the Debtors shall be converted to cases under Chapter 7 of the Bankruptcy Code; and

**ORDERED**, that effective upon the date of this Order, pending the qualification of a permanent trustee under section 702 of the Bankruptcy Code, all contested matters and adversary proceedings in the Debtors' bankruptcy cases are stayed unless otherwise ordered by the Court.

DATED: _____
       Wilmington, Delaware

                         _____
                         Honorable Mary F. Walrath
                         United State Bankruptcy Judge

2

# Exhibit 20

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRI-VALLEY CORPORATION, *et al.*,[1] | ) | Case No. 12-12291 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | **Requested Hearing Date:  March 19, 2013 at 10:30 a.m.** |
| | ) | **Requested Objection Deadline:  March 19, 2013 at 10:30 a.m.** |
| | ) | |
| | ) | |
| | ) | |

## EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF TVC OPUS I DRILLING PROGRAM L.P. FOR ENTRY OF AN ORDER IMMEDIATELY CONVERTING CASES TO CHAPTER 7

The Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P. (the "Equity Committee"), by and through their undersigned counsel, hereby file this Emergency Motion (the "Motion"), pursuant to section 1112 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), for entry of an order in the form attached hereto immediately converting the Debtors' cases to cases under Chapter 7 of the Bankruptcy Code.  In support of this Motion, the Equity Committee respectfully represents as follows:

### JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334).

2.     The statutory predicate for the relief requested herein is section 1112(b) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

3.     On March 6, 2013, the Debtors filed the *Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code Effective April 30, 2013*.   The Equity Committee is in agreement with the Debtors that these Chapter 11 cases should be converted to Chapter 7 of the Bankruptcy Code.   The only remaining issue, however, is the timing for such conversion.   The Debtors proposed that the cases convert effective at 5:00 p.m. (ET) on April 30, 2013, by which date the estates will have crept another approximately 45 days closer to the expiration of the Debtors' existing director and offer liability insurance policy on June 30, 2013 and the deadlines for filing additional Challenges under the DIP Financing Order (defined below).   The Equity Committee, however, believes that these cases should be converted immediately in order to preserve any remaining assets and causes of actions for the Chapter 7 Trustees to pursue for the benefit of the Debtors' estates and creditors.

## GENERAL BACKGROUND

4.     On August 7, 2012 (the "Petition Date"), Tri-Valley Corporation ("Tri-Valley"), Tri-Valley Oil & Gas Co. ("TVOG"), Select Resources Corporation, Inc. ("Select"), and Tri-Valley Opus I Drilling Program L.P. ("Opus" and, together with Tri-Valley, TVOG, and Select, the "Debtors"), each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court") (collectively, the "Chapter 11 Cases").

5.     On August 27, 2012, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee" and together with the

Equity Committee, the "Official Committees").   On September 15, 2012, the Office of the

United States Trustee appointed the Equity Committee to represent the interests of Opus's equity

holders.

***The DIP Financing Order and the Official Committees' Complaint Challenging the Entirety
of the Gamble Parties' Pre-Petition Claims.***

   6. On September 28, 2012, the Court entered the *Final Order Pursuant to 11 U.S.C.*

*§§ 105, 361, 362, 363, 364 and 507 (A) Authorizing Post-Petition Financing, (B) Authorizing*

*Use of Cash Collateral, (C) Granting Adequate Protection, and (D) Granting Related Relief* (the

"DIP Financing Order") [Docket No. 201].

   7. Following a contested hearing on the Equity Committee's *Motion for an Order*

*Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1* [Docket No. 277] (the

"2004 Motion") and entry of the *Order Granting Motion of the Official  Committee of Equity*

*Security Holders of TVC Opus I Drilling Program L.P. for an Order Pursuant to Bankruptcy*

*Rule 2004 and Local Bankruptcy Rule 2004-1 and Addressing Challenge Period Deadlines*

[Docket No. 371] (the "2004 Order"), the parties engaged in limited discovery regarding

potential challenges to the liens and claims asserted by George T. Gamble and the George T.

Gamble 1991 Trust (the "Gamble Parties") required to be asserted by the First Challenge Period.

   8. On November 19, 2012, the Official Committees timely filed the *Complaint for*

*Declaratory Judgments and to Avoid Avoidable Transfers* [Docket No. 361] (the "Complaint")

against the Gamble Parties.  Through the Complaint, the Official Committees asserted 9 Counts

for relief seeking certain declaratory judgments pursuant to 11 U.S.C. §§ 506 and 28 U.S.C. §

2201 and avoidance of transfers of interests in property of the Debtors pursuant to 11 U.S.C.

§§544, 547, 548, and 550.  The Gamble Parties have moved to dismiss the Complaint.  The

parties have fully briefed the Motion to Dismiss, but not yet submitted it for the Court's

consideration on account of the parties entering into the Stipulation Regarding Standstill and Extension of Deadlines dated as of January 18, 2013 (the "Second Standstill Agreement"), which was approved by the Court on January 22, 2013. The Parties further agreed to extend the standstill in the Amended Stipulation Regarding Standstill and Extension of Deadlines (the "Second Standstill Agreement").

9.      Pursuant to paragraph 3 in the Second Standstill Agreement, (i) any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until May 22, 2013 to file a complaint based on equitable subordination or recharacterization against the Lender or any affiliate of the Lender (including G. Thomas Gamble) (the "Interim Challenge Period Deadline"); and (ii) any Committee or subsequently appointed Chapter 7 or 11 trustee shall have until July 23, 2013 to seek standing to prosecute any claims or causes of action other than Possible Existing Indebtedness Claims against the Lender or its affiliates, which claims may include claims derivative of the Debtors' estates notwithstanding the stipulations, admissions and agreements of the Debtors contained in the DIP Financing Order, and if Standing is granted, until the earlier of (x) two weeks from when standing is granted or (y) August 19, 2013, to initiate an action on any such claim or cause of action (the "Second Challenge Period Deadline").

10.     Pursuant to the First and Second Standstill Agreements, the Debtors, the Gamble Parties, and the Equity Committee engaged in discussions regarding a consensual plan and settlement. Unfortunately, the parties were not able to reach agreement.

11.     On March 6, 2013, the Debtors filed the *Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code Effective April 30, 2013* (the "Debtors' Conversion Motion").

## RELIEF REQUESTED

12.     The Equity Committee seeks entry of an order pursuant to section 1112(b) of the Bankruptcy Code converting the Debtors' cases to cases under Chapter 7 of the Bankruptcy Code effective immediately.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

13.     Through the Debtors' Conversion Motion, the Debtors concede that a basis exists for the conversion of the Debtors' cases, however, the Debtors seek to delay conversion until April 30, 2013.  An April 30, 2013 effective date of conversion will leave the Chapter 7 Trustees with merely 30 days in which to complete the investigation of any causes of action that may lie against the Tri-Valley Board of Directors (including Gamble), which the Equity Committee has not concluded on account of the parties' entry into the First and Second Standstill Agreements, prior to the expiration of the existing D&O liability insurance policy on June 30, 2013.  While expiration of the D&O liability policy may not preclude the Chapter 7 Trustees from asserting appropriate claims against the Tri-Valley Board, the Chapter 7 Trustees should be afforded as much time as possible to complete the investigation and bring appropriate claims prior to that deadline to ensure that insurance proceeds remain available in the event a judgment is entered.

14.     Moreover, the upcoming Interim Challenge Deadline occurs on May 22, 2013, less than one month after the proposed effective date in the Debtors' Conversion Motion.  The deadline to seek standing related to the Second Challenge Period Deadline occurs on July 23, 2013, less than three months after the proposed effective date in the Debtors' Conversion Motion.  Given the multitude of issues in these cases, a fact that is evidenced in the Debtors' Conversion Motion by their request for two Chapter 7 Trustees, the Equity Committee submits

that these timeframes are simply too tight for a Trustee to effectively get "up to speed" and bring an informed and effective challenge action.

15.     In addition, immediate conversion to Chapter 7 will preserve the estates' remaining limited resources and avoid additional professional fees that otherwise will likely be incurred.

16.     As the Court is well aware, the Debtors have sold or otherwise disposed of substantially all of their tangible assets, and have no ongoing business operations with which to generate cash.  Thus, there is no reasonable prospect of the Debtors' rehabilitation.  The Equity Committee respectfully submits that the circumstances warrant immediate conversion of these cases to Chapter 7, and that immediate conversion is in the best interests of the Debtors' estates and creditors to preserve what little assets remain for the benefit of all interested parties.

## NOTICE

17.     No trustee or examiner has been appointed in these Chapter 11 Cases.  The Equity Committee will serve notice of this Motion on:  (i) counsel to the Debtors; (ii) the Office of the United States Trustee; (iii) counsel to the Creditors' Committee; (iv) counsel to the Gamble Parties; and (v) those parties who have requested service pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Equity Committee submits that no other or further notice is necessary.

## NO PREVIOUS REQUEST

18.     No previous request for the relief sought herein has been made by the Equity Committee to this or any other court.

WHEREFORE the Equity Committee respectfully request entry of the Order, attached hereto granting the relief requested herein and such other and further relief as is appropriate.

Dated: March 12, 2013

ASHBY & GEDDES, P.A.

Don A. Beskrone (DE Bar No. 4380)
Gregory A. Taylor (DE Bar No. 4008)
Amanda M. Winfree Herrmann (DE Bar No. 4615)
Leigh-Anne M. Raport (DE Bar No. 5055)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for the Official Committee of Equity Security Holders of Tri-Valley Opus I Drilling Program L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TRI-VALLEY CORPORATION, *et al.*,[1] | ) | Case No. 12-12291 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket Nos.** |
| | ) | |

## ORDER CONVERTING CASES TO CHAPTER 7

Upon motion (the "Motion") of the Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P. (the "Equity Committee"), for entry of an Order, pursuant to section 1112(b) of the United States Bankruptcy Code (the "Bankruptcy Code") converting these cases to cases under Chapter 7 of the Bankruptcy Code;[2] and after due deliberation and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is **GRANTED**.

2.      The Debtors' cases are hereby converted to cases under Chapter 7 of the Bankruptcy Code effective immediately upon entry of this Order (the "Conversion Date").

3.      The Debtors shall:

---

[1] The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

a. turn over to the chapter 7 Trustees all records requested by the Chapter 7 Trustees and property of the estate under the Debtors' custody and control as required by Bankruptcy Rule 1019(4); and

b. within 14 days of the date of this order, file a schedule of unpaid debts incurred after commencement of these cases including the name and address of each creditor as required by Bankruptcy Rule 1019(5); and it is further

4. The Debtors shall, within 30 days from the date of this order, file and transmit to the United States Trustee a final report and account as required by Bankruptcy Rule 1019(5)(A).

5. A representative of the Debtors and, if requested by the Chapter 7 Trustees, counsel to the Debtors in the chapter 11 cases, shall appear at the first meeting of creditors pursuant to Sections 341(a) and 343 of the Bankruptcy Code, and such representative shall be available to testify at such meeting.

6. Except to the extent otherwise previously ordered by the Court, all professionals retained in the Debtors' chapter 11 cases under Bankruptcy Code section 327 (except for those "ordinary course" professionals retained by the Debtors) shall file their final fee applications within 45 days of the entry of this Order (the "Filing Deadline").

7. The deadline for any party to object to any final fee application shall be forty-five (45) days after the Filing Deadline (the "Objection Deadline").

8. A hearing to consider all timely filed final fee applications shall be held on this Court's next regularly scheduled chapter 7 hearing day after the Objection Deadline,

9. Effective as of the Conversion Date and pending the qualification of a permanent Trustee under section 702 of the Bankruptcy Code, all contested matters in the Debtors' bankruptcy cases and any adversary proceeding filed in connection with the Debtors' bankruptcy cases are stayed, unless otherwise ordered by further order of this Court.

{00729224;v2 }

2

10.     The Court shall retain jurisdiction to hear and determine all matters arising

from or relating to this Order.

Dated: Wilmington, Delaware
       March __, 2013

_____
The Honorable Mary F. Walrath
United States Bankruptcy Court

## CERTIFICATE OF SERVICE

I, Leigh-Anne M. Raport, hereby certify that on March 12, 2013, I caused one copy of the foregoing document to be served upon the parties on the attached service list via first class U.S. Mail, postage prepaid, unless otherwise indicated.

Leigh-Anne M. Raport (#5055)

TRI-VALLEY CORPORATION, *et al.*,
Case No. 12-12291 (MFW)
2002 Service List
Avery# 5162 Labels

CHARLES A. DALE
MACKENZIE L. SHEA
K&L GATES LLP
STATE STREET FINANCIAL CENTER
ONE LINCOLN STREET
BOSTON, MA  02111-2950
(COUNSEL TO THE DEBTORS)

BRIAN MILLER, ESQ.
AKERMAN SENTERFITT LLP
ONE SOUTHEAST THIRD AVENUE
25TH FLOOR
MIAMI, FL  33131
(COUNSEL TO LYNN BLYSTONE, BEHROOZ SARAFRAZ)

SUSAN F. BALASCHAK, ESQ.
NICHOLAS J. LOUISA, ESQ.
AKERMAN SENTERFITT LLP
335 MADISON AVENUE
26TH FLOOR
NEW YORK, NY  10017
(COUNSEL TO LYNN BLYSTONE, BEHROOZ SARAFRAZ)

DELAWARE SECRETARY OF STATE
DIVISION OF CORPORATIONS/ FRANCHISE TAX
PO BOX 898
DOVER, DE  19903

**HAND DELIVERY**
RICK S. MILLER, ESQ.
FERRY, JOSEPH & PEARCE, P.A.
824 MARKET ST, SUITE 1000
WILMINGTON, DE  19801
(COUNSEL TO GEORGE T. GAMBLE 1991 TRUST)

GEORGE T. GAMBLE
PO BOX 128
OAKVILLE, CA  94562

**HAND DELIVERY**
ADAM G. LANDIS
KERRI K. MUMFORD
KIMBERLY A. BROWN
LANDIS RATH & COBB LLP
919 MARKET STREET, SUITE 1800
WILMINGTON, DE 19801
(COUNSEL TO THE DEBTORS)

**HAND DELIVERY**
TIIARA PATTON
OFFICE OF THE UNITED STATES TRUSTEE
844 N. KING STREET, SUITE 2207
LOCK BOX 35
WILMINGTON, DE  19801

**HAND DELIVERY**
NORMAN L. PERNICK, ESQ.
PATRICK J. REILLEY, ESQ.
COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, PA
500 DELAWARE AVENUE, SUITE 1410
WILMINGTON, DE  19801
(COUNSEL TO GARY D. BORGNA)

DELAWARE SECRETARY OF TREASURY
820 SILVERLAKE BLVD, SUITE 100
DOVER, DE 19904

GEORGE BEAN
OPUS SPECIAL COMMITTEE
11393 S.W. RIVERWOOD ROAD
PORTLAND, OR  97219-8446

GEORGE T. GAMBLE 1991 TRUST
C/O GEORGE T. GAMBLE, TRUSTEE
PO BOX 128
OAKVILLE, CA  94562

PATRICIA WILLIAMS PREWITT, ESQ.
LAW OFFICE OF PATRICIA WILLIAMS PREWITT
10953 VISTA LAKE COURT
NAVASOTA, TX  77868
(COUNSEL TO PLAINS MARKETING, LP)

00671421;v2 }

INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA, PA  19101-7346

**HAND DELIVERY**
KATHARINE L. MAYER, ESQ.
MCCARTER & ENGLISH, LLP
RENNAISSANCE CENTRE
405 N. KING STREET, 8TH FLOOR
WILMINGTON, DE  19801
(COUNSEL TO WESTERN OILFIELDS SUPPLY)

ROBERT H. BRUMFIELD, III, ESQ.
LAW OFFICES OF ROBERT H. BRUMFIELD
1601 F STREET
BAKERSFIELD, CA  93301
(COUNSEL TO BAKER HUGHES, INC.)

**HAND DELIVERY**
JAMES E. O'NEILL, ESQ.
PACHULSKI STANG ZIEHL & JONES LLP
919 N. MARKET STREET, 17TH FLOOR
WILMINGTON, DE  19801
(COUNSEL TO UNSECURED CREDITORS COMMITTEE)

JOHN W. KIM, ESQ.
NOSSAMAN LLP
777 S. FIGUEROA STREET, 34TH FLOOR
LOS ANGELES, CA  90017
(COUNSEL TO NAFTEX)

PETER MARGUGLIO
OPUS SPECIAL COMMITTEE
4 MARIPOSA COURT
TUBURON, CA  94920-2017

IRA D. KHARASCH, ESQ.
JEFFREY N. POMERANTZ, ESQ.
SHIRLEY S. CHO, ESQ.
PACHULSKI STANG ZIEHL & JONES LLP
10100 SANT AMONICA BOULEVARD, 13TH FL
LOS ANGELES, CA  90067-4100
(COUNSEL TO UNSECURED CREDITORS COMMITTEE)

CATHERINE D. MEYER, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 SOUTH FIGUEROA STREET, SUITE 2800
LOS ANGELES, CA  90017-5406
(COUNSEL TO DIP LENDER)

PETER HUGGINS
OPUS SPECIAL COMMITTEE
PHOENIX ENERGY
2094 185TH ST # 19
FAIRFIELD, IA  52556

ROBERT MILLER
OPUS SPECIAL COMMITTEE
534 MAIN AVENUE
DURANGO, CO  81301

CAROL M. BURKE, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN LLP
TWO HOUSTON CENTER
909 FANNIN, SUITE 2000
HOUSTON, TX  77010-1018
(COUNSEL TO DIP LENDER)

DEREK DUNDAS
RUTAN & TUCKER LLP
611 ANTON BLVD #1400
PO BOX 1950
COSTA MESA, CA  92628-1950

ANDREW M. TROOP, ESQ.
KERRY A. BRENNAN, ESQ.
DAVID S. FORSH, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 BROADWAY
NEW YORK, NY  10036-4039
(COUNSEL TO DIP LENDER)

SECURITIES & EXCHANGE COMMISSION
SECRETARY OF THE TREASURY
100 F STREET, NE
WASHINGTON, DC  20549

ROBERT MILLER
OPUS SPECIAL COMMITTEE
534 MAIN AVENUE
DURANGO, CO 81301

**HAND DELIVERY**
ELIHU E. ALLINSON, III, ESQ.
SULLIVAN HAZELTINE ALLINSON LLC
901 N. MARKET STREET, SUITE 1300
WILMINGTON, DE 19801
(COUNSEL TO NAFTEX)

SECURITIES & EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
ATTN: GEORGE S. CANELLOS, REGIONAL DIRECTOR
3 WORLD FINANCIAL CENTER, SUITE 400
NEW YORK, NY 10281-1022

TODD GARRETT
OPUS SPECIAL COMMITTEE
11 VIA PARAISO WAY
TIBURON, CA 94920

**HAND DELIVERY**
KATHLEEN M. MILLER, ESQ.
MICHAEL P. MIGLIORE, ESQ.
SMITH, KATZENSTEIN & JENKINS LLP
800 DELAWARE AVENUE, 10TH FLOOR
WILMINGTON, DE 19801
(COUNSEL TO R. MILLER, G. BEAN, P. HUGGINS, T. GARRETT, P. MAGUGLIO)

**HAND DELIVERY**
FREDERICK B. ROSNER, ESQ.
SCOTT J. LEONHARDT, ESQ.
THE ROSNER LAW GROUP LLC
824 MARKET STREET, SUITE 810
WILMINGTON, DE 19801
(COUNSEL TO LYNN BLYSTONE, BEHROOZ SARAFRAZ)

LINDA BOYLE
TW TELECOM INC.
10475 PARK MEADOWS DRIVE, #400
LITTLETON, CO 80124

CARL DORÉ, JR.
WILLIAM B. HARRIS
DORÉ MAHONEY LAW GROUP, PC
17171 PARK ROW, SUITE 160
HOUSTON, TX 77084
(COUNSEL TO KEY ENERGY SERVICES)

**HAND DELIVERY**
ROBERT BRADY, ESQ.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
RODNEY SQUARE
1000 NORTH KING STREET
WILMINGTON, DE 19801

**HAND DELIVERY**
MICHAEL DEBAECKE, ESQ.
STANLEY B. TARR, ESQ., VICTORIA A. GUILFOYLE, ESQ
BLANK ROME LLP
1201 N. MARKET STREET, SUITE 800
WILMINGTON, DE 19801

LUKE G. ANDERSON
NATHANIEL S. CURRALL
K&L GATES LLP
1 PARK PLAZA, TWELFTH FLOOR
IRVINE, CA 92614
(COUNSEL TO THE DEBTORS)

JARED S. HAWK
K&L GATES LLP
210 SIXTH AVENUE
PITTSBURGH, PA 15222-2613
(COUNSEL TO THE DEBTORS)

SUSAN N.K. GUMMOW
FORAN GLENNON PALENDECH PONZI & RUDLOFF
222 N. LASALLE STREET, SUITE 1400
CHICAGO, IL 60601
(CHARTIS SPECIALTY INSURANCE COMPANY)

RIVERSIDE CLAIMS LLC
PO BOX 626
PLANETARIUM STATION
NEW YORK, NY 10024

0671421;v2 }

# Exhibit 21

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TRI-VALLEY CORPORATION, *et al.*,[1] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: June 19, 2013 at 2:00 p.m.**<br>**Objections Due: June 10, 2013 at 4:00 p.m. (ET)** |

## SEVENTH MONTHLY AND FINAL FEE APPLICATION OF K&L GATES LLP FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO 11 U.S.C. §§ 330 AND 331

| | |
|---|---|
| Name of Applicant: | K&L Gates LLP ("K&L") |
| Authorized to Provide Professional Services to: | The Debtors and Debtors-In-Possession |
| Date of Retention: | *Nunc Pro Tunc* to August 7, 2012 |
| Period for which monthly compensation and reimbursement sought: | March 1, 2013 through March 25, 2013[2] |
| Amount of monthly compensation sought as actual, reasonable and necessary: | $91,523.50 |
| Amount of monthly expense reimbursement sought as actual, reasonable and necessary: | $4,171.79 |
| Period for which final compensation and reimbursement sought: | August 7, 2012 through March 25, 2013[3] |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is P.O. Box 20429, Bakersfield, CA 93390.

