United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN SIEGAL, et al.,

          Plaintiffs,

   v.

G. THOMAS GAMBLE, et al.,

          Defendants.

Case No.  13-cv-03570-RS

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND KLG'S
MOTION TO DISMISS AND SPECIAL
MOTION TO STRIKE PLAINTIFFS'
EIGHTH CLAIM FOR RELIEF**

## I.     INTRODUCTION

Plaintiffs Steven Siegal, David Groblebe, Christian Wipf, and James Rybicki were among the investors who purchased securities in the Tri-Valley Corporation Opus I Drilling Program, L.P. ("Opus").  They assert a host of claims grounded in fraud on behalf of a putative class arising from the sale of Opus securities and the ensuing bankruptcy proceedings initiated by Opus and its general managing partner, Tri-Valley Corporation ("TVC").  Plaintiffs also accuse two unlicensed and unregistered securities broker-dealers, Dr. Alfred Lopez and Behrooz Sarafraz, of various securities violations.  Specifically, they claim Lopez and Sarafraz operated as Opus "aggregators"—separate business entities that pooled small investments to buy Opus units.  In the same complaint, plaintiffs assert a claim for aiding and abetting breach of fiduciary duty against K&L Gates, LLP ("KLG"), which represented both Opus and TVC throughout their respective bankruptcies.

Plaintiffs advance seven claims for relief against Lopez and Sarafraz based on various legal theories.  The deficiencies of those claims in the Second Amended Consolidated Complaint ("SACC") are legion, and therefore they must all be dismissed.  To start, only David Groblebe averred that he invested in aggregators, and thus only he can bring claims against aggregators like Lopez and Sarafraz.  Accordingly, the claims of the other named plaintiffs must be dismissed with prejudice.  In addition, because the UCL's protections do not extend to sales involving securities transactions, Claim 4 (under Cal. Bus. & Prof. Code § 17200) may not advance.

Although Groblebe has pleaded facts establishing standing to assert claims against Lopez and Sarafraz on the remaining claims (Claims 1, 2, 3, 5, and 6), as each sound in fraud, he has not done so with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).  Because he has pleaded facts establishing that he acquired a securitized interest in an aggregator, his claims against Lopez and Sarafraz for direct liability and liability for purchasing securities from unlicensed brokers (Claims 1 and 3) may still be cured if pleaded with sufficient particularity.  Additionally, Claim 7 (negligent misrepresentation) avers omissions as opposed to misrepresentations as the basis of Groblebe's claim, which is not actionable under that theory of liability.  Groblebe therefore is afforded one final opportunity to cure the pleading deficiencies identified in this order, provided he can amend the complaint in good faith.

KLG has demonstrated that plaintiffs' eighth claim for relief (aiding and abetting breach of fiduciary duty) violates the anti-SLAPP statute.  Not only do plaintiffs seek to hold KLG accountable for its protected activity, but their claims lack merit because all of KLG's allegedly sinister actions were taken while KLG was acting as TVC's agent or in furtherance of TVC's bankruptcy petition.

## I.   BACKGROUND[1]

TVC is an oil and gas development company that, in 2002, created Opus, a limited liability

---

[1] The factual background herein is based on averments in the complaint, which must be taken as true for purposes of a motion to dismiss, and exhibits attached to KLG's Request for Judicial Notice (Docket No. 131), which is unopposed and will be granted.

United States District Court
Northern District of California

partnership.  Opus's intended purpose was to acquire oil and gas leases for TVC's exploration and management.  TVC assumed the role of Opus's general managing partner, and from 2002 to 2010, orchestrated Opus's sale of approximately $97 million in securities to nearly a thousand individual investors.  The Opus Partnership Agreement, which governed the relationship between TVC and Opus, precluded TVC from "taking any action . . . which does not primarily benefit [Opus]."  SACC ¶ 75.

The crux of plaintiffs' claims 1-7 is that defendants misrepresented the state of Opus's financial health and duped them into investing in a failing corporation.  Lopez, Sarafraz, and Opus's other agents sent potential investors private placement memoranda, emails, mailings, and oral communications.  These communications omitted critical facts about Opus's financial health and business operations.  Opus did not disclose, for example, that TVC was insolvent, that Opus employed unregistered broker-dealers, that finders received 18% commissions, or that the SEC had investigated Sarafraz.  Ignorant of these facts, plaintiffs purchased Opus units directly from Opus or indirectly from Opus brokers.

These falsehoods and omissions garnered Opus investments from about 300 "direct" investor plaintiffs, who "purchased Opus units directly from Opus," and 700 "indirect" investor plaintiffs, who purchased from aggregators "sponsored" by Opus.  SACC ¶ 35.  Opus units typically required a $1,000,000 investment, which meant many private investors could not purchase these securities.  To expand the pool of potential investors, TVC worked with unlicensed brokers, like Lopez and Sarafraz, to create aggregators, partnerships or limited liability companies created for the purpose of marshaling investor funds primarily to purchase Opus units.  Although Lopez and Sarafraz were not licensed or registered brokers, TVC paid each of them 18% commissions for their efforts.

TVC's officers and directors (the "O&D defendants") inappropriately siphoned $7.5 million of Opus funds into TVC.  When Opus objected, and the conflict between the two entities became clear, they agreed to form the Opus Special Committee ("OSC"), a group of Opus partners convened to mediate those disputes with the assistance of independent counsel.  KLG helped TVC

United States District Court
Northern District of California

draft an amendment to the Partnership Agreement to provide for the formation of the OSC and a letter describing the changes to the Opus partners.  Responsibility for vetting OSC members also fell to KLG.  Those selected to serve on the OSC signed "stringent" non-disclosure agreements, which KLG drafted, prohibiting OSC members from communicating with Opus partners about the negotiations.  SACC ¶ 117.  During the negotiations between April 2011 and May 2012, KLG "participated actively" and "advocated" that a $5 million receivable be charged to Opus instead of TVC.  SACC ¶¶ 118–19.  At the conclusion of the negotiations, TVC and OSC reached an agreement in principle and began drafting the final agreement in which TVC admitted to various wrongdoings.  Ultimately, however, TVC abandoned the agreement, which spawned a series of communications in which OSC accused TVC of breaching its fiduciary obligations—a characterization TVC contested.

After these negotiations fell through, in June 2012, TVC engaged KLG's bankruptcy attorneys to explore ways to address its financial troubles.  About a month later, TVC allegedly sent the Opus partners financial statements containing material misrepresentations "with KLG's knowledge and insistence."  SACC ¶ 91.  Plaintiffs aver that these financial statements led them to believe TVC intended to implement the agreed settlement.  Shortly thereafter, however, TVC and OSC held a meeting at which a KLG attorney announced that the TVC Board intended to file for bankruptcy on behalf of both TVC and Opus.  KLG "pressured" OSC members to contribute to Debtor in Possession financing, informed the OSC members that Opus was insolvent, and advised them not to communicate any information about the bankruptcy to Opus partners.  SACC ¶ 93.