[2] These cases were converted to Chapter 7 on March 25, 2013.

[3] This Application includes estimated fees and expenses in the amounts of $7,500 and $500 respectively for post-conversion time and expenses from March 25, 2013 for the preparation and filing of this Application through the prosecution of this Application. K&L reserves the right to request from the Debtors additional post-conversion expense reimbursement (in connection with expenses not yet posted to K&L's account)

Amount of final fees to be approved
as actual, reasonable and necessary:        $1,579,597.00

Amount of final expenses sought
as actual, reasonable and necessary:        $61,812.89

This is a: __X__ monthly ___ interim __X__ final application

**Prior Monthly Applications**:

| PRIOR MONTHLY FEE STATEMENTS | | | | | |
|---|---|---|---|---|---|
| | | Requested | | Approved | |
| Dated Filed | Period Covered | Fees | Expenses | Fees | Expenses |
| 11/1/2012 | 8/7/12 – 9/30/12 | $560,185.50 | $22,949.83 | $560,185.50 | $21,445.53[4] |
| 11/21/12 | 10/1/12 – 10/31/12 | $266,898.00 | $18,557.10 | $266,898.00 | $16,715.90[5] |
| 12/28/12 | 11/1/12 – 11/30/12 | $235,489.50 | $10,675.52 | $235,489.50 | $10,547.12[6] |
| 1/25/13 | 12/1/12 – 12/31/12 | $198,209.50 | $2,284.20 | $198,209.50 | $2,284.20[7] |
| 2/19/13 | 1/1/13 – 1/31/13 | $145,852.00 | $5,223.59 | $145,852.00 | $5,223.59[8] |
| 3/15/13 | 2/1/13 – 2/28/13 | $81,439.00 | $2,350.11 | Pending | Pending[9] |

| INTERIM APPLICATION FOR COMPENSATION | | | | | |
|---|---|---|---|---|---|
| | | Requested | | Approved | |
| Date Filed | Period Covered | Fees | Expenses | Fees | Expenses |
| 1/15/13 | 8/7/12 – 11/30/12 | $1,062,573.00 | $50,341.25 | $1,062,573.00 | $50,341.25[10] |

---

[4] Approved on interim basis pursuant to Administrative Order (as defined below). See Certification of Counsel dated November 27, 2012 [Docket No. 376].

[5] Approved on interim basis pursuant to Administrative Order. See Certificate of No Objection to Application Regarding Docket No. 367 dated December 17, 2012 [Docket No. 438].

[6] Approved on interim basis pursuant to Administrative Order. See Certification of Counsel dated January 22, 2013 [Docket No. 522].

[7] Approved on interim basis pursuant to Administrative Order. See Certification of No Objection to Application Regarding Docket No. 530 dated February 20, 2013 [Docket No. 578].

[8] Approved on interim basis pursuant to Administrative Order. See Certificate of No Objection to Application Regarding Docket No. 571 dated March 14, 2013 [Docket No. 647].

[9] As the Debtors' cases were converted to Chapter 7 prior to expiration of the objection deadline, K&L refrained from filing a Certificate of No Objection for said Application, although no objections were filed by the deadline.

[10] Approved on interim basis pursuant to Court Order dated February 20, 2013 [Docket No. 572].

2

### FINAL COMPENSATION BY INDIVIDUAL

| Name of Professional | Position w/K&L and Year of Admission | Year of Law School Graduation | Hourly Billing Rate[11] | Total Billed Hours | Total Compensation |
|---|---|---|---|---|---|
| Allen, D. B. | Partner/1996 | 1996 | 585.00 | 9.70 | 5,674.50 |
| Anderson, L. G. | Partner/2000 | 2000 | 540.00 | 203.50 | 109,890.00 |
|  |  |  | 575.00 | 58.60 | 33,695.00 |
| Bassetti, M | E-DAT Clerk | N/A | 85.00 | 5.80 | 493.00 |
| Bernfield, W. J. | Partner/1978 | 1978 | 655.00 | 2.00 | 1,310.00 |
| Bevan, E. A. | Associate/2007 | 2007 | 500.00 | 2.20 | 1,100.00 |
| Bibikos, G. A. | Associate | 2003 | 425.00 | 17.30 | 7,352.50 |
| Bicks, J. A. | Partner/1985 | 1985 | 825.00 | 1.00 | 825.00 |
| Bisnar, L. A. | Paralegal | N/A | 250.00 | 40.40 | 10,100.00 |
| Bowman, M. B. | Staff Lawyer/2003 | 2002 | 325.00 | 8.10 | 2,632.50 |
| Brighton, J. | Partner/1989 | 1989 | 650.00 | 35.30 | 22,945.00 |
| Chandler, J. | Associate/2007 | 2007 | 350.00 | 2.60 | 910.00 |
| Cossitt, S. L. | Paralegal | N/A | 275.00 | 56.30 | 15,482.50 |
|  |  |  | 285.00 | 25.20 | 7,182.00 |
| Currall, N.A. | Associate/2000 | 2000 | 510.00 | 13.10 | 6,681.00 |
| Dale, C. A. | Partner/1991 | 1991 | 665.00 | 445.60 | 296,324.00 |
|  |  |  | 695.00 | 113.50 | 78,882.50 |
| Duffy, S. L. | Paralegal | N/A/ | 240.00 | 10.10 | 2,424.00 |
| Fallon, R.M. | Paralegal | N/A | 245.00 | 379.70 | 93,026.50 |
|  |  |  | 265.00 | 18.90 | 5,008.50 |
| Fennel, L. W. | E-DAT Atty/1996 | N/A | 340.00 | 4.00 | 1,360.00 |
| Ford, B. M. | Partner/2003 | 2002 | 480.00 | .20 | 96.00 |
| French, E. T,. | Associate/2012 | 2012 | 320.00 | 8.00 | 2,560.00 |
| Garraux, L. J. | Associate/2008 | 2007 | 335.00 | 29.80 | 9,983.00 |
| Goodfried, M. B. | E-DAT Atty/1998 | N/A | 340.00 | 20.80 | 7,072.00 |
|  |  |  | 350.00 | 13.60 | 4,760.00 |
| Graf, A. M. | E-DAT Clerk | N/A | 85.00 | .40 | 34.00 |
| Hawk, J. S. | Associate/2004 | 2004 | 440.00 | 9.40 | 4,136.00 |
| Johnson, J. | E-DAT Analyst | N/A | 165.00 | 29.80 | 4,917.00 |
| Jones, C. S. | Associate/2010 | 2009 | 310.00 | 45.00 | 13,950.00 |
|  |  |  | 340.00 | 1.50 | 510.00 |
| Kasollja, R. | Associate/2008 | 2008 | 340.00 | 16.80 | 5,712.00 |
| Kinchla, A. M. | Associate/2009 | 2009 | 355.00 | 11.90 | 4,224.50 |
|  |  |  | 385.00 | 145.80 | 56,133.00 |
| Kirby, R. A. | Partner/1974 | 1974 | 800.00 | 10.30 | 8,240.00 |
|  |  |  | 840.00 | 1.00 | 840.00 |
| Knox, B. K. | Partner/1989 | 1988 | 605.00 | 7.50 | 4,537.50 |
| Kuffel, C. M. | E-DAT Analyst | N/A | 180.00 | 2.90 | 522.00 |

---

[11] In January 2013, K&L increased its hourly billing rates.

3

| | | | 190.00 | 2.10 | 399.00 |
|---|---|---|---|---|---|
| Lane, J. | Partner/2004 | 2004 | 475.00 | 367.80 | 174,705.00 |
| | | | 500.00 | 53.80 | 26,900.00 |
| Lebiodia, N. P. L. | Associte/2006 | 2006 | 350.00 | 37.50 | 13,125.00 |
| Majumder, B. | Partner/1993 | 1993 | 565.00 | 2.10 | 1,186.50 |
| McCalmon, B. K. | Partner/1996 | 1996 | 600.00 | .40 | 240.00 |
| McCooe, P. | Associate/2012 | 2012 | 320.00 | 7.40 | 2,368.00 |
| McDonald, A. A. | Paralegal | N/A | 235.00 | 53.70 | 12,619.50 |
| | | | 245.00 | 8.60 | 2,107.00 |
| McGrath, N. M. | Associate/2010 | 2009 | 340.00 | 108.00 | 36,720.00 |
| Meyers, N. F. | Paralegal | N/A | 345.00 | 25.20 | 8,694.00 |
| Nylen, S. T. | Partner/2003 | 2002 | 465.00 | 14.60 | 6,789.00 |
| Parrish, F. | Partner/1998 | 1998 | 560.00 | .30 | 168.00 |
| Petraglia, W.C. | Associate/2009 | 2009 | 325.00 | 122.70 | 39,877.50 |
| | | | 360.00 | 3.70 | 1,3320.00 |
| Petrides, T. H. | Associate/2009 | 2009 | 695.00 | .40 | 278.00 |
| Plumer, J. J. | Associate/2010 | 2009 | 320.00 | 27.80 | 8,896.00 |
| Phillips, G. D. | Associate/2010 | 2010 | 325.00 | 19.20 | 6,240.00 |
| Reinhardt, L. E. | Associate/2009 | 2009 | 300.00 | 2.70 | 810.00 |
| Ringwood, P. | E-DAT Clerk | N/A | 85.00 | 1.40 | 119.00 |
| Rohm, B. D. | Associate/2008 | 2008 | 335.00 | 12.20 | 4,087.00 |
| Shea, M. L. | Associate/2006 | 2006 | 420.00 | 532.40 | 223,608.00 |
| | | | 450.00 | 131.20 | 59,040.00 |
| Travastino, J. M. | Partner/1981 | 1980 | 440.00 | 50.10 | 22,044.00 |
| Tupper, R. E. | E-DAT Atty/1990 | 1990 | 375.00 | .20 | 75.00 |
| Wright, G. S. | Partner/1994 | 1994 | 650.00 | 115.00 | 74,750.00 |
| | | | 750.00 | 31.00 | 23,250.00 |
| | | | | | |
| | | | **Total** | **3,516.70** | **$1,572,097.00** |

**Blended Hourly Rate: $495.34**

4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TRI-VALLEY CORPORATION, *et al.*,[12] | Case No. 12-12291 (MFW) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: June 19, 2013 at 2:00 p.m.<br>Objections Due: June 10, 2013 at 4:00 p.m. (ET) |

### SEVENTH MONTHLY AND FINAL FEE APPLICATION
### OF K&L GATES LLP FOR COMPENSATION FOR SERVICES
### RENDERED AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE
### DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO 11 U.S.C. §§ 330 AND 331

K & L Gates LLP ("K&L"), bankruptcy counsel for the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby submits this *Seventh Monthly and Final Fee Application of K&L Gates for Compensation for Services Rendered and Reimbursement of Expenses As Counsel to the Debtors and Debtors in Possession Pursuant to 11 U.S.C. §§ 330 and 331* (the "Application") pursuant to 11 U.S.C. §§ 105(a), 330 and 331, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Local Rule 2016-2 of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, seeking entry of an order awarding K&L compensation for actual and necessary fees and expenses rendered to, or incurred on behalf of, the Debtors from March 1, 2013, through and including March 25, 2013 (the "Monthly Application Period"); and for final approval of compensation for legal services performed during the period commencing August 7, 2012 through and including March 25, 2013 (the together with the Monthly Application Period, the "Application Period") totaling

---

[12] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tri-Valley Corporation (5250), Tri-Valley Oil & Gas Co. (7433), Select Resources Corporation, Inc. (0386), and TVC Opus I Drilling Program L.P. (0334). The Debtors' corporate headquarters and the mailing address for each Debtor is 4927 Calloway Drive, Bakersfield, CA 93312.

$1,641,409.89 in total fees and expenses.

In support of the Application, K&L respectfully represents as follows:

## BACKGROUND

1.      On August 7, 2012 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.      A more detailed description of the Debtors' business and the events leading up to the Petition Date is set forth in the *Declaration of Maston N. Cunningham in Support of Chapter 11 Petitions and First Day Motions and Applications,* filed on August 7, 2012 (the "Cunningham Declaration") [Docket No. 3].

3.      On August 27, 2012, the U.S. Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") [Docket No. 80].

4.      On August 28, 2012, this Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members* (the "Administrative Order") [Docket No. 91].

5.      On August 30, 2012, this Court entered the *Order Authorizing the Debtors to Employ and Retain K&L Gates LLP as General Bankruptcy Counsel for the Non-Opus Debtors and Debtors-in-Possession* [Docket No. 117], *nunc pro tunc* to the Petition Date, with respect to Tri-Valley Corporation, Tri-Valley Oil & Gas Company, and Select Resources Corporation, Inc. (the "Initial K&L Retention Order"). The hearing with respect to K&L's retention for TVC Opus I Drilling Program L.P. ("Opus") was continued to a later date in response to concerns

raised by the U.S. Trustee and the Court.[13]

6.     On September 15, 2012, the U.S. Trustee appointed the Official Committee of Equity Security Holders for Opus (the "Equity Committee") [Docket No. 161].

7.     On October 17, 2012, this Court entered the *Supplemental Order Approving the Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of K&L Gates LLP as General Bankruptcy Counsel for the Debtors and Debtors-In-Possession* [Docket No. 252] approving *nunc pro tunc* to the Petition Date, K&L's retention for Opus, other than with regard to certain Opus conflict matters addressed therein (the "Supplemental K&L Order" and together with the Initial K&L Retention Order and the Amended K&L Retention Order, the "K&L Retention Order").

8.     On March 25, 2013, the Debtors' cases were converted to Chapter 7 of the Bankruptcy Code (the "Conversion Date").   On March 26, 2013, Charles Stanziale was appointed Chapter 7 trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co., and Select Resources Corporation, Inc.  On March 26, 2013, Jeoffrey L. Burtch was appointed Chapter 7 trustee of TVC Opus I Drilling Program L.P.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding and this Application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M).

10.     The statutory bases for relief requested herein is 11 U.S.C. §§ 105(a), 330 and 331.

---

[13] After the hearing, the Initial K&L Retention Order was revised to correct a typo therein (the "Amended K&L Retention Order") [Docket No. 127].

## TERMS AND CONDITIONS OF COMPENSATION

11.     Subject to Court approval, K&L seeks payment for compensation on an hourly basis, plus reimbursement of actual, necessary expenses incurred by K&L during the Application Period.  With the exception of copy charges (which are charged at a lower rate), the rates charged by K&L in this case do not differ from the rates charged to K&L's non-bankruptcy clients.

12.     A summary of the hours spent, the names of each professional and paraprofessional rendering services to the Debtors during the Application Period, the regular customary billing rates and the total value of time incurred by each of the K&L attorneys rendering services to the Debtors is attached hereto as Exhibit "A."  A summary of the same for the Monthly Period is attached hereto as "Exhibit A1."  A copy of the computer generated time entries reflecting the time recorded for these services, organized in project billing categories in accordance with the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (the "Guidelines"), is attached hereto as "Exhibit "B."  A statement of expenses incurred by K&L during the Application Period is attached hereto as "Exhibit "C."  A summary of the same for the Monthly Application Period is attached hereto as "Exhibit C1."  All time entries and requested expenses are in compliance with rule 2016-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").[14]

13.     Pursuant to the Administrative Order, K&L and other professionals retained in this case are authorized to file and to serve upon the parties identified in the Administrative Order monthly fee applications (a "Monthly Fee Application") of their fees and

---

[14] K&L has also attempted to ensure that this Application complies with the Guidelines.  To the extent that the Guidelines conflict with the Local Rules, in particular, Local Rule 2016-2, K&L has chosen to comply with such Local Rule.  K&L will supplement this Application with additional detail or information upon request.

expenses. After the expiration of a twenty-one (21) day objection period, the Debtors are authorized to promptly pay eighty percent (80%) of the fees and one hundred percent (100%) of the expenses requested in the Monthly Fee Application, unless an objection has been lodged against specific fees and/or expenses, or the Court orders otherwise.

14.     In accordance with the Administrative Order, K&L has previously filed and served upon the parties identified in the Administrative Order its First, Second, Third, Fourth, Fifth, and Sixth Monthly Fee Applications for the periods of August 7 – September 30, 2012, October 1 – 31, 2012, November 1 – 30, 2012, December 1 – 31, 2012, January 1 - 31, 2013, and February 1 – 28, 2013 on November 1, 2012, November 21, 2012, December 28, 2012, January 25, 2013, February 19, 2013 and March 15, 2013 respectively. Upon filing a Certificate of No Objection, K&L was entitled to 80% payment of fees requested therein and 100% of expenses. K&L has been paid such amounts for its First through Fifth Monthly Fee Applications. As the Debtors' cases were converted to Chapter 7 prior to expiration of the objection period for its Sixth Monthly Fee Application, K&L refrained from filing a Certificate of No Objection for said Application, although no objections were filed by the deadline.

15.     On February 20, 2013, the Court issued an Order [Docket No. 572] granting K&L's *Interim Application for Compensation and Reimbursement of Expenses (First)* [Docket No. 496], approving fees in the amount of $1,062,573.00 and expenses in the amount of $50,341.25 for the period of August 7, 2012 through and including November 30, 2012, and authorizing the Debtors to remit the 20% holdback of approved fees for those months.