In 2012, KLG prepared and filed petitions for Chapter 11 bankruptcy for both TVC and Opus.  Plaintiffs claim that Opus was solvent, and therefore the bankruptcy was unnecessary.  Instead, they contend, the bankruptcy proceedings were all part of a scheme to ensure the wind up of the Opus partnership went forward "in a manner favorable to TVC."  SACC ¶¶ 94, 96.

In the bankruptcy proceedings, both KLG and the U.S. Trustee raised the structural conflict presented by the relationship between TVC and Opus, and proposed the creation of the Opus Equity Committee ("Equity Committee"), comprised of seven Opus partners, to represent

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Opus's independent interests.  The Equity Committee retained independent counsel and an

2  independent financial advisor before proceeding with the bankruptcy.  It worked with TVC and

3  Opus to appoint an additional director to the TVC board and to retain independent conflict

4  counsel, none of whom lodged any objection with the bankruptcy court regarding KLG's dual

5  representation.  With these safeguards in place, the bankruptcy court approved KLG's retention

6  applications as to both debtors.  In August 2013, after conducting a hearing, the bankruptcy court

7  approved the sale of the debtors' assets.  Both the OSC and the Equity Committee were party to

8  those proceedings.

9       In March 2013, the bankruptcy court granted the debtors' motion to convert their

10  bankruptcy filing to Chapter 7 and appointed a Chapter 7 Trustee for the Opus estate (the "Opus

11  Trustee").  KLG filed motions requesting payment of fees and costs for representing both TVC

12  and Opus throughout the bankruptcy proceedings.  After the OSC, Equity Committee, and the

13  Opus Trustee had an opportunity to review the fee applications, only the Opus Trustee filed an

14  objection, raising the issue of KLG's role as representative of two debtors.  He requested a

15  breakdown of services rendered to Opus and fees allocable to the Opus estate, which KLG

16  provided, and further retained the right to object and to seek disgorgement for any approved fee or

17  expense as information became available during the course of claims administration.  Despite this

18  objection, the bankruptcy court approved both requests for fees and costs.

19       On June 27, 2013, the named plaintiffs filed this complaint as a putative class action

20  against fifteen defendants, including ten former officers and directors of TVC (Thomas Gamble,

21  Loren Miller, Henry Lowenstein, Paul Bateman, Edward Gabriel, James Mayer, Lynn Blystone,

22  Maston Cunningham, John Durbin, and Greg Billinger); two allegedly unlicensed and unregistered

23  broker-dealers (Behrooz Sarafraz and Dr. Alfred Lopez); and KLG.  The bulk of plaintiffs'

24  complaint focuses on allegations of fraud, misrepresentation, breach of fiduciary duty, and

25  violations of California and federal securities laws allegedly committed by the O & D defendants

26  and the securities broker-dealer defendants.

27       In 2014, the O&D defendants settled with plaintiffs who sought preliminary approval of

28

the class settlement in this court.  Because a similar motion was pending in the Bankruptcy Court for the District of Delaware, the motion was denied without prejudice.  Since then, the bankruptcy court has granted preliminary approval of the class settlement.  Lopez, Sarafraz, and KLG remain as the only defendants who have not reached a settlement agreement with plaintiffs.

Previously, Lopez, Sarafraz, and KLG moved successfully to dismiss the plaintiffs' First Amended Class Action Complaint ("FACC").  Plaintiffs were granted leave to amend all claims against Lopez and Sarafraz, but only as to one claim against KLG:  aiding and abetting breach of fiduciary duty.  Along with its motion to dismiss the FACC, KLG filed a special motion to strike plaintiffs' claims pursuant to California's anti-SLAPP statute, which was denied.  Plaintiffs elected to file a SACC—the subject of the three motions at issue now.

## II.    LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a)(2).  "[D]etailed factual allegations are not required," but a complaint must provide sufficient factual averments "to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)).  In addition, "in allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud and mistake."  Fed. R. Civ. P. 9(b).  To satisfy this requirement, a plaintiff must plead "the who, what, when, where, and how that would suggest fraud."  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (internal quotation marks omitted).  "A plaintiff must set forth *more* than the neutral facts necessary to identify the transaction.  The plaintiff must set forth what is false or misleading about a statement, and why it is false."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks and alteration omitted).

Federal Rule of Civil Procedure 12(b)(6) provides a mechanism to test the legal sufficiency of the averments in the complaint.  Dismissal is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint in whole or in part is subject to dismissal if it lacks a cognizable legal theory or the complaint does not include

1    sufficient facts to support a plausible claim under a cognizable legal theory.  *Navarro v. Block*,

2    250 F.3d 729, 732 (9th Cir. 2001).  When evaluating a complaint, the court must accept all its

3    material allegations as true and construe them in the light most favorable to the non-moving party.

4    *Iqbal*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content

5    that allows the court to draw the reasonable inference that the defendant is liable for the

6    misconduct alleged."  *Id.*  This standard requires "more than a sheer possibility that the defendant

7    has acted unlawfully."  *Id.*  "Where a complaint pleads facts that are merely consistent with a

8    defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

9    relief."  *Id.* (internal quotation marks omitted).  When plaintiffs have failed to state a claim upon

10    which relief can be granted, leave to amend should be granted unless "the complaint could not be

11    saved by any amendment."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

12        Sarafraz's request to join Lopez's motion to dismiss shall be construed as a motion for

13    judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  After the pleadings

14    are closed—but early enough not to delay trial—a party may move for judgment on the

15    pleadings."  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is properly granted when there is

16    no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of

17    law."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (footnote omitted).  Because the

18    legal standards governing 12(b)(6) motions to dismiss and 12(c) motions for judgment on the

19    pleadings are virtually identical, "[t]he standard articulated in *Twombly* and *Iqbal* applies equally."

20    *Perez v. Wells Fargo & Co.*, 75 F. Supp. 3d 1184, 1187 (N.D. Cal. 2014) (citing *Chavez v. United*

21    *States,* 683 F.3d 1102, 1108–09 (9th Cir.2012)).  The claim must therefore be "plausible on its

22    face."  *Twombly*, 550 U.S. at 570.  When courts consider motions for judgment on the pleadings,

23    they are constrained to look at only the averments in the complaints or judicially noticeable

24    documents "unless the motion is converted into a Rule 56 summary judgment."  *Crosby v. Wells*

25    *Fargo Bank, N.A.*, 42 F. Supp. 3d 1343, 1345 (C.D. Cal. 2014).

26                              **III.    DISCUSSION**

27        **A.  Claims Against Lopez and Sarafraz**

28

United States District Court
Northern District of California

1    1. _Claim 1:_ *"Primary" Liability for Misrepresentations in Connection with Security Sales, Cal. Corp. Code §§ 25401, 25501*

Section 25401 of the California Corporations Code prohibits the use of "any oral or written communication[s]," including material "untrue statement[s]" and material omissions to offer or to buy securities. Those who suffer injury due to a violation of section 25401 may turn to section 25501 of the same code for relief in the form of damages or rescission. *See Cal. Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 109 (2001) (describing the enforcement mechanisms of California's Corporate Securities Law). Only those "who purchase[] a security" from the section 25401 violator or "sell[] a security" to him or her, may recover, provided they did not know the truth about the falsified or omitted facts at the time of sale. Cal. Corp. Code § 25501. Those who offer and sell securities are not liable if they exercised reasonable care and did not know that material facts were falsified or omitted. *Id.*

The conduct section 25501 proscribes is often referred to as "primary" or "direct" liability because entities directly responsible for transacting with plaintiffs are liable for the falsely represented securities. *AREI II Cases*, 216 Cal. App. 4th 1004, 1013 (2013). Thus, liability extends to only the "actual seller" in privity with the purchaser. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (2007) (holding that a securities "placement agent" employed by the issuing company was not liable because the issuing company did not transfer the securities to the plaintiffs).