16.     As a result of approval of its First through Fifty Monthly and Interim Fee Applications, K&L has received payments on account thereof and is presently owed on account of: (1) 20% holdback for December 2012; (ii) 20% holdback for January 2013; (iii) 100% of fees

9

and expenses in its Sixth Monthly Fee Application for February 2013 (as the objection deadline had not passed as of the Conversion Date); (iv) 100% of fees and expenses for March 1-25, 2013, for which no monthly statement was previously filed, but is contained in this Application, as separately shown on Exhibits A1 and C1 attached hereto; and (v) estimated fees and expenses for preparation and prosecution of this Application.

**SUMMARY OF PROFESSIONAL SERVICES**

17.     By this Application, K&L respectfully seeks: (i) a final award of compensation for professional services rendered to and expenses incurred for and on behalf of the Debtors in possession during the Application Period in the approximate aggregate amount of $1,641,409.89; and (ii) an order expressly allowing all prior monthly fee statements and payments made to K&L, including the allowed but unpaid portions of any prior monthly fee statements.  The compensation sought by the Final Application reflects a blended hourly rate of $495.34 (exclusive of paraprofessional time) which K&L submits is reasonable given the nature of the issues confronted and the results achieved in this bankruptcy case.

18.     In support of this Application, K&L submits the following supporting documentation, all of which is incorporated herein by reference:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Summary Sheet for August 7, 2012 – March 25, 2013 |
| A1 | Summary Sheet for March 1-25, 2013 |
| B | A copy of the computer generated time entries reflecting the time recorded for these services, organized in project billing categories in accordance with the United States Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (the "Guidelines") |

| C | A Statement of Expenses incurred by K&L during the Application Period |
|---|---|
| C1 | A Statement of Expenses incurred by K&L for March 1-25, 2013 |

19.     Each of the foregoing reports is prepared and maintained by K&L in the ordinary course of business.   With regard to "Exhibit B," "Exhibit C," and "Exhibit C1" respectively, these reports are prepared substantially contemporaneously with the performance of the professional services described or the incurring of the expenses for which reimbursement is sought hereby.  All time entries and requested expenses are in compliance with Rule 2016-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## CASE STATUS

20.     During the Chapter 11 cases, the Debtors filed monthly operating reports, which reports contained up-to-date information regarding the amount of cash on hand or on deposit in the Debtors' estates, the amount and nature of accrued unpaid administrative expenses, the Debtors' operating profits or losses, or the amount of unencumbered funds in the Debtors' estates.

21.     To the best of K&L's knowledge, the Debtors have paid to the U.S. Trustee their initial quarterly fees and have filed their monthly operating reports for the periods of August 7-31, 2012, September 1-30, 2012, October 1-31, 2012, November 1-30, 2012, December 1-31, 2012, January 1-31, 2013, February 1-28, 2013, and March 1-25, 2013.

## NARRATIVE SUMMARY OF SERVICES
## RENDERED ON A PROJECT SUMMARY BASIS

22.     All of the professional services that K&L rendered to the Debtors during the Application Period are set forth in detail in "Exhibit B," segregated according to project

11

billing categories pursuant to the Guidelines. A description of certain services deserving specific mention appears below, by project category:[15] It should be noted that there are instances where actual services performed, based on the description of the services, could have been placed in any one of a number of the categories. However, none of the services were billed to or included in more than one category.

        (A).    **SEC Reports:** (Total Hours: 4.70; Total Fees: $2,232.50)

23.    During the Application Period, K&L advised the Debtors with respect to their SEC reporting obligations (including the drafting and filing of Forms 10-Q and 12b-25) in connection with the commencement of the Chapter 11 cases and the contemplated sales of their assets therein.

        (B).    **D&O Policy Coverage Analysis:** (Total Hours: 166.80; Total Fees: $108,196.00)

24.    During the course of the Chapter 11 cases, K&L, among other things, (i) reviewed and analyzed the Debtors' insurance policies; (ii) prepared responses to initial coverage letters from insurers; (iii) prepared memorandums of law and frequent status updates to insurers pertaining to the commencement of these cases under Chapter 11, the contemplated sales of the Debtors' assets herein, conversion to Chapter 7, and other developments; (iv) communicated with insurers related to pending litigation and potential settlement opportunities, and (v) communicated with counsel to various parties related to same.

25.    During these cases, the Equity Committee pursued Rule 2004 examinations of the Debtors as well as litigation against the DIP Lender and Mr. Gamble. In response thereto, K&L was required to expend considerable effort evaluating the Debtors' D&O policies to determine, and later seek to invoke, available coverage (which may be a significant

---

[15] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in K&L's First Monthly Fee Application.

asset of the Chapter 7 estates) including without limitation, (i) developing strategies related to insurance and other issues arising from the discovery requests made by the Committee; (ii) reviewing and analyzing the Committees' settlement demands related to the litigation; (iii) drafting regular status updates to insurers related thereto; and (iv) communicating with various parties in interest regarding same.

26.     In addition, K&L responded to investor claims and potential coverage implications related to Opus and corresponded with Mr. Truesdell of the Opus Conflicts Committee (as defined below) regarding same.  Lastly, K&L also developed strategies for responding to anticipated environmental claims connected to the Debtors' oil and gas assets

### (C).     SEC Investigation of TVC Opus 1 Drilling Program:  (Total Hours: 17.20; Total Fees: $11,272.00)

During the Application Period, K&L reviewed, analyzed, and evaluated various requests from the SEC related to the ongoing production of documents in connection with the SEC's pre-petition investigation of the Debtors.

### (D).     Asset Disposition:  (Total Hours: 781.00; Total Fees: $366,119.50)

27.     During the Application Period, K&L performed extensive services related to the two-step sale of substantially all of the Debtors' assets (the "Sale") consisting of (i) the oil and gas properties located in and around the Edison Oil Field near Bakersfield, California in which the Debtors held leasehold interests (the "Edison Assets"); (ii) the properties located in the Richardson and Tolovana Districts of Alaska in which the Debtors held mineral rights and mining claims (the "Mineral Assets"); and (iii) the oil and gas properties located in the Oxnard Oil Field near Oxnard, California in which the Debtors held leasehold interests (the "Pleasant Valley Assets") (collectively, the "Sale").  Ultimately, the Sale collectively generated over

$22,000,000 in total cash proceeds - and although the parties had hoped for a greater outcome, the purchase price obtained reflects the unfortunate market realties, including the nature of the Debtors' highly-speculative business and the pre-petition difficulties they had faced in developing it. As the Sale process was commenced shortly after the Petition Date in early August 2012 and was not completed until December 21, 2012, K&L incurred its greatest amount of fees in this project category.

28.   The Sale was originally structured so that all assets would be sold at the same time. However, the Debtors agreed to modify the structure as a two-step process after the Creditors' and Equity Committees requested that the Pleasant Valley Assets be exposed to the market longer that the Debtors' other assets. As a result of this change to the Sale structure, K&L incurred significant time during the Application Period revising the various sale orders and bid procedures and drafting new ones related to contract and lease assumption to accommodate the extended timeline with respect to the Pleasant Valley Assets. The combined efforts of the Debtors' legal team, along with those of the Debtors' financial advisor, FTI Consulting, Inc. ("FTI"), and other parties in interest, resulted in a competitive bidding process and the successful closings of both steps of the Sale, generating over $22,000,000 in total cash proceeds to the Debtors' estates.

29.   The first step of the Sale consisted of the Edison and Mineral Assets. The Debtors held an auction on October 17, 2012, with a sale hearing the following day on October 18, 2012. The closings for the Edison and Mineral Assets occurred on November 1, 2012, respectively, and collectively generated $3,210,000 in total cash proceeds to the Debtors' estates.

30.   With respect to the Sale of the Edison and Mineral Assets, K&L, among other things, (i) reviewed and revised escrow agreements for various bidders; (ii) corresponded

with the Debtors, potential bidders, and interested parties and their counsel regarding sale and bidding issues; (iii) reviewed applicable leases and prepared supplemental cure schedules; (iv) analyzed bids received and addressed sale objections raised by third parties, including the objection of Fighting Dragon Trust, (discussed further below); (v) conducted the auctions and prepared for and attended the sale hearing with respect to same; (vi) reviewed, commented, and revised the asset purchase agreements; (vii) drafted and revised the sale orders, assignment and assumption agreements, bills of sale, closing statements, flow of funds statements, quitclaim deeds, termination notices, board consents, joint authorization letters, and closing certificates; and (viii) attended to closing matters related thereto.

31.    With respect to the objection to the sale of the Edison and Mineral Assets asserted by the Fighting Dragon Trust, K&L (i) reviewed all applicable leases and related documents associated therewith; (ii) corresponded with the Debtors and other parties in interest to formulate an analysis and strategy to address the objection; (iii) researched and drafted a reply to the objection, along with related affidavits; and (iv) negotiated the terms of a settlement that was ultimately approved by the Court as part of the Edison sale order.

32.    The second step of the Sale, related to the Pleasant Valley Assets, had a Bid Deadline of November 30, 2012. Prior to the Deadline, K&L worked extensively with the Debtors and FTI to respond to various diligence and other requests from potential bidders. Although interest in the assets by other potential bidders was active up until (and even after) the expiration of the Bid Deadline, the Debtors received only one Qualified Bid. As a result, the Debtors canceled the Auction and obtained authority by Order dated December 11, 2012 to sell the Pleasant Valley Assets to Clarity Management, LP (or its designee) for a total purchase price of approximately $19 million. The sale of the Pleasant Valley Assets closed on December 21,

2012.

33. K&L incurred significant time preparing for the sale of the Pleasant Valley Assets, including (i) corresponding with the Debtors, FTI, the Creditors' Committee, the Equity Committee, and the DIP Lender (and their respective professionals) regarding various sale issues; (ii) developing strategies and analyzing various proposals to modify the sale procedures (including possible equity bids); (iii) analyzing legal issues pertaining to the sale of oil and gas leases; (iv) negotiating and reviewing non-disclosure agreements with potential bidders; (v) reviewing management presentation and other documents prepared to generate interest in the auction; (vi) revising the form of asset purchase agreement and the cure schedule; (vii) drafting the Pleasant Valley Sale Order, hearing outline, and witness proffers; (viii) drafting a response to the sale objection of Luna & Glushon; (ix) preparing for and attending the sale hearing; (x) drafting an objection to a potential motion to stay the closing of the sale which was expected to be filed; and (xi) updating parties in interest with respect to the sale's status.

34. With respect to the Sale of the Edison, Mineral, and Pleasant Valley Assets, and in additional to the services described above, K&L incurred time (i) preparing the necessary transaction documents and sale pleadings; (ii) preparing the service list to send requisite notice to creditors and other parties in interest; (iii) preparing and reviewing allocation analyses related to distribution of the expected sale proceeds among the Debtors' estates; (iv) drafting responses to and resolving various objections related to the bidding procedures, cure amounts, and other sale issues; (v) negotiating with the respective lessors of the Debtors' oil and gas leases; and (vi) compiling an extensive cure schedule of all executory contracts and leases to be assumed and assigned as part of the Sale. Given the complex nature of the Debtors' assets (i.e., oil and gas leases and mining claims), the drafting of the various transactional documents

16

and sale pleadings was a sizeable task.

35.     Finally, K&L corresponded with the Debtors and FTI regarding the disposition or abandonment of the Debtors' remaining miscellaneous assets and drafted and revised notices and pleadings relating to the same.  In connection with potential sales of these miscellaneous assets, K&L (i) reviewed the underlying agreements; (ii) conferred with counsel to Armstrong Petroleum regarding Webb Tract; (iii) reviewed the objection of the California Department of Oil, Gas, and Geothermal Resources (the "DOGGR") to the Debtors' motion to abandon certain assets and researched case law regarding same; (iv) drafted a reply and affidavit to respond to DOGGR's objection; and (v) conferred with the Debtors and counsel to the DOGGR regarding same.

### (E).     Business Operations: (Total Hours: 161.60; Total Fees: $81,725.50)

36.     At the outset of the Chapter 11 cases, K&L: (i) advised the Debtors on how issues arising in these bankruptcy cases would impact the Debtors' ongoing business operations; (ii) communicated with the U.S. Trustee, the DIP Lender, and other parties in interest (including the Equity and Creditors' Committees upon their respective appointments) concerning the Debtors' business operations, Chapter 11 status, and relief requested in various first day and other motions; (iii) worked with the foregoing parties in interest to consensually resolve issues regarding the relief requested in the first day and other motions; (iv) prepared and participated in the Debtors' initial interview with the U.S. Trustee and the Section 341 meeting of creditors; (v) prepared and filed the initial and monthly operating reports with the U.S. Trustee; and (vi) responded to numerous vendors, lessors, and counterparties who could have disrupted the Debtors' business operations following the Petition Date.

37.     In addition, K&L participated in, and prepared minutes and resolutions

17

for, meetings of the Tri-Valley Corporation Board of Directors (the "Board") to address conflict of interest matters at the start of these cases relating to Opus. Further, throughout the Chapter 11 cases, K&L: (i) drafted a charter creating a special committee (the "Opus Conflicts Committee") of the Board and drafted a Board resolution appointing Hobart Truesdell as the independent director charged with overseeing the Opus Conflicts Committee; (ii) engaged Mr. Truesdell and his counsel on a regular basis thereafter regarding a variety of operational and other strategic issues, and (iii) attended various meetings with the Debtors and Board related thereto.

38.     Throughout these cases, K&L responded to numerous issues raised by the Debtors and other parties in interest in connection with its business operations including those related to cash flow and other day-to-day management issues. K&L also drafted a legal opinion to the transfer agent for proposed 144 sale and drafted an opinion for a re-registration of stock certificates.

39.     Following the Sale, K&L (i) corresponded with the Debtors' management and FTI regarding various wind-down matters, including the abandonment of certain gas assets, the removal of equipment, and the essential tasks to complete before conversion; (ii) prepared for and participated in various conference calls with the Debtors' Board, concerning conversion to Chapter 7 and various wind-down matters; (iii) corresponded with the Debtors' management, the U.S. Trustee, and the Committees regarding the conversion order and associated payment schedule; and (iv) analyzed and prepared claim objections, as discussed further below.

(F).     **Case Administration: (Total Hours: 419.40; Total Fees: $182,971.50)**

40.     In connection with the administration of the Debtors' cases during the Application Period, K&L incurred time (i) finalizing pleadings, motions, and notices to be filed with the Court; (ii) coordinating service of such filings with Delaware counsel and the Debtors'

18

noticing agent; (iii) revising and updating the Debtors' master service lists; (iv) reviewing applicable bar date notices, preparing supplemental bar date notices, and corresponding with Epiq Systems, Inc. regarding service of same; (vi) conducting daily and weekly conferences with the Debtors, local counsel, the DIP Lender, the Creditors' Committee, the Equity Committee, and other parties in interest concerning case status; (v) traveling to, preparing for, and attending hearings; and (vi) corresponding with and preparing status updates for Delaware counsel and the Debtors regarding the status of various objections.

       41.     During the Chapter 11 cases, the Court conducted numerous omnibus hearings for which K&L needed to prepare for and attend on behalf of the Debtors. In addition, K&L filed several procedural and substantive motions with the Court. As part of this, K&L frequently addressed questions from the Debtors' creditors, equity holders, and other parties in interest, including the U.S. Trustee, the DIP Lender, the Creditors' Committee, and the Equity Committee about certain matters that had or would be filed with the Court and solicited their input and/or addressed their concerns. As bankruptcy counsel, K&L received numerous inquiries from the Debtors about certain vendors, creditors, counterparties, lessors, and their counsel, some of which required K&L to correspond by telephone, e-mail, or letters to either: (i) answer their questions; and/or (ii) request that they continue to (or cease to) do something that affected the Debtors' business operations.

       42.     During the pendency of the Debtors' Chapter 11 cases, K&L: (i) held discussions with the Creditors' and Equity Committees regarding the litigation and potential standstill thereof; (ii) corresponded with the Committees regarding document production requests and due diligence related thereto; and (iii) drafted and revised various pleadings and agreements, including the standstill agreement.

43.     Following the Sale, K&L: (i) discussed a potential consensual Chapter 11 plan with various parties in interest; (ii) corresponded with the Debtors regarding conversion of their cases to Chapter 7; (iii) corresponded with the Debtors, the Equity Committee, the Creditors' Committee, Mr. Truesdell, the insurers, the U.S. Trustee, and other parties in interest concerning conversion, wind-down issues, waterfall of funds, and the possible settlement of claims against the Debtors' directors and officers; (iv) researched post-judgment interest rates regarding certain claims; (v) drafted and revised the motion to convert; (vi) drafted and revised a motion to pay oil and gas lien claims; (vii) drafted and revised a motion to abandon assets; and (viii) attended other general case administration matters such as noticing and servicing of these motions.

**(G).     Claims Administration and Objections: (Total Hours: 268.70; Total Fees: $93,709.50)**

44.     This category includes time spent by K&L: (i) reviewing and analyzing proofs of claim, particularly those related to shareholder interests and/or alleged securities fraud claims; (ii) researching case law in preparation for potential substantive objections and affirmative defenses to proofs of claim; (iii) drafting, reviewing, and revising a first omnibus claim objection; (iv) reviewing responses to the first omnibus claim objection; (v) conferring with Equity Committee regarding its responses to the first omnibus claim objection; (vi) discussing a potential settlement of the Luna & Glushon alleged secured claim with its counsel; (vii) drafting a reply to the opposition to dismissal of the litigation filed by the Luna & Glushon; (viii) revising and filing a motion to deem certain claims satisfied; and (ix) corresponding with the Debtors and Debtors' insurers regarding various claim objections and motion to deem claims satisfied.

45.     This category also includes K&L's extensive assistance in the preparation

20

and filing of the Debtors' Schedules of Assets and Liabilities and their Statements of Financial Affairs. Given the complexity of the Debtors' oil and gas businesses and their corporate structure, this task was a substantial undertaking. Of particular note, because of the nature of the Debtors' business, several of the Debtors faced potential liability for the various trade-related debts incurred in operation of their respective oil and gas fields. Because of this, K&L assisted the Debtors in identifying these shared liabilities and properly accounted for them as part of the preparation of each Debtor's Schedules. In addition, the Debtors' oil and gas leases and mining claims, of which there are hundreds, needed to be properly reflected on each Debtor's Schedules (including for example, the precise percentage working or other interest that each Debtor held in situations where more than one Debtor held an interest in such oil and gas lease). As a result of these nuances unique to the oil and gas industry, K&L incurred significant time assisting the Debtors with the preparation of their Schedules and Statements.

        **(H).**   **Employee Benefits/Pensions:** **(Total Hours: 1.40; Total Fees: $588.00)**

      46.    In this category, K&L reviewed and edited the Debtors' notification to employees about the Debtors' bankruptcy filing and discussed with the Debtors the payment of accrued employee vacation time in accordance with the Court's order regarding same.

        **(I).**   **Fee/Employment Applications:** **(Total Hours: 173.90; Total Fees: $59,610.00)**

      47.    During the Application Period, K&L: (i) drafted, revised, and finalized its retention application as the Debtors' general bankruptcy counsel; (ii) revised its statement under Fed. R. Bankr. P. 2016 and Del. Bankr. L.R. 2016-1; (iii) reviewed its invoices, bills, and related materials; (iv) drafted, reviewed, and revised Monthly, Interim, and Final Fee Applications and related exhibits pursuant to the Administrative Order; (v) answered questions from the U.S.

Trustee related to its Fee Applications; (vi) prepared certificates of no objection regarding Fee Applications; (vii) assisted in creating the retention applications for the Debtors' accountant; and (viii) at the request of the Debtors, reviewed the fee applications of other professionals, answered questions related to the payment of other professionals, and corresponded with FTI and Delaware counsel with respect to the same.