Plaintiffs contend that Lopez and Sarafraz omitted material information and made materially false statements about Opus's business operations and financial health when they promoted Opus securities. Because this claim sounds in fraud, Federal Rule of Civil Procedure 9(b) governs the plaintiffs' pleading burden as "[i]t is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action." *Vess*, 317 F.3d at 1103. Indeed, even when fraud is not an element of the state claim asserted, if plaintiffs choose to aver that the defendant has engaged in fraudulent conduct, the complaint must satisfy Rule 9(b)'s pleading standard. *Id.* Accordingly, despite plaintiffs' protestations to the

1    contrary, they must aver "the who, what, when, where, and how that would suggest fraud."

2    *Cooper*, 137 F.3d at 627.  They have not come close to satisfying that standard.

3          To start, Siegal, Wipf, and Rybicki have not adequately pleaded a direct-liability claim

4    against Lopez or Sarafraz because they purchased Opus units from Opus, not aggregators.

5    Without any nexus between the harm they allegedly suffered and defendants' actions, they cannot

6    establish any basis for the relief they request.  Accordingly, their claims must be dismissed with

7    prejudice.

8          Only Groblebe avers that he purchased Opus units from "brokers, including Sarafraz and

9    Lopez."  SACC ¶ 12.  He has not, however, provided sufficient factual details to satisfy Rule

10    9(b)'s heightened pleading standard.  Direct liability typically extends to only the issuer of stock—

11    in this case, Opus—not brokers or placement agents.  *Apollo*, 158 Cal. App. 4th at 253 (quoting 1

12    Marsh & Volk, Practice Under California Securities Laws, ¶ 14.03[4] (Mathew Bender & Co.

13    2014 ed.)) ("[N]o occasion or justification exists . . . to impose liability based on [a participation]

14    theory on anyone other than the actual vendor of that security under [Cal.] Corp. Code. §§ 25401

15    and 25502 . . . because . . . §§ 25504, 25504.1, and 25504.2 precisely set forth the extent to which

16    persons other than the vendor may be liable.").  The SACC states that Groblebe purchased an

17    interest in a partnership or limited liability corporation (he does not specify which).  He did not, in

18    fact, purchase an Opus security directly from the issuer of stock—Opus.  Nor has Groblebe

19    averred that Lopez and Sarafraz sold him Opus units.  Indeed, Opus's private placement

20    memorandum, which has been judicially noticed, establishes that Groblebe and others investors

21    like him could not purchase Opus units from Lopez or Sarafraz because those who wished to

22    purchase such investments were required to sign a subscription agreement with TVC to complete

23    the transfer of securities.  Lopez's Request for Judicial Notice Ex. 1 at 32.

24          Although the SACC does not establish Groblebe acquired an *Opus* security, Groblebe has

25    shown that he purchased *a securitized interest* in one of these aggregators.  The aggregators "sold

26    interest in the LLCs, which entitled each investor to a fractionalized interest in OPUS units."

27    SACC ¶ 51.  Under the California Corporations Code, a "security" may include "interest in a

United States District Court
Northern District of California

28

1    limited liability company and any class or series of interests (including any fractional or other

2    interest in that interest."  Cal. Corp. Code § 25019 (defining "security").  Thus, the SACC sets

3    forth sufficient facts to conclude that Groblebe acquired a security directly from an aggregator.

4          While having made that showing, Groblebe has not set forth details establishing that Lopez

5    and Sarafraz may be directly liable, and therefore has not satisfied Rule 9(b)'s pleading

6    requirements.  He does not, for example, provide any information about when Lopez or Sarafraz

7    allegedly misrepresented Opus's business practices and omitted material facts.  Nor has he

8    provided information as to when or where he purchased Opus units.  Claim 1 must therefore be

9    dismissed.  Groblebe is afforded one final opportunity to amend the complaint provided he can do

10   so in good faith.

      2.   _Claim 2:_  *"Secondary" Liability for Misrepresentations in Connection with*
11         *Security Sales, Cal. Corp. Code §§ 25504 and 25504.1*

12

13         Liability for securities violations also extends to the primary violator's employees and to

14   those who materially aid a primary section 25401 violator who deals in securities.  Cal. Corp.

15   Code § 25504.  This means that agents, associates, affiliates, and broker-dealers may be

16   "secondarily" liable if they act with the "intent to deceive or defraud."  *Id.* § 25504.1.  This form

17   of secondary liability is often referred to as aider and abettor liability.  *See* 1 Marsh & Volk,

18   Practice Under the Cal. Securities Laws (rev. ed. 2012) § 14.03[4][d], p. 14–26.  To prevail under

19   either section, plaintiffs must allege a primary violation of sections 25401 and 25501.  *Moss v.*

20   *Kroner*, 197 Cal. App. 4th 860, 875 (2011).  As long as plaintiffs show they were in privity with

21   the primary violator, as section 25401 requires, they need not show that they were in privity with

22   the secondary violators under sections 25504 and 25504.1.  *Id.*  When plaintiffs seek to impose

23   secondary liability "for selling or offering to sell a security by means of false and misleading

24   statements . . . the complaint must include allegations demonstrating how the defendant assisted in

25   the act of selling or offering to sell securities by means of false and misleading statements."  *AREI*

26   *II Cases*, 216 Cal. App. 4th at 1014-15.  The acts of preparing or assisting the preparation of the

27   offering documents, "communicating misrepresentations directly to investors," or "facilitating the

28

1    act of selling or attempting to sell the securities by means of misrepresentations or omissions of

2    material fact" are among the ways a broker may aid or abet primary violators. *Id.* at 1015.

3    Because Groblebe has asserted Lopez and Sarafraz violated California's securities laws when they

4    made false statements and withheld material information, the claim sounds in fraud and must

5    comply with Rule 9(b).

6          Plaintiffs aver only that Sarafraz and Lopez "materially aided in violations by knowingly

7    participating in the extensive marketing of OPUS Units." SACC ¶ 56. This naked assertion falls

8    woefully short of Rule 9(b)'s pleading requirements. Specifically, the SACC does not clearly

9    state whether Groblebe purchased interests in aggregators from Lopez and Sarafraz, or whether he

10   purchased those interests from some other unidentified aggregators. *See* SACC ¶ 12. Nor has

11   Groblebe pleaded facts establishing when or where he received the allegedly false

12   communications from Lopez and Sarafraz. He has not even differentiated between the statements

13   he received from Lopez and those Sarafraz communicated to him. Furthermore, Groblebe has not

14   identified which statements Lopez and Sarafraz knew to be false. Plaintiffs' failure to heed this

15   court's prior warning to plead violations with the requisite specificity strongly suggests they

16   cannot comply with Rule 9(b)'s stringent pleading demands. There remains, however, the

17   possibility that Groblebe can rectify these deficiencies, and therefore he is afforded one last

18   opportunity to do so if such averments may be advanced in good faith.