48.     As mentioned above, K&L's retention for Opus was not approved in the Initial K&L Retention Order, but instead, was heavily negotiated by the parties for several more weeks until entry of the Supplemental K&L Order. During this period, K&L spent considerable time discussing its retention for Opus, and crafting the ultimate resolution embodied in the Supplemental K&L Order with the U.S. Trustee, Creditors' Committee, and Equity Committee.

(J).     <u>Fee/Employment Objections</u>: (Total Hours: 3.90; Total Fees: $1,480.50)

49.     Among other services provided in this category during the Application Period, K&L reviewed and prepared responses to the U.S. Trustee's questions concerning K&L's Monthly Fee Applications.

(K).     <u>Financing</u>: (Total Hours: 174.40; Total Fees: $89,659.50)

50.     K&L spent considerable time in this category related to the negotiation of the debtor-in-possession ("<u>DIP</u>") financing necessary to support the Debtors' Chapter 11 cases and the Sale of their assets contemplated therein. From the outset of the cases, the finalization of DIP financing became a hotly contested issue in light of the Debtors' rather unique corporate structure in which Tri-Valley Corporation serves as the managing general partner of Opus. As a result, K&L incurred a significant amount of time negotiating the terms of that financing, first with the Creditors' Committee and the ad hoc group of Opus investors, and second, with the Equity Committee. These negotiations were extensive and involved numerous discussions and

meetings with counsel to the DIP Lender, Creditors' Committee, ad hoc group, Equity Committee, and U.S. Trustee, as well as internally among the Debtors, Delaware counsel, and FTI. In total, the Court conducted four hearings related to DIP financing, ultimately resulting in entry of a fully consensual final DIP order on September 28, 2012. In connection therewith, K&L drafted, revised, and finalized the DIP financing agreement and accompanying disclosure schedules, and the initial, interim, and final orders approving the DIP financing. In addition, K&L spent time conferring with the Debtors and Delaware counsel regarding the Equity Committee's requested Rule 2004 examination, document production related thereto, and due diligence related to a potential challenge by the Creditors' and/or Equity Committee(s) pursuant to the terms of the final DIP order.

51.     In addition, K&L performed the following work to close the DIP financing: (i) revising, reviewing, and finalizing the DIP loan agreement; (ii) creating a checklist of deliverables as conditions for closing the DIP financing agreement and reviewing status thereof; and (iii) drafting and reviewing ancillary agreements to the DIP loan agreement, including pledge and security agreements, Secretary of State certificates, a certificate of insurance, deeds of trust, and other documents. In addition, K&L worked closely with FTI to create and finalize a budget to govern the Debtors' use of the DIP financing proceeds.

52.     Once the DIP financing closed, K&L: (i) corresponded with the Debtors regarding the repayment of the DIP financing facility from the Sale proceeds pursuant to the DIP documents; (ii) reviewed the Debtors' DIP draw requests; (iii) corresponded with the Debtors regarding the payment of approved professional fees in accordance with the budget governing same; (iv) reviewed and responded to questions regarding reimbursement of the DIP Lender's legal fees; and (v) reviewed flow of fund statements regarding the payoff of the DIP loan.

(L).     **Litigation**:  (Total Hours: 132.80; Total Fees: $40,631.50)

53.     In connection with the adversary proceeding filed by Luna & Glushon, K&L: (i) conducted legal research related to, and drafted, reviewed, and revised the Debtors' motion to dismiss Luna & Glushon's complaint; (ii) drafted, reviewed, and revised the answer to the Chartis interpleader complaint; and (iii) conducted extensive legal research relating to, and drafted, reviewed, and revised a reply to, the opposition filed by Luna & Glushon to the Debtors' motion to dismiss.

54.     In connection with the adversary proceeding and Rule 2004 examination commenced by the Equity and Creditors' Committees, K&L complied, reviewed, and prepared the extensive production of documents in response to the Committees' discovery requests, as described in greater detail below.

(M).     **Meeting of Creditors**:  (Total Hours: 563.70; Total Fees: $234,534)

55.     Among other services provided in this category during the Application Period, K&L prepared for and attended the Creditors' Committee formation meeting, the initial interview with the U.S. Trustee, and the Section 341 meeting of creditors.

56.     As a result of the precocious state of the Debtors' affairs prior to the Petition Date, and the filing of these bankruptcy cases, many of the Opus investors expressed considerable discord, either to the Debtors directly or through the ad hoc group, with respect to the degree of information available to them in the public domain.  As a result of this discord, the Debtors agreed to host an informational meeting at which they would update the Opus investor body on why the filing of these cases was necessary and what the Debtors intended to do during them.  K&L prepared and conducted the presentation, which involved a significant amount of work to ensure that the information provided was accurate and appropriate in light of the

24

Debtors' obligations under the Bankruptcy Code and SEC requirements.

57. In response to the Equity Committee's Rule 2004 examination, K&L: (i) conducted various phone calls and discussions with the Debtors, their financial advisors, and other related parties; (ii) reviewed the Equity Committee's Rule 2004 discovery motion, objections, and responses thereto; (iii) strategized and coordinated document review and production of documents in response to same; (iv) performed due diligence in preparation of the Rule 2004 examination; (v) coordinated review and production of documents with the Debtors and third parties for the First and Second Challenge Periods, including redaction of the same for privilege; (vi) reviewed non-disclosure agreements with the Equity Committee related to document production; and (vii) reviewed, analyzed, and prepared responses and objections to the Committee's subpoenas sent to the Debtors' current directors and (viii) addressed indemnity issues involving the Committee's subpoenas.

58. With respect to the Committees' complaint against the DIP Lender and Mr. Gamble, K&L: (i) reviewed and analyzed the complaint to determine confidentiality restrictions and which information, if any, should remain under seal; (ii) attended settlement meeting with the Committees; and (iii) communicated and negotiated confidentiality agreements with insurer and Mr. Gamble surrounding ongoing settlement discussions.

  (N). **Plan and Disclosure Statement:** **(Total Hours: 130.10; Total Fees: $65,590.00)**

59. Among other services provided in this category during the Application Period, K&L: (i) drafted a proposed Chapter 11 plan and disclosure statement for the Debtors' cases, which was intended to serve as the template for the Debtors' exit from Chapter 11; (ii) revised said plan and disclosure statement; (iii) corresponded with counsel for the Equity Committee and other parties in interest regarding sale procedures, plan allocation, and possible

25

settlement structure; (iv) drafted an outline for a possible settlement with the Equity Committee to be embodied in the plan; (v) reviewed the waterfall analysis related thereto; (vi) attended plan negotiation and settlement meetings regarding plan terms; (vii) researched, drafted, reviewed, and revised a motion to extend the Debtors' exclusivity periods in order to provide additional time for the parties to negotiate the terms of a consensual Chapter 11 plan; (viii) corresponded with FTI, the Debtors' independent director and his counsel, and the Gamble Trust and its counsel regarding plan prospects, waterfall analysis, litigation standstill, and a wind-down budget; and (ix) corresponded and negotiated with the Debtors' independent director, the Gamble Trust, and the Equity Committee regarding a potential consensual Chapter 11 plan; and (x) when such efforts proved unsuccessful, moved to convert these Chapter 11 cases.

> (O). **Executory Contracts/Leases:** (Total Hours: 180.40; Total Fees: $66,764.00)

60.    In this category, K&L assisted the Debtors in preparing the cure schedules necessary for the two-step Sale, which included hundreds of their executory contracts and unexpired leases, and their relevant information (including cure amounts). As mentioned above, the nature of the Debtors' business made the preparation of the cure schedule to be a sizable task and critical to the Sale because the Debtors' primary assets were oil and gas leases and mining claims.

61.    In addition, K&L: (i) drafted, revised, and finalized a motion to assume an environmental consulting contract with Sespe Consulting, Inc., which contract was necessary to complete critical remediation work related to the Pleasant Valley Assets; (ii) researched applicable case law on anti-assignment clauses with respect to certain oil leases to be sold as part of the Pleasant Valley Assets; (iii) reviewed the Brea, Edison, and Stafford leases and corresponded with the Debtors about issues related thereto; (iv) drafted a motion to extend time

26

to assume or reject unexpired leases; (v) obtained the affirmative consent of notice parties listed on the supplemental cure schedule; (vi) analyzed the leases related to the mining claims and amendments thereto; (vii) revised notices of de minimis asset sales; (viii) resolved counterparty consent issues pertaining to the sale of the Edison and Mineral Assets; (ix) drafted and revised the Debtors' motion to assume and assign additional contracts to the Edison Assets buyer; (x) researched and drafted motions to reject certain leases including the ORRI agreement; (xi) reviewed Petrawest lease assignment documents and background materials and conferred with the Debtors and third parties regarding the Petrawest lease agreement; (xii) researched and prepared reply brief in support of motion to reject Petrawest contract; and (xiii) researched avoidance of liens under state law and finalized memorandum of law responding to the objections to the sale of leases.

   62. K&L also spent a considerable amount of time analyzing, reviewing, and preparing a response to the objection of Fighting Dragon Trust to the sale of the Edison Assets. In particular, K&L: (i) reviewed the operative documents; (ii) corresponded with the Debtors regarding the appropriate response to the objection; (iii) researched case law and drafted a memorandum of law on legal issues pertaining to the objection; and (iv) prepared and drafted an affidavit and reply to the objection.

   63. Finally, following the Sale, K&L prepared pleadings related to the rejection of the Debtors' remaining executory contracts and unexpired leases.

   (P). **Oil & Gas – Regulatory:** **(Total Hours: 65.80 Total Fees: $25,918.00)**

   64. During the Application Period, K&L: (i) reviewed an analyzed the relevant California statute pertaining to oil and gas liens; (ii) researched and drafted a form of assumption and assignment agreement in connection with the conveyance of certain oil and gas

leases; (iii) reviewed applicable sale orders related to the sale of certain real estate of the Debtors; (iv) assessed the propriety of quitclaim and grants deeds; (v) compiled and drafted closing checklists for all conveyance matters; (vi) corresponded with third parties regarding decommissioning obligations of the Debtors in Nevada; (vii) conducted research related to the Debtors' expected abandonment of oil and gas assets; (viii) corresponded with the Debtors and several regulatory agencies related to the abandonment of the Debtors' remaining gas assets; and (ix) drafted and revised a motion to pay oil and gas lien vendors with asset sale proceeds.

65.     As discussed above, DOGGR filed an objection to the Debtors' motion to abandon certain oil and gas assets. In response to the DOGGR objection, K&L: (i) reviewed and distinguished authority cited by the DOGGR; (ii) researched relevant statutory and case law in support of the Debtors' reply; (iii) drafted, reviewed, and revised a reply and affidavit of the Debtors' management; and (iv) conferred with the DOGGR regarding the motion, objection, and reply.

### (Q).    Alaska Mineral Rights – Regulatory:  (Total Hours: 2.60; Total Fees: $1,134.00)

66.     At the beginning of the Chapter 11 cases, K&L reviewed, analyzed, and evaluated the annual rental and labor requirements for Alaska mining claims and the relevant Alaska statutes related to the ability to sell and transfer such claims.

### (R).    Environmental:  (Total Hours: 7.30; Total Fees: $4,416.50)

67.     During the first few weeks of the Chapter 11 cases, K&L reviewed, analyzed, and evaluated environmental reports pertaining to the Debtors' assets and drafted a form of agreement pertaining to a suggested course of action for outstanding environmental issues.

(S).  **Pleasant Valley Ranch Dispute**:  (Total Hours: 261.00; Total Fees: $135,544.50)

68.      During the Application Period, K&L provided services to the Debtors in connection with the ongoing dispute (the "Dispute") with Pleasant Valley Ranch ("Pleasant Valley").  Resolution of the dispute was critical with respect to the second step of the Sale in December, 2012.  As part of its efforts, K&L researched applicable law pertaining to the dispute and propounded discovery on a very condensed timeline.

69.      Among other services provided in this category, K&L: (i) reviewed and analyzed all of the documents related to the Dispute, including surface lease, state court litigation pleadings, and other relevant documents; (ii) engaged in discussions with the Debtors, counsel to Pleasant Valley, and other parties in interest to discuss the parameters of a potential settlement of the dispute; (iii) researched issues relating to overriding royalties and post-production costs; (iv) corresponded with the Debtors and Pleasant Valley regarding outstanding royalty issues; (v) reviewed Pleasant Valley's cure objection and settlement proposals; (vi) engaged in extensive settlement negotiations with the Debtors, Pleasant Valley, the Equity and Creditors' Committees, and their related professionals with respect thereto; (vii) prepared a scheduling order; (viii) prepared and organized discovery requests and drafted stipulated facts and issues; (ix) researched and prepared documents and subpoenas to certain third parties related to Pleasant Valley's purported 1031 exchange deals; (x) analyzed insurance coverage issues for cure amounts under Pleasant Valley's settlement proposal; (xi) reviewed and analyzed stipulations to take certain actions in the state court action related to the Pleasant Valley litigation; (xii) drafted and revised a motion seeking approval of settlement, assumption, and assignment agreements with Pleasant Valley; and (xiii) corresponded with the Debtors and various third parties regarding environmental insurance issues related to the settlement.

29

70.     Finally, after the closing of the Pleasant Valley Asset sale, K&L corresponded with counsel to Pleasant Valley regarding said sale and the request for additional adequate assurances regarding same.

## SUMMARY OF EXPENSES INCURRED

71.     During the Application Period, K&L incurred actual and necessary expenses in rendering legal services to the Debtors in the amount of $61,812.89, for which K&L has already received reimbursement for 100% of such expenses sought in K&L's First, Second, Third, Fourth, and Fifth Monthly Applications, as set forth in Exhibit "C".[16] An itemization of these out-of-pocket expenses is annexed hereto as **Exhibit C** and incorporated herein by reference. As noted above, K&L has not yet been reimbursed for the expenses sought in its Sixth and Seventh Monthly Fee Statements or for its estimated expenses related to the preparation and prosecution of this Application.

72.     All expenses for which reimbursement is sought were incurred in connection with the rendering of professional services to the Debtor, and were reasonable and necessary. Telecopying services completed in-house by K&L were charged at $0.75 per page for outgoing facsimiles only, plus cost of telephone usage, not to exceed $1.00. K&L represents that the rate for duplication charged to the Debtors was $0.10 per page, consistent with the Local Rules and Guidelines. In order to more efficiently handle the voluminous copying of pleadings served and filed in these cases, K&L on occasion retained third-party duplication service providers. K&L seeks reimbursement only for the actual expenses charged by such third-party service providers. K&L also seeks reimbursement for computer assisted research, which is the actual cost of such charges and the out-of-pocket expenses incurred by K&L during the

---

[16] Exhibit "C" sets forth in summary detail the expenses incurred during the Application Period. Due to its voluminous nature, actual copies of invoices from K&L's vendors are not attached, but are available for inspection upon request.

Application Period for travel, lodging, and meals.

73.     As such, K&L seeks reimbursement for its reasonable, necessary and actual expenses incurred during the Application Period for the total amount of $61,312.89.

## COMPENSATION REQUESTED

74.     K&L expended 3,516.70 hours during the Application Period in furtherance of its efforts on behalf of the Debtors.  Pursuant to 11 U.S.C. §§ 105(a), 330, and 331, Fed. R. Bankr. P. 2016, and Del. Bankr. L.R. 2016-2, K&L requests allowance of compensation in the amount of $1,641,409.89[17] for legal services rendered during the Application Period at a blended hourly rate of $495.34and $61,312.89 for expenses.

## LEGAL STANDARD

75.     Bankruptcy Code Section 330(a)(1) allows the payment of:

> (A)     reasonable compensation for actual, necessary services rendered by the trustee, examiner, ambudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

> (B)     reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).  Reasonableness of compensation is informed by the "market-driven approach," which considers the nature, extent and value of services provided by the professional and the cost of comparable services in non-bankruptcy contexts.  *See Zolfo Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 258 (3d Cir. 1995); *In re Busy Beaver Bldg. Ctr., Inc.*, 19 F.3d 833, 849 (3d Cir. 1994).  Thus, the "baseline rule is for firms to receive their customary rates." *Zolfo Cooper*, 50 F.3d at 259.

76.     In accordance with its practices in non-bankruptcy matters, K&L has

---

[17] This amount already takes into account certain reductions that K&L made where it believed there were inefficiencies or redundancies in the time incurred.  Further, following the Conversion Date, K&L incurred at least approximately $5,300.00 in additional fees assisting in transitioning the cases to the respective Chapter 7 trustees.

calculated its compensation requested in this Application by applying its standard hourly rates. K&L's calculation is based upon hourly rates that are well within the range of rates that are charged by comparable firms in similar bankruptcy cases. Accordingly, K&L's rates should be determined to be reasonable under Bankruptcy Code Section 330.

77.     K&L's fees during the Application Period are also reasonable under the prevailing legal standard and should be allowed. The amount of these fees is not unusual given the complexity, size and the extraordinary amount of work required at the outset of the Debtors' Chapter 11 cases. K&L's fees are commensurate with fees that other attorneys of comparable experience and expertise have charged and been awarded in similar Chapter 11 cases. Accordingly, K&L's fees are reasonable pursuant to Bankruptcy Code Section 330.

78.     Bankruptcy Code Section 330(a)(1)(B) permits reimbursement for actual and necessary expenses. K&L's legal services and expenses incurred during the Application Period are set forth in this Application and constitute only those necessary expenses that were incurred for the benefit of the Debtors' estates. K&L has properly requested reimbursement of only actual, necessary and appropriate legal expenses.

79.     Except as permitted by Rule 2016 of the Federal Rules of Bankruptcy Procedure, no agreement or understanding exists between K&L and/or any third person for the sharing or division of compensation. All of the services for which compensation is requested in this Application were rendered at the request of and solely on behalf of the Debtors.

80.     Pursuant to the standards set forth in 11 U.S.C. § 330, K&L submits that the compensation requested is for actual and necessary services and expenses, and is reasonable, based upon the nature, extent and value of such services, the time spent thereon, and the costs of comparable services in a case under the Bankruptcy Code.

32

81.     The time records annexed to this Application constitute only a general statement of the services rendered and time expended without description of the pressure and constraints under which K&L actually rendered these services.  The considerable challenges of this case have been attended to and managed by K&L at all levels, promptly, expertly, and often to the exclusion of other matters in K&L's office.  K&L submits, therefore, that its fees and expenses were necessary, reasonable, and justified, and should be allowed in full.

### APPLICATION OF RETAINER

82.     K&L is currently holding a retainer in the amount of $208,685.01.  By this Final Application, K&L seeks permission, upon approval thereof, to apply that retainer to amounts outstanding (and seek payment from the estates for any remaining balance).  The amount outstanding consists of (i) the 20% holdback fees for December 2012 and January 2013; (ii) 100% of fees and expenses for February 2013 (the Monthly Fee Application for which was not eligible to be paid prior to the Conversion Date); (iii) 100% of the fees and expenses for March 1 - 25, 2013 (the Monthly Fee Application for which is included herein); and (iv) estimated fees and expenses in preparing and prosecuting this Application.

### FINAL APPROVAL

83.     This is the final request for compensation by K&L.  K&L hereby certifies that it has not agreed to share compensation awarded to it in this case with any other person or entity.

84.     The Debtors have been provided a copy of the within Application.

85.     By this Application, K&L requests final allowance of this Application and all prior monthly and interim fee statements.

### NOTICE AND NO PRIOR REQUEST

86.    No examiner has been appointed in these cases.  Notice of this Application has been given to: (a) the U.S. Trustee; (b) counsel to the Chapter 7 Trustees; (c) counsel for the DIP Lender; (d) counsel for the Creditors' Committee; and (e) counsel for the Equity Committee. The Debtors submit that no other or further notice is necessary.