19          3.   *Claim 3:  Unlicensed Broker Dealers, Cal. Corp. Code § 25501.5*

20         Section 25501.5 creates a private right of action for those who purchase securities from

21   unlicensed broker-dealers. Cal. Corp. Code § 25501.5. It affords such purchasers the right to sue

22   for rescission or damages where the person from whom they purchased securities was required to

23   obtain a license by section 25200 *et seq*., but failed to do so at the time of the transaction. *Id.*

24   California Corporations Code § 25004 defines "broker-dealer" as "any person engaged in the

25   business of effecting transactions in securities in this state for the account of others or for his own

26   account." "Any other issuer[s]" and agents who are "employee[s] of a broker-dealer or issuer" do

27   not qualify as "broker-dealers." *Id.* § 25004(a). Only Groblebe has a plausible claim against

28

United States District Court
Northern District of California

1    Lopez and Sarafraz for the sale of securities without a license because only he "purchased OPUS

2    units . . . through an Aggregator."  SACC ¶ 12.  Accordingly, all other plaintiffs' claims for a

3    violation of section 25501.5 may not advance.

4         Groblebe has not, however, satisfactorily pleaded facts establishing liability attaching to

5    either Lopez or Sarafraz for a section 25501.5 violation.  Lopez argues primarily that Groblebe

6    cannot plead any facts to establish liability for a violation of 25501.5 because those who wished to

7    acquire Opus securities had to "date, sign and complete a subscription agreement" with TVC.

8    RJN Ex. 1 at 32.  As addressed above, Groblebe has pleaded facts establishing that he acquired a

9    security interest from an aggregator.  At best, Groblebe has averred that he bought securities in an

10   unidentified LLC or other business entity, but the complaint is vague as to whether Lopez or

11   Sarafraz operated the LLC from which he purchased the interest.  Also absent from the SACC are

12   facts establishing where Groblebe was when he purchased or whether Lopez was "engaged in the

13   business of effecting transactions in securities *in this state.*"  Cal. Corp. Code § 25004 (emphasis

14   added).  The only information that could possibly establish that a sale took place in California is

15   the fact that Sarafraz is a citizen of California.  Groblebe and Lopez are not.  That a person is a

16   citizen of a state is insufficient to leap to the conclusion that the sale of a security took place in

17   that state.  These missing details are essential to state a claim for relief, and therefore the claim

18   must be dismissed.  If Groblebe can, in good faith, plead facts establishing a claim for a violation

19   of section 25501.5, he will have one final opportunity to make that effort.

20        *4.  Claim 4:  Violations of the UCL, Cal. Bus. & Prof. Code § 17200 et seq.*

21        The UCL, Cal. Bus. & Prof. Code § 17200, "prohibits business acts that are (1) fraudulent,

22   (2) unfair, or (3) unlawful."  *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 996 (N.D. Cal. 2010)

23   (citing *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 837-39 (2006)).  Plaintiffs

24   assert claims under all three prongs.

25        Plaintiffs' UCL claims are not viable, however, because the UCL's protections do not

26   extend to securities transactions under any of the three prongs.  *Bowen v. Ziasun Tech. Inc.*, 116

27   Cal. App. 4th 777, 789-90 & n.9 (2004) (holding that because the Federal Trade Commission Act,

28

which serves as an analog for California's UCL, does not encompass securities transactions, section 17200 does not reach such transactions).  Plaintiffs correctly note that, since *Bowen*, some courts have questioned the validity of its conclusion.  *See Strigliabotti v. Franklin Res., Inc.*, No. C 04-00883, 2005 WL 645529, at *9 (N.D. Cal. Mar. 7, 2005) ("The California courts have expressly held that federal securities laws do not preempt Section 17200 generally.  In addition, *Bowen* and the cases on which it rests all dealt with fraud in the sale of securities." (citations omitted)); *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 & n.20 (2007) (noting that the Attorney General filed an amicus brief arguing *Bowen* was wrongly decided).  The fact remains, however, that California courts, not a federal court interpreting California law, must decide whether to overturn *Bowen*'s holding.  Until that day, *Bowen* endures.

Finally, although courts have narrowly limited *Bowen*'s scope to securities transactions, *see In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009), plaintiffs' claim falls squarely within *Bowen*'s holding; the only transactions at issue are securities transactions.  Because plaintiffs cannot plead facts to cure its claim for violation of the UCL based on securities transactions, their fifth claim for relief must be dismissed without leave to amend.

### 5.  *Claims 5:  Breach of Fiduciary Duty, Constructive Fraud, Conversion*

To plead plaintiffs' fifth claim for breach of fiduciary duty, they must show the existence of a fiduciary relationship, its breach, and damage proximately caused by the breach.  *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1114 (2015).  Plaintiffs' claims sound in fraud, and therefore must satisfy Rule 9(b)'s heightened pleading standards.  *See Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995).  The bulk of plaintiffs' fifth claim contains facts about the dispute between TVC and Opus about how TVC charged Opus costs, and about the events leading up to the bankruptcy filings.  Lopez and Sarafraz are mentioned in but two paragraphs of plaintiffs' lengthy narrative.  Because Groblebe is the only named plaintiff who had contact with an aggregator, only he is in a position to advance this claim.  The claims of the other named plaintiffs are therefore dismissed with prejudice.

Plaintiffs apparently advance two theories of how Lopez and Sarafraz were fiduciaries.

United States District Court
Northern District of California

1    First, Groblebe asserts that Lopez and Sarafraz acted as his brokers, dealers, and/or investment

2    advisors even though they were never licensed to do so, thereby amounting to a breach of

3    fiduciary duty.  SACC ¶ 72.  Noticeably missing from the SACC, however, is any averment that

4    Lopez and Sarafraz actually became Groblebe's broker.  The very absence of any such licenses on

5    the part of Lopez and Sarafraz alone is alleged to constitute a fiduciary duty to the entire class.

6    *See id.*  Groblebe does not explain, however, how the lack of a broker's license creates a fiduciary

7    duty separate and apart from the duty a broker owes to his or her clients.  Put another way, the

8    unlicensed status of Lopez and Sarafraz did not by itself give rise to a fiduciary duty to everyone

9    with whom they had contact.

10       Second, plaintiffs conclusorily assert Lopez and Sarafraz were "privy to inside dealings

11   with Opus" and "touted their 'insider' status and expertise while marketing Opus Units."  SACC ¶

12   100.  "Insiders" owe a fiduciary duty to those whom they entice to buy shares in a limited

13   partnership.  *Eisenbaum v. W. Energy Res., Inc.*, 218 Cal. App. 3d 314, 322 (1990).  While

14   "insiders" can include the partnership's directors and officers, courts have also recognized that an

15   "insider" may come in the form of a "broker, promoter, partner, corporate agent . . . limited

16   partnership syndicator," or a "controlling stockholder[]."  *Id.* at 323 (internal citations omitted).