87.    No prior request for the relief sought in this Application has been made to this or any other Court.

WHEREFORE, K&L respectfully requests that the Court enter an Order pursuant to Section 330 and 331 of the Bankruptcy Code:

     a.     awarding K&L:

          i.     an allowance of final compensation for professional services rendered to and expenses incurred for and on behalf of the Debtor during the Application Period in the aggregate amount of $1,641,409.89, which includes reimbursement of its actual, reasonable, and necessary expenses incurred during the Application Period and an allowance of $7,500 and $500 for estimated fees and expenses incurred in preparing and prosecuting this Application;

     b.     authorizing K&L to apply its retainer to all amounts outstanding and directing the Debtors to immediately pay any amounts remaining unpaid after such application;

     c.     affirming all prior awards of compensation; and

     d.     granting K&L such other and further relief as is just and proper.

**[Signature Page to Follow]**

Dated: May 9, 2013
      Boston, Massachusetts

                      Respectfully submitted,

                      TRI-VALLEY CORPORATION, *et al.*

                      By its counsel,

                      Charles A. Dale III
                      Mackenzie L. Shea
                      **K&L Gates LLP**
                      State Street Financial Center
                      One Lincoln Street
                      Boston, Massachusetts 02111
                      Telephone: (617) 261-3100
                      Facsimile: (617) 261-3175
                      E-mail: chad.dale@klgates.com
                                  mackenzie.shea@klgates.com

                      *Counsel to Debtors and Debtors-In-Possession*

# Exhibit 22

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 7 |
| TRI-VALLEY CORPORATION, *et al.*, | ) |
| | ) C.A. No. 12-12291 (MFW) |
| Debtors. | ) |
| | ) **Re: Docket Nos. 716, 717, 722, 732,** |
| | ) **740, 741, 742, 746, 747, 748, 752** |
| _____ | ) |
| In re: | ) |
| | ) |
| TVC OPUS 1 DRILLING PROGRAM, L.P., | ) C.A. No. 12-12294 (MFW) |
| | ) |
| Debtor. | ) **Re: Docket No. 12** |

## OMNIBUS ORDER ALLOWING COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES FOR CHAPTER 11 PROFESSIONALS EMPLOYED IN THESE CASES

1.       Before the Court are various final fee applications of Chapter 11 Professionals employed in the jointly administered Chapter 11 cases of the captioned debtors.  This Order addresses the final fee applications of each of the Chapter 11 Professionals identified in Exhibit A (the "Final Fee Applications").

2.       This Court has jurisdiction over each of these matters pursuant to 28 U.S.C.§§ 1334 and 157(b)(2).

3.       The Chapter 7 Trustee of the estate of TVC Opus 1 Drilling Program, L.P. (the "Opus Trustee") formally objected to the Final Fee Applications (the "Opus Trustee Objection"). At the hearing on the Final Fee Applications, the Chapter 7 Trustee for the estate of the Tri-Valley Corporation debtors (the "Tri-Valley Trustee" and, together with the Opus Trustee, the "Chapter 7 Trustees") joined in the relief sought by the Opus Trustee's Objection.

4.       This Order resolves the Chapter 7 Trustees' Objections to the Final Fee Applications.

5.      As stated in Exhibit A, each of the Final Fee Applications is approved in the amounts stated in column J of Exhibit A.  The approval of these amounts is on a final basis as to all parties in interest in these bankruptcy cases, except the Chapter 7 Trustees.  With respect to the Chapter 7 Trustees, the approval is on the interim basis. All rights of the Chapter 7 Trustees are expressly reserved, including but not limited to, all rights with respect to final allowance of the approved and paid amounts and with respect to seeking disgorgement of any prior or future payment to any of the Chapter 11 Professionals, and with respect to any other affirmative relief available to the Chapter 7 Trustees.

6.      Any Chapter 11 Professional holding a retainer is authorized to apply its retainer to all outstanding amounts awarded to it, as approved herein, and shall return any remaining retainer within ten (10) business days to each of the Chapter 7 Trustees, on a fifty-fifty (50/50) pro rata basis.

7.      The Chapter 11 Professionals will work with the Chapter 7 Trustees to reach an agreeable allocation of all unpaid fees and expenses between the debtors' estates, as appropriate.

8.      This Order shall be effective immediately upon its entry.

9.      This Court shall retain jurisdiction over all matters arising from or related to the interpretation or implementation of this Order.


THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

DATED: _____, 2013

# EXHIBIT A

# TRI-VALLEY CORPORATION, et al, Case No. 12-12291 (MFW)
## Summary Chart of Final Fee Applications for the Period
## Through March 25, 2013

| Professional & Role in Case | Interim & Final Compensation Period | Total Fees Requested for the Interim & Final Period | Amount of Fees for Which Payment Was Requested in Monthly Applications (80%) | Amount of Holdback Fees Requested (20%) | Total Expenses Requested for the Interim Period (100%) | Voluntary Reduction of Requested Expenses | Total Amount Requested for the Interim Period (Fees and Expenses) | Total Amount Authorized for the Interim Period | Total Amount Requested Case (Fees and Expenses) |
|---|---|---|---|---|---|---|---|---|---|
| **K&L Gates LLP** (Counsel to the Debtors and Debtors in Possession) | 8/7/12-3/25/13 D.I. 748 Filed 5/9/13 | $1,579,597.00[1] | $1,263,677.60 | $247,770.85[2] | $61,812.89 | $0.00[3] | $1,641,409.89 | $1,579,597.00 Fees $61,812.89 Expenses | $1,641,409.89 |
| **Landis Rath & Cobb LLP** (Counsel to the Debtors and Debtors in Possession) | 8/7/12-3/25/13 D.I. 747 Filed 5/9/13 | $760,892.75[4] | $604,714.20 | $144,292.54[5] | $17,053.60 | $0.00 | $777,946.35 | $760,892.75 Fees $17,053.60 Expenses | $777,946.35 |
| **FTI Consulting, Inc.** (Financial Advisors to the Debtors and Debtors in Possession) | 8/7/12-3/25/13 D.I. 746 Filed 5/9/13 | $1,325,000.00[6] | $1,180,000.00 | $245,000[7] | $69,580.23 | $0.00 | $1,394,580.23 | $1,325,000.00 Fees $69,580.23 Expenses | $1,394,580.23 |
| **Pachulski Stang Ziehl & Jones LLP** (Counsel to the Official Committee of Unsecured Creditors) | 8/27/12 – 3/25/13 D.I. 722 Filed 4/22/13 | $667,726.75 | $534,181.40 | $667,192.57 | $28,226.56 | $0.00 | $695,953.31 | $667,726.75 Fees $28,226.56 Expenses | $695,953.31 |

[1] All figures are based upon the final fee application as no second interim fee application was filed.

[2] This amount includes the following amounts which have not been paid: (1) 20% holdback for fees in December 2012; (2) 20% holdback for fees in January 2013; (3) 100% for fees and expenses in February 2013 (although authorized to do so, the Debtors have not yet paid the 80% of fees and 100% of expenses KLG is entitled to for this month); and (4) 100% for fees and expenses in March 2013.

[3] Voluntary reductions of expenses were taken in First, Second, and Third Monthly Fee Statements and such reductions are already reflected in total amount of expenses requested. See D.I. 376, 438, 522.

[4] All figures are based upon the final fee application as no second interim fee application was filed.

[5] This amount includes the following amounts which have not yet been paid: (1) 20% holdback for fees in December 2012; (2) 20% holdback for fees in January 2013; (3) 100% for fees and expenses in February 2013; and (4) 100% for fees and expenses in March 2013.

[6] $600K completion fee included and previously requested in monthly application at 100%.

[7] This amount includes the following amounts which have not yet been paid: (1) 20% holdback for fees in December 2012; (2) 100% for fees and expenses in January 2013; and (3) 100% for fees and expenses in February 2013; and (4) 100% for fees and expenses in March 2013.

MEI 15827551v.1

# TRI-VALLEY CORPORATION, et al., Case No. 12-12291 (MFW)
## Summary Chart of Final Fee Applications for the Period
## Through March 25, 2013

| Applicant | Period / D.I. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gavin/Solmonese LLC (Financial Advisors to the Official Committee of Unsecured Creditors) | 8/27/12 – 3/31/13 D.I. 732 Filed 4/29/13 | $167,742.54 | $134,194.03 | $33,548.51 | $437.10 | $0.00 | $168,179.64 | $167,742.54 Fees $437.10 Expenses | $168,179.64 |
| Ashby & Geddes, P.A. (Counsel to the Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P.) | 9/18/12 – 3/25/13 D.I. 740 Filed: 5/8/13 | $1,196,056.00[8] | $956,844.80 | $90,409.30[9] | $26,347.30 | N/A | $1,222,403.30 | $1,222,403.30 | $1,222,403.30 |
| Conway MacKenzie, Inc. (Financial Advisors to the Official Committee of Equity Security Holders TVC Opus I Drilling Program L.P.) | 9/20/12-3/25/13 D.I. 741 Filed: 5/8/13 | $445,921.66[10] | $356,737.32 | $65,851.00[11] | $9,539.21 | N/A | $455,460.87 | $455,460.87 | $455,460.87 |
| Committee Members of Equity Security Holders TVC Opus I Drilling Program L.P.) | 9/15/12-3/25/13 D.I. 742 | N/A | N/A | N/A | $3,726.23 | N/A | $3,726.23 | $3,726.23 | $3,726.23 |
| Young Conaway Stargatt & Taylor LLP (Special Conflict Counsel for Debtor TVC Opus I Drilling Program L.P.) | 9/14/12-3/25/13 D.I. 717 Filed 4/19/13 | $320,779.50[12] | $256,623.60 | $110,293.90[13] | $7,654.48 | 0.00 | 328,433.98 | 320,779.50 Fees 7,654.48 Expenses | 328,433.98 |

---

[8] All figures are based upon the final fee application as no second interim fee application was filed.
[9] This figure represents holdback fees to be paid for the period from December 1, 2012 through March 25, 2013. Holdback fees for the period from September 18, 2012 through November 30, 2012 were requested and approved by this Court's February 20, 2013 Order (D.I. 572).
[10] All figures are based upon the final fee application as no second interim fee application was filed.
[11] This figure represents holdback fees to be paid for the period from December 1, 2012 through March 25, 2013.
[12] All figures are based upon the final fee application as no second interim fee application was filed.
[13] This amount includes the 80% the Debtors were authorized to pay previously for fees incurred during February 2013. Although authorized to do so, the Debtors have not yet paid the 80% YCST is entitled to for February 2013.

MEI 15827531v.1

2

# TRI-VALLEY CORPORATION, et al, Case No. 12-12291 (MFW)
## Summary Chart of Final Fee Applications for the Period
## Through March 25, 2013

| | | | | | | | | Fees | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Sharon Roth** (Financial Advisors to Special Conflict Counsel for Debtor TVC Opus I Drilling Program L.P.) | 10/4/12-3/25/13 D.I. 716 Filed 4/17/13 | $49,595.00[14] | $39,676.00 | $17,997.00[15] | $113.23 | 0.00 | $49,708.23 | $49,595.00 Fees $113.23 Expenses | $49,708.23 |

---

[14] All figures are based upon the final fee application as no second interim fee application was filed.

[15] This amount includes the 80% the Debtors were authorized to pay previously for fees incurred during February 2013. Although authorized to do so, the Debtors have not yet paid the 80% Ms. Roth is entitled to for February 2013.

ME1 15827531v.1

3

# Exhibit 23

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TRI-VALLEY CORPORATION, et al.,<br><br>        Debtors. | Chapter 7<br><br>Case No. 12-12291 (MFW)<br>(Jointly Administered)<br><br>**Hearing Date: TBD**<br>**Obj. Deadline: February 27, 2015 @ 4:00 p.m.** |
| In re:<br><br>TVC OPUS I DRILLING PROGRAM L.P.,<br><br>        Debtors. | Chapter 7<br><br>Case No. 12-12294 (MFW) |
| CHARLES A. STANZIALE, as Chapter 7 Trustee of TRI-VALLEY CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>F. LYNN BLYSTONE, et al.,<br><br>        Defendants. | Case No. 12-12291 (MFW)<br><br>Adv. Proc. No. 13-51212 (MFW) |
| JEOFFREY L. BURTCH as Chapter 7 Trustee of TVC OPUS I DRILLING PROGRAM, L.P.,<br><br>        Plaintiff,<br><br>    v.<br><br>F. LYNN BLYSTONE, et al.,<br><br>        Defendants. | Case No. 12-12291 (MFW)<br><br>Adv. Proc. No. 13-51214 (MFW) |

| | |
|---|---|
| CHARLES A. STANZIALE, as Chapter 7 Trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co. and Select Resources Corp., Inc., <br><br>        Plaintiff, <br><br>    v. <br><br> G. THOMAS GAMBLE and G. THOMAS GAMBLE, as trustee of GEORGE T. GAMBLE 1991 TRUST, <br><br>        Defendants. | Case No. 12-12291 (MFW) <br><br> Adv. No. 13-51312 (MFW) |
| JEOFFREY L. BURTCH, in his capacity as Chapter 7 Trustee for the ESTATE OF TVC OPUS I DRILLING PROGRAM, L.P., <br><br>        Plaintiff, <br><br>    v. <br><br> G. THOMAS GAMBLE and G. THOMAS GAMBLE, as trustee of GEORGE T. GAMBLE 1991 TRUST, <br><br>        Defendants. | Case No. 12-12291 (MFW) <br><br> Adv. No. 13-51316 (MFW) |
| OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF TVC OPUS I DRILLING PROGRAM L.P. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TRI-VALLEY CORPORATION, *et al.*, <br><br>        Plaintiffs, <br><br>    v. <br><br> G. THOMAS GAMBLE and G. THOMAS GAMBLE, as trustee of GEORGE T. GAMBLE 1991 TRUST, <br><br>        Defendants. | Case No. 12-12291 (MFW) <br><br> Adv. No. 12-50994 (MFW) |

| | |
|---|---|
| CHARLES A. STANZIALE, as Chapter 7 Trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co. and Select Resources Corp., Inc., | |
| Plaintiff, | Case No. 12-12291 (MFW) |
| v. | Adv. No. 14-50625 (MFW) |
| F. LYNN BLYSTONE, | |
| Defendant. | |
| CHARLES A. STANZIALE, as Chapter 7 Trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co. and Select Resources Corp., Inc., | |
| Plaintiff, | Case No. 12-12291 (MFW) |
| v. | Adv. No. 14-50623 (MFW) |
| JAMES KROMER, | |
| Defendant. | |
| CHARLES A. STANZIALE, as Chapter 7 Trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co. and Select Resources Corp., Inc., | |
| Plaintiff, | Case No. 12-12291 (MFW) |
| v. | Adv. No. 14-50624 (MFW) |
| JAMES G. BUSH, | |
| Defendant. | |
| CHARLES A. STANZIALE, as Chapter 7 Trustee of Tri-Valley Corporation, Tri-Valley Oil & Gas Co. and Select Resources Corp., Inc., | |
| Plaintiff, | Case No. 12-12291 (MFW) |
| v. | Adv. No. 14-50622 (MFW) |
| JOSEPH KANDLE, | |
| Defendant. | |

ME1 19740307v.1

**TRUSTEES' MOTION FOR APPROVAL OF (A) GLOBAL SETTLEMENT OF
LITIGATION AND DISPUTES INVOLVING FORMER DIRECTORS AND OFFICERS
OF TRI-VALLEY CORP. AND (B) AGREEMENT ON HOW TO ALLOCATE
SETTLEMENT PROCEEDS AMONG THE TRUSTEES AND CLASS ACTION
PLAINTIFFS PURSUANT TO FED. R. BANKR. P. 9019**

Charles A. Stanziale, Jr. (the "TVC Trustee"), in his capacity as the Chapter 7 Trustee of the estates of Tri-Valley Corporation, *et al.* (the "TVC Debtors"), by and through his counsel, McCarter & English LLP, and Jeoffrey L. Burtch (the "Opus Trustee"), in his capacity as the Chapter 7 Trustee of the estate of TVC Opus I Drilling Program, L.P. ("Opus" and collectively with the TVC Debtors, the "Debtors"), by and through his counsel, Cozen O'Connor, hereby move this Court for entry of an Order Approving (a) a global settlement of, *inter alia*, adversary proceedings, pending motions and other litigation and disputes ("Settlement Agreement"), and (b) an agreement among the Trustees and a group of class action plaintiffs on how to allocate the cash proceeds of the global settlement ("Allocation Agreement"), pursuant to Fed. R. Bankr. P. 9019 (the "Motion"), and in support thereof, state as follows:

**JURISDICTION, VENUE, PREDICATES FOR RELIEF**

1.     The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §1334(b). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The predicate for the relief requested herein is Bankruptcy Rule 9019.

**BACKGROUND**

4.     On August 7, 2012 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

5.     On March 25, 2013, an Order was entered converting the Chapter 11 bankruptcy cases to cases under Chapter 7 of the Bankruptcy Code.

6.     On March 26, 2013, the Office of the United States Trustee for the District of Delaware appointed Charles A. Stanziale, Jr. as Chapter 7 Trustee for the TVC Debtors and Jeoffrey L. Burtch as Chapter 7 Trustee for Opus.

7.     In accordance with their duties under the Bankruptcy Code, the Trustees investigated the estates' potential causes of action against former directors and officers of TVC for breaches of fiduciary duty, equitable subordination, disgorgement of improperly received funds from the estate, and fraudulent and preferential transfers, and instituted a number of adversary actions.

8.     Following multiple sessions with an experienced mediator, the Trustees, certain defendants, and their insurers have, subject to Bankruptcy Court approval, reached a comprehensive settlement of disputes.  The parties to the Settlement Agreement are:

    a.  The "Plaintiffs": the TVC Debtors' estates and the TVC Trustee; the Opus estate and the Opus Trustee; and Steven Siegal, James Rybicki, David Groblebe, individually and as General Partner of Grobco II, and Christian Wipf (collectively, the "Named California Plaintiffs"), all individually and on behalf of the Opus Shareholder Settlement Class as defined herein, and G. Robert Miller, individually and as a member of the Settlement Class (collectively, the "California Plaintiffs");

    b.  The "Defendants": Paul Bateman, Greg Billinger, Milton J. Carlson, Maston Cunningham, John Durbin, Edward Gabriel, Dennis Lockhart, Henry Lowenstein, James Mayer, Loren Miller and Harold Noyes; F. Lynn Blystone; G. Thomas Gamble and George T. Gamble 1991 Trust (collectively, "Gamble"); James Kromer; James G. Bush; Joseph Kandle.

    c.  The Directors and Officers Insurance Companies (collectively the "D&O Insurers"): National Union Fire Insurance Company of Pittsburgh, PA and AIG Claims, Inc. ("National Union"); Arch Insurance Company ("Arch"); Liberty Mutual Insurance Company ("Liberty").

See Settlement Agreement at ¶ 1.

9. The settlements described herein resolve, *inter alia*, disputes related to the Debtors' bankruptcy cases, a putative class action pending in the United States District Court for the Northern District of California, as well as the following adversary proceedings pending in this Court:

> *Stanziale, Jr. v. Blystone, et al.,* Adv. Pro. No. 13-51212-MFW (Bankr..Del. 2013)
>
> *Burtch v. Blystone et al.,* Adv. Pro. No. 13-51214-MFW (Bankr. Del. 2013)
>
> *Stanziale, Jr. v. Gamble, et al.,* Adv. Pro. No. 13-51312-MFW (Bankr. Del. 2013)
>
> *Burtch v. Gamble, et al*., Adv. Pro. No. 13-51316-MFW (Bankr. Del. 2013)
>
> *Official Committee of Equity Security Holders of TVC Opus I Drilling Program L.P. et al. v. Gamble, et al.,* Adv. Pro. No. 12-50994-MFW (Bankr. Del. 2012).
>
> *Stanziale, Jr. v. Blystone*, Adv. Pro. No. 14-50625-MFW (Bankr. Del. 2014)
>
> *Stanziale, Jr. v. Kromer*, Adv. Pro. No. 14-50623 (Bankr. Del. 2014)
>
> *Stanziale, Jr. v. Bush*, Adv. Pro. No. 14-50624 (Bankr. Del. 2014)
>
> *Stanziale, Jr. v. Kandle*, Adv. Pro. 14-50622 (Bankr. Del. 2014).