17   The common law duty of a corporate insider arises from (i) a relationship affording access to

18   "inside information intended to be available only for a corporate purpose," and (ii) the

19   "unfairness" of permitting the insider to leverage that information by selling securities without

20   disclosure of material facts.  *Chiarella v. United States*, 445 U.S. 222, 227 (1980).

21       The SACC lacks the specific factual averments Rule 9(b) requires to identify a fiduciary

22   duty running between Groblebe and Lopez or Sarafraz.  It contains no information about where,

23   when, or how Lopez and Sarafraz "touted" their insider status and what "inside" information they

24   relayed to potential buyers.  Nor does Groblebe claim that Lopez and Sarafraz made

25   representations about their "insider status" to him directly.  A generous reading of the SACC leads

26   to the tenuous conclusion that Lopez and Sarafraz had contact with Groblebe, but Rule 9(b)

27   requires more of him; courts should not have to read between the lines of the complaint to find a

28

claim for relief.  Plaintiffs were warned that these naked assertions do not satisfy Rule 9(b)'s

pleading requirements, and yet the SACC includes just such unspecific and conclusory assertions.

As such, the motion to dismiss must be granted.  Groblebe is afforded one final opportunity to

plead a claim for breach of fiduciary duty with sufficient particularity.

### 6.   *Claim 6:  Aiding and Abetting Breach of Fiduciary Duty*

California law permits a claim for aiding and abetting breach of fiduciary duty to proceed

under either of two theories.  The first requires that the aider and abettor "give substantial

assistance to the other in accomplishing a tortious result and the person's own conduct, separately

considered, constitutes a breach of duty to the third person."  *Casey v. U.S. Bank Nat'l Ass'n*, 127

Cal. App. 4th 1138, 1144 (2005).  The second imposes liability on one who "knows the other's

conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other

to so act."  *Id.*  As fraud is the gravamen of this claim, Groblebe must meet Rule 9(b)'s exacting

standards.  Once again, he has failed to do so.

Groblebe has not adequately pleaded that Lopez and Sarafraz owed plaintiffs a fiduciary

duty.  The SACC does not aver that Lopez and Sarafraz were actually Groblebe's brokers or

identified when the alleged fiduciary relationship arose.  Moreover, Groblebe does not identify

when Lopez and Sarafraz engaged in tortious activity, how they knew their conduct was tortious,

or even that they acted with the purpose of assisting the O&D defendants to breach their duties to

Opus investors.  In the absence of these critical details, claims against Lopez and Sarafraz must be

dismissed with a final opportunity to amend.

### 7.   *Claim 7:  Negligence and Negligent Misrepresentation*

To state a claim for negligent misrepresentation, a plaintiff must aver (1) the defendant

misrepresented a material fact, (2) absent reasonable grounds for believing the representation to be

true, (3) with intent to induce reliance; (4) that the plaintiff justifiably relied on the representation;

and (5) damages. *Jackson v. Fischer*, 931 F. Supp. 3d 1049, 1068 (N.D. Cal. 2013) (citing *In re

Daisy Sys. Corp.*, 97 F.3d 1171, 1180 (9th Cir. 1996)).  Although knowledge of falsity is not

required, the misrepresentation must be affirmative; omissions or implied representations are

United States District Court
Northern District of California

United States District Court
Northern District of California

insufficient.  *Apollo*, 158 Cal. App. 4th at 243.  Most courts in this district subject state common law negligent misrepresentation claims to the heightened pleading standards of Rule 9(b), *see Jackson v. Fischer*, 2013 WL 6732872, at *17 (N.D. Cal. Dec. 20, 2013) (citing cases), and that standard applies to the claim at issue here.  Again, because Groblebe is the only plaintiff who had contact with an aggregator, he is the only named plaintiff capable of advancing any claim against Lopez and Sarafraz.

As addressed above, Groblebe has utterly failed to plead with particularity how Lopez and Sarafraz knew the statements in the offering letters were false.  Instead, he baldly contends Sarafraz and Lopez were "leading salespersons" and "insiders." SACC ¶ 111.  These unadorned assertions do not alone establish that Lopez and Sarafraz lacked a reasonable basis to believe the statements made to plaintiffs were true.  Groblebe's claim for negligent misrepresentation fails for the additional reason that he has not averred any facts demonstrating reliance on the misrepresentations or material omissions Lopez and Sarafraz specifically made.  Absent facts establishing this critical element, plaintiffs' seventh claim cannot advance.  Groblebe is afforded a final opportunity to remedy these deficiencies.

### B.  Claim Against KLG

#### 1.  *KLG's Special Motion to Strike*

Charged with aiding and abetting TVC's breach of fiduciary duty to Opus, KLG contends that all of its averred misconduct arose from actions taken as Opus and TVC's counsel in bankruptcy proceedings, and it is therefore shielded from suit by California's anti-SLAPP statute.  Section 425.16 of the California Code of Civil Procedure permits defendants to file a special motion to strike "[a] cause of action . . . arising from any act . . . in furtherance of the person's right of petition or free speech."[2]  To prevail on an anti-SLAPP motion, KLG must first show that

---

[2] The anti-SLAPP motion is a creature of California—not federal—civil procedure.  Despite its state origins, the Ninth Circuit has concluded special motions to strike do not directly collide with the Federal Rules of Civil Procedure, and therefore defendants may file such motions in federal court.  *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999).  Recently, members of the Ninth Circuit have questioned the reasoning of *Newsham* and urged revisiting its holding.  *See Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188-92 (9th Cir. 2013)

United States District Court
Northern District of California

1  the plaintiffs' claim for relief "arises from" its exercise of free speech or petition rights as defined

2  in section 425.16. *Equilon Enter., LLC v. Consumer Causes, Inc.*, 29 Cal. 4th 53, 67 (2002). If

3  KLG satisfies that burden, then plaintiffs must "demonstrate[] a probability of prevailing on the

4  claim." *Id.*

5                  *a.  Step One:  Protected Activity*

6          To show that plaintiffs' claim for breach of fiduciary duty arises from protected activity,

7  KLG must demonstrate that its acts "underlying" plaintiffs' claim were "in furtherance of [TVC's]

8  right of petition." *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002). The key is to focus on

9  "the defendant's *activity* that gives rise to his or her asserted liability," and not "the form" of the

10  claim for relief. *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.

11  App. 4th 658, 671 (2005) (quoting *Navellier v. Sletten*, 29 Cal.4th 82, 92 (2002)) (internal

12  quotation marks omitted) (emphasis in original). In other words, that plaintiffs assert a claim for

13  breach of fiduciary duty instead of, for example, a claim for negligence is of no moment when

14  considering whether KLG has satisfied step one.

15          Section 425.16-protected activity includes "any written or oral statement or writing made

16  before a . . . judicial proceeding," or "made in connection with an issue under consideration or

17  review by a . . . judicial body." Cal. Code Civ. Proc. § 425.16(e)(1)-(2). Lawyers are therefore

18  shielded from liability for litigation-related speech, including legal advice given in connection

19  with litigation. *Thayer v. Kabateck Brown Kellner LLP*, 207 Cal. App. 4th 141, 154 (2012).