<u>See</u> Settlement Agreement at ¶ 2.

10. In addition, the parties have settled the motion filed by Gamble to compel payment of attorneys' fees and expenses from the Debtors' estates in accordance with the Final DIP Order and the DIP Credit Agreement (D.I. No. 769) (collectively, the adversary proceedings listed above together with the Gamble motion, the "<u>Litigation</u>"). The settlement also resolves, *inter alia*, pending class action litigation in the U.S. District Court for the District of Northern California filed on behalf of Opus investors against former directors and officers of TVC, styled *Siegal, et al. v. Gamble, et al.,* No. 13-cv-03570-JSC (N.D. Cal. 2013) (the "<u>California Action</u>"). All of these disputes were the subject of an extensive mediation process that included the defendants' insurance carriers (the "<u>D&O Insurers</u>") that had issued D&O Liability Policies to

indemnify TVC's directors and officers. The mediation was conducted over several days by an accomplished mediator under the auspices of JAMS, the largest private alternative dispute resolution provider in the world.

11. The Trustees also reached an agreement with the California Action plaintiffs regarding the allocation of the settlement proceeds and further cooperative efforts in the future ("Allocation Agreement").

12. The Trustees now seek Bankruptcy Court approval for the Settlement Agreement and the Allocation Agreement (collectively, the "Settlements").

## SUMMARY OF SETTLEMENTS[1]

13. The Settlement Agreement (a copy of which is attached hereto as **Exhibit A**) provides for, *inter alia*, the payment of $9,000,000 in cash (the "Settlement Fund") to the Trustees and the California Plaintiffs.[2] The Settlement Fund will consist of $8 million to be paid by the D&O Insurers and $1 million to be paid by Gamble. In addition to his cash contribution, Gamble will be waiving asserted secured and administrative expense claims against the Debtors' estates of more than $1.8 million. The Trustees and the California Plaintiffs will partially reimburse the Outside Directors for legal expenses not to exceed $61,200 from the Settlement Fund in connection with insurance coverage issues pertaining to the Litigation.

14. The Settlement Agreement provides for mutual releases and the entry of orders by this Court against the Trustees, the debtors, and anyone claiming through them, and by the District Court in California against the Settlement Class, and anyone claiming through the class

---

[1] This summary is included solely for ease of reference but is in no way controlling over terms contained in the respective settlement agreements. In the event of any inconsistency, the terms of the respective settlement agreements shall control.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

members, from prosecuting, directly or indirectly, any of the Released Claims or any claims arising from the Released Claims. However, the failure of the Bankruptcy Court to enter the Bankruptcy Bar Order on the grounds that it lacks the power to do so are not grounds for termination of the Settlement. Specifically, Section 5 of the Settlement Agreement provides for the following releases upon satisfaction of the Conditions Precedent:

a. Each of the Plaintiffs and Defendants does fully, finally and forever release each other, as well as all respective past and present parents, subsidiaries and affiliates, and their respective current and former directors, officers, general partners, managers, employees, attorneys, and agents, the D&O Insurers and all persons and entities insured under the policies issued by the D&O Insurers to Tri-Valley or Opus from all claims that were or could have been alleged in the Proceedings or which relate in any way to the subject matter of the Proceedings, except as provided herein and in Paragraphs 7 and 8 [of the Settlement Agreement] and subject to the terms of the Insurer Agreements (the "Released Claims"). By way of example and without limitation of the foregoing, the foregoing releases expressly include any (i) claims by Gamble for attorneys' fees and expenses against Tri-Valley and/or Opus, and (ii) any and all claims by any of the Trustees, the estates of Tri-Valley or Opus, or any other Plaintiff, whether direct or derivative, against Defendants, including but not limited to, any actions under Chapter 5 of title 11 of the United States Code. The foregoing releases will not apply to (i) any claims by and between Opus and Tri-Valley, all of which are expressly preserved, and (ii) any claims by the Plaintiffs against K&L Gates LLP, Behrooz Sarafraz, and persons other than Defendants who received commissions or other payments in connection with the sale of Tri-Valley stock or interests in Opus. Nothing contained in this paragraph is intended to prohibit or prevent the Plaintiffs from taking discovery from the Defendants in aide of their claims against other persons, but both Plaintiffs and Defendants will cooperate in good faith to minimize the expense and disruption caused by such discovery and Defendants reserve the right to seek reimbursement and/or indemnification for attorney's fees and costs from any Plaintiff serving discovery requests, subject to any objections or defenses by said Plaintiff.

b. Each of the Defendants and their respective agents, representatives, attorneys, successors, heirs, and assigns (the "Defendant-Related Parties"), on the one hand, and Arch and Liberty and each of their respective present, former and future corporate parents, subsidiaries, and affiliates, and their licensees, assigns, principals, shareholders, representatives, insurers, reinsurers, agents, attorneys, employees, partners, officers, and directors, in their official and unofficial capacities, jointly and individually (the "Arch and Liberty Parties"), on the other hand, shall release and forever discharge one another from any and all actual or potential actions, causes of action, suits, proceedings, liabilities, demands, or

claims for coverage, sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments, compensation or other monetary or non-monetary relief whatsoever, in law or in equity, suspected or unsuspected, claimed or unclaimed, liquidated or unliquidated, matured or unmatured, fixed or contingent, known or unknown, previously existing, existing as of the date of this Agreement or hereafter arising, whether contractual, extra-contractual, in tort, or otherwise that the Defendant-Related Parties, on the one hand, and Arch and Liberty Parties, on the other hand, had, have, or may have in the future against one another with respect to (i) any of the Released Claims; (ii) the Proceedings; (iii) any of the allegations asserted in the Proceedings; (iv) any matter alleging, arising out of, based upon, or attributable to the facts alleged in the Proceedings or alleging any Wrongful Act (as defined in National Union Policy 02-206-15-24) which is the same as or related to any Wrongful Act alleged in the Proceedings; or (v) the D&O Insurers' investigation, evaluation, or handling of the Proceedings or the Released Claims, including but not limited to allegations of any "bad faith" or extra-contractual obligations, breach of any oral or written promise, or breach of any duty grounded in law or in contract relating thereto. Notwithstanding the foregoing and anything else herein to the contrary, the Arch and Liberty Parties and Defendant-Related Parties shall not be released from their obligations under this Agreement and any applicable Insurer Agreement. Nothing herein shall impact or impair the terms of the Insurer Agreements.

c. The D&O Insurers release Plaintiffs from all claims arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement, or resolution of the Proceedings.

15. The Trustees will dismiss the Litigation upon approval of the Settlement by this Court and the District Court in California and receipt of the Settlement Funds.

16. In addition to entry of the bar orders, the Settlement Agreement is conditioned upon the approval of this Court, including dismissal with prejudice of the Adversary Proceedings; and approval by the *Siegal* Court, including certification of the Settlement Class for purposes of the settlement, satisfaction of certain Opt-Out Conditions, dismissal of all claims against Defendants in the *Siegal* Action, and final approval by the *Siegal* Court. The Opt-Out Conditions permit the Defendants to terminate the Settlement if a specified number of members of the Settlement Class in the *Siegal* Action request exclusion from the Settlement Class, and two or more Defendants elect to terminate the Settlement.

17.     The Trustees and the Plaintiffs in the California Action entered into a separate Allocation Agreement that would result in the following distribution of the cash proceeds among the three parties:  $2.25 million to the TVC estates; $2.25 million to the Opus estate; and $4.5 million to the Plaintiffs in the California Action.  A copy of the Allocation Agreement is attached hereto as **Exhibit B**.  The Allocation Agreement provides that the Trustees will assign to the California Plaintiffs any claims the estates hold against the Debtors' former attorneys and agree to waive the Debtors' attorney-client privilege with those attorneys; the Trustees and the California Plaintiffs also agreed to jointly prosecute their claims against Behrooz Sarafraz and certain other alleged "finders" who received illegal commissions from TVC or Opus in connection with the sale of TVC stock or Opus units, sharing the expense and effort of the litigation and dividing the proceeds of any recovery as follows: 50% to the California Plaintiffs, 25% to the Opus estate and 25% to the TVC Debtors' estates.  The Allocation Agreement also applies the same percentages to the payment to the Outside Directors in partial reimbursement of their legal fees.  Finally, the Opus Trustee agreed to waive any deficiency claims Opus may have against the California Plaintiffs who are alleged to be general partners of Opus, and the California Plaintiffs agreed that any claim submitted in the Bankruptcy Cases by any Class Member shall be classified as equity rather than debt.

## RELIEF REQUESTED

18.     By this Motion, the Trustees seek entry of an order, substantially in the form of the Proposed Form of Order, approving the Settlement Agreement and the Allocation Agreement.

19.     Bankruptcy Rule 9019 governs the approval of compromises and settlements, and provides as follows:

On motion by the Trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019.

20.    The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored."  *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also Matter of Penn Central Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) ("In administrating reorganization proceedings in an economical and practical matter it will often be wise to arrange the settlement of claims . . .") (internal citation marks and quotation marks omitted).

21.    In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] [it]self of all facts necessary [to form] an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, [and] estimate . . . the complexity, expense and likely duration of such litigation . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *Matter of Penn Central Transp. Co.*, 596 F.2d at 1114; *see also In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (describing the "ultimate inquiry to be whether the compromise is fair, reasonable, and in interest of the estate") (internal citations and quotation marks omitted).

22.    The United States Court of Appeals for the Third Circuit has enumerated four factors that should be considered in determining whether a compromise should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin* (*In re Martin*), 91

F.3d 389, 393 (3d Cir. 1996) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)); *accord In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

23.     Furthermore, the decision to approve a compromise is "within the [sound] discretion of the bankruptcy court."  *In re World Health Alternatives, Inc.*, 344 B.R. at 296.  In making its decisions, the bankruptcy court should not substitute its judgment for that of the debtor.  The court is not to decide the numerous questions of law or fact raised by the litigation, but rather should canvas the issues to determine "whether the settlement fall[s] below the lowest point in the range of reasonableness."  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983) (internal citations and quotations omitted); *see also In re World Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the range of litigation possibilities") (internal quotation marks and citations omitted).

24.     In passing upon the reasonableness of a proposed compromise, the Court "may give weight to the opinions of the Trustee, the parties and their counsel in determining the reasonableness of the proposed settlement."  *In re Bell & Beckwith*, 77 B.R. 606, 612 (Bankr. N.D. Ohio), *aff'd*, 87 B.R. 412 (N.D. Ohio 1987); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other") (internal citations omitted).

25. The Trustees believe that the Settlement Agreement and related Allocation Agreement[3] rise well above the "lowest point in the range of reasonableness." Additionally, as discussed more fully below, each of the applicable *Martin* factors set forth above weighs in favor of approving the Settlement.[4] The Court should therefore approve the Settlement pursuant to Bankruptcy Rule 9019 and applicable law.

### Probability of Success in Litigation

26. While the Trustees believe that the Litigation asserted viable claims (which the Defendants denied and disputed), they recognize that any recovery in the Litigation would be uncertain. The Litigation resolved by the Settlement Agreement involves complicated factual and legal issues regarding (i) the interpretation of previous Orders of this Court; (ii) rights that may be afforded under a debtor-in-possession financing arrangement; (iii) whether and at what point the Debtors became insolvent; (iv) whether under Delaware law the directors and officers breached their duty of care and/or loyalty; (v) whether the claims are covered under each of the three layers of insurance (some issues are common and some are unique to a particular policy); and (vi) whether parties have standing and the Court has jurisdiction to address the claims brought before the Court. The Litigation also would have involved addressing and resolving complicated state and federal securities law issues, Delaware corporate governance issues, and the procedural issues of proceeding with six separate law suits in two courts. The issues, no matter how they may be decided by this Court or the class action court in California, are such that the losing party is certain to pursue appellate review. While there are a myriad of issues that

---

[3] The Settlement Agreement is not conditioned on the Court's approval of the Allocation Agreement, although the Trustees believe that they should be considered together.

[4] The Trustees believe that the Settlement does not present any significant issues regarding the second *Martin* factor (consisting of likely difficulties in collection). Although, as noted in paragraph 28, potentially wasting insurance policies could lead to a difficulty in collection. Nonetheless, this factor likely weighs neither in favor nor against approval of the Settlement Agreement.

are disputed, there are certain issues that if any one of them is decided against the Trustees, it could severely impair the recovery for the estates.

27.     The Allocation Agreement resolves the dispute over how to allocate the recovery among the three plaintiffs with both overlapping and unique legal and equitable claims against the various defendants.  Litigation over these issues would serve only to delay and erode ultimate recovery to the stakeholders in these cases.

**Complexity of Litigation Involved, and Expense, Inconvenience, and Delay Necessarily Attending the Litigation**

28.     As set forth above, the claims involve complex legal and factual issues regarding the alleged breaches of fiduciary duties and avoidance action under Chapter 5 of the Bankruptcy Code.  Given the extensive factual record and myriad of legal issues, the Litigation would be protracted and very expensive for the Debtors' estates.  Furthermore, since most of the settling Defendants are insureds under the D&O policies, protracted litigation could exhaust the D&O policies through payment of the defense costs of the various legal teams assisting the multiple Defendants.  Even if the policies were not exhausted, the D&O Insurers raised substantial policy defenses to the Debtors' claims.  The Settlement avoids these obstacles in favor of a prompt and efficient resolution without the need to expend further estate resources.

29.     Bankruptcy courts have authority to enter settlement bar orders. Bar orders are used to encourage partial settlements of litigation involving multiple defendants by barring contribution claim litigation against settling defendants by non-settling defendants.  *In re Tribune Co.,* 464 B.R. 126 (D. Del. Bankr. 2011), *reh. den.*, 464 B.R. 208 (D. Del. Bankr. 2011). *See also In re Washington Mutual, Inc.,* 2012 WL 1563880 (D. Del. Bankr. Feb. 24, 2012) (Walrath, J.) (Order confirming plan includes bar order). *But see, In re Devon Capital Management, Inc.*, 261 B.R. 619 (W.D. Pa. Bankr. 2001) (Court refuses to approve bar order not

limited to claims for contribution or indemnification). Delaware has adopted the Uniform Contribution Among Tortfeasors Law, 10 Del. C. § 6301 *et seq.,* which provides for a reduction, to the extent of the released tortfeasor, of the injured person's damages recoverable against all the other tortfeasors, thus providing contribution- protections to persons affected by the bar order.

### Paramount Interest of Creditors

30.     Entry into the Settlements also serves the paramount interest of creditors of the Debtors' estates.  Resolution of the claims through the Settlements represents a successful outcome for the Debtors' creditors by obviating the need for potentially protracted litigation and the expenses necessarily attendant to such litigation.  The fourth *Martin* factor is therefore satisfied and weighs heavily in favor of the Court approving the Settlements.

31.     With respect to the Allocation Agreement, the Trustees have assessed the respective merits of the claims asserted by each claimant, the non-cash consideration being provided (the waiver by Gamble of over $1.8 million in asserted secured and administrative expense claims), and the parties' respective contributions throughout the mediation process to reach an acceptable compromise.  Since the California Plaintiffs and the Trustees each brought suit against Sarafraz, it made sense for them to reach an agreement to cooperate in the prosecution of those claims and any future claims against alleged "finders" who received illegal commissions for the sale of TVC stock and/or Opus partnership interests.  Finally, the Allocation Agreement provides for cooperation between the California Plaintiffs and the Trustees in dealing with the claims against former counsel to the Debtors, with any recovery inuring to the California Plaintiffs and any expenses being borne by them.

32.     Based on the foregoing, the Trustees submit that approval of the Settlement Agreement and the related Allocation Agreement is in the best interests of the Debtors' estates

and their creditors because it eliminates the risk of no recovery, the possibility of any protracted litigation with the Settling Parties, eases the administrative burden on these estates, and provides for a meaningful recovery in the amount of $2.25 million for each of the TVC Debtors and Opus and their respective creditors. The Settlement therefore represents a compromise between and among the parties that is fair and equitable and in the best interests of the Debtors' estates and their creditors.

### NOTICE

33. The Trustees have served notice of this Motion on the United States Trustee, the settling defendants, and parties who are required to receive notice under Bankruptcy Rule 2002.

34. No prior request for the relief sought herein has been made to any court.

### CONCLUSION

WHEREFORE, the Trustees respectfully request that this Court enter the attached Proposed Form of Order granting the Motion approving the Settlement Agreement and the Allocation Agreement, and granting such other and further relief as the Court deems just and equitable.

### [Intentionally Blank]

Dated: January 28, 2015
       Wilmington, Delaware

**McCARTER & ENGLISH, LLP**

By: */s/ Kate Roggio Buck*
William F. Taylor, Jr. (DE #2936)
Kate R. Buck (DE #5140)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Telephone 302.984.6300
Facsimile 302.984.6399
kbuck@mccarter.com

 *- and -*

Charles A. Stanziale, Jr., Esq.
Clement J. Farley, Esq.
Jeffrey T. Testa, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444

*Attorneys for Charles A. Stanziale, Jr., Chapter 7*
*Trustee of the estates of Tri-Valley Corporation, et al.*

*- and -*

COZEN O'CONNOR

By: __*/s/ Mark E. Felger*__
Mark E. Felger (DE #3919)
Barry M. Klayman (DE#3676)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2000
Fax: (302) 295-2013
Email: mfelger@cozen.com
       bklayman@cozen.com

*Attorneys for Jeoffrey L. Burtch, Chapter 7 Trustee*
*for the estate of TVC Opus I Drilling Program, L.P*

ME1 19740307v.1

# Exhibit 24

# EXHIBIT A

# SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE (the "Agreement") is entered into as of this 13th day of January, 2015 by and among the Parties hereto.

## Background

Whereas, Tri-Valley Corporation ("TVC"), a Delaware corporation, was engaged in the business of crude oil and natural gas exploration, development, and production.

Whereas, TVC Opus I Drilling Program, L.P. ("Opus"), a Delaware limited partnership, was formed in 2002 by TVC for the purpose of engaging in the exploration, drilling, development, and operation of oil and gas prospects in California and Nevada. TVC raised approximately $97 million through private placement of Opus partnership units and attracted approximately 73 general partners and 222 limited partners. TVC served as the Managing Partner of Opus pursuant to the Agreement of Partnership dated May 16, 2002, as amended.

Whereas, on August 7, 2012, TVC, together with its wholly owned subsidiaries, Tri-Valley Oil & Gas Co. ("TVOG") and Select Resources Corporation, Inc. ("Select", and collectively with TVC, TVOG, and Opus, the "Debtors"), and Opus filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Whereas, on March 23, 2013, the Bankruptcy Court entered an order converting the Debtors' cases from chapter 11 to chapter 7 of the Bankruptcy Code.

Whereas, on March 26, 2013, the Office of the United States Trustee appointed Charles A. Stanziale as Chapter 7 Trustee of the estates of TVC, TVOG, and Select ("TVC Trustee"), and Jeoffrey L. Burtch as Chapter 7 Trustee of the Opus estate (the "Opus Trustee", and together with the TVC Trustee, the "Trustees").