20  "Legal advice and settlement made in connection with litigation are within section 425.16, and

21  may protect defendant attorneys from suits brought by third parties on any legal theory or cause of

22  action 'arising from' those protected activities." *Id.*

23          Throughout the SACC plaintiffs accuse KLG of engaging in conflicted representation of

24

25               _____

26  (Watford, J., dissenting from denial of rehearing en banc); *Makaeff v. Trump University, LLC*, 715
F.3d 254, 272-76 (9th Cir. 2013) (Kozinski, J., concurring and requesting rehearing en banc).

27  District courts are bound to follow binding Ninth Circuit precedent unless the U.S. Supreme Court
or the Ninth Circuit en banc reverses course.

28

both Opus and TVC in the bankruptcy proceedings. The resulting tapestry conveys a picture of attorney malpractice. The bankruptcy court's orders approving KLG's retention as counsel for both TVC and Opus and subsequent fee award barred any relitigation of whether KLG's representation was incompetent, and thus plaintiffs' malpractice claims against KLG were dismissed. Dkt. 104 at 12. That same order rejected KLG's anti-SLAPP motion because the "actions taken to plaintiffs' detriment," which "included filings and legal advice" were "'incidental' or 'collateral' . . . from the core, unprotected act of engaging in representation in a manner that breached a duty of loyalty." Dkt. 104 at 8 (citing *Peregrine*, 133 Cal. App. 4th at 672; *Benasra v. Mitchell Silberberg & Knupp LLP*, 123 Cal. App. 4th 1179, 1189 (2004)). Plaintiffs nevertheless contend that, even though they may not sue KLG for malpractice, its "decision to represent both TVC and Opus" before and during the bankruptcy proceedings removes KLG's actions from underneath section 425.16's protective veil. Pls.' Opp'n to Mot. to Strike at 6. The question, then, is whether removal of the underlying malpractice claims impacts the conclusion that plaintiffs' claims do not arise from protected activity.

Repeatedly, California courts have stressed that activity—not claims—inform whether an attorney's activity is protected. *See, e.g.*, *Peregrine*, 133 Cal. App. 4th at 671. Thus, the mere fact plaintiffs' malpractice claim cannot proceed does not, by itself, favor KLG's position. The real trouble for plaintiffs is that they were never KLG's clients. The California Court of Appeal has drawn a line between three categories of claims against attorneys. The first, claims "by former clients against their former attorneys based on the attorneys' acts on behalf of those clients," are not "within the ambit of SLAPP." *Thayer*, 207 Cal. App. 4th at 158. The second category— claims brought by former clients "against attorneys based upon statements or conduct solely on behalf of different clients"—fall under SLAPP. *Id.* (internal quotation marks omitted). So, too, do claims by nonclients against attorneys. *Id.*

In response, plaintiffs rely upon numerous cases involving clients who pursued claims against their attorneys. *See Freeman v. Schack*, 154 Cal. App. 4th 719, 732 (2007) (holding that the anti-SLAPP statute is inapplicable to a malpractice claim for "undertaking to represent a party

1   with interests adverse to plaintiffs, in violation of the duty of loyalty he assertedly owed them");

2   *Kolar v. Donahue, McIntosh & Hammerton*, 145 Cal. App. 4th 1532, 1540, 52 Cal. Rptr. 3d 712,

3   718 (2006) (rejecting a special motion to strike a malpractice claim because unlike "a third party

4   suing an attorney for petitioning activity," "the threat of malpractice encourages the attorney to

5   petition competently and zealously"); *Bensara*, 123 Cal. App. at 1189 (holding that section 425.16

6   did not preclude plaintiffs' claim for breach of loyalty against their former attorney who accepted

7   representation of a new client and abandoned the old client); *Jespersen v. Zubiate-Beauchamp*,

8   114 Cal. App. 4th 624, 630 (2003) (rejecting a special motion to strike a legal malpractice claim

9   against the plaintiff's former attorney).  All of these authorities are beside the point because they

10  do not address the applicability of the anti-SLAPP statute when nonclients assert that an attorney

11  engaged in conflicted representation.

12          Plaintiffs identify only one instance where a California Court of Appeal arguably held

13  section 425.16 to be inapplicable to a claim by a nonclient against an attorney:  *Coretronic Corp.*

14  *v. Cozen O'Connor*, 192 Cal. App. 4th 1381 (2011).  A close examination of the facts of that case,

15  however, reveals that the prospect of an attorney-client relationship motivated the result, rendering

16  this authority inapplicable to the facts presented here.  In *Coretronic*, the plaintiffs found

17  themselves as defendants in a lawsuit and sought coverage and defense from its liability insurance

18  provider, which retained Cozen O'Connor to determine whether it was obligated to cover and to

19  defend against those claims.  *Id.* at 1384.  To facilitate Cozen O'Connor's evaluation of the

20  insurance policy, the plaintiffs disclosed confidential information.  Later, the party suing the

21  plaintiffs retained Cozen O'Connor in another matter.  *Id.*  The California Court of Appeal

22  concluded that these circumstances did not fall within the ambit of anti-SLAPP because the

23  activity giving rise to the claim did "not arise from defendants' protected activity representing

24  their clients in pending or threatened litigation."  *Id.* at 1391.  Instead, the gravamen of the claim

25  was that Cozen O'Connor obtained the plaintiffs' sensitive information that could be used to their

26  detriment.  *Id.*  The asserted breach of the duty of loyalty was the root of the complaint, and

27  therefore section 425.16 was inapplicable.  *Id.*

28

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND KLG'S SPECIAL MOTION TO STRIKE
CASE NO. 13-cv-03570-RS

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In contrast, plaintiffs cannot claim that KLG owed them a duty of loyalty; they were never KLG's prospective or existing clients. That they have alleged and suggested that KLG committed malpractice is not enough if they wish to hold KLG liable for acts it took in furtherance of its actual client's right to petition.[3]

The next question is whether KLG's alleged improper activity was in furtherance of TVC's right to petition for bankruptcy. Plaintiffs understandably do not focus on KLG's conduct during the bankruptcy proceedings, choosing instead to focus on KLG's allegedly improper conduct before the bankruptcy proceedings began. The protections section 425.16 offers do not, however, take effect at the moment litigation commences. "[C]ommunications preparatory to or in anticipation of the bringing of an action or other official proceeding . . . are entitled to the benefits of section 425.16." *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1268 (2008) (quoting *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999)). The mere possibility of litigation, however, does not transform activity into the type section 425.16 was meant to protect. For the purposes of section 425.16, a statement or action is "in connection with litigation . . . if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." *Neville*, 160 Cal. App. 4th at 1266 (citation omitted). Moreover, the statements or actions must be "reasonably relevant to pending or *contemplated* litigation." *Id.* (emphasis in original).