Whereas, the Trustees continued or commenced the Adversary Proceedings (as defined below) against certain Defendants (as defined below).

Whereas, on June 27, 2013, Steven Siegal, et al., commenced a class action lawsuit against certain Defendants in the Superior Court of California in and for the County of San Francisco, which case was subsequently removed by the Defendants to the United States District Court for the Northern District of California, San Francisco Division (the "*Siegal* Court").

Whereas, the Defendants have denied any liability to the Plaintiffs in the Proceedings.

Whereas, the Parties agreed to voluntary mediation in an effort to resolve all of the pending claims in the Proceedings.

Whereas, with the assistance of the mediator, the Parties have agreed to settle and resolve all of the pending claims in the Proceedings.

1

Whereas, the Parties entered into a Settlement Term Sheet dated as of October 2, 2014, which Term Sheet envisioned the negotiation and execution of a formal Settlement Agreement containing additional mutually agreed terms and conditions that are customary for agreements of this type.

## Agreement

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

1.  Parties to this Agreement (collectively the "Parties"):

    a.  The "Plaintiffs":

        i.   The Estates of Tri-Valley Corporation, Tri-Valley Oil & Gas Co., and Select Resources Corporation, Inc. (collectively "Tri-Valley"), by Charles A. Stanziale as Chapter 7 Trustee (the "TVC Trustee");

        ii.  The Estate of the TVC Opus I Drilling Program, L.P. ("Opus"), by Jeoffrey L. Burtch as Chapter 7 Trustee (the "Opus Trustee");

        iii. Steven Siegal, James Rybicki, David Groblebe, individually and as General Partner of Grobco II, and Christian Wipf (collectively, the "Named California Plaintiffs"), all individually and on behalf of the Opus Shareholder Settlement Class as defined herein, and G. Robert Miller, individually and as a member of the Settlement Class (collectively, the "California Plaintiffs").

    b.  The "Defendants":

        i.   Paul Bateman, Greg Billinger, Milton J. Carlson, Maston Cunningham, John Durbin, Edward Gabriel, Dennis Lockhart, Henry Lowenstein, James Mayer, Loren Miller and Harold Noyes (the "TVC Outside Directors and Officers");

        ii.  F. Lynn Blystone;

        iii. G. Thomas Gamble and George T. Gamble 1991 Trust (collectively, "Gamble");

        iv.  James Kromer;

        v.   James G. Bush;

        vi.  Joseph Kandle.

    c.  The Directors and Officers Insurance Companies (collectively the "D&O Insurers"):

        i.   National Union Fire Insurance Company of Pittsburgh, PA and AIG Claims, Inc. ("National Union");

        ii.  Arch Insurance Company ("Arch");

2

        iii.   Liberty Mutual Insurance Company ("Liberty").

2.   <u>Actions Related to this Settlement Agreement (collectively, the "Proceedings")</u>

    a.   The "Bankruptcy Cases":

        i.   In re Tri-Valley Corporation, Case No. 12-12291-MFW (Bankr. D. Del. 2012);

        ii.   In re Tri-Valley Oil & Gas Co., Case No. 12-12292-MFW (Bankr. D. Del. 2012);

        iii.   In re Select Resources Corporation, Inc., Case No. 12-12293-MFW (Bankr. D. Del. 2012); and

        iv.   In re TVC Opus I Drilling Program, L.P., Case No. 12-12294-MFW (Bankr. D. Del. 2012).

    b.   The "Adversary Proceedings":

        i.   *Stanziale, Jr. v. Blystone, et al.*, Adv. Pro. No. 13-51212-MFW (Bankr. Del. 2013);

        ii.   *Burtch v. Blystone, et al.*, Adv. Pro. No. 13-51214-MFW (Bankr. Del. 2013);

        iii.   *Stanziale, Jr. v. Gamble, et al.*, Adv. Pro. No. 13-51312-MFW (Bankr. D. Del. 2013);

        iv.   *Burtch v. Gamble, et al.*, Adv. Pro. No. 13-51316-MFW (Bankr. Del. 2013);

        v.   Official Committee of Equity Security Holders of TVC Opus I Drilling Program, L.P., et al. v. Gamble, et al., Adv. Pro. No. 12-50994-MFW (Bankr. D. Del. 2012);

        vi.   *Stanziale, Jr. v. Blystone*, Adv. Pro. No. 14-50625-MFW (Bankr. D. Del. 2014);

        vii.   *Stanziale, Jr. v. Kromer*, Adv. Pro. No. 14-50623 (Bankr. D. Del. 2014);

        viii.   *Stanziale, Jr. v. Bush*, Adv. Pro. No. 14-50624 (Bankr. D. Del. 2014);

        ix.   *Stanziale, Jr. v. Kandle*, Adv. Pro. 14-50622 (Bankr. D. Del. 2014).

    c.   The "*Siegal* Action":

        i.   *Siegal v. Gamble, et al.*, 13-cv-03570-JSC (N.D. Cal. 2013)

3.   <u>Settlement Fund</u>: The aggregate value of the Settlement Fund will be US $9 million (the "Settlement Fund"). Within 30 days of execution of this Agreement, National Union will cause the following payments to be made: (i) payment of $1 million into an interest-bearing escrow account (the "Initial Settlement Fund"); and (ii) payment of previously invoiced defense costs and fees of certain Defendants as set forth in the side letter agreement dated

October 21, 2014 (the "Side Letter") as well as the separate agreement entered into by National Union and the Defendants contemporaneously herewith (the "National Union Agreement" and together with the Side Letter, the "Insurer Agreements"). Within 30 days of the date on which all Conditions Precedent (as defined in Paragraph 12 below) are satisfied, with the exception of the dismissals with prejudice of the Adversary Proceedings, which shall occur within 5 business days after the following payments are made, the D&O Insurers and Gamble shall cause payments to be made into the Settlement Fund as follows: (1) National Union: $2,733,513.87 (which amount is in addition to the Initial Settlement Fund); (2) Arch: $3,736,993.07; (3) Liberty: $529,493.07, and (4) Gamble: $1,000,000. In no event shall any of the other Defendants be required to pay any amounts under this Agreement. Until the Adversary Proceedings have been dismissed with prejudice, (a) no proceeds from the Settlement Fund shall be disbursed, and (b) the proceeds of the Settlement Fund shall not become property of the estates of any of the debtors in the Bankruptcy Cases.

4. <u>Division of Settlement Fund</u>:  Plaintiffs have agreed to allocate the Settlement Fund among them as follows:

    a.   $4.5 million to the California Plaintiffs;

    b.   $2.25 million to the TVC Trustee; and

    c.   $2.25 million to the Opus Trustee.

    d.   The settlement embodied in this Agreement (the "Settlement") is not conditioned on court approval of the allocation of recovery amounts among the Plaintiffs or other claimants, or court approval of any request for attorneys' fees and/or expenses.

5. <u>Releases</u>:  In consideration for the mutual obligations contained herein, and effective upon satisfaction of the Conditions Precedent:

    a.   Each of the Plaintiffs and Defendants does fully, finally and forever release each other, as well as all respective past and present parents, subsidiaries and affiliates, and their respective current and former directors, officers, general partners, managers, employees, attorneys, and agents, the D&O Insurers and all persons and entities insured under the policies issued by the D&O Insurers to Tri-Valley or Opus from all claims that were or could have been alleged in the Proceedings or which relate in any way to the subject matter of the Proceedings, except as provided herein and in Paragraphs 7 and 8 below and subject to the terms of the Insurer Agreements (the "Released Claims").  By way of example and without limitation of the foregoing, the foregoing releases expressly include any (i) claims by Gamble for attorneys' fees and expenses against Tri-Valley and/or Opus, and (ii) any and all claims by any of the Trustees, the estates of Tri-Valley or Opus, or any other Plaintiff, whether direct or derivative, against Defendants, including but not limited to, any actions under Chapter 5 of title 11 of the United States Code.  The foregoing releases will not apply to (i) any claims by and between Opus and Tri-Valley, all of which are expressly preserved, and (ii) any claims by the Plaintiffs against K&L Gates LLP, Behrooz Sarafraz, and

persons other than Defendants who received commissions or other payments in connection with the sale of Tri-Valley stock or interests in Opus. Nothing contained in this paragraph is intended to prohibit or prevent the Plaintiffs from taking discovery from the Defendants in aide of their claims against other persons, but both Plaintiffs and Defendants will cooperate in good faith to minimize the expense and disruption caused by such discovery and Defendants reserve the right to seek reimbursement and/or indemnification for attorney's fees and costs from any Plaintiff serving discovery requests, subject to any objections or defenses by said Plaintiff.

b.   Each of the Defendants and their respective agents, representatives, attorneys, successors, heirs, and assigns (the "Defendant-Related Parties"), on the one hand, and Arch and Liberty and each of their respective present, former and future corporate parents, subsidiaries, and affiliates, and their licensees, assigns, principals, shareholders, representatives, insurers, reinsurers, agents, attorneys, employees, partners, officers, and directors, in their official and unofficial capacities, jointly and individually (the "Arch and Liberty Parties"), on the other hand, shall release and forever discharge one another from any and all actual or potential actions, causes of action, suits, proceedings, liabilities, demands, or claims for coverage, sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments, compensation or other monetary or non-monetary relief whatsoever, in law or in equity, suspected or unsuspected, claimed or unclaimed, liquidated or unliquidated, matured or unmatured, fixed or contingent, known or unknown, previously existing, existing as of the date of this Agreement or hereafter arising, whether contractual, extra-contractual, in tort, or otherwise that the Defendant-Related Parties, on the one hand, and Arch and Liberty Parties, on the other hand, had, have, or may have in the future against one another with respect to (i) any of the Released Claims; (ii) the Proceedings; (iii) any of the allegations asserted in the Proceedings; (iv) any matter alleging, arising out of, based upon, or attributable to the facts alleged in the Proceedings or alleging any Wrongful Act (as defined in National Union Policy 02-206-15-24) which is the same as or related to any Wrongful Act alleged in the Proceedings; or (v) the D&O Insurers' investigation, evaluation, or handling of the Proceedings or the Released Claims, including but not limited to allegations of any "bad faith" or extra-contractual obligations, breach of any oral or written promise, or breach of any duty grounded in law or in contract relating thereto.  Notwithstanding the foregoing and anything else herein to the contrary, the Arch and Liberty Parties and Defendant-Related Parties shall not be released from their obligations under this Agreement and any applicable Insurer Agreement.  Nothing herein shall impact or impair the terms of the Insurer Agreements.

c.   The D&O Insurers release Plaintiffs from all claims arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement, or resolution of the Proceedings.

5

6.  Bar Orders:

    a.    Upon court approval of the Settlement, the Parties shall jointly request that the *Siegal* Court enter a permanent bar order (the "Bar Order") containing all of the following provisions:

        i.    Upon payment of the Settlement Fund pursuant to paragraph 3 of this Agreement, the Court permanently bars and enjoins (A) all members of the Settlement Class and their heirs, executors, administrators, trustees, predecessors, successors, affiliates, representatives, and assigns – and anyone else purporting to act on behalf of, for the benefit of, or derivatively for any of them – from filing, commencing, prosecuting, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from any other lawsuit, arbitration, or administrative, regulatory, or other proceeding, or order (as well as a motion or complaint in intervention in the *Siegal* Action if the person or entity filing such motion or complaint in intervention purports to be acting as, on behalf of, for the benefit of, or derivatively for any of the above persons or entities), in any jurisdiction or forum, that is based upon, arises out of, or relates to any Released Claim, or that is based upon, arises out of, or relates to the *Siegal* Action or the transactions and occurrences referred to in the *Siegal* complaint, and (B) all persons and entities from filing, commencing or prosecuting any other lawsuit as a class action or other proceeding (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action) on behalf of any member of the Settlement Class, if such other lawsuit is based upon, arises out of, or relates to any Released Claim, or is based upon, arises out of, or relates to the *Siegal* Action or the transactions and occurrences referred to in the *Siegal* complaint. This paragraph expressly excludes claims against (1) Behrooz Sarafraz, (2) persons other than Defendants who received commissions or other payments in connection with the sale of Tri-Valley stock or interests in Opus, and (3) K&L Gates and its affiliates.

        ii.    In accordance with 15 U.S.C. ¶ 78u-4(f)(7)(A) and Cal. CCP. Code § 887 et seq., any and all claims for contribution arising out of any Released Claim (A) by any person or entity against any of the released persons or entities ("Releasees") and (B) by any of the Releasees against any person or entity (other than as set out in 15 U.S.C. § 78u-4(f)(7)(A)(ii)) are hereby permanently barred, extinguished, discharged, satisfied, and unenforceable. Accordingly, without limitation to any of the above, (1) any person or entity is hereby permanently enjoined from commencing, prosecuting, or asserting against any of the Releasees any such claim for contribution, and (2) the Releasees are hereby permanently enjoined from commencing, prosecuting, or asserting against any person or entity any such claim for contribution.

        iii.    The Bar Order shall not release, interfere with, limit, or bar the assertion by any Releasee of any claim for insurance coverage under any insurance, reinsurance or indemnity policy that provides coverage respecting the conduct at issue in the *Siegal* Action.

6

b. The Trustees, on behalf of themselves, the Debtors and the Debtors' estates, will include a permanent bar order ("Bankruptcy Bar Order") in the proposed 9019 Order in the Proceedings, containing all of the following provisions:

i. Upon payment of the Settlement Fund pursuant to paragraph 3 of this Agreement, the Trustees, Tri-Valley and Opus (and all other persons that hold, have held, or may hold a claim or other debt or liability, or interest or other right of an equity holder, against, in or relating to Tri-Valley or Opus or their respective estates) (collectively the "Barred Persons") are permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, in any court, arbitration proceeding, administrative agency, or other forum in the United States of America or elsewhere, any actions, causes of action, claims, counterclaims, cross-claims, suits, proceedings, damages, punitive damages, costs, expenses and attorneys' fees, demands and liabilities whatsoever of every kind and nature, whether known or unknown, accrued or unaccrued, in law, equity or otherwise that the Barred Persons ever had or now have or may have against any of the Releasees constituting or arising from the Released Claims, including any claims that are duplicative or derivative of any Released Claims, or any Released Claims that could have been brought by or on behalf of the Trustees, Tri-Valley or Opus.

ii. Upon payment of the Settlement Fund pursuant to paragraph 3 of this Agreement, all Barred Persons are permanently barred, enjoined, and restrained from commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, in any court, arbitration proceeding, administrative agency, or other forum in the United States of America or elsewhere, any actions, causes of action, claims, counterclaims, cross-claims, suits, damages, punitive damages, costs, expenses and attorneys' fees, and demands whatsoever of every kind and nature, whether known or unknown, accrued or unaccrued, in law, equity or otherwise that the Barred Persons ever had or now have or may have against any of the Releasees arising out of, connected with, or related to (A) negotiating and agreeing to the Settlement Agreement; (B) agreeing to make or accept the Settlement Fund; and (C) agreeing to the scope of the Settlement Agreement and the releases set forth in the Settlement Agreement.

iii. Notwithstanding the foregoing, nothing in the Bankruptcy Bar Order shall be deemed to impact or limit the ability of any Party to the Settlement Agreement to file an action in a court of appropriate jurisdiction to enforce the Settlement Agreement or for damages resulting from breach of the Settlement Agreement.

7. <u>Indemnification of Fees and Expenses of Certain Defendants</u>: Notwithstanding any other provision in this Agreement, Arch and Liberty agree to indemnify Paul Bateman, Greg Billinger, F. Lynn Blystone, Milton J. Carlson, Maston Cunningham, John Durbin, Edward M. Gabriel, Dennis P. Lockhart, Henry Lowenstein, James S. Mayer, Loren J. Miller, Harold J. Noyes (collectively, "Certain Defendants") for up to $66,013.86 in past, current or future reasonable Defense Costs (as defined in National Union Policy 02-206-15-24) related to or arising out of, or related to the claims asserted in, *Stanziale, Jr. v. Blystone, et al.*, Adv.

Pro. No. 13-51212-MFW (Bankr. Del. 2013), *Burtch v. Blystone, et al.*, Adv. Pro. No. 13-51214-MFW (Bankr. Del. 2013) or the *Siegal* Action. Arch and Liberty shall indemnify such Defense Costs on an equal basis and their respective obligations shall not exceed $33,006.93. However, Defense Costs incurred to respond to any objection filed related to the Settlement approval proceedings for the above-listed actions (or any action or proceeding commenced in violation of the Bar Order) shall not count towards this $66,013.86 limit. In addition to the $66,013.86 in past, current or future reasonable Defense Costs and to Defense Costs incurred to respond to any objection filed related to the Settlement approval proceedings, Arch will also indemnify Defendants for Defense Costs, subject to a sublimit of $20,000 through a motion to dismiss, incurred to respond to any new action or proceeding commenced by a Class Member in violation of the Bar Order, and Liberty will also indemnify Defendants for Defense Costs, subject to a sublimit of $13,333 through a motion to dismiss, incurred to respond to any new action or proceeding commenced by a Class Member in violation of the Bar Order. Any additional obligation Arch and Liberty may have with respect to any such new action or proceeding beyond the motion to dismiss will be determined in accordance with the terms of their respective insurance policies and in accordance with the foregoing specified releases. In all events, payment of any Defense Costs by Arch or Liberty shall, in accordance with the terms of their respective policies, reduce the limit of liability of such policies. In no event shall Arch or Liberty have any obligation for the payment of any Defense Costs or other Loss (also defined in National Union Policy 02-206-15-24) after the limit of liability of their respective policies is exhausted.

8. Claims for Unpaid Directors' Fees and Expenses: Nothing in this Agreement waives or prejudices any rights the TVC Outside Directors have with respect to claims against TVC and Opus for unpaid directors' fees and expenses. The Trustees reserve the right to object to any such claims. Plaintiffs agree to indemnify the TVC Outside Directors and Officers for legal expenses not to exceed $61,200, incurred in the defense of *Stanziale, Jr. v. Blystone, et al.*, Adv. Pro. No. 13-51212-MFW (Bankr. Del. 2013), *Burtch v. Blystone, et al.*, Adv. Pro. No. 13-51214-MFW (Bankr. Del. 2013), and the *Siegal* Action. The payments for legal expenses shall be allocated equally among the California Plaintiffs, the TVC Trustee, and the Opus Trustee and shall be paid from their respective shares of the Settlement Fund within ten (10) days after the payments into the Settlement Fund by the D&O Insurers and Gamble in accordance with Paragraph 3. The payments for legal expenses shall be sent by wire to the following account:

|  |  |
|---|---|
| Account Name: | Gilbert LLP IOLTA |
| Account Number: | 10000083932219 |
| Bank Name: | SunTrust Bank |
| Bank Address: | 1445 New York Avenue, NW |
|  | Washington, DC 20005 |
| ABA#: | 061000104 |

9. Administrative Expenses: Costs of notice to members of the Settlement Class (as defined below) and costs of administering the Settlement, including costs of notice required by 28 U.S.C. § 1715(b) (collectively, "Administrative Expenses") shall be advanced from the Initial Settlement Fund.

8

10. <u>California Plaintiffs' Counsel Fees</u>:  California Plaintiffs' counsel may apply to the *Siegal* Court for an award of reasonable attorneys' fees and litigation expenses to be paid from California Plaintiffs' share of the Settlement Fund ("California Plaintiffs' Counsel Fees").