Plaintiffs zero in on KLG's assistance to TVC as it prepared for bankruptcy. For example, plaintiffs claim KLG helped TVC implement a strategic plan "entirely to Opus's detriment" by "advising TVC regarding the filing of a consolidated bankruptcy, despite the fact that Opus was solvent, not advising TVC regarding its duties of loyalty and care." SACC ¶ 127. With respect to KLG's other supposedly wrongful actions, the SACC does not provide much information about

---

[3] Indeed, plaintiffs previously disavowed any claim that KLG owed them a duty by virtue of an attorney-client relationship. *See* Dkt. 104 at 12-13 ("Plaintiffs do not suggest KLG represented them as individuals, in addition to its role as counsel to Opus, such that it owed them each duties concurrent with the attorney-client relationship.").

whether those actions were steps along the path towards bankruptcy.  For example, KLG's role in selecting members of the OSC, drafting the non-disclosure agreement, and the negotiations between the OSC and TVC do not apparently relate to contemplated bankruptcy proceedings.  These pre-bankruptcy activities are not, however, part of TVC's alleged breach of fiduciary duty to Opus.  The SACC makes plain that plaintiffs believe the breach occurred when TVC proceeded to bankruptcy with Opus in tow despite the fact Opus was solvent.  *See* SACC ¶ 127.  Thus, the theory of plaintiffs' claim is rooted in KLG's actions in furtherance of TVC's right to petition.[4]

> b.  <u>Step Two:</u>  *The Merits of Plaintiffs' Claim That KLG Aided and Abetted TVC's Breach of Fiduciary Duty*

When a plaintiff has asserted a claim arising from conduct protected by section 425.16, he or she must "state and substantiate a legally sufficient claim."  *Premier Med. Mgmt. Sys., Inc. v. Cal. Ins. Guarantee Assn.*, 136 Cal. App. 4th 464, 476 (2008) (internal quotation marks and alterations omitted).  Thus, the plaintiff's task is twofold:  he or she must (1) "demonstrate that the *complaint is both legally sufficient*" and (2) make a prima facie showing that facts support a judgment in his or her favor.  *Id.* (emphasis in original).  That said, "[t]he required probability that the plaintiffs will prevail need not be high."  *Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1177 (9th Cir. 2015) (alterations and internal quotation marks omitted).

KLG asserts that plaintiffs cannot hold them liable for aiding and abetting based on alleged *inaction*.  To the extent plaintiffs have claimed that KLG's *actions* aided and abetted a breach of fiduciary duty, KLG asserts four affirmative defenses:  (1) that the agent's immunity rule bars plaintiffs' claim; (2) that litigation privilege created by California Civil Code § 47(b) shields KLG

---

[4] At the hearing on this motion, plaintiffs argued that permitting this second special motion to strike Claim 8 was unfair because KLG's special motion to strike was previously denied and plaintiffs were granted leave to amend the complaint.  They contend that by granting plaintiffs leave to amend their claim for aiding and abetting breach of fiduciary duty, the court suggested plaintiffs could amend the complaint without fear that doing so would subject them to a second special motion to strike and possible sanctions.  Leave to amend a complaint is not, however, a duty to amend the complaint.  Plaintiffs chose to include Claim 8 in the SACC, and therefore KLG also has the option to use all tools at its disposal to defend against the claim.

United States District Court
Northern District of California

1    from liability; (3) that plaintiffs' claim violates the bankruptcy code's automatic stay; and (4) that

2    the doctrine of collateral estoppel bars plaintiffs' claims.

3            To hold KLG liable for aiding and abetting TVC's breach of its fiduciary duty to Opus,

4    plaintiffs must show (1) that KLG knew TVC's "conduct constitute[d] a breach of duty and [gave]

5    substantial assistance or encouragement to [TVC] to so act" or (2) that KLG gave "substantial

6    assistance or encouragement to [TVC] in accomplishing a tortious result" and its own conduct was

7    a breach of duty.  *Fiol v. Dellstedt*, 50 Cal. App. 4th 1318, 1325-26 (1996).  "Mere knowledge that

8    a tort is being committed and the failure to prevent it" do not qualify as "substantial subsistence or

9    encouragement because, "[a]s a general rule, one owes no duty to control the conduct of another."

10   *Id.* 1326 (internal quotation marks omitted).  Plaintiffs insist KLG is liable under both theories.

11           KLG's liability depends, in part, on a predicate finding that the O & D defendants

12   breached a fiduciary duty.  Plaintiffs claim TVC and the O & D defendants breached their

13   fiduciary duties to the Opus partners by charging Opus unauthorized expenses, causing Opus to

14   appear insolvent, filing for bankruptcy without the Opus partners' prior approval, and other

15   wrongdoings.  SACC ¶ 97.  According to the SACC, KLG was "largely responsible for

16   developing and implementing" TVC's plan to breach its fiduciary duties to Opus.  *Id.* ¶ 121.

17           Plaintiffs primarily fault KLG for inaction:  (1) failing to advocate "a course of action . . .,

18   which would allow OPUS to continue its business outside of bankruptcy; (2) failing to advise

19   TVC of its fiduciary duty to Opus prior to filing the bankruptcy petition; (3) failing to seek the

20   Opus investor partners' approval to sell most of the partnership's assets; (4) failing to seek the

21   Opus partners' approval to file for bankruptcy; (5) failing to inform TVC that KLG was required

22   to get consent from Opus partners before representing both TVC and Opus in the bankruptcy

23   proceedings; (6) failing to withdraw as Opus's representative during the bankruptcy proceedings;

24   and (7) failing to advise TVC that it could not act adversely to Opus during the windup of the

25   Opus partnership.  SACC ¶ 127.  These omissions do not constitute substantial assistance or

26   encouragement.  *See Fiol*, 50 Cal. App. 4th at 1326.

27           Nevertheless, plaintiffs have identified certain affirmative acts KLG took, which they

United States District Court
Northern District of California

1  contend assisted TVC's breach of its fiduciary duty to Opus:  (1) advising TVC to file petitions for

2  bankruptcy on behalf of TVC and Opus; (2) advocating for TVC to obtain a disputed $5 million

3  receivable; (3) negotiating for an increase in Opus's liability; (4) vetting OSC members; (5)

4  drafting the OSC members' non-disclosure agreements; and (6) preparing TVC and Opus for the

5  Chapter 11 bankruptcy proceedings.  *See* SACC ¶¶ 113-27.  KLG contends those acts fall within

6  the ambit of the agent's immunity rule or the litigation privilege.

7                              i.   Agent's Immunity Rule

8        In general, "an agent is not liable for conspiring with the principal when the agent is acting

9  in an official capacity on behalf of the principal."  *Berg & Berg Enters., LLC v. Sherwood*

10  *Partners, Inc.*, 131 Cal. App. 4th 802, 817 (2005), *as modified on denial of reh'g* (Aug. 25, 2005)

11  (internal quotation marks omitted).[5]  Thus, because "[t]he relationship of attorney and client is one

12  of agent and principal," this general "agent's immunity rule" shields attorneys from liability for

13  their principal's tortious actions with two exceptions.  *Shafer v. Berger, Kahn, Shafton, Moss,*

14  *Figler, Simon & Gladstone*, 107 Cal. App. 4th 54, 69 (2003), *as modified on denial of reh'g* (Apr.

15  8, 2003).  First, a claim for conspiracy or aiding and abetting may proceed against an attorney who

16  "violates a duty that he or she independently owe[d] to the plaintiff[.]"  *Berg & Berg*, 131 Cal.

17  App. 4th at 817.  Second, an attorney may be liable when his or her "acts go beyond the

18  performance of a professional duty owed to the client and are, in addition, done for his or her own

19  personal financial gain."  *Id.* at 817-18.

20        Plaintiffs contend their claims fall within the first exception because KLG owed a duty to

21  abstain from conflicted representation.  As discussed above, however, plaintiffs cannot claim that

22  KLG owed a duty to them; they were never KLG's clients.  To the extent KLG may have breached

23

---

[5] Plaintiffs protest that *Berg & Berg* is irrelevant authority because the court's analysis rested upon California Civil Code § 1714.10.  The California Court of Appeal made clear that section 1714.10 was a codification of the agent's immunity rule and exceptions thereto.  *See* 131 Cal. App. 4th at 824-25 ("These exceptions [enumerated in section 1714.10(c)] mirror those carved out from the agent's immunity rule . . . .").  The discussion of the agent's immunity rule in *Berg & Berg* is therefore persuasive authority.

United States District Court
Northern District of California

1   a duty to TVC and/or Opus or committed malpractice, the bankruptcy court's approval of KLG's

2   fee application put those claims to rest.  Dkt. 104 at 12.  Consequently, because KLG did not

3   represent plaintiffs, it could not have breached any duty to avoid conflicted representation of them.

4        Alternatively, plaintiffs imply KLG breached a second duty—the "independent legal duty

5   to refrain from defrauding nonclients." *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1151

6   (2013).  Because this claim sounds in fraud, plaintiffs must satisfy Rule 9(b)'s heightened

7   pleading standard, but they have not identified any false or misleading statements KLG allegedly

8   made.  Plaintiffs' claim against KLG therefore boils down to a complaint about the arguments

9   TVC's attorneys made and actions they took at the direction of TVC.  For example, plaintiffs are

10  upset that KLG screened OSC candidates at TVC's request, drafted non-disclosure agreements at

11  TVC's direction, and negotiated on TVC's behalf.  None of these actions constitutes a breach of

12  an independent duty KLG owed to plaintiffs.  Moreover, in each instance, KLG was acting as

13  TVC's agent.  Consequently, their claim for aiding and abetting breach of fiduciary duty is not

14  cognizable.

15              ii.    Litigation Privilege

16       Even if the agent's immunity rule did not shield KLG from liability, the litigation privilege

17  precludes plaintiffs' claims from advancing further because some of KLG's allegedly wrongful

18  activities were communicative acts in furtherance of TVC' impending bankruptcy.  Section 47(b)

19  of the California Civil Code protects attorneys from liability for "any statement made in a 'judicial

20  proceeding' or 'any other official proceeding authorized by law.'"  *Graham-Sult v. Clainos*, 756

21  F.3d 724, 742 (9th Cir. 2013) (quoting Cal. Civ. Code § 47(b)).  The privilege applies to any

22  communication or publication "required or permitted by law in the course of a judicial proceeding

23  to achieve the objects of the litigation," even when the communications are made "outside the

24  courtroom and no function of the court or its officers [are] involved."  *Silberg v. Anderson*, 50 Cal.

25  3d 205, 212 (1990), *as modified* (Mar. 12, 1990).  When the communications at issue occurred

26  prior to or in anticipation of litigation, privileged communications include only those with "some

27  relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously

28

United States District Court
Northern District of California

1  and in good faith to resolve a dispute." *Edwards v. Centex Real Estate Corp.*, 15, 36 (1997)

2  (emphasis in original).

3       Many of the affirmative acts at issue involve communicative acts in anticipation of TVC's

4  petition for Chapter 11 bankruptcy.  Plaintiffs complain, for example, that KLG advised TVC to

5  file for bankruptcy.  There are "few communicative acts more clearly within the scope of the

6  privilege than . . . meeting and discussing . . . the merits of" a proposed action.  *Rubin v. Green*, 4

7  Cal. 4th 1187, 1195 (1993).  The same can be said for the act of preparing the Chapter 11

8  bankruptcy petitions.[6]  Accordingly, KLG is not liable for these acts taken in furtherance of

9  TVC's impending bankruptcy proceedings.[7]

10      KLG has satisfied both criteria to warrant specially striking plaintiffs' eighth claim for

11  relief.  The challenged activities arise from actions taken in furtherance of the right to petition and

12  plaintiffs' claim for aiding and abetting breach of fiduciary duty is without merit.  Accordingly,

13  KLG's special motion to strike is granted.

14      **2.  KLG's Motion to Dismiss**

15      As explained above, the agent's immunity rule and litigation privilege prevent plaintiffs'

---

16

17  [6] Previously, KLG's attempt to assert the litigation privilege was rejected because plaintiffs
18  asserted malpractice claims against KLG. Dkt. No. 104 at 7. This exception does not apply,
    however, when the plaintiff was never the attorney's client. *See Kolar v. Donahue, McIntosh &*
    *Hammerton*, 145 Cal. App. 4th 1532, 1541 (2006) ("The litigation privilege shields litigants,
19  attorneys and witnesses from liability for virtually all torts except malicious prosecution. Yet if it
    also protected an attorney from any suit by a former client, no malpractice suit could be brought."
20  (internal alterations and quotation marks omitted)). Accordingly, this exception to the litigation
    privilege does not apply to plaintiffs' claim for aiding and abetting a breach of fiduciary duty.

21  [7] KLG argues (1) that plaintiffs' action against KLG violates the automatic stay "to obtain
22  possession of property of the estate or of property from the estate or to exercise control over
    property of the estate," 11 U.S.C. § 362(a)(3); and (2) that the doctrine of collateral estoppel
23  precludes their claim. These arguments appear not to weigh in KLG's favor. First, the automatic
    bankruptcy stay does not apply to claims by or against non-debtors. *Chugach Timber Corp. v. N.*
24  *Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.)*, 23 F.3d 241, 246 (9th Cir.
    1994). Neither plaintiffs nor KLG were debtors in the bankruptcy actions; only TVC and Opus
25  were. Second, the doctrine of collateral estoppel appears to be inapplicable in this case because
    plaintiffs have challenged the legality of KLG's actions before the bankruptcy—the propriety of
26  which the bankruptcy court did not consider when approving the fee application. *See Wilson v.*
    *Belleque*, 554 F.3d 816, 830 (9th Cir. 2009) (noting that collateral estoppel applies only when
27  issues are litigated or necessarily decided).

28

claims against KLG for its affirmative conduct.  Accordingly, plaintiffs' claim against KLG must also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### IV.    CONCLUSION

In sum, Claims 4 is dismissed without leave to amend.  Claims 1, 2, 3, 5, and 7 are also dismissed.  Only Groblebe is granted leave to amend those claims if he can do so in good faith.  Finally, KLG's special motion to strike Claim 8 and motion to dismiss are granted.

**IT IS SO ORDERED**.

Dated:  March 21, 2016

_____
RICHARD SEEBORG
United States District Judge