11. <u>Opus Shareholder Settlement Class</u>:

    a.    There will be a settlement class in the *Siegal* Action comprising all persons and entities who purchased securities issued by or on behalf of TVC Opus I Drilling Program, L.P., directly or indirectly, personally or through aggregators (the "Settlement Class"). Excluded from the Settlement Class are all defendants in the *Siegal* Action, their parent companies and subsidiaries, and members of their nuclear families.  Defendants may terminate the Settlement if a specified number of members of the Settlement Class request exclusion from the Settlement Class, as set forth in a supplemental agreement entered into contemporaneously with the Settlement Term Sheet (the "Opt-Out Conditions").  The Opt-Out Conditions shall be deemed satisfied unless two or more Defendants give written notice of termination to all Parties.

    b.    Subject to *Siegal* Court approval, the Settlement Class shall be conditionally certified solely for purposes of the settlement embodied in this Agreement.  If, for any reason, this Agreement is not approved by the *Siegal* Court, the stipulation for certification and all of the agreements contained herein (except those that apply in the event the Agreement does not receive final approval or the Conditions Precedent are not satisfied) shall be considered null and void and may not be referred to or used as evidence or for any other purpose whatsoever in the Proceedings or any other action or proceeding.

    c.    "Settlement Class Member" shall mean and include each member of the Settlement Class except those who validly and timely request exclusion from the Settlement Class.

    d.    Settlement Class Member Benefits:

        i.    Payments to the Settlement Class Members shall be made from the Settlement Fund, and specifically from the allocation to California Plaintiffs as set forth in Paragraph 4.a. above, minus any allocation of Administrative Expenses (as set forth in Paragraph 9 above) and minus California Plaintiffs' Counsel Fees (as set forth in Paragraph 10 above) that may be approved and awarded by the *Siegal* Court (the "California Settlement Fund").

        ii.    Each Settlement Class Member's share of the California Settlement Fund shall be determined on a pro-rata basis, calculated as each Settlement Class Member's total investment minus return or other payment received from the investment (if any).  Each Settlement Class Member shall receive notice as detailed in Paragraph 11.e., below.

    e.    Notice to the Settlement Class and Claims Process

9

i. The California Plaintiffs will submit, in connection with the motion for preliminary approval of the Settlement, a form of Notice of Settlement ("Notice"), attached hereto as Exhibit A, for *Siegal* Court approval.

ii. The California Plaintiffs will also submit, in connection with the motion for preliminary approval of the Settlement, a form of claim form substantially in the form attached hereto as Exhibit B (the "Claim Form"), for *Siegal* Court approval. The Claim Form shall identify the amount of the Settlement Class Member's investment, and will allow the Settlement Class Member to correct the amount stated, upon providing satisfactory proof, under oath, of the investment amount.

iii. Upon *Siegal* Court approval of the Notice and Claim Form, the California Plaintiffs will promptly cause the Notice and Claim Form to be mailed, by First Class U.S. Mail, to the Settlement Class Members. Settlement Class Members shall have forty-five (45) days from the time that Notice is deemed mailed (the "Claim Period") during which to complete and return Claim Forms, contest the amount of their investment, object to the Settlement, or opt out of the Settlement.

iv. Funds from the California Settlement Fund shall not be distributed to Settlement Class Members until after the occurrence of all Conditions Precedent, and one of the following:
  (1) no appeal and/or petition for review is taken, and the time for an appeal or writ appeal has expired; or
  (2) an appeal and/or petition for review is taken and the settlement is affirmed, and the time period during which further petition for hearing, appeal or writ can be taken has expired;
Within 30 calendar days of the satisfaction of all contingencies set forth in this Paragraph, the California Plaintiffs shall cause payments due to Settlement Class Members to be mailed, by First Class U.S. Mail. Notwithstanding the foregoing, if the 30th calendar day following satisfaction of contingencies falls on a weekend or holiday, the California Plaintiffs shall have until close of the next business day to complete mailing of Settlement Class Member Benefits (as defined in Paragraph 11(d) above).

f. Court Approval and Final Judgment

i. Upon full execution of this Agreement, counsel for the California Plaintiffs, with cooperation from counsel for Defendants in the *Siegal* Action shall take all necessary steps to obtain an order of the *Siegal* Court substantially in the form attached hereto as Exhibit C (the "Preliminary Approval Order"), granting conditional certification of the Settlement Class, granting preliminary approval of this Agreement, and approving the forms and methods of notice to the Settlement Class set forth herein. The Preliminary Approval Order shall further set a date for hearing ("Final Hearing") at which the *Siegal* Court will determine whether the requirements for certification of the Settlement Class have been met; whether the proposed settlement should be finally approved as fair, reasonable, adequate, and in the best interests of the Settlement Class Members; whether the award of fees

10

and expenses to Settlement Class Counsel should be approved; and whether a final judgment should be entered dismissing the *Siegal* Action against the Defendants in the *Siegal* Action on the merits and with prejudice against the Settlement Class Representatives and the Settlement Class Members. The *Siegal* Action shall continue against those persons who are not parties to this Agreement, including Behrooz Sarafraz and K&L Gates LP.

ii.    Upon the *Siegal* Court's approval of this Agreement and the settlement set forth herein, counsel for the California Plaintiffs, with cooperation from counsel for Defendants in the *Siegal* Action, shall take all necessary steps to obtain an order of the *Siegal* Court substantially in the form attached hereto as Exhibit D ("Final Approval Order"), granting final certification of the Settlement Class, granting final approval of this Agreement, and setting forth the Bar Order in Paragraph 6(a) above.

iii.   Upon the *Siegal* Court's approval of this Agreement and the settlement set forth herein, counsel for the California Plaintiffs, with cooperation from counsel for Defendants in the *Siegal* Action, shall take all necessary steps to obtain entry of a judgment substantially in the form attached hereto as Exhibit E ("Final Judgment"), dismissing with prejudice the *Siegal* Action against the Defendants in the *Siegal* Action on the merits and with prejudice against the Settlement Class Representatives and the Settlement Class Members who do not file valid and timely requests for exclusion pursuant to the Notice above. The *Siegal* Action shall continue against those persons who are not parties to this Agreement, including Behrooz Sarafraz and K&L Gates LP.

iv.    Should this Agreement not receive final *Siegal* Court approval for any reason, or if this Agreement is canceled or terminated or is overturned on appeal, or does not become final as a result of further proceedings on remand, this Agreement shall be null and void and of no force and effect, and nothing herein shall be deemed to prejudice the position of any of the Parties with respect to the *Siegal* Action or otherwise, and neither the existence of this Agreement nor its contents shall be admissible in evidence, referred to for any purpose in the *Siegal* Action or in any other litigation or proceeding, or be deemed a presumption, concession or admission by Defendants of any fault, liability or wrongdoing.

12.  Conditions Precedent: The Settlement is conditioned upon the following (the "Conditions Precedent"):

a.    Negotiation and execution of this Agreement;

b.    Approval of the Settlement by the Bankruptcy Court, including dismissal with prejudice of the Adversary Proceedings;

c.    Approval by *Siegal* Court, including preliminary approval, certification of the Settlement Class for settlement purposes only, satisfaction of the Opt-Out Conditions,

11

dismissal of all claims against Defendants in the *Siegal* Action, and final approval in accordance with the terms of this Agreement;

d. Entry of the Bar Order by the *Siegal* Court and the Bankruptcy Bar Order by the Bankruptcy Court in accordance with paragraph 6 above. The failure of the Bankruptcy Court to enter the Bankruptcy Bar Order on the grounds that it lacks the power to do so will not be grounds for termination of the Settlement.

13. Bankruptcy Court Approval of the Settlement: Within fifteen (15) business days after execution of this Agreement, the Trustees shall file motions seeking approval of the Settlement by the Bankruptcy Court, which other Parties shall not oppose. The motions shall be circulated to the Defendants in advance of filing and shall be in a form reasonably acceptable to the Defendants.

14. *Siegal* Court Approval of the Settlement: Within fifteen (15) business days after execution of this Agreement, California Plaintiffs shall file a motion seeking preliminary approval of the Settlement by the *Siegal* Court, which other Parties shall not oppose. The California Plaintiffs shall take all necessary actions required in order to obtain final approval of the Settlement. The motions shall be circulated to the Defendants in advance of filing and shall be in a form reasonably acceptable to the Defendants.

15. Certification of Opus Shareholder Settlement Class: Simultaneously with the California Plaintiffs' motion for preliminary approval of the Settlement, California Plaintiffs will seek, and the Parties will not object to, certification of the Settlement Class for settlement purposes only. The Parties (other than California Plaintiffs) need not join the class certification request and neither admit nor agree that the Settlement Class is appropriate for purposes of litigation. The motion and other documents filed in support of such requests shall be circulated to the Defendants in advance of filing and shall be in a form reasonably acceptable to the Defendants.

16. Litigation Stayed: Litigation of the Proceedings shall be stayed pending the Parties' efforts to effectuate the terms of the Settlement.

17. Termination of the Settlement:

a. If any of the following events occurs, each Party shall have the right to terminate the Settlement:

i. The *Siegal* Court denies, with prejudice, preliminary approval or final approval of the Settlement, or certification of the Settlement Class for settlement purposes only, and the California Plaintiffs exhaust all reasonable and meritorious means of review of the Court's orders, including reconsideration or appeal;

ii. The Opt-Out Conditions are not satisfied;

iii. The Bankruptcy Court denies approval of the Settlement.

iv. Either the *Siegal* Court or the Bankruptcy Court does not enter the Bar Order or the Bankruptcy Bar Order in accordance with paragraph 6 above; provided, however, that the failure of the Bankruptcy Court to enter the Bankruptcy Bar Order on the grounds that it lacks the power to do so will not be grounds for termination of the Settlement.

b. Any Party seeking to terminate the Settlement under subparagraph (a) shall provide written notice to all other Parties. In the event of termination for any of the reasons set forth in subparagraph (a), the Parties will be returned to the positions they were in immediately prior to the date of execution of the Settlement Term Sheet, as if the Settlement Term Sheet and this Agreement never existed, and the remaining Initial Settlement Fund shall within 15 days after the effective date of such termination be refunded to National Union, net of any actual Administrative Expenses incurred in connection with the Settlement up to the date of termination.

18. <u>No Admissions</u>: Defendants each and all deny any wrongdoing and make no admissions concerning the allegations in the Proceedings. The provisions of the Settlement Term Sheet and this Agreement and all negotiations, discussions and proceedings in connection with the Settlement are not an admission by Defendants of fault, liability or wrongdoing as to any facts or claims alleged or asserted in the Proceedings or in any other actions or proceedings, and shall not be received in evidence or otherwise used in the Proceedings or in any other action or proceeding for any purpose. If the Settlement does not become final and effective, the Parties will revert to their respective litigation positions as if the Settlement Term Sheet and this Agreement never existed.

19. <u>Confidentiality</u>: The Settlement Term Sheet is confidential, and is governed by Rule 408 of the Federal Rules of Evidence, Delaware Bankruptcy Local Rule 9019-5(d), and any similar rules and statutory provisions governing the non-admissibility of settlement discussions, as well as the terms of the JAMS mediation agreement among the Parties.

20. <u>Best Efforts and Cooperation</u>: The Parties shall cooperate and exercise their best efforts to implement the terms of the Settlement, to satisfy the Conditions Precedent, to obtain approval of this Agreement, and to reasonably avoid the occurrence of events that would lead to termination of the Settlement. The California Plaintiffs agree to this Settlement and will not opt out or solicit or encourage other Settlement Class members to opt out.

21. <u>Authority</u>: Undersigned counsel represent that they have authority to sign this Agreement on behalf of their respective clients.

22. <u>Governing Law</u>: This Agreement shall be governed by and interpreted in accordance with the federal laws of the United States (including the federal common law of contracts) and, to the extent such federal laws are not applicable, by the laws of the State of Delaware without giving effect to principles of conflicts of laws that would require the application of laws of another jurisdiction.

23. <u>Entire Agreement; Agreement to be Construed as a Whole</u>: This Agreement contains the entire understanding between the Parties as to all matters referred to herein, except to the

13

extent that this Agreement incorporates, contemplates, or acknowledges an ancillary agreement and such ancillary agreement is executed by the parties thereto. No other representations, covenants, undertakings, or prior or contemporaneous agreements, whether oral or written, regarding any matters that are not specifically contained in, incorporated into, or acknowledged by this Agreement, shall be deemed to have any effect or binding impact upon the Parties. This Agreement has been jointly negotiated by the Parties and is agreed to by the Parties. The language of this Agreement shall be construed as a whole according to its fair meaning and in accordance with its purpose and without regard to whom may have drafted any particular provision herein.

24. Counterparts: This Agreement may be executed in any number counterparts and by facsimile, all of which taken together shall constitute one and the same instrument, and any of the Parties may execute this Agreement by signing any such counterpart, provided that this Agreement shall not become effective until all Parties have executed the same.

25. Amendments or Modifications: This Agreement may only be amended or modified by a writing signed by all Parties. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provisions of this Agreement. Any notices required or contemplated herein shall also be in writing.

26. Agreement Supported by Consideration; No Duress: The Parties agree, covenant, represent, and warrant that this Agreement is supported by consideration and that this Agreement is being entered into knowingly, voluntarily, without mental reservation, with no purpose of evasion, and with the intent to be legally bound hereby, without coercion of any kind, in part to remove the uncertainty and expenses of additional negotiations and further or possible future litigation and with an adequate opportunity for and the actual benefit of the assistance and advice of legal counsel.

27. No Admission: This Agreement represents the full settlement and compromise of disputed claims. Neither the execution nor the performance of this Agreement shall be construed as an admission of liability on the part of any Party to this Agreement, and all Parties expressly deny any such liability.

28. Nonreliance: Each Party expressly assumes any and all risk that the facts and law may be or become different from the facts and law as known to, or believed to be, by the Parties as of the date of this Agreement, and no Party has relied upon any information supplied by the other or its counsel, or upon any obligation or alleged obligation of the other Party or its counsel to disclose information relevant to this Agreement.

29. Binding Effect; Benefit: This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors, administrators, trustees, executors, and assigns. Except as specifically set forth herein, nothing in this Agreement, express or implied, is intended to confer upon any other person any rights, remedies, obligations, or liabilities.

30. Acknowledgment of Legal Advice: The Parties acknowledge and agree that they enter into this Agreement after consultation with their attorneys, that their attorneys have explained

the terms of this Agreement, and that they fully understand and voluntarily accept the terms of this Agreement.

31. <u>Rule of Construction</u>:  The Parties and their respective counsel have reviewed this Agreement and acknowledge and agree that any rule of construction that would require an ambiguity, if any, in this Agreement to be construed against the drafter shall not be employed in the interpretation of this Agreement.

32. <u>Necessary Acts; Further Assurances</u>:  The Parties shall, at their own cost and expense, execute and deliver such further documents and instruments and shall take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this Agreement or to show the ability to carry out the intent and purposes of this Agreement, including without limitation any action required to be taken with the Internal Revenue Service or applicable state department of revenue.  In no event shall any Party unreasonably refuse to perform such acts.

33. <u>Severability</u>:  If any term or other provision of this Agreement is determined to be invalid, illegal or incapable of being enforced by any rule or law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the Settlement contemplated hereby is fulfilled.

IN WITNESS WHEREOF, the Parties have executed and delivered this Settlement Agreement and Release as of the date first above written.

PLAINTIFFS:

By_____
Eduardo Glas

McCarter & English, LLP

*Attorneys for Charles Stanziale, Jr. Chapter 7*
*Trustee of Tri-Valley Corporation*

By_____
Mark E. Felger

Cozen O'Connor

15

*Attorneys for Jeoffrey L. Burtch, Chapter 7*
*Trustee of TVC Opus I Drilling Program L.P.*

By _____
Edward S. Zusman

Markun Zusman Freniere & Compton LLP

*Attorneys for Steven Siegal, James Rybicki,*
*David Groblebe, individually and as General*
*Partner of Grobco II, and Christian Wipf, all*
*individually and on behalf of the Opus*
*Shareholder Settlement Class, and G. Robert*
*Miller, individually*

By _____
G. Robert Miller

16

*Attorneys for Jeoffrey L. Burtch, Chapter 7
Trustee of TVC Opus I Drilling Program L.P.*

By_____
    Edward S. Zusman

    Markun Zusman Freniere & Compton LLP

*Attorneys for Steven Siegal, James Rybicki,
David Groblebe, individually and as General
Partner of Grobco II, and Christian Wipf, all
individually and on behalf of the Opus
Shareholder Settlement Class, and G. Robert
Miller, individually*

By G. Robert Mille    12/17/2014
    G. Robert Miller

16

**DEFENDANTS:**

By_____
    Lynn K. Neuner
    George S. Wang

    Simpson Thacher & Bartlett LLP

*Attorneys for Paul Bateman, Greg Billinger,
Milton J. Carlson, Maston Cunningham, John
Durbin, Edward Gabriel, Dennis Lockhart,
Henry Lowenstein, James Mayer, Loren Miller
and Harold Noyes*


By_____
    Brian P. Miller
    Samantha J. Kavanaugh

    Akerman LLP

*Attorneys for F. Lynn Blystone*


By_____
    J. Cory Falgowski

    Reed Smith LLP

*Attorneys for G. Thomas Gamble*


By: _____
    Eric Sutter

    CGA Law Firm

*Attorneys for Joseph Kandle*


By: _____
    Rolland Jones

    Jones & Associates

*Attorneys for James G. Bush*

17

**DEFENDANTS:**

By_____

    Lynn K. Neuner
    George S. Wang

    Simpson Thacher & Bartlett LLP

    *Attorneys for Paul Bateman, Greg Billinger,*
    *Milton J. Carlson, Maston Cunningham, John*
    *Durbin, Edward Gabriel, Dennis Lockhart,*
    *Henry Lowenstein, James Mayer, Loren Miller*
    *and Harold Noyes*

By_____

    Brian P. Miller
    Samantha J. Kavanaugh

    Akerman LLP

    *Attorneys for F. Lynn Blystone*

By_____

    J. Cory Falgowski

    Reed Smith LLP

    *Attorneys for G. Thomas Gamble*

By: _____

    Eric Sutter

    CGA Law Firm

    *Attorneys for Joseph Kandle*

By: _____

    Rolland Jones

    Jones & Associates

    *Attorneys for James G. Bush*

17

**DEFENDANTS:**

By _____
    Lynn K. Neuner
    George S. Wang

    Simpson Thacher & Bartlett LLP

    *Attorneys for Paul Bateman, Greg Billinger,*
    *Milton J. Carlson, Maston Cunningham, John*
    *Durbin, Edward Gabriel, Dennis Lockhart,*
    *Henry Lowenstein, James Mayer, Loren Miller*
    *and Harold Noyes*

By _____
    Brian P. Miller
    Samantha J. Kavanaugh

    Akerman LLP

    *Attorneys for F. Lynn Blystone*

By _____
    J. Cory Falgowski

    Reed Smith LLP

    *Attorneys for G. Thomas Gamble*

By: _____
    Eric Sutter

    CGA Law Firm

    *Attorneys for Joseph Kandle*

By: _____
    Rolland Jones

    Jones & Associates

    *Attorneys for James G. Bush*

17

**DEFENDANTS:**

By_____

    Lynn K. Neuner
    George S. Wang

    Simpson Thacher & Bartlett LLP

    *Attorneys for Paul Bateman, Greg Billinger,*
    *Milton J. Carlson, Maston Cunningham, John*
    *Durbin, Edward Gabriel, Dennis Lockhart,*
    *Henry Lowenstein, James Mayer, Loren Miller*
    *and Harold Noyes*

By_____

    Brian P. Miller
    Samantha J. Kavanaugh

    Akerman LLP

    *Attorneys for F. Lynn Blystone*

By_____

    J. Cory Falgowski

    Reed Smith LLP

    *Attorneys for G. Thomas Gamble*

By: _____

    Eric Sutter

    CGA Law Firm

    *Attorneys for Joseph Kandle*

By: _____

    Rolland Jones

    Jones & Associates

    *Attorneys for James G. Bush*

